1  COOLEY GODWARD KRONISH LLP
   JOHN C. DWYER (136533) (dwyerjc@cooley.com)
2  GRANT P. FONDO (181530) (gfondo@cooley.com)
   ANGELA L. DUNNING (212047) (adunning@cooley.com)
3  Five Palo Alto Square
   3000 El Camino Real
4  Palo Alto, CA 94306
   Telephone:    (650) 843-5000
5  Facsimile:    (650) 857-0663

6  Attorneys for Defendant
   BROCADE COMMUNICATIONS SYSTEMS, INC.
7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11

12  HAI-NING HUANG, WAY-LING HWANG,        Case 07        5950
    FRANK PETRUNO and GORDON A.
13  MECCAY, on Behalf of Themselves and All    NOTICE OF REMOVAL
    Others Similarly Situated,
14
                 Plaintiffs,
15
          v.
16
    GREGORY L. REYES, ANTONIO
17  CANOVA, NICHOLAS G. MOORE, DAVID
    L. HOUSE, SETH D. NIEMAN,
18  CHRISTOPHER B. PAISLEY, NEIL
    DEMPSEY, BROCADE
19  COMMUNICATIONS SYSTEMS, INC. and
    DOES 1 through 25,
20
                 Defendants.
21

22

23          TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

24  DISTRICT OF CALIFORNIA, AND TO THE CLERK OF THAT COURT:

25          PLEASE TAKE NOTICE that defendant Brocade Communications Systems, Inc.

26  ("Brocade"), by and through its undersigned counsel, hereby removes the state court action

27  described below from the Superior Court of the State of California, County of Santa Clara, to the

28  United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1331,

COOLEY GODWARD
KRONISH LLP         762977 v1/PA                    1.                      NOTICE OF REMOVAL
ATTORNEYS AT LAW
NEW YORK

1441 and 1446 and the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. §§ 77p and 78bb ("SLUSA"). Brocade respectfully submits that removal is proper for the following reasons:

1.  On or about October 23, 2007, plaintiffs commenced a civil action in the Superior Court of the State of California, County of Santa Clara, captioned *Huang et al. v. Reyes et al.*, Case No. 1:07-CV-097163 (the "Action").

2.  Defendant Brocade was served with copies of the Summons, Complaint, Civil Lawsuit Notice and Civil Case Cover Sheet on October 24, 2007. True and correct copies of the Complaint, Summons and Civil Lawsuit Notice are attached hereto as Exhibit A.

3.  No other process, pleadings or orders have been filed or served on Brocade in the Action as of the date of filing of this Notice of Removal.

4.  This Notice of Removal is filed within thirty days of receipt by Brocade of the Complaint and, thus, is timely under 28 U.S.C. § 1446(b). *See* Ex. A; *see also Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) (holding that defendant's time to remove is triggered by service of the summons and complaint on defendant); Fed. R. Civ. P. 6; Cal. Civ. Proc. Code § 12, 12a, 135.

5.  As of the date of filing of this Notice of Removal, Brocade is informed and believes that no other defendants have been served in the Action. However, to the extent that any other defendant's consent is required, Brocade is informed and believes that all defendants consent to this removal.

## JURISDICTION

6.  This action is a putative class action brought "on behalf of all holders of Brocade common stock" between February 21, 2001 and May 16, 2005. (Compl. ¶ 22; *see also* ¶ 1.)

7.  The Complaint alleges a single state law claim against all defendants for breach of the fiduciary duty of disclosure and seeks unspecified damages and other relief based on allegations that defendants, among other things, disseminated false or misleading statements and misrepresented or omitted material facts regarding Brocade's options granting practices. (*Id.* ¶¶ 1, 77-78, 108-109.)

1    **8.**    This Court has exclusive jurisdiction over the Action because, under federal law,

2    plaintiffs' claim is completely preempted under SLUSA.

3    **9.**    Under SLUSA, "[n]o covered class action based upon the statutory or common

4    law of any State or subdivision thereof may be maintained in any State or Federal court by any

5    private party alleging – (1) an untrue statement or omission of a material fact in connection with

6    the purchase or sale of a covered security; or (2) that the defendant used or employed any

7    manipulative or deceptive device or contrivance in connection with the purchase or sale of a

8    covered security." 15 U.S.C. § 77p(b); 15 U.S.C. § 78bb(f)(1).

9    **10.**    SLUSA further provides that "[a]ny covered class action brought in any State

10    court involving a covered security . . . shall be removable to the Federal district court for the

11    district in which the action is pending." 15 U.S.C. § 77p(c); 15 U.S.C. § 78bb(f)(2).

12    **11.**    As alleged in the Complaint, the Action is a "covered class action" within the

13    meaning of 15 U.S.C. §§ 77p(f)(2)(A) and 78bb(f)(5)(B)(i) because the named plaintiffs seek to

14    recover damages on a representative basis and allege that common questions of law and fact

15    predominate. (Compl. ¶¶ 1, 22-23, Prayer for Relief.)

16    **12.**    The claim asserted by plaintiffs against Brocade arises under state law.

17    **13.**    The Complaint alleges misrepresentations and omissions by Brocade and/or use by

18    Brocade of a deceptive device or contrivance in connection with the sale or purchase of its

19    common stock. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 87 (2006)

20    (holding that "holder" claims are "in connection with the purchase or sale of securities" and

21    preempted under SLUSA); *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1130 (9th Cir. 2002)

22    (holding that a grant of options is a sale of securities for purposes of SLUSA's preemption

23    provision because "it is a contract to sell a security when the option is exercised").

24    **14.**    The Brocade common stock at issue is a "covered security" within the meaning of

25    15 U.S.C. § 77r(b)(l)(A), 15 U.S.C. §§ 77p(f)(3) and 78bb(f)(5)(E) because it is traded on the

26    Nasdaq National Market System under the ticker symbol "BRCD." (Compl. ¶¶ 2, 23a.)

27    **15.**    None of the exceptions contained in SLUSA applies to the claim against Brocade.

28

1    **16.**    Accordingly, this Court has original jurisdiction over the Action without regard to

2    the amount in controversy or citizenship of the parties because the Action is preempted by

3    SLUSA and was originally filed in the Superior Court of the State of California, County of Santa

4    Clara, which is within the Northern District of California. 28 U.S.C. §§ 1331, 1441(b); 15 U.S.C.

5    § 77p(b); 15 U.S.C. § 78bb(f)(1).

6    **17.**    Pursuant to 28 U.S.C. § 1446(d), Brocade will promptly file a Notice of Filing of

7    Notice of Removal with the Santa Clara County Superior Court to effectuate removal. Brocade

8    will also promptly serve plaintiffs' attorneys of record and all other defendants with this Notice of

9    Removal and the Notice of Filing of Notice of Removal.

10    **18.**    Nothing herein constitutes a waiver of any of Brocade's rights, objections or

11    defenses, including without limitation its right to seek dismissal of the Complaint on any grounds.

12    <strong>INTRADISTRICT ASSIGNMENT</strong>

13    **19.**    Intradistrict assignment to the San Francisco Division of this Court is appropriate

14    as the Action is related to four other civil actions pending in that Division before the Honorable

15    Charles R. Breyer, namely: (1) *In re Brocade Securities Litigation*, No. 3:05-CV-02402-CRB (the

16    "Federal Class Action"), filed on May 19, 2005; (2) *In re Brocade Communications Systems, Inc.*

17    *Derivative Litigation*, No. 3:05-CV-02233-CRB (the "Federal Derivative Action"), filed on June

18    1, 2005; (3) *Securities And Exchange Commission v. Reyes et al.*, No. 3:06-CV-04435-CRB, filed

19    July 21, 2006; and (4) *Securities and Exchange Commission v. Byrd*, 3:07-CV-04223-CRB, filed

20    August 17, 2007 (collectively, the "Related Actions").

21    **20.**    This Action is related to the Related Actions pursuant to Civ. L.R. 3-12(a) because

22    it concerns substantially the same parties, transactions and events and because it appears likely

23    that there will be an unduly burdensome duplication of labor and expense or conflicting results if

24    the Action is conducted before a different District Judge.

25    **21.**    Pursuant to Civ. L.R. 3-12(b), Brocade will promptly file an Administrative

26    Motion to Consider Whether Cases Should Be Related in the Federal Class Action, the earliest-

27    filed case, and will comply with all other requirements thereof.

28

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
NEW YORK

762977 v1/PA                                4.                      **NOTICE OF REMOVAL**

1      **WHEREFORE**, Brocade respectfully requests that the entire Action proceed before this

2   Court as an action properly removed. This Notice of Removal is signed pursuant to Federal Rule

3   of Civil Procedure 11.

4

5   Dated: November 26, 2007                    Respectfully submitted,

6                                               COOLEY GODWARD KRONISH LLP

7

8

9                                               Grant P. Fondo

10                                              Attorneys for Defendant
                                                BROCADE COMMUNICATIONS SYSTEMS, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

762977 v1/PA                               5.                          **NOTICE OF REMOVAL**

1

## CERTIFICATE OF SERVICE

2        I am a citizen of the United States and a resident of the State of California, over the age

3    of 18 years, and not a party to the within action. I am employed in Santa Clara County, State of

4    California, in the office of a member of the bar of this Court, at whose direction the service was

5    made. My business address is Cooley Godward LLP, Five Palo Alto Square, 3000 El Camino

6    Real, Palo Alto, CA 94306-2155. On November 26, 2007, I served the following documents on

7    the parties listed below in the manner(s) indicated:

8

### NOTICE OF REMOVAL

9    ☐    (BY U.S. MAIL) I am personally and readily familiar with the business practice

10    of Cooley Godward LLP for collection and processing of correspondence for
      mailing with the United States Postal Service, and I caused such envelope(s), with

11    postage fully prepaid, to be deposited with the U.S. Postal Service.

12    ☐    (BY MESSENGER SERVICE) I consigned the document(s) to an authorized
      courier and/or process server for hand delivery on this date.

13    ☐    (BY FACSIMILE) I am personally and readily familiar with the business practice

14    of this firm for collection and processing of documents to be transmitted by fax
      and I caused such document(s) on this date to be faxed to the offices of

15    addressee(s) at the numbers listed below.

16    X    (BY OVERNIGHT MAIL) I am personally and readily familiar with the business
      practice of this firm for collection and processing of correspondence for overnight

17    delivery, and I caused such document(s) to be deposited with a facility regularly
      maintained by FedEx for overnight delivery.

18    ☐    (BY ELECTRONIC MAIL) I am personally and readily familiar with the

19    business practice of this firm for the preparation and processing of documents in
      portable document format (PDF) for e-mailing, and I prepared said documents in

20    PDF and then served them by e-mailing them to the following internet addresses.

21    **\*\*SEE ATTACHED SERVICE LIST\*\***

22

23        I declare under penalty of perjury that the foregoing is true and correct. Executed on

24    November 26, 2007, at Palo Alto, California.

25    Michelle Alcobendas

26

27

28

1

**\*\*SERVICE LIST\*\***

2

Garrett L. Waltzer
**Skadden Arps Slate Meagher & Flom**

3

**LLP**
525 University Avenue

4

Palo Alto, CA 94301
Tel:    (650) 470-4540

5

Fax:    (650) 470-4570
Email: gwaltzer@skadden.com

6

**Attorney for Gregory L. Reyes**

7

Stephen D. Hibbard
**Shearman & Sterling LLP**

8

525 Market Street, Suite 1500
San Francisco, CA 94105

9

Tel: (415) 616-1174
Fax: (415) 616-1199

10

Email: shibbard@shearman.com
**Attorney for David House, Nicholas G.**

11

**Moore and Christopher B. Paisley**

12

Jonathan Shapiro
**Wilmer Cutler Pickering Hale & Dorr,**

13

**LLP**
1117 California Avenue

14

Palo Alto, CA 94306-2155
Tel:    (650) 858-6101

15

Fax:    (650) 858-6100
Email: jonathan.shapiro@wilmerhale.com

16

**Attorney for Seth D. Neiman**

17

Norman Blears
**Heller Ehrman LLP**
275 Middlefield Road
Menlo Park, CA 94025-3506
Tel:    (650) 324-7000
Fax:    (650) 324-0638
Email: nblears@hewm.com
**Attorney for Antonio Canova**

Jeffrey L. Bornstein
Leah Gabriana Shough
**K&L Gates LLP**
55 Second Street, Suite 1700
San Francisco, CA 94105
Tel:    (415) 882-8200
Fax:    (415) 882-8220
Email: jeff.bornstein@klgates.com
Email: leah.shough@klgates.com
**Attorney for Neal Dempsey**

Timothy J. Burke,
**Stull Stull & Brody**
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA 90024
Tel: (310) 209-2468
Fax: (310) 209-2087
Email: tburke@ssbla.com
**Attorney for Hai-Ning Huang,**
**Way-Ling Hwang, Frank Petruno**
**and Gordon A. Meccay**

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

## SUMMONS
### (CITACION JUDICIAL)

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
GREGORY L. REYES
[Additional Parties Attachment form is attached]

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
HAI-NING HUANG, WAY-LING HWANG, FRANK PETRUNO, and
GORDON A. MECCAY, on Behalf of Themselves and All Others
Similarly Situated



10/24/07  3:00 pm

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ENDORSED

2007 OCT 23  P 2: 25

KIRI TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF SANTA CLARA, CALIFORNIA

BY_____ DEPUTY CLERK

M. Rosales

---

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

---

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of the State of California, County of Santa Clara
191 North First Street
San Jose, CA 95113

CASE NUMBER:
*(Número del Caso):*  CV 097163

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Timothy J. Burke (SBN 181866)    (310) 209-2468
STULL, STULL & BRODY, 10940 Wilshire Boulevard, Suite 2300, Los Angeles, CA 90024

| DATE: *(Fecha)* **OCT 23 2007** | Clerk, by *(Secretario)* M. Rosales KIRI TORRE | , Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED: You are served**
[SEAL]
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):* BROCADE COMMUNICATIONS SYSTEMS, INC.

under: ☑ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify):*

4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
American LegalNet, Inc.  www.USCourtForms.com



SUM-200(A)

| SHORT TITLE: HAI-NING HUANG, et al. v. GREGORY L. REYES, et al. | CASE NUMBER: |
|---|---|

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☑ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

ANTONIO CANOVA,
NICHOLAS G. MOORE,
DAVID L. HOUSE,
SETH D. NIEMAN,
CHRISTOPHER B. PAISLEY,
NEIL DEMPSEY,
BROCADE COMMUNICATIONS SYSTEMS, INC.,
and DOES 1 through 25,

Page _____ of _____

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

American LegalNet, Inc.
www.FormsWorkflow.com

1  Timothy J. Burke (181866)
   STULL, STULL & BRODY
2  10940 Wilshire Boulevard
   Suite 2300
3  Los Angeles, CA 90024
   Tel:   (310) 209-2468
4  Fax:   (310) 209-2087

5  Jules Brody
   Aaron L. Brody
6  STULL, STULL & BRODY
   6 East 45th Street
7  New York, NY 10017
   Tel:   (212) 687-7230
8  Fax:   (212) 490-2022

9  [Additional Counsel Appear
   on Signature Page]
10
   Counsel for Plaintiffs
11

12

ENDORSED

2003 OCT 23 ℗ 2: 25

KIRI TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF SANTA CLARA, CALIFORNIA
BY_____
        DEPUTY CLERK

M. Rosale

13        SUPERIOR COURT OF THE STATE OF CALIFORNIA

14             FOR THE COUNTY OF SANTA CLARA

15                                    1 0 7 C V 0 9 7 1 6 8

16  HAI-NING HUANG,                    )  CASE NO.
    WAY-LING HWANG,                    )              FILE VIA FAX
17  FRANK PETRUNO,                     )
    GORDON A. MECCAY, and              )  CLASS ACTION
18  on Behalf of Themselves and All Others Similarly )
    Situated,                         )  COMPLAINT FOR BREACHES OF
19                                     )  FIDUCIARY DUTY
             Plaintiffs,               )
20                                     )  JURY TRIAL DEMANDED
         v.                            )
21                                     )
    GREGORY L. REYES,                  )
22  ANTONIO CANOVA,                    )
    NICHOLAS G. MOORE,                 )
23  DAVID L. HOUSE,                    )
    SETH D. NIEMAN,                    )
24  CHRISTOPHER B. PAISLEY,            )
    NEIL DEMPSEY,                      )
25  BROCADE COMMUNICATIONS SYSTEMS, INC., )
    and DOES 1 through 25,             )
26                                     )
             Defendants.               )
27  _____

28

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY
W:\STULL\BROCADE3\PLD\Complaint 001.wpd

1        Plaintiffs, through their attorneys, bring this Complaint against defendant Brocade

2   Communications Systems, Inc. ("Brocade" or the "Company") and certain directors of the

3   Company, allege on personal knowledge as to themselves and their activities, and on information

4   and belief as to all other matters, based on investigation and discovery conducted by counsel:

5                **SUMMARY**

6    1.    This is a shareholders' action on behalf of all individuals who owned Brocade

7   common stock between February 21, 2001 and May 16, 2005, alleging that certain current and

8   former officers and members of its Board of Directors (the "Board") breached their fiduciary duties

9   when they failed to inform shareholders that they had issued backdated Brocade stock options to

10  certain senior executives and other employees.

11    2.    Brocade is a publicly traded company whose common stock is traded on Nasdaq

12  under the ticker symbol "BRCD." Brocade is the leading provider of networked storage solutions

13  that help organizations connect, share, and manage their information.

14               **JURISDICTION**

15    3.    This Court has jurisdiction over the subject matter of this action pursuant to the

16  California Constitution Article VI, Section 10, because the case is an action not given by statute to

17  other trial courts.

18    4.    Venue is proper in this County under Section 395(a) of the California code of Civil

19  Procedure in that some or all of the Defendants reside in this County.

20                **PARTIES**

21    5.    Plaintiffs Hai-Ning Huang, Way-Ling Hwang, Frank Petruno, and Gordon A.

22  Meccay ("Plaintiffs") are and were at all relevant times shareholders of Brocade.

23    6.    Defendant Brocade is a Delaware corporation with its principal offices located at

24  1745 Technology Drive, San Jose, California, 95110. Brocade designs, develops, markets, sells and

25  supports data storage networking products and services. It offers a line of intelligent storage

26  networking switches and storage are networking ("SAN") management operating systems that

27  enable companies to implement highly available, scalable, manageable and secure environments for

28  data storage applications. The Brocade SilkWorm family of SAN switches is designed to help

**COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**

1   companies reduce the cost and complexity of managing business information within a data storage

2   environment. Brocade products are installed worldwide at companies, institutions and other entities

3   of all sizes, ranging from large enterprises to small businesses. Brocade products and services are

4   marketed, sold and supported worldwide to end users through distribution partners, including

5   original equipment manufacturers ("OEMs"), value added distribution, systems integrators and

6   value added resellers ("VARs").

7       7.     Defendant David L. House ("House") is currently Chairman of Brocade's Board of

8   Directors and served as the Company's Chief Executive Officer in January, 2005. House has served

9   as a director of the Company since at least February 2004. House is a resident and citizen of

10   California.

11      8.     Defendant Gregory L. Reyes ("Reyes") served as the Company's Chairman of the

12   Board and Chief Executive Officer from July, 1998 until January 2005. Reyes is currently a

13   consultant to Brocade's CEO and Board of Directors. Reyes is a citizen and resident of California.

14      9.     Defendant Antonio Canova ("Canova") has served as the Company's Chief Financial

15   Officer and Vice President since November 2004. Prior to that, Canova served as the Company's

16   Chief Financial Officer from May 2001 through November 2004 and Vice President, Finance from

17   April 2000 through November 2000. Canova is a citizen and resident of California.

18      10.    Defendant Nicholas G. Moore ("Moore") has served as a Director of the Company

19   and member of its Audit Committee since at least March 2003. Moore is a citizen and resident of

20   California.

21      11.    Defendant Seth D. Nieman ("Nieman") has served as a Director of the Company

22   since 1995. Neiman served as Chairman of the Board from August 1995 to June 1996. According

23   to the Company's Proxy filed with the Securities and Exchange Commission ("SEC") on February

24   26, 2001, Neiman was on the Company's Audit Committee for fiscal year 2000. Neiman is a citizen

25   and resident of California.

26      12.    Defendant Christopher B. Paisley ("Paisley") has served as a Director of the

27   Company and a member of its Audit Committee since 2002. Paisley is a citizen and resident of

28   California.

3

1        13.     Defendant Neil Dempsey ("Dempsey") has served as a Director of the Company
2   since 1995. He served as a member of the Company's Audit Committee for fiscal years 2000
3   through 2003. Dempsey is a citizen and resident of California.

4        14.     Defendants House, Reyes, Canova, Moore, Neiman, Paisley and Dempsey are
5   collectively referred to herein as the "Individual Defendants."

6        15.     The true names and capacities of defendants sued herein under California Code of
7   Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiffs, who
8   therefore sue these defendants by such fictitious names. Plaintiffs will seek to amend this
9   Complaint and include these Doe defendants' true names and capacities when they are ascertained.
10  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged
11  herein and for the injuries suffered by the Company.

12                        **DUTIES OF THE INDIVIDUAL DEFENDANTS**

13       16.     Each Individual Defendant owed Brocade's public shareholders the duty to exercise
14  due care, loyalty and good faith in the management and administration of the affairs of the
15  Company. The conduct of the Individual Defendants complained of herein involves a knowing,
16  reckless or grossly negligent and culpable violation of their obligations as directors and/or officers
17  of Brocade, the absence of good faith on their part and a reckless disregard for their duties to the
18  Company and its shareholders, all of which the Individual Defendants were aware or should have
19  been aware.

20       17.     By reason of their positions as officers, directors, and fiduciaries of Brocade and its
21  shareholders and because of their ability to control the business and corporate affairs of Brocade, the
22  Individual Defendants owed Brocade's shareholders fiduciary obligations of trust, good faith,
23  loyalty, and due care, and were and are required to use their utmost ability to control and manage
24  Brocade in a fair, just, honest, and equitable manner. The Individual Defendants were and are
25  required to act in furtherance of the best interests of Brocade's shareholders so as to benefit all
26  shareholders equally and not in furtherance of their personal interests or benefit.

27

28

                                          4

**COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**

1    18.    The Individual Defendants, because of their positions of control and authority as
2  directors and/or officers of Brocade, were able to and did, directly and/or indirectly, exercise control
3  over the wrongful acts complained of herein.

4    19.    At all times relevant hereto, each of the Individual Defendants was the agent of each
5  of the other Individual Defendants and of Brocade, and was at all times acting within the course and
6  scope of such agency.

7    20.    To discharge the aforesaid duties, the Individual Defendants were required to
8  exercise reasonable and prudent supervision over the management, policies, practices, controls, and
9  financial affairs of Brocade.

10    21.    Because of their Board membership and/or executive and managerial positions with
11  Brocade and their access to internal corporate documents (including the Company's operating plans,
12  budgets and forecasts and reports of actual operations compared thereto), conversations and
13  connections with other corporate officers and employees, attendance at management and Board of
14  Directors meetings and committees thereof, and their receipt of reports and other information
15  provided to them in connection therewith, each of the Individual Defendants had access to
16  undisclosed information about Brocade's business prospects, financial condition, performance,
17  accounting and revenue recognition practices, as alleged herein.

18                              **CLASS ACTION ALLEGATIONS**

19    22.    Plaintiffs bring this action pursuant to §382 of the California Code of Civil
20  Procedure on their own behalf and as a class action on behalf of all holders of Brocade common
21  stock, who are being and will be harmed by defendants' actions described below (the "Class").
22  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other
23  entity related to or affiliated with any defendants.

24    23.    This action is properly maintainable as a class action because:

25        a.    The class is so numerous that joinder of all members is impracticable.  There
26              are millions of Brocade stock issued and outstanding.  The shares trade on the
27              Nasdaq National Market under the ticker symbol "BRCD", and thousands of
28              Brocade stockholders of record are located throughout the United States;

                                          5

| 1 | | b. | There are questions of law and fact which are common to the Class, including |
| 2 | | | whether the defendants have engaged or are continuing to act in a manner |
| 3 | | | calculated to benefit themselves at the expense of Brocade's minority |
| 4 | | | stockholders and whether plaintiffs and other members of the Class would be |
| 5 | | | irreparably damaged if the defendants are not enjoined in the manner |
| 6 | | | described below; |
| 7 | | c. | The defendants have acted or refused to act on grounds generally applicable |
| 8 | | | to the Class thereby making appropriate final injunctive relief with respect to |
| 9 | | | the Class as a whole; |
| 10 | | d. | Plaintiffs are committed to prosecuting this action and have retained |
| 11 | | | competent counsel experienced in litigation of this nature. The claims of |
| 12 | | | plaintiffs are typical of the claims of the other members of the class and |
| 13 | | | plaintiffs have the same interest as the other members of the Class. |
| 14 | | | Accordingly, plaintiffs are adequate representatives of the Class and will |
| 15 | | | fairly and adequately protect the interests of the Class; and |
| 16 | | e. | Plaintiffs anticipate that there will be no difficulty in the management of this |
| 17 | | | litigation as a class action. |

24. For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

25. In September of 1999, Brocade's Board of Directors approved the Company's NSO Plan. The NSO Plan provides for the grant of non-statutory stock options to employees and consultants. The NSO Plan was attached as Exhibit 10.8 to Brocade's 1999 year-end SEC Form 10-K and was operative at all times during the Class Period.

26. Pursuant to Paragraph 2(a) of the NSO Plan, the Plan "Administrator" is defined as "the Board or any of its Committees as shall be administering the Plan." Thus, the Board was charged with administering the Plan or by delegating its powers to distinct committees. Pursuant to paragraph 4(a) of the NSO Plan, the Plan "shall be administered by the Board or (ii) a Committee,

6

1    which Committee shall be constituted to satisfy Applicable laws." Paragraph 4(b)(i-vi) of the NSO

2    Plan further gives the Board or Committee the sole authority to, among other things, determine: (1)

3    who may receive option grants, (2) the number of shares granted by such options, and (3) the

4    exercise price for such options. Further, pursuant to paragraph 4(x), the NSO Plan gives the Board

5    or its Committee the power to authorize any person to execute on behalf of the Company any

6    instrument to effect the grant of an option previously granted by the Board or Committee.

7        27.    Brocade, and the Individual Defendants knowingly or deliberately disregarded the

8    express written requirements of the Company's Stock Option Plans and GAAP, and manipulated the

9    dates upon which options were reported as granted under the NSO Plan in order to strategically

10    award grants at lower exercise prices but hide the true cost of such grants in violation of GAAP.

11        28.    Defendants doled out options with utter disregard for the rules and Brocade's own

12    Stock Option Plans. This led to systematic abuses at Brocade in its administering of and reported

13    expensing of its stock-based compensation systems.

14        29.    For example, Brocade's Executive Officers carried out a pervasive scheme whereby

15    they would systematically backdate option grants, give employees false start dates, or sign an

16    employee on as a current employee and then immediately place that employee on a leave of absence

17    (even though the employee was still actually working for another company), so that Brocade could

18    grant the employee options at the earliest date, and lowest exercise prices possible.

19        30.    Knowing that the granting of options can severely misrepresent earnings if not

20    properly accounted for, Brocade and the defendants ignored and blatantly violated the express

21    requirements of Brocade's own Stock Option Plans and GAAP. Shareholders were kept ignorant of

22    the true costs that these stock option grants were wreaking on the Company because Defendants

23    omitted the material truth about what the Company was doing from all of its Financial Statements

24    issued during the Class Period.

25        31.    The accounting principles in place during the Class Period regarding accounting for

26    stock options were clear, simple and unambiguous. APB No. 25 required companies to record as a

27    compensation cost the difference between the fair value of the underlying stock and the exercise

28    price of the option. Under APB No. 25, compensation cost is the quoted market price of the stock

7

1    on the grant date *less* the amount the employee must pay to acquire the stock (exercise price).

2    Opinion 25, ¶ 10. The only circumstance permitting a company to not record any cost arises when

3    employee stock options are granted at a price equal to or greater than the market price on the date of

4    the grant and the measurement date of the option grant date is certain. The measurement date is

5    certain only when the date of the grant is fixed and determinable. If all conditions are not met, then

6    the company must use the variable accounting method, which requires disclosure of the grant as a

7    compensation expense each quarter.

8        32.    The foregoing paragraph constitutes the entirety of the accounting rules regarding

9    option grants with which Brocade was required to comply. Thus, throughout the Class Period, it was

10    very simple to conduct the required computation of what was a compensation expense under APB

11    No. 25: quoted market price - exercise price = compensation cost. If the product of the equation is

12    zero (market price = exercise price), the option has been granted "at-the-money" and no

13    compensation cost was required to be recorded. If the product of the equation is a negative number

14    (market price < exercise price), the option has been granted "out-of-the-money" and no

15    compensation cost was required to be recorded. However, if the product of the equation is a positive

16    number (market price > exercise price), the option has been granted "in-the-money" and the product

17    of the equation must be recorded as compensation cost.

18        33.    The proper application of APB No. 25 is that simple. And, Brocade, Reyes, Canova,

19    Jensen, Dempsey, and Neiman all knew it was that simple. Indeed, in the *Notes to Financial*

20    *Statements* contained in Brocade's 10-K for fiscal year 1999, the Company—and thus its officers

21    and directors—admitted that it understood this simple rule, and further understood its effect on

22    Brocade's financials:

23        Brocade accounts for the Plans and the Purchase Plan in accordance with APB No.
         25 **whereby the difference between the exercise price and the fair value at the**

24        **date of the grant is recognized as compensation expense.** Had compensation been
         determined under the provisions of SFAS No. 123, net income (loss) would have

25        decreased or increased, respectively, to the following pro forma amounts, (in
         thousands except per share data:

26                          \*    \*    \*

27

28

8

1    The fair value of each option grant was estimated on the date of the grant using the
     Black-Scholes option pricing model. . . .

2

3    *Notes to Financial Statements*, Brocade's 10-K for fiscal year 1999, at pp. 44-45 (emphasis added).

4    34.    As officers and directors of the Company, Reyes, Canova, Dempsey and Neiman

5    were charged with knowing that the Company was required to use the very accounting rules that

6    appeared in Brocade's public filings. Further, Brocade's Code of Ethics requires officers and

7    directors to gain sufficient familiarity with the rules and regulations relevant to their duties.

8    35.    Brocade's publicly filed Stock Option Plans specifically charged Brocade's Board of

9    Directors with the responsibility to carry out those Plans in compliance with the language of the

10   Plans.

11   36.    Brocade's Stock Option Plans specifically charged Brocade's Board of Directors

12   with the responsibility of carrying out the Company's Stock Option Plans according to the

13   requirements of the Plans.

14   37.    Brocade's statements regarding the changes to its internal controls processes and

15   disclosures for stock option grants is an implicit admission that these controls, processes and

16   procedures were not present during the Class Period, which, as described more fully herein, not only

17   violated its own Stock Option Plans, but also directly led to the Company's false accounting for and

18   disclosure of stock option grants throughout the Class Period.

19   38.    On July 20, 2006, the *Wall Street Journal* published a report titled "Setting the Date:

20   How One Tech Company Played With the Timing of Stock Options." This news report was based,

21   among other things, upon interviews with nine former employees and a review of relevant company

22   documents. Steve Stecklow, *Setting the Date: How One Tech Company Played With the Timing of*

23   *Stock Options*, WALL ST. J., July 20, 2006, at A1.

24   39.    The report states that in 2002, certain Brocade employees received a request from

25   their human resource managers "to alter the employment records of several executives to make it

26   seem like they joined the company later than they really did" in order to "give their stock options

27   more value." *Id.* The reason for this instruction was that Brocade's stock price had dropped since

28   these executives joined the Company causing their options to be underwater; thus, by changing their

9

**COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
W:\STU\I\BROCADE3\PLD\Complaint 001.wpd

1    start date, the options would be replaced or repriced so that they would carry a lower, in the money,

2    strike price. *Id.* Jensen inquired about how Brocade's computer systems stored employee records.

3    One former employee stated that he was "given folders, one at a time, containing revised offer

4    letters of jobs from these executives." The new letters were dated several months after the original

5    one, so that options given when the executives came aboard could carry later dates, when the price

6    was lower." *Id.* When the former employee told Jensen he did not want to change any more

7    records, Jensen told him he did not have to and then a supervisor changed the remaining records.

8    *Id.*

9         40.    The report also cited several former employees as describing Brocade's scheme to

10   place employees on "part-time" status so that they could be given options at an earlier date—and

11   lower strike price—than the date and strike price that would be in effect when the employees

12   actually went to work for the Company. According to one source, "This was not a secret. Everybody

13   knew about it." The report states that one participant in this scheme was none other than Canova.

14   Canova received an offer letter dated November 13, 2000, in which he was told he would get

15   options for 180,000 shares with a grant date of "the first date of your employment." *Id.* The same

16   letter instructed Canova that he could work "up to four hours per week prior to joining fulltime" to

17   "accelerate your on-boarding with Brocade." *Id.* Canova was not to start as a full-time employee

18   until December 11, 2000. By the time Canova actually started working at the Company the stock

19   had increased by approximately 9%. That gain, however, was erased a few days later when the stock

20   sank. Thus, Brocade ultimately made it appear that the option grant date was December 21, 2000 so

21   that the strike price could be set as of that date, a move that on paper would equate to a profit of

22   nearly $16 million. *Id.*

23         41.    Further, according to the report, Brocade's "compensation committee" for granting

24   options "consisted solely of Mr. Reyes." *Id.* One source stated that Jensen would take a list of new

25   hires to Reyes and then Jensen "would return with a printout, initialed by Mr. Reyes, listing closing

26   prices for every day since the previous grant date. One date – often close to the lowest, and several

27   weeks in the past – would be highlighted in yellow and be used as the grant date for the group . . . ."

28   *Id.*

10

**COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
WnsTUI URROCANF3IPI D\Comnlaint 001 wnd

1      42.    The *Wall Street Journal* report ran the morning of July 20, 2006. That afternoon, the

2  SEC and DOJ held a joint news conference announcing the filing of civil charges against Reyes,

3  Jensen and Canova and criminal charges against Reyes and Jensen. A federal grand jury handed

4  down an indictment against Reyes and Jensen three weeks later on August 10, 2006. The

5  documents filed pursuant to these federal proceedings contain the following factual allegations that

6  further detail pervasive accounting fraud that occurred at Brocade from 1999-2004 and describe the

7  direct involvement in this fraudulent scheme by Reyes, Canova and their controlled person, Jensen:[1]

8  •    Reyes orchestrated a fraudulent scheme whereby he routinely executed
       backdated documents providing "in the money" option grants, evaded rules
9      requiring Brocade to publicly report the associated expenses and materially
       understated Brocade's expenses and overstated its income.

10 •    Reyes was given sole authority to grant options to employees (other than
11     certain officers and directors) as the sole member of Brocade's Compensation
       Committee.

12 •    From at least 2000 through 2004, Reyes used the authority delegated to him
13     to choose when to grant options to non-officer employees, as well as how
       many to grant. Reyes used the virtually unchecked authority given to him to
14     grant "in-the money" options by falsifying the date on which the grants were
       made, thereby granting the options with well below-market strike prices.

15 •    Brocade's public filings for fiscal years 2000-2003 represented that Brocade
16     accounted for its option grants in accordance with GAAP, including APB 25.
       Except in a few minor instances, Brocade did not disclose any compensation
17     expenses in connection with its option grants in its SEC filings.

18 •    Reyes and Jensen often waited until the end of the fiscal quarter before
       granting options. Jensen provided Reyes with a list (name of employee,
19     number of options, hire date for new hires, and other information) of options
       granted at a purported "Compensation Committee Meeting" occurring on a
20     given date. Jensen's staff would also print out the historical pricing
       information, highlight the lowest closing price during the period, and give it
21     to Reyes with the Committee meeting minutes. Reyes would then sign the
       minutes and date them as if the meetings occurred on the highlighted low
22     dates and the stock options were priced at the market value of Brocade's
       stock on those dates. Reyes and Jensen both knew that Reyes had not granted
23     the options on the date set forth in the options grant.

24     ■    The above-described practice for pricing option grants became so
            routine that by June 2003, an HR employee prepared a memorandum
25          describing the practice in detail.

26

27     [1] The SEC Civil Complaint, the DOJ Criminal Complaint, and the Indictment are
28 incorporated herein by reference in their entirety.

11

1        •     Reyes and Jensen provided the minutes of the purported Committee meetings to Brocade employees responsible for recording the grant in Brocade's books and records and preparing its financial statements. As Reyes and Jensen further knew, because they supplied the false underlying documentation, the Company did not record an expense related to the grants in its financial statements.

2

3

4

•     Reyes and Jensen backdated the following specific stock option grants:

5

6             ■     In January 2002, they backdated the Committee meeting minutes approving a grant to October 31, 2001 when Brocade's stock closed at $24.20 (the lowest price during 1Q 2002).

7

8             ■     They backdated the Committee meeting minutes approving a grant to November 28, 2001 so that employees hired between October 30, 2001 and November 28, 2001 could receive a stock option price of $28.82 (the lowest price between October 30 and November 28).

9

10          ■     They backdated the Committee meeting minutes approving a grant to January 22, 2002 so that employees hired between November 28, 2001 and January 22, 2002 could receive a stock option price of $31.76.

11

12

13          ■     They backdated the Committee meeting minutes approving a grant to February 28, 2002 when Brocade's stock closed at $21.97 (the lowest price during 2Q 2002).

14

15        •     Jensen told HR employees who reported to her that they should not discuss stock option grants using e-mail.

16        •     Jensen stated that she was personally involved with Reyes' stock pricing decisions approximately 90% of the time. Jensen stated that she cautioned Reyes not to always pick the low dates because it looked suspicious.

17

18        •     Reyes backdated options grants on at least nine occasions between January 2, 2001 and July 2, 2002.

19

20        •     During ten consecutive fiscal quarters (beginning with the third quarter ended July 31, 2000, through the fourth quarter ended October 26, 2002), Brocade granted stock options to employees at the quarterly low stock price in 8 out of 10 quarters, and with exercise prices near the quarterly low in the other two quarters.

21

22

23        •     Reyes backdated options grants on at least six occasions between August 15, 2003 and October 20, 2004.

24        •     During five consecutive fiscal quarters beginning with the quarter ended October 26, 2003, through the quarter ended October 30, 2004, Reyes made 32 options grants. Of those grants, 19 grants to over 1,000 employees (approximately 16 million shares), were priced at the weekly low closing price for Brocade's stock and for an additional three grants, within just $0.03 of the weekly low.

25

26

27

28        •     Reyes and Jensen caused numerous employment offer letters and similar records to be backdated so that certain employees could receive earlier stock

12

1         option grants that were purportedly made and priced when the market value of Brocade's stock was relatively low.

2

3      •    When an HR employee questioned Jensen about the legality of Brocade's practice of backdating an employee offer letter, Jensen responded that she did not care and that HR did it because that is what Reyes wanted.

4

5      •    Reyes knew the applicable accounting rules as he spoke frequently within the Company, with persons outside of Brocade, and publicly, about the rules requiring public companies to record an expense for "in-the-money" options grants. Reyes sought to evade the requirement by falsifying the dates, aware that the Company relied on the falsified options documentation to prepare its financial statements.

6

7

8      •    Canova, a CPA well-versed in the proper accounting of "in-the-money" stock option grants, discussed these rules and their effect with Brocade's external auditors (KPMG) and others including Reyes.

9

10     •    In April 2001, Canova received an email from Jensen in which a Brocade manager had stated that Brocade's option price was "usually the lowest closing price" experienced between meetings when options were granted. Canova instructed Jensen that she should caution the manager "not to make statements about the board granting shares at the lowest price."

11

12

13     •    Also in April 2001, Canova and Brocade's controller discussed the controller's concerns about the delay between purported options grant dates and the dates when the finance department employees received documentation of the grants. Although the delay was the result of, and suggested the existence of, the options backdating scheme, other than speaking with Reyes, Canova did nothing to investigate.

14

15

16

17     •    In early 2002, Canova learned of facts suggesting that options grants that included two executives, Richard Geruson and Daniel Cudgma, had been backdated and that Jensen had also used false dates on letters offering employment to them.

18

19     •    In October 2002, Canova received an email describing option grants to Geruson as "forging option paperwork and offer letters so he could get better priced options." Although Canova was repeatedly confronted with information about falsified books and the backdating scheme, Canova did not investigate or review the impact of backdated or falsified options grants on Brocade's financial statements.

20

21

22

23     •    After learning these facts, Canova facilitated the fraud by directing finance department employees to ensure that the dates used for option grants in the Compensation Committee meeting minutes were consistent with employee records reflecting their hiring dates. Where the two types of records were inconsistent, Canova instructed employees to ensure that the Compensation Committee meeting minute dates corresponded to the hire dates of the employees listed in the minutes.

24

25

26

27     •    Canova knew, or was reckless in not knowing, that the option grant documentation used to prepare Brocade's financials was not reliable, the scheme resulted in the under reporting of compensation expenses, and the

28

13

:

1    scheme rendered Brocade's public filings and disclosures materially false and
     misleading.

2
   • Reyes knew that he and other officers received improperly backdated options,
3    and was thus motivated, in part, to enrich himself and other officers.

4  • In a June 2003 resolution, a committee of the board of directors accepted a
     recommendation that Reyes be granted a total of 1.1 million options divided
5    into two grants during two fiscal quarters. Reyes granted himself 600,000
     options as of August 15, 2003 and 500,000 options as of December 10, 2003.
6    Only after the grants were made and recorded in Brocade's books and records
     did the committee of Brocade's board approve the grants.

7
   • On at least two occasions, Reyes received large options grants that were dated
8    the same date on which he had granted other employees backdated
     options—April 17, 2001 and October 1, 2001.

9
   • Reyes "granted" approximately 2 million options to over 260 employees on
10   October 30, 2001, but he did not actually approve this option grant until
     January 2002, when Brocade's stock price was significantly higher. In
11   January 2002, Reyes and Jensen backdated the grant to October 30, 2001,
     preparing false committee minutes to create the appearance that the options
12   had been granted on the earlier date.

13 • On February 1, 2002, Reyes interviewed and decided to hire Daniel Cudgma.
     Reyes directed that Cudgma be included in an options grant that was
14   backdated to November 28, 2001, when Brocade's stock price was
     approximately $8 per share lower than the February 1, 2002 closing price.
15   Jensen prepared the committee meeting minutes, signed by Reyes, granting an
     option to Cudgma to purchase 285,000 shares, backdated to, and asserting a
16   false hire date of, November 28, 2001.

17 • After Brocade's stock price declined, Reyes reacted by directing Jensen to
     change the option grant to Cudgma several times in March and April 2002. In
18   approximately mid-April 2002, in an effort to retain Cudgma, Reyes signed
     Compensation Committee meeting minutes increasing Cudgma's option grant
19   to 500,000 shares, backdated as of February 28, 2002 (a date on which
     Brocade's stock closed at approximately $4 per share below the then-current
20   market price). At approximately the same time, Jensen directed persons in the
     HRD to prepare a new offer letter for Cudgma, this time backdated to January
21   28, 2002.

22   43.    As set forth extensively throughout this Complaint, Defendants had every incentive

23 to withhold material, non-public information. Specifically, if Brocade's improper and illegal option

24 backdating scheme were kept from the public, then Brocade could: (1) hire and retain employees

25 without having to incur large cash compensation expenses for high salaries; (2) unilaterally grant

26 themselves absurdly large numbers of lucrative options at the lowest possible price; and (3) increase

27 the stock's price by hiding the true impact that the cost of these option grants had on Brocade's

28 public financials.

14

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY

1      44.    Reyes and Canova signed Brocade's Financial Statements, which contained

2  certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 ("SOX") for each quarter

3  (Form 10-Q) and each Annual Report (Form 10-K) for fiscal years 2002 through 2004. By signing

4  these certifications, Reyes and Canova swore—subject to criminal penalty—that they: (1) had

5  reviewed each Financial Statement; (2) designed or caused to be designed Brocade's internal

6  disclosure controls and procedures upon which Brocade's accounting for stock option grants was

7  based; (3) that such disclosures and procedures were adequate; (4) **that all material information**

8  **relating to Brocade was made known to Reyes and Canova as certifying officers**; and (5) that

9  the Financial Statements were accurate. Specifically, Reyes and Canova certified that:

10      (1) The Financial Statements listed below (all of which have been restated) and
        certified under SOX:

11

12          •    Full compliance with Section 13(a) or 15(d) of the Securities
              Exchange Act of 1934.

13          •    That information contained in such Annual Report on Form 10-K
              fairly presents in all material respects the financial condition and
14              results of operations of Brocade

15  *See* 2002 Form 10-K (Reyes and Canova); 2003 Form 10-K (Reyes and Canova); 2004 Form 10-K
    (Canova); Forms 10-Q for quarters ending July 27, 2002, January 25, 2003, April 26, 2003, July 26,
16  2003, January 24, 2004, May 1, 2004, July 31, 2004 and October 30, 2004.

17      (2) Reyes and Canova signed the Financial Statements listed below (all of which
        have been restated) and certified under SOX:

18

19          •    Brocade maintained disclosure controls and procedures and
              internal control over financial reporting

20          •    Disclosure controls and procedures are controls and other
              procedures of an issuer that are designed to ensure that
21              information required to be disclosed by the issuer in the
              reports that it files or submits under the Act is recorded,
22              processed, summarized and reported, within the time periods
              specified in the Commission's rules and forms. This includes,
23              but is not limited to, controls and procedures designed to
              ensure that information required to be disclosed by an issuer in
24              the reports that it files or submits under the Act is accumulated
              and communicated to the issuer's management, including its
25              principal executive and principal financial officers, or persons
              performing similar functions, as appropriate to allow timely
26              decisions regarding required disclosure. *See* SEC Rule 13(a)-
              15(e), 17 C.F.R. §240.13a-15(e); 17 C.F.R. §240.15d-15(e).

27

28

                              15

1    *See* Exhibit 99.1 to SEC Form 10-K for Fiscal Year 2002; Exhibit 32.1 to SEC Form 10-K for
     Fiscal Year 2003; Exhibit 32.1 to SEC Form 10-K for Fiscal Year 2004; Exhibit 32.1 to SEC for 10-
2    Q for each listed 10-Q.

3        (3) Reyes and Canova signed the Financial Statements listed below (all of which
         have been restated) and certified under SOX:

4
5        •    The certifying officers are responsible for establishing and
              maintaining disclosure controls and procedures for the
6             registrant, and have:

7        •    Designed, or supervised design, of disclosure controls and
              procedures to ensure that material information relating to
8             Brocade was made known to the certifying officers,
              particularly during the period in which the report was being
9             prepared;

10       •    Had evaluated the effectiveness of Brocade's disclosure
              controls and procedures and presented in the filing the
11            certifying officer's conclusions about the effectiveness of the
              disclosure controls and procedures, as of the end of the period
12            covered by the report; and

13       •    Had disclosed in the reports any change in Brocade's internal
              control over financial reporting that occurred during Brocade's
14            most recent fiscal quarter that has materially affected, or is
              reasonably likely to materially affect, Brocade's internal
15            control over financial reporting.

16       •    The certifying officers have disclosed, based on their most
              recent evaluation of internal control over financial reporting,
17            to Brocade's auditors and the audit committee of Brocade's
              board of directors:

18       •    All significant deficiencies and material weaknesses in the
              design or operation of internal control over financial reporting
19            that are reasonably likely to adversely affect the registrant's
              ability to record, process, summarize and report financial
20            information; and

21       •    Any fraud, whether or not material, that involves management
              or other employees who have a significant role in the
22            registrant's internal control over financial reporting.

23   *See* Exhibits 31.1 and 31.2 to SEC Form 10-Q for: September 8, 2003, January 20, 2004, March 8,
     2004, June 14, 2004, September 13, 2004, January 31, 2005 (Canova only), and March 31, 2005
24   (Canova only).

25       45.    By signing these certifications, Reyes and Canova swore, subject to criminal penalty,

26   that they had actual contemporaneous knowledge of (1) all data regarding the granting, recording

27   and disclosure of stock option grants, (2) the way such data was used in creating each Financial

28   Statement, and (3) the specific internal controls (of which Brocade's Restatement admits there were

16

1  few, if any) that Brocade used to ensure that stock options were properly granted, recorded and
2  disclosed.

3      46.    The Audit Committee decided to begin an internal investigation into the very
4  accounting scheme that had taken place right in front of them. However, to conduct this
5  investigation, the Audit Committee brought in new—and independent—legal counsel, Morrison &
6  Foerster, to head the investigation. Morrison & Foerster in turn engaged a new accounting team,
7  PricewaterhouseCoopers ("PWC"), to conduct a forensic accounting investigation into the matter.
8  In essence, Brocade had to bring in new, independent outsiders to do the job that Brocade, its legal
9  counsel, and its Audit Committee Members failed to do in the first place.

10      47.    According to documents filed by Brocade in the derivative litigation, the internal
11  investigation began on November 1, 2004 and continued through the end of January 2005. The
12  internal investigators interviewed thirty current and former employees and reviewed approximately
13  850,000 pages of documents obtained from twenty-five former employees and the Company's
14  central repository. According to Brocade, these employees and documents came from "numerous
15  relevant departments" including the human resources department.

16      48.    At the conclusion of this three-month internal investigation, the Company
17  determined that the way in which Brocade accounted for stock option grants in publicly filed
18  statements during the Class Period was incorrect and required restatement. Unfortunately, Brocade
19  had to initiate a second internal investigation. This second investigation lasted six months and
20  focused more directly on Brocade's accounting for stock-based compensation to employees on
21  leaves of absences and in transition roles prior to leaving Brocade. The second investigation
22  resulted in more employee interviews and review of over two million pages of internal documents.
23  The conclusions reached as a result of this second investigation resulted in yet another restatement
24  of Brocade's Financial Statements.

25      49.    On January 6, 2005, the Company began to make a series of admissions regarding
26  massive, systematic and widespread accounting violations that occurred over a five-year period as a
27  result of Defendants' scheme. That day, Brocade announced that it would restate its Financial
28  Statements for fiscal years ending 2002 and 2003 to record additional stock-based compensation

17

**COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
W:\STULI\BROCADE3\PLD\Complaint 001.wpd

1 | expenses as a result of an Audit Committee internal review that was later completed on January 24,

2 | 2005.

3 | 50.    As a result of this investigation and audit, Brocade restated its Financial Statements

4 | for 1999 through 2004. *See* Brocade Form 10-K filed January 31, 2005. On November 14, 2005, in

5 | its amended SEC Form 10-K filed for the fiscal year-ended 2004, Brocade further admitted that its

6 | accounting practices had failed in three major regards and, thus, that all of the Financial Statements

7 | issued since its inception as a public company were materially false and misleading:

8 |     In January 2005, following an internal review by our Audit Committee, we
      determined that we had not correctly accounted for: (A) stock option grants that were
9 |     made to new hires on their offer acceptance date, rather than the date of their
      commencement of employment, during the period May 1999 to July 2000; (B) stock
10 |    option grants that were made to persons engaged on a part-time basis prior to their
      new hire full-time employment during the period August 2000 to October 2002; and
11 |    (C) stock option grants where there was insufficient basis to rely on our internal
      process and related documentation to support recorded measurement dates used to
12 |    account for certain stock options granted prior to August 2003. As a result, we
      restated our financial statements to record additional stockbased compensation
13 |    charges relating to many stock option grants from the periods 1999 though the third
      quarter of fiscal 2003 as well as a valuation allowance associated with deferred tax
14 |    assets related to previously recorded stock option tax benefits (the "January 2005
      Restatement"). In addition, it was concluded that there were improprieties in
15 |    connection with the documentation of stock option grants and related employment
      records of a small number of employees prior to mid-2002, which resulted in
16 |    immaterial adjustments included in this restatement.

17 | *See also* Brocade Form 10-K filed January 31, 2005, p. 56 n.3.

18 |     51.    The Restatement was the result of the investigation conducted by Brocade's own

19 | Audit Committee. As a direct result of the Audit Committee's findings, Brocade relieved

20 | Defendant Reyes from his positions as CEO and Chairman. Brocade further admitted that its

21 | internal controls and disclosure procedures regarding Brocade's stock option granting process were

22 | not only flawed during the Class Period but were, for the most part, utterly non-existent.

23 |     52.    Brocade's Restatements are a public admission that all of the Financial Statements

24 | and related press releases issued during the Class Period were materially false and misleading

25 | because they omitted material facts when made. The specific Financial Statements at issue are all of

26 | Brocade's SEC Form 10-K's and 10-Q's filed for fiscal years 2000-2004, as well as numerous press

27 | releases issued by the Company during these years, which incorporated the same financial

28 | information set forth therein.

18

53.    On January 6, 2005, the Company issued a press release entitled "Brocade Communications to Restate Financial Statements; Company Currently Expects Adjustments to Relate to Stock Compensation; Company Plans to Delay the Filing of its Form 10-K for Fiscal Year Ending October 30, 2004." The press release stated in part:

> Brocade Communications Systems, Inc., the world's leading provider of infrastructure solutions for Storage Area Networks (SANs), announced today that it currently expects to restate its financial statements for fiscal years ending 2002 and 2003 to record additional stock-based compensation expense as a result of an internal review. During the course of the review, which is still ongoing, the Company determined that the way in which it accounted for stock option grants was incorrect and requires restatement. The Company currently expects the restatement to relate to stock compensation. The Company does not currently anticipate any material adjustments to its historical revenues, non-stock option related operating expenses or cash positions. The Company expects related adjustments will be made to the Company's financial statements for fiscal years prior to 2002, as necessary. Specifically, the Company has determined it incorrectly accounted for, and will record historical stock-based compensation charges relating to, (i) grants that were made to new hires on their offer acceptance date, rather than the date of their commencement of employment, during the period May 1999 to July 2000, and (ii) grants that were made to persons engaged on a parttime basis prior to their new hire full-time employment during the period August 2000 to October 2002.
>
> Brocade's audit committee is conducting the internal review with the assistance of outside counsel and accountants, both of whom were retained for this purpose. The review is ongoing. There can be no assurance that additional adjustments will not be required. The Audit Committee expects to complete the review process in the next few weeks. The Company intends to provide more information as soon as it is available. "Our core business remains strong and the restatement does not affect the underlying fundamentals of our business. We continue to successfully execute on our strategies and plans and to further strengthen the overall position of the Company, " said Greg Reyes, Brocade Chairman and Chief Executive Officer.

54.    On January 24, 2005, the Company issued a press release entitled "Brocade Announces the Completion of Audit Committee Internal Review; All Adjustments Are Non Cash and Relate to Stock-Based Compensation and Associated Tax Adjustments."

55.    On May 16, 2005,, the Company filed an 8-K that revealed that the Financial Statements in question still did not accurately portray Brocade's financial results for the relevant period and, therefore, should not be relied upon. Specifically, the 8-K stated as follows:

> On May 11, 2005, on management's recommendation, Brocade Communications Systems, Inc., in consultation with KPMG LLP, the Company's independent registered accounting firm, determined that the Company's financial statements for the fiscal years ending 2001, 2002, 2003 and 2004, and the interim periods contained therein, should no longer be relied upon because of an error in such financial statements as addressed in Accounting Principles Board Opinion No. 20. The Company will restate its financial statements for those periods and expects

19

1    related adjustments will be made to the Company's financial information for fiscal
     2001, as necessary.(emphasis added).

2

3        56.    On that same day, Brocade issued a press release (expressly incorporated into its May

4    16, 2005 8-K) that further expounded on this Restatement:

5        ...the Company will restate its financial statements for the fiscal years ending
         2002 through 2004 to record additional charges for stock-based compensation
6        expense...Following the completion of an Audit Committee review announced on
         January 24, 2005, additional information came to the Company's attention that
7        indicated that its guidelines regarding stock option granting practices were not
         followed during the period from August 2003 through November 2004. After
8        further review, the Company concluded that it could not rely on the documentation
         used to support the recorded measurement dates for stock options granted in that
9        period. As a result, the Company will restate its financial statements to account for
         additional stock-based compensation for stock options granted from August 2003
10       through November 2004. The additional charges are expected to result in a
         cumulative increase in non-cash stock option compensation expense of $0.8 million
11       over fiscal years 2003 and 2004.

12       After discovering the additional information regarding noncompliance of its
         guidelines, the Company commenced a review of certain other practices that could
13       impact stock option accounting. This review determined that from 2001 through
         2004, the Company had not appropriately accounted for the cost of stock based
14       compensation for certain employees on leaves of absences (LOA) and in transition
         roles prior to ceasing employment with Brocade . . . after discovering the additional
15       information regarding non-compliance of its guidelines, the Company commenced a
         review of certain other practices that could impact stock option accounting. This
16       review determined that from 2001 through 2004, the Company had not appropriately
         accounted for the cost of stock based compensation for certain employees. . .
17       Management estimates the total increase in non-cash compensation expense related
         to these matters to be in a range of approximately $31 to $52 million for fiscal years
18       2001 through 2004.

19       57.    The table below reflects the total effects of these combined adjustments and are the

20   Company's preliminary estimate of the approximate impact to the Company's non-cash expenses

21   and EPS. The Company does not currently expect that there will be any impact on non-cash

22   expenses and EPS for any period in fiscal year 2005.

| Year | Additional Non-Cash Expense | Reduction in EPS |
|------|-----------------------------|------------------|
| 2001 | $12.0 - $26.0 million | $0.05 - $0.11 share |
| 2002 | $19.0 - $23.0 million | $0.08 - $0.09 |
| 2003 | $0.2 - $0.8 million | $0.00 - $0.01 |
| 2004 | $0.8 - $2.8 million | $0.00 - $0.01 |

20

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY
W:\STLI\I\BROCADE3\PLD\Complaint 001.wpd

1       58.   Further, on May 16, 2005, Brocade disclosed that the Department of Justice was

2 working with the SEC "in a joint investigation regarding the Company's stock option granting

3 process." Ultimately, the accounting improprieties first announced on May 16, 2005 were included

4 in a further restatement on November 14, 2005:

5         As previously disclosed on Form 8-K filed with the Securities and Exchange
        Commission on May 16, 2005, Brocade Communications Systems, Inc. (the
6         "Company") determined that the Company's financial statements for the fiscal years
        ended October 30, 2004, October 25, 2003, and October 26, 2002, and the interim
7         periods contained therein, should no longer be relied upon because of errors in such
        financial statements. The Company has restated those financial statements, which
8         appear in the Company's Annual Report on Form 10-K/A for the fiscal year ended
        October 30, 2004 (the "Form 10-K/A"). As a result of such restatements, on
9         November 10, 2005, the Company, on management's recommendation and in
        consultation with the Company's Audit Committee and KPMG, LLP, the Company's
10        independent registered public accounting firm, concluded that the financial
        statements for the first fiscal quarter of 2005 ended January 29, 2005, should no
11        longer be relied upon because of an error in such financial statements.

12         Specifically, the Company concluded that the Company's balance sheet for the first
        quarter of fiscal 2005 ended January 29, 2005 needs to be restated to reflect the
13        cumulative effect of the restatements previously announced on additional paid-in
        capital and retained earnings. The restatement of the financial statements for the
14        quarter ended January 29, 2005 relates exclusively to reclassifications within
        shareholders equity related to the cumulative effect of the foregoing restatements.
15

16       59.   The Restatements serve as an express admission by Defendants that Brocade's

17 previously issued Financial Statements and its public statements regarding those results were false

18 and misleading for the entire Class Period because, due to Brocade's improper accounting for its

19 stock-based compensation expenses, Brocade's Financial Statements failed to disclose material facts

20 necessary to make such statements not materially false and misleading and in violation of GAAP.

21       60.   GAAP are those principles recognized by the accounting profession as the

22 conventions, rules and procedures necessary to define accepted accounting practices at a particular

23 time. Regulation S-X, 17 C.F.R. §210A-0l(a)(I), states that financial statements filed with the SEC

24 that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

25 Regulation S-X requires that interim financial statements must also comply with GAAP, with the

26 exception that interim financial statements need not include disclosures that would be duplicative of

27 disclosures accompanying annual financial statements. Brocade's Restatements of earnings were

28 clearly material. The decision as to whether to expense the grant of stock options to employees

21

1  directly affects a company's earnings per share. Or, better put, what outside shareholders' share of
2  earnings are.

3        61.    Furthermore, pursuant to GAAP, as set forth in Accounting Principles Board Opinion
4  ("APB") No. 20, the type of Restatement and revisions announced by Brocade were to correct for
5  material errors in previously issued Financial Statements. APB No. 20, ¶¶ 7-13. Specifically,
6  Brocade's Restatement was not due to a change in reporting entity or a change in accounting
7  principle, but rather to correct material errors in previously issued Financial Statements: in
8  particular, improper accounting regarding its stock-based compensation program that, when
9  corrected, dramatically lowered Brocade's previously stated earnings and net income, and increased
10  its compensation expenses and related tax expenses.

11        62.    Further evidence of the materiality of the Restatement is the fact that there was a
12  restatement at all. GAAP notes that the restatement of past financial statements is a disfavored
13  method of recognizing an accounting change as it dilutes confidence by investors in the financial
14  statements, it makes it difficult to compare financial statements and it is often difficult, if not
15  impossible, to generate the numbers when restatement occurs. APB No. 20, ¶ 14. Moreover,
16  immaterial corrections are not required to be restated. APB No. 20, ¶ 38.

17        63.    Thus, GAAP provides that financial statements should only be restated under limited
18  circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting
19  principles used or to correct an error in previously issued financial statements. Brocade's
20  Restatements were not due to a change in reporting entity or a change in accounting principle, but
21  rather to material errors in previously issued Financial Statements. The Restatements are, therefore,
22  material as the applicable accounting principles.

23        64.    Thus, the Restatement concedes that all of the Company's Financial Statements
24  issued during the Class Period were materially false and misleading because they omitted such
25  material facts. The Restatement revealed that pervasive, massive, and systematic accounting
26  violations occurred for five straight years.

27        65.    Buried in Brocade's January 24, 2005 Restatement was the fact that Reyes resigned
28  from his position as CEO and Chairman, remaining at the Company as a director and a consultant.

22

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY
WASTLILLIBROCADE3\PLD\Complaint 001.wpd

1    66.    Canova resigned from his position as CFO and principal accounting officer of the
2 Company on December 15, 2005.

3    67.    The timing of Reyes' and Canova's departures suspiciously coincided with the
4 revelation of Brocade's mass stock option backdating scandal, Reyes' stock sales, the joint
5 investigation by federal regulators, Brocade's Restatement, and the findings of Brocade's internal
6 investigation.

7    68.    On or about May 16, 2005, Brocade announced that the SEC began investigating
8 Brocade's accounting and disclosure of stock option grants. Brocade also acknowledged that same
9 day that the Department of Justice was working with the SEC in a joint investigation regarding these
10 issues. Brocade announced on or about June 1, 2005, that the SEC had upgraded its investigation
11 into a formal investigation.

12    69.    On July 20, 2006, the SEC filed a civil complaint against Reyes and Canova, as well
13 as Jensen. The SEC complaint charged Reyes with backdating options he doled out as a "committee
14 of one" to hundreds of employees, boosting the potential value of the options and concealing
15 millions of dollars of compensation expenses from shareholders. The complaint further alleged that
16 Canova enabled the backdating scheme to continue undetected by ignoring facts that called into
17 question the integrity of Brocade's Financial Statements based on its options grants. On the same
18 date, the U.S. Attorney for the Northern District of California filed a criminal complaint against
19 Reyes and Jensen alleging a single count of securities fraud, which carries a maximum penalty of 20
20 years in prison and a $5 million fine. The criminal complaint was supported by the affidavit of FBI
21 Agent Joseph Schadler.

22    70.    In a joint press conference with the SEC and DOJ, SEC Chairman Cox warned that
23 backdating "deceives investors and the market as a whole about the financial health of companies
24 that cheat in this way." He added, "It is poisonous to an efficient marketplace." Furthermore, when
25 asked about the argument that the government had not alleged a motive for personal gain against
26 Reyes, U.S. Attorney Kevin V. Ryan countered, "We don't have to show personal gain [to bring
27 criminal securities-fraud charges]. Different people have different reasons for what they do and why
28 they do it."

23

**COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
WASTH I IBROCADE3\PLD\Complaint 001.wpd

1    71.    On August 9, 2006, United States Magistrate Judge Chen denied Reyes' motion to
2 dismiss the criminal complaint against him.

3    72.    On August 10, 2006, Reyes was charged with 12 additional counts of securities fraud
4 in a federal Indictment. These charges included conspiracy, securities fraud, mail fraud, falsifying
5 books and making false statements to accountants. Jensen also was indicted on eight counts of
6 conspiracy, securities fraud, mail fraud and falsifying books.

7    73.    On August 10, 2006, Brocade announced that a settlement agreement with plaintiffs
8 in the derivative shareholder lawsuit in which Brocade agreed to strengthen corporate governance
9 and pay $525,000 in attorneys' fees. That fact that these Defendants entered into such a quick
10 settlement in the derivative case on the same day that the Indictment was handed down against
11 Reyes, when no monetary relief was afforded to the Company, and after the Court had granted the
12 defendants' motion to dismiss, evidences that Defendants rushed into the settlement to prevent
13 further inspection of the Company's internal records. The conspicuously quick nature of this
14 settlement is exacerbated by the fact that pursuant to the settlement, the Company—which was the
15 only party in the derivative litigation to have access to and review the documents used by Morrison
16 & Foerster and PWC—refused to release any claims it has against Reyes.

17    74.    Moreover, Brocade's Stock Option Plans specifically charged Brocade's Board of
18 Directors with the responsibility of carrying out the Company's Stock Option Plans according to the
19 requirements of the Plans. Clearly, as evidenced by Brocade's own Restatement, the Individual
20 Defendants failed this task miserably.

21    75.    Brocade admitted in its Restatement that its internal controls and disclosure
22 procedures regarding Brocade's stock option granting process were flawed during the Class Period.
23 *See* Brocade's SEC Form 10-K filed January 31, 2005, pp. 83-84, Item 9A. Brocade admitted that
24 these controls were so fundamentally flawed that the Company's Financial Statements could not be
25 relied upon for the entire Class Period and that these flaws were not remedied until the end of
26 Brocade's fiscal year 2004. *Id.* Brocade further announced that significant changes were made to
27 its Disclosure Controls and Internal Controls over Financial Reporting and the stock option grant
28 process, which were not in place during all or part of the Class Period. *Id.* These changes and

24

1    additions, which are set forth in detail above, are significant because they establish that such
2    internal controls, processes and procedures **were not** in place during the relevant parts of the Class
3    Period.

4      76.    Further, Brocade's Stock Option Plans filed with the SEC, which are discussed in
5    detail above, specifically mandated that Brocade's Board of Directors be in charge of stock option
6    grants for the entire Class Period. The Plans expressly require that the Board, in its entirety, or
7    through a specifically appointed Committee thereof, control granting of stock option grants and
8    ensure that such grants are awarded, accounted for, and disclosed in compliance with the Plans and
9    federal law.

10      77.    As set forth in great detail above, Brocade engaged in a number of improper stock
11    option grants during the Class Period, which caused five years of Brocade's Financial Statements to
12    be materially false and misleading.

13      78.    In light of the detailed facts set forth above, Defendants' regular press releases, made
14    by Brocade, and Financial Statements filed with the SEC, which were made by Brocade were
15    materially false and misleading statements during the Class Period. Set forth chronologically below,
16    these statements misrepresented Brocade's financial results because they omitted information which
17    would have shown that the Company's earnings per share, net income, net stock compensation
18    expenses and associated income tax consequences were far worse than what the Company claimed
19    in each of these statements. Additionally, these statements provided wholly false explanations to
20    support the Company's improperly reported results, and failed to disclose that Brocade was
21    engaging in a pervasive scheme and set of fraudulent accounting practices that rendered its financial
22    reporting wholly unreliable. Moreover, as the Class Period progressed, Brocade was forced to live
23    with the consequences of its earlier lies, the same accounting tricks on which Brocade relied to
24    boost its early Class Period results unwound and caused its later Class Period results to suffer. The
25    signatories to each such Financial Statement are set forth in the chart of restated financial results.

26      79.    On June 13, 2000, the Company filed its SEC Form 10-Q for the second quarter of
27    the year 2000.

28

25

1      80.    On September 12, 2000, the Company filed is SEC Form 10-Q for the third quarter

2 of the year 2000.

3      81.    On January 26, 2001, the Company filed its SEC Form 10-K for the year ended 2000.

4      82.    On February 21, 2001, the Company issued a press release entitled "Brocade

5 Announces Record Revenue and Earnings for First Quarter of Fiscal 2001." The press release

6 stated in part:

> Brocade Communications Systems, Inc., the leading provider of Storage Area
> Networking infrastructure, reported today record revenue and earnings for the first
> quarter of fiscal 2001 (Q1 01). For Q1 01, net revenues were $165.0 million, as
> compared to the $42.7 million reported in the first quarter of fiscal 2000 (Q1 00) and
> the $132.1 million reported in the fourth quarter of fiscal 2000 (Q4 00). During Q1
> 01, deferred revenue increased by $7.1 million to $9.1 million.
>
> Net income for Q1 01 was $32.5 million as compared to the $7.3 million reported in
> Q1 00 and the $27.2 million reported in Q4 00. Diluted net income per share for Q 1
> 01 was $0.13 as compared to the $0.03 reported in Q 1 00 and the $0.11 reported in
> Q4 00. Operating income as a percentage of net revenues in Q 1 01 increased to 26.9
> percent of revenues, up from 26.6 percent in Q4 00. This is the seventh consecutive
> quarter that operating income, as a percentage of revenues, has increased.
>
>                       \*   \*   \*
>
> Greg Reyes, Brocade President and CEO, commented on the quarter: "We are very
> pleased with our financial results for the quarter, which demonstrate our continued
> focus and execution in providing the world's leading networking infrastructure for
> storage area networks. In every industry, in every sector across the globe, companies
> are relying on Brocade SAN infrastructure to network their servers and storage, keep
> pace with exponential growth in data storage requirements, and deliver a platform to
> reduce the cost of managing, administering, and moving business-critical data."

19      83.    On April 20, 2001, the Company issued a press release entitled "Brocade Announces

20 Preliminary Q2 01 Financial Results." The press release stated in part:

> Brocade Communications Systems, Inc. announced today preliminary results for the
> second quarter of fiscal 2001. Brocade expects to report total net revenue for the
> second quarter of fiscal 2001 (Q2 01) that will be approximately 30 percent less than
> the net revenue reported in the first quarter of fiscal 2001 (Q1 01). Diluted net
> income per share for Q2 01 is expected to be in the range of $0.05-$0.06 per share.
> During the second quarter, Brocade expects that gross margins will remain in the 60
> percent range and will continue at those levels for the next several quarters.
> Additionally, Brocade expects that DSOs will be within the target range of 50 to 60
> days. "As enterprise capital spending continues to thaw, we are well positioned for
> growth in the latter part of fiscal 2001 and we expect our year-over- year revenue
> growth will be approximately 58 percent," said Greg Reyes, Brocade President and
> CEO.

26

84.     On May 15, 2001, the Company issued a press release entitled "Brocade Announces

Second Quarter Fiscal 2001 Financial Results." The press release stated in part:

> Brocade Communications Systems, Inc. reported today financial results for the second quarter of fiscal 2001 (Q201). For Q2 01, net revenues were $115.2 million as compared to the $62.1 million reported in the second quarter of fiscal 2000 (Q200).
>
> Net income for Q2 01 was $12.0 million as compared to the $13.3 million reported in Q2 00. Diluted net income per share for Q2 01 was $0.05 as compared to the $0.06 reported in Q2 00. During the second quarter, gross margins remained at 60 percent.
>
> In Q2 01, Brocade generated $6.1 million in cash after purchasing $16.9 million in capital equipment and making $10.6 million in minority investments. Total cash at the end of Q2 01 was $217.1 million. Brocade exited the quarter with$5.7 million in deferred revenue. The majority of the deferred revenue was related to inventory held by Brocade master resellers that has not sold through to the end customer.
>
> Greg Reyes, Brocade Chairman and CEO, commented on the quarter:
>
> Considering the current difficult economic environment for technology companies, the second quarter was a period of significant achievement for Brocade. We are pleased that we met the expectations that we set out in April, and we believe that the second quarter was the low water mark for our business.

85.     On August 15, 2001, the Company issued a press release entitled "Brocade Exceeds

Revenue Estimates for the Third Quarter of Fiscal 2001." The press release stated in part:

> Brocade Communications Systems, Inc. reported today financial results for the third quarter of fiscal 2001 (Q3 01). ForQ3 01, net revenues were $116.3 million, a $24.2 million increase from the $92.1 million reported in the third quarter of fiscal 2000(Q3 00) and a $1.1 million increase from the second quarter of fiscal 2001 (Q201). Brocade exited the quarter with $13.4 million in deferred revenue, an increase of$7.7 million over the $5.7 million reported in Q2 01.
>
> Net income for Q3 01 was $12.0 million as compared to the $20.1 million reported in Q3 00 and the $12.0 million reported in Q2 01. Diluted net income per share for Q3 01 was $0.05 as compared to the $0.08 reported in Q3 00 and the $0.05 reported in Q2 01. During the third quarter, gross margins remained at 60 percent, an improvement over the 58.6 percent reported in Q3 00 and consistent with Q2 01. In Q3 01, Brocade generated $23.8 million in cash after investing $20.6 million in capital equipment. Total cash at the end ofQ3 01 was $241.0 million.
>
> Greg Reyes, Brocade Chairman and CEO, commented on the quarter: "We are pleased with our results for the third quarter, which demonstrate our ability to manage well through a challenging economic environment.

27

1       86.     On November 28, 2001, the Company issued a press release entitled "Brocade

2   Announces Record Revenue for Fiscal Year 2001; Storage Networking Leader Reports Annual

3   Revenue Growth of 56 Percent." The press release stated in part:

4           Brocade Communications Systems, Inc. reported today financial results for the fourth
            quarter ended October 27,2001 (Q401).
5
            In Q4 01, net revenue was $116.5 million, as compared to the $116.3 million
6           reported in the third quarter of fiscal 2001 (Q301). For fiscal year 2001 (FY 01),
            revenue was a record $513.0 million, an increase of $184.0 million, or 56 percent,
7           from fiscal year 2000 (FY 00).

8           Brocade exited Q401 with $12.6 million in deferred revenue. Diluted pro forma net
            income per share for Q4 01 was $0.05, consistent with the diluted net income per
9           share reported in Q3 01. Pro forma net income for Q4 01 was $10.9 million as
            compared to net income of $12.0 million reported in Q3 01. For FY 01, pro forma
10          net income was $67.4 million and pro forma diluted net income per share was $0.28,
            as compared to net income of$67.9 million and diluted net income per share of
11          $0.28, respectively, reported in FY 00. These pro forma results exclude charges
            of$77.1 million related to purchase commitments, facilities lease losses and asset
12          impairments, and the write-down of private minority equity investments.

13          These results compare to net revenue of $132.1 million reported in the fourth quarter
            of fiscal 2000 (Q4 00) and net income and diluted net income per share of $27.2
14          million and $0.11, respectively.

15          During the fourth quarter, pro forma gross margins remained at 60.0 percent, a slight
            improvement over the 59.8 percent gross margins reported in Q4 00 and consistent
16          with Q3 01 gross margins. Gross margins on a pro forma basis for FY 01 were 60.0
            percent, as compared to 58.2 percent gross margins for FY 00.
17
            In Q4 01 Brocade generated $14.2 million in cash after purchasing approximately
18          $18.7 million in capital equipment. For FY 01, Brocade generated more than $100
            million in cash, after investing $82.3 million in capital equipment. Brocade's total
19          cash balance at the end of Q4 01 was a record $255.1 million.

20          For Q4 01, accounts receivable days sales outstanding was 54 days, down from the
            57 days achieved during Q3 01. Inventory at the end of the fourth quarter was $10.3
21          million and represented annualized inventory turns of 18 times on a pro forma basis.

22          Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are very
            pleased with our results for 2001 and our ability to manage and optimize our
23          business model in a challenging economic environment. We believe that our
            investments in 2001, including our significant investment in research and
24          development, will allow us to take full advantage of the next phase in the market's
            evolution and position us for resumed growth in 2002."
25

26      87.     Each of the above-listed press releases and Financial Statements were false and

27   misleading because each such statement overstated Brocade's earnings per share and net income,

28   and understated Brocade's compensation expenses and related tax expenses.

                                                28

1      88.    On January 24, 2002, the Company filed its SEC Form 10-K for the year ended 2001.

2      89.    On February 13, 2002, the Company issued a press release entitled "Brocade Reports

3   Financial Results for the First Quarter of Fiscal Year 2002." The press release stated in part:

4      Brocade Communications Systems, Inc. reported today financial results for the first
       fiscal quarter of 2002 (Q1 02), which ended January 26, 2002. In Q1 02, net revenue
5      was $123.1 million, gross margins were 60 percent, net income was $11.7 million,
       and diluted net income per share was $0.05. Quarterly sequential revenue growth for
6      Q1 02 was nearly six percent. Brocade exited Q1 02 with $13.9 million in deferred
       revenue, an increase of $1.3 million over deferred revenue at the end of the fourth
7      fiscal quarter of 2001 (Q4 01).

8      In Q1 02 Brocade generated $568.7 million in cash including $537.6 million received
       from the issuance of convertible subordinated debt. Excluding the net proceeds from
9      the convertible debt offering, cash increased $31.1 million after purchasing $24.5
       million in capital equipment. Brocade's total cash, cash equivalents and short-term
10     investments were $823.9 million at the end of Q1 02.

11     For Q1 02, accounts receivable days sales outstanding were 54 days, consistent with
       Q4 01. Inventory at the end of Q1 02 was $9.2 million, down from the $10.3 million
12     at the end of Q4 01. Greg Reyes, Brocade Chairman and CEO, commented on the
       quarter, "We are extremely pleased with our results for the first fiscal quarter of
13     2002.

14     90.    On May 15, 2002, the Company issued a press release entitled "Brocade Reports

15   Financial Results for the Second Fiscal Quarter of 2002; And More Than 9 Percent Quarterly

16   Sequential Revenue Growth." The press release stated in part:

17     Brocade Communications Systems, Inc. reported today financial results for the
       second fiscal quarter ended April 27, 2002 (Q2 02). In Q2 02, net revenues
18     were $135.0 million, which is an increase of more than 17 percent from the $115.2
       million reported in the second fiscal quarter of 200 1 (Q2 01), and an increase of
19     more than 9 percent from the $123.1 million reported in the first fiscal quarter of
       2002 (Q1 02). Brocade exited Q2 02 with $16.1 million in deferred revenue, which is
20     an increase of $2.2 million from Q 1 02.

21     Net income for Q2 02 was $14.0 million, which is an increase of nearly 17 percent
       from the $12.0 million reported in Q2 01 and a nearly 20 percent increase from the
22     $11.7 million reported in Q1 02.

23     Diluted net income per share for Q2 02 was $0.06, an increase from the $0.05
       reported in Q1 02 and $0.05 for Q2 01. During Q2 02, gross margins were 60.2
24     percent. In Q2 02 cash and investments increased by $23.8 million, after purchasing
       approximately $17.8 million in capital equipment. Total cash and investments at the
25     end of Q2 02 were a record $847.7 million. For Q2 02, accounts receivable days
       sales outstanding were 53 days, an improvement of 1 day over that reported in Q102.
26     Inventory at the end of Q2 02 was $5.5 million.

27     Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are
       extremely pleased with our results for the second fiscal quarter of 2002."

28

29

1     91.    On November 21, 2002, the Company issued a press release entitled "Brocade

2  Announces Q4 and Fiscal 2002 Financial Results; Storage Networking Leader Achieves 31 Percent

3  Year over Year Revenue Growth in Q4 02; Reports Record Revenue for Fiscal 2002 of $562.4 12

4  Million." The press release stated in part:

5        Brocade Communications Systems, Inc. announced today financial results for its
        fourth quarter ended October 26,2002 (Q4 02). For Q4 02, net revenue was $153.1
6        million, an increase of31 percent from $116.5 million reported in the fourth quarter
        of fiscal 2001 (Q401). This compares to $151.2 million reported in the third quarter
7        of fiscal 2002 (Q3 02). For fiscal 2002 (FY 02), revenue was a record $562.4
        million, an increase of 10 percent from $513.0 million reported in fiscal 2001
8        (FY01).

9        Net income for Q4 02 was $15.7 million, or $0.07 per share. This compares to a net
        loss of $53.7 million for Q4 01 or $0.24 per share. For FY 02, net income was $59.7
10       million or $0.25 per share, as compared to net income of$2.8 million or $0.01 per
        share, reported in FY 01.

11
        Deferred revenue at the end of Q4 02 was $22.4 million, an increase of $4.1 million
12       from $18.3 million at the end of Q3 02. During Q4 02, gross margins were 58.5
        percent.
13

14     92.    Each of the above-listed press releases and Financial Statements were false and

15  misleading because each such statement overstated Brocade's earnings per share and net income,

16  and understated Brocade's compensation expenses and related tax expenses.

17     93.    On January 22, 2003, the Company filed its SEC Form 10-K for the fiscal year ended

18  2002.

19     94.    On February 12, 2003, the Company issued a press release entitled "Brocade Reports

20  Financial Results for the First Quarter of Fiscal 2003; Storage Networking Leader Achieves

21  Business Optimization Targets and Expands Market Leadership Position." The press release stated

22  in part:

23       Brocade Communications Systems, Inc. reported financial results today for its
        quarter of fiscal year 2003 ended January 25,2003 (Q1 03). Net revenue for Q1 03
24       was first $123.1 million. This compares to $153.1 million reported in the fourth
        quarter of fiscal year 2002 (Q4 02), and $123.1 million reported in the first quarter of
25       fiscal year2002 (Q1 02).

26       Pro forma net income for Q1 03 was $0.3 million or $0.00 per share. Pro forma net
        income excludes a restructuring charge of $10.1 million associated with the 12
27       percent reduction in workforce that was announced on November 21,2002.
        Reporting on a Generally Accepted Accounting Principles (GAAP) basis, net loss for
28       Q1 03 was $6.9 million, or $0.03 per share. This compares to GAAP net income for

30

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY
W:\STU\I\BROCADE3\PLD\Complaint 001 wpd

1    Q4 02 of $15.7 million, or $0.07 per share, and GAAP net income of $11.7 million
     or $0.05 per share in Q1 02. A reconciliation between pro forma net income and net
2    loss on a GAAP basis is provided in a table summary immediately following the Pro
     Forma Condensed Consolidated Statements of Operations.

3

4    Greg Reyes, Brocade Chairman and CEO, commented on the quarter, "We are
     pleased with our financial results for the first quarter of fiscal year 2003. This was a
     quarter of continued execution for Brocade. We met our business optimization
5    goals, reducing operating expenses by 12 percent quarter over quarter . . . .

6        95.    On May 14, 2003, the Company issued a press release entitled "Brocade Reports

7    Second Quarter Fiscal 2003 Financial Results." The press release stated in part:

8    Brocade Communications Systems, Inc. reported today financial results for its second
     quarter of fiscal year 2003, which ended April 26, 2003 (Q2 03). Net revenue for Q2
9    03 was $130.9 million, which compares to $123.1 million reported in the first quarter
     of fiscal year 2003 (Q1 03), and $135.0 million reported in the second quarter of
10   fiscal year 2002 (Q2 02).

11   Reporting on a Generally Accepted Accounting Principles (GAAP) basis, net loss
     forQ2 03 was $146.0 million, or $0.57 per share. This compares to a GAAP net loss
12   for Q1 03 of $6.9 million, or $0.03 per share, and GAAP net income of $14.0 million
     or $0.06 per share in Q2 02.

13
     Non-GAAP net loss for Q2 03 was $1.0 million or $0.00 per share, as compared to
14   non-GAAP net income of $0.3 million or $0.00 per share in Q1 03. There was no
     difference between GAAP and non-GAAP net income in Q2 02. Non- GAAP net
15   income for Q2 03 excludes in-process research and development, deferred stock
     compensation and other acquisition costs related to the acquisition of Rhapsody
16   Networks, Inc. (Rhapsody) in Q2 03, and severance, asset impairment, and other
     charges related to the restructuring of business operations that was announced on
17   April 10, 2003. A reconciliation between GAAP and non-GAAP information is
     attached to this press release.

18
     "I am pleased with the results that we have delivered in meeting our expectations of
19   revenue, gross margin and operating expense," said Greg Reyes, Brocade Chairman
     and CEO. "Moving forward, we remain committed to driving revenue growth and
20   profitability."

21       96.    On August 13, 2003, the Company issued a press release entitled "Brocade Reports

22   Third Quarter Fiscal 2003 Financial Results; Storage Networking Leader Increases Revenue, Net

23   Income, and EPS On a Sequential Basis." The press release stated in part:

24   Brocade Communications Systems, Inc. reported today financial results for its third
     quarter of fiscal year 2003 (Q3 03), which ended July 26,2003. Net revenue for Q3
25   03 was $133.5 million, an increase from the $130.9 million reported in the second
     quarter of fiscal year 2003 (Q203). Net revenue reported in the third quarter of fiscal
26   year 2002 (Q3 02) was $151.2 million.

27   Non-GAAP net income for Q3 03 was $2.0 million, or $0.01 per share, as compared
     to anon-GAAP net loss of$1.0 million or $0.00 per share in Q2 03. Non- GAAP net
28   income for Q3 03 excludes deferred stock compensation related to the acquisition of

                                       31

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY
WASTULIAPPOCADE3IPL D\Complaint 001 wnd

1    Rhapsody Networks, Inc. (Rhapsody) that was completed in Q2 03. A reconciliation
     between GAAP and non-GAAP information is contained in the tables below.

2

3    Reporting on a Generally Accepted Accounting Principles (GAAP) basis, net income
     for Q3 03 was $1.9 million, or $0.01 per share. This compares to a GAAP net loss

4    for Q2 03 of$146.0 million, or $0.57 per share, and GAAP net income of $18.3
     million or $0.08 per share in Q3 02. There was no difference between GAAP and
     non-GAAP net income in Q3 02.

5

6    We are pleased with our results for our third fiscal quarter in which we delivered
     increased revenue, operating income, and earnings per share to our shareholders,"
     said Greg Reyes, Brocade Chairman and CEO.

7

8        97.    On November 20, 2003, the Company issued a press release entitled "Brocade

9    Reports Fourth Quarter and Fiscal Year 2003 Results; Storage Networking Leader Increases

10   Revenue, Net Income, and EPS on a Sequential Basis." The press release stated in part:

11   Brocade Communications Systems, Inc. reported today financial results for its fourth
     quarter (Q4 03) and fiscal year 2003 (FY 03) which ended October 25,2003. Net

12   revenue for Q4 03 was $137.8 million, an increase of three percent from $133.5
     million reported in the third quarter of fiscal year 2003 (Q3 03). Net revenue

13   reported in the fourth quarter of fiscal year 2002 (Q4 02) was $153.1 million. Net
     revenue for FY 03 was $525.3 million, as compared to net revenue of $562.4 million

14   reported in fiscal year 2002 (FY 02).

15   Non-GAAP net income for Q4 03 was $4.6 million, or $0.02 per share, as compared
     to anon-GAAP net income of $2.0 million, or $0.01 per share, in Q3 03. Non-GAAP

16   net income for Q4 03 excludes gains related to repurchases of convertible
     subordinated debt, a gain on the disposition of private strategic investments, a

17   reduction of previously recorded restructuring costs, and deferred stock
     compensation expense related to the acquisition of Rhapsody Networks, Inc. For FY

18   03, non-GAAP net income was $5.6 million, or $0.02 per share. Non-GAAP net
     income for FY 03 excludes gains related to repurchases of convertible subordinated

19   debt, net gains on the disposition of private strategic investments, restructuring costs,
     and deferred stock compensation and in-process research and development expenses

20   related to the Rhapsody acquisition.

21       98.    Each of the above-listed press releases and Financial Statements were false and

22   misleading because each statement overstated Brocade's earnings per share and net income, and

23   understated Brocade's compensation expenses and related tax expenses.

24       99.    On January 20, 2004, the Company filed its SEC Form 10-K for the year ended 2003.

25       100.   On February 11, 2004, the Company issued a press release entitled "Brocade Reports

26   First Quarter of Fiscal 2004 Results; Revenues Increase 5% Sequentially and 18% Year Over Year."

27   The press release stated in part:

28

32

COMPLAINT FOR BREACHES OF FIDUCIARY DUTY

Brocade Communications Systems, Inc. reported today financial results for its first quarter of fiscal year 2004 (Ql 04) which ended January 24,2004. Net revenues for Q 1 04 were $145.0 million, an increase of five percent from $137.8 million reported in the fourth quarter of fiscal year 2003 (Q4 03) and an increase of 18 percent from$123.1 million reported in the first quarter of fiscal 2003 (Ql 03).

"Our first quarter was a good one, and fiscal 2004 is off to an excellent start for Brocade. During the first quarter, we saw revenue growth across our entire business," said Greg Reyes, Brocade Chairman and CEO. "This represents our 4th quarter in a row of improved revenue, gross margin and operating margin. With our upcoming product cycle and improving trends in the storage sector, we continue to be confident in our market position and future prospects."

Non-GAAP net income for Ql 04 was $8.0 million, or $0.03 per share, as compared to non-GAAP net income of$4.6 million, or $0.02 per share, reported in Q4 03 and non-GAAP net income of $0.0 million, or $0.00 per share, reported in Q 103. Non-GAAP net income for Ql 04 excludes gains related to repurchases of convertible subordinated debt, deferred stock compensation expense related to the acquisition of Rhapsody Networks, Inc. (Rhapsody), and lease termination, facilities consolidation and other related costs. Non-GAAP net income for Q4 03 excludes gains related to repurchases of convertible subordinated debt, a gain on the disposition of private strategic investments, a reduction of previously recorded restructuring costs, and deferred stock compensation expense related to the acquisition of Rhapsody. Non-GAAP net income for Ql 03 excludes net gains on the disposition of private strategic investments and restructuring costs associated with a company-wide workforce reduction in Ql 03. A reconciliation between GAAP and non-GAAP information is contained in the tables below.

Reporting on a GAAP basis, net loss for Ql 04 was $36.8 million, or $(0.14) per share. This compares to GAAP net income for Q4 03 of$14.8 million, or $0.06 per share, and GAAP net loss for Ql 03 of$6.9 million, or $(0.03) per share.

101.    On May 19, 2004, the Company issued a press release entitled "Brocade Reports Second Quarter of Fiscal 2004 Results; Revenues and Gross Margins Increase for Fifth Consecutive Quarter." The press release stated in part:

Brocade Communications Systems, Inc. reported today financial results for its second quarter of fiscal year 2004 (Q2 04) which ended May 1, 2004. Net revenues for Q2 04 were $145.6 million, a slight increase from $145.0 million reported in the first quarter of fiscal year 2004 (Ql 04) and an increase of 11 percent from $130.9 million reported in the second quarter of fiscal 2003 (Q203).

"In addition to delivering our fifth consecutive quarter of improvement in revenue and gross margin, during the quarter we continued to execute on our long term strategy by extending our product portfolio with four major product introductions," said Greg Reyes, Brocade Chairman and CEO. "We also strengthened the company's position across the entire spectrum of the SAN market and have set the stage to accelerate the achievement of our previously stated financial model targets by a full year."

Non-GAAP net income for Q2 04 was $8.1 million, or $0.03 per share, as compared to non-GAAP net income of$8.0 million, or $0.03 per share, reported in Q 1 04 and non-GAAP net loss of $1.1 million, or $(0.00) per share, reported in Q203. Non-

33

1    GAAP net income for Q2 04 excludes restructuring charges, settlement cost of a
     claim associated with the acquisition of Rhapsody Networks, Inc. (Rhapsody),
2    deferred stock compensation expense related to Rhapsody, and gains on the
     disposition of private strategic investments. Non-GAAP net income for Q1 04
3    excludes lease termination, facilities consolidation and other related costs, deferred
     stock compensation expense related to the acquisition of Rhapsody, and gains related
4    to repurchases of convertible subordinated debt. Non-GAAP net loss for Q2 03
     excludes restructuring charges, in-process research and development, and deferred
5    stock compensation expense related to the acquisition of Rhapsody, and gains related
     to repurchases of convertible subordinated debt. Non-GAAP net loss for Q2 03
6    excludes restructuring charges, in-process research and development, and deferred
     stock compensation expense related to the acquisition of Rhapsody. A reconciliation
7    between GAAP and non-GAAP net income (loss) is contained in the tables below.

8    Reporting on a GAAP basis, net loss for Q2 04 was $2.0 million, or $(0.01) per
     share. This compares to GAAP net loss for Q1 04 of $36.8 million, or $(0.14) per
9    share, and GAAP net loss for Q2 03 of $146.0 million, or $(0.57) per share.

10       102.    On August 12, 2004, the Company issued a press release entitled "Brocade

11   Announces Preliminary Q3 2004 Results; Revenue on Track, Exceeds EPS Guidance." The press

12   release stated in part:

13       Brocade Communications Systems, Inc., the world's leading provider of
         infrastructure solutions for Storage Area Networks (SANs), today announced
14       preliminary results for the third quarter of fiscal 2004 (Q3 04) ended July 31, 2004.
         Brocade expects to report net revenue for Q3 04 in a range of $149.5 to 150.5 million
15       and GAAP net income per share of $0.06 to $0.07. The GAAP earnings include a
         pre-tax gain of $3.5 million, equivalent to $0.01 per share, related to repurchases
16       of $47.4 million of the company's convertible subordinated debt.

17       "I am pleased to announce revenue that is in line with our previous outlook and better
         than expected EPS," said Greg Reyes, Brocade Chairman and CEO. "Given the
18       unusually large number of pre-announcements by storage-related companies with
         lower than expected financial results, we believe that it is important to provide our
19       preliminary results so the market can assess Brocade's performance and competitive
         position accurately."

20

21       103.    On November 22, 2004, the Company issued a press release entitled "Brocade

22   Reports Fourth Quarter and Fiscal Year 2004 Results; Record Annual Revenue of $596.3 Million

23   Increases 14% Year Over Year Fourth Quarter Operating Margin Increases to 16%." The press

24   release stated in part:

25       Brocade Communications Systems, Inc. reported today financial results for its fourth
         quarter (Q4 04) and fiscal year 2004 (FY 04) which ended October 30, 2004. Net
26       revenues for Q4 04 were $155.6 million, an increase of four percent from $150.0
         million reported in the third quarter of fiscal year 2004 (Q3 04) and an increase of 13
27       percent from $137.8 million reported in the fourth quarter of fiscal 2003 (Q403). Net
         revenues for FY 04 were $596.3 million, an increase of 14 percent from $525.3
28       million reported in fiscal year 2003 (FY 03)

                                    34

1

## COUNT I

2

(Against All Defendants)
Class Claim for Breach of the Duty of Disclosure

3

4    106.    Plaintiffs hereby reallege and incorporate by reference the allegations in the

5    preceding paragraphs as if fully set forth herein.

6    107.    Plaintiffs bring this claim as a direct claim, on behalf of themselves and the Class,

7    against defendants for breach of their fiduciary duty of disclosure.

8    108.    Defendants caused the Company to publish and/or disseminate its 1997, 1998, 1999,

9    2000, 2001, 2002, 2003, 2004, and 2005 Definitive Proxies with the false representation that option

10   grants were made with strike prices no less than the fair market value on the date of the grant.

11   Defendants failed to disclose that they knew and/or recklessly disregarded a pervasive options

12   backdating scheme from 1997 to 2006 causing the options to be issued during much of that time to

13   carry a much lower price than the strike price.

14   109.    As a result of the Defendants' backdating scheme, the 1997, 1998, 1999, 2000, 2001,

15   2002, 2003, 2004, and 2005 Definitive Proxies and the Form 10-K for the years 1997, 1998, 1999,

16   2000, 2001, 2002, 2003, 2004, 2005, and 2006 and respective Form 10-Qs, materially overstated

17   Brocade's net income and retained earnings.

18   110.    The Class was harmed as a result of the dilution of its voting power and

19   proportionate share of the Company due to the dedication of over millions of Brocade shares as a

20   result of the addition of stock pursuant to Evergreen Provision and adoption of the 2004 Equity

21   Incentive Plan..

22

## PRAYER FOR RELIEF

23   WHEREFORE, plaintiffs pray for judgment and relief as follows:

24   1.    Ordering that this action may be maintained as a class action and certifying plaintiffs

25         as the Class representatives;

26   2.    Declaring that defendants have breached and/or are aiding and abetting breaches of

27         fiduciary and other duties to plaintiffs and the other members of the Class;

28

36

1      4.    Preliminarily and permanently enjoining the defendants from granting any stock

2            options and from allowing the exercise of any of the currently outstanding options

3            granted under the stock option plans during the Class Period outlined herein;

4      5.    Awarding compensatory damages against defendants, individually and severally, as

5            the facts may justify, in an amount to be determined at trial, together with pre-

6            judgment interest thereon at the maximum rate allowed by law from date of judicial

7            demand until paid;

8      6.    Awarding costs and disbursements, including plaintiff's counsel's fees and experts'

9            fees; and

10     7.    Granting such other and further relief as the Court may deem just and proper.

11                                    **JURY DEMAND**

12     Plaintiffs demand a trial by jury.

13     Dated: October 23, 2007                    Timothy J. Burke
                                                 STULL, STULL & BRODY
14

15
                                           By:
16                                               Timothy J. Burke
                                                 10940 Wilshire Boulevard
17                                               Suite 2300
                                                 Los Angeles, CA 90024
18                                               Tel:   (310) 209-2468
                                                 Fax:   (310) 209-2087
19
                                                 Jules Brody
20                                               Aaron L. Brody
                                                 STULL, STULL & BRODY
21                                               6 East 45th Street
                                                 New York, NY 10017
22                                               Tel:   (212) 687-7230
                                                 Fax:   (212) 490-2022
23
                                                 Joseph H. Weiss
24                                               WEISS & LURIE
                                                 551 Fifth Avenue
25                                               Suite 1600
                                                 New York, NY 10176
26                                               Tel:   (212) 682-3025
                                                 Fax:   (212) 682-3010
27
                                                 Counsel for Plaintiffs
28

                                           37

**COMPLAINT FOR BREACHES OF FIDUCIARY DUTY**
W:\STULL\BROCADE3\PLD\Complaint 001.wpd

## CIVIL LAWSUIT NOTICE

CASE NUMBER: _____    1 0 7 C V 0 9 7 1 6 3

*Superior.Court of California, County of Santa Clara*
*191 N. First St., San Jose, CA 95113*

## READ THIS ENTIRE FORM

_PLAINTIFFS_ (the person(s) suing): Within 60 days after filing the lawsuit, you must serve each defendant with the Complaint, Summons, an *Alternative Dispute Resolution (ADR) Information Sheet*, and a copy of this *Civil Lawsuit Notice*, and you must file written proof of such service.

---

_DEFENDANTS_ (the person(s) being sued): You must do each of the following to protect your rights:

1. You must file a written response to the Complaint, in the clerk's office of the Court, within 30 days of the date the *Summons* and *Complaint* were served on you;

2. You must send a copy of your written response to the plaintiff; and

3. You must attend the first Case Management Conference.

Warning: If you do not do these three things, you may automatically lose this case.

---

_RULES AND FORMS_: You must follow the California Rules of Court (CRC) and the Santa Clara County Superior Court Local Civil Rules and use proper forms. You can get legal information, view the rules and get forms, free of charge, from the Self-Service Center at 99 Notre Dame Avenue, San Jose (408-882-2900 x-2926), or from:

- State Rules and Judicial Council Forms: www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms: www.sccsuperiorcourt.org/civil/rule1loc.htm
- Rose Printing, 39 N. First St., San Jose (408-293-8177)

For other local information, visit the Court's Self-Service website www.scselfservice.org and select "Civil."

_CASE MANAGEMENT CONFERENCE (CMC)_: You must meet with the other parties and discuss the case, in person or by telephone, at least 30 calendar days before the CMC. You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC. You or your attorney must appear at the CMC. You may ask to appear by telephone – see Local Civil Rule 8.

---

Your Case Management Judge is: Hon. Jack Komar    for all purposes    DEPT: 17C

The first CMC is scheduled as follows: (Completed by Clerk of Court)
Date: 3/7/07    Time: 10:00am Dept.: 17C

The next CMC is scheduled as follows: (Completed by party if the first CMC was continued or has passed)
Date: _____    Time: _____ Dept.: _____

---

_ALTERNATIVE DISPUTE RESOLUTION (ADR)_: If all parties have appeared and filed a completed ADR Stipulation Form (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

_WARNING_: Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---

CIVIL LAWSUIT NOTICE

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

Timothy J. Burke, Esq. (SBN 181866)
STULL, STULL & BRODY
10940 Wilshire Boulevard, Suite 2300
Los Angeles, CA 90024
TELEPHONE NO.: (310) 209-2468    FAX NO.: (310) 209-2087
ATTORNEY FOR (Name): Plaintiffs Hai-Ning Huang, et al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
STREET ADDRESS: 191 North First Street
MAILING ADDRESS: same
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Downtown Superior

**ENDORSED**

2007 OCT 23 P 2: 25

KIRI TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF SANTA CLARA, CALIFORNIA
BY _____ M. Rosales
DEPUTY

CASE NAME:
HAI-NING HUANG, et al. v. GREGORY L. REYES, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: 1 0 7 C V 0 9 7 1 6 3 |
|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder | |
| | | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: |
| | | | DEPT: |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Other collections (09) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [✓] Securities litigation (28) |
| [ ] Product liability (24) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | **Real Property** | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] Other complaint (not specified above) (42) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Other petition (not specified above) (43) |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [✓] is [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties       d. [ ] Large number of witnesses
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve       e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [✓] Substantial amount of documentary evidence       f. [✓] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary  b. [✓] nonmonetary; declaratory or injunctive relief   c. [ ] punitive
4. Number of causes of action (specify):
5. This case [✓] is [ ] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: October 23, 2007

Timothy J. Burke, Esq.
(TYPE OR PRINT NAME)                                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use Judicial Council of California CM-010 [Rev. July 1, 2007] | CIVIL CASE COVER SHEET | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3 www.courtinfo.ca.gov |

American LegalNet, Inc.
www.FormsWorkflow.com

**CM-010**

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) (*if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto*)

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability (*not asbestos or
toxic/environmental*) (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) (*not civil
harassment*) (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
(*not medical or legal*)
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract (*not unlawful detainer
or wrongful eviction*)
Contract/Warranty Breach–Seller
Plaintiff (*not fraud or negligence*)
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage (*not provisionally
complex*) (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property (*not eminent
domain, landlord/tenant, or
foreclosure*)
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential*)
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
(*arising from provisionally complex
case type listed above*) (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment (*non-
domestic relations*)
Sister State Judgment
Administrative Agency Award
(*not unpaid taxes*)
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified
above*) (42)
Declaratory Relief Only
Injunctive Relief Only (*non-
harassment*)
Mechanics Lien
Other Commercial Complaint
Case (*non-tort/non-complex*)
Other Civil Complaint
(*non-tort/non-complex*)
**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition (*not specified
above*) (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**