# EXHIBIT 5

1 | ROBBINS UMEDA & FINK LLP
BRIAN J. ROBBINS (190264)
2 | MARC M. UMEDA (197847)
SHARLA N. HILBURN (237596)
3 | 610 West Ash Street, Suite 1800
San Diego, CA 92101
4 | Telephone: 619/525-3990
Facsimile: 619/525-3991
5
JOHNSON LAW FIRM
6 | A Professional Corporation
FRANK J. JOHNSON (174882)
7 | BRETT M. WEAVER (204715)
402 West Broadway, 27th Floor
8 | San Diego, CA 92101
Telephone: 619/230-0063
9 | Facsimile: 619/230-1839

10 | Co-Lead Counsel for Plaintiffs

11 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

12 | COUNTY OF SANTA CLARA

13 | IN RE BROCADE COMMUNICATIONS    )  Lead Case No. 1:05CV041683
SYSTEMS, INC. DERIVATIVE LITIGATION )  (consolidated with 1:05CV041800 and
14 | )  1:05CV041950)
)
15 | This Document Relates To:    )  (Derivative Action)
)
16 | ALL ACTIONS.    )  CONSOLIDATED AMENDED
)  SHAREHOLDER DERIVATIVE
17 | CHEAN SEE LIM and ROBERT BROWN    )  COMPLAINT FOR BREACH OF
Derivatively on behalf of BROCADE    )  FIDUCIARY DUTY, ABUSE OF
18 | COMMUNICATIONS SYSTEMS, INC.    )  CONTROL, GROSS MISMANAGEMENT,
)  WASTE OF CORPORATE ASSETS,
19 | Plaintiffs,    )  UNJUST ENRICHMENT, ACCOUNTING,
)  RECISSION, CONSTRUCTIVE TRUST,
20 | vs.    )  AND VIOLATIONS OF THE CALIFORNIA
)  CORPORATIONS CODE §§25402 AND
21 | DAVID L. HOUSE, MICHAEL KLAYKO,    )  25403, PROFESSIONAL NEGLIGENCE
RICHARD DERANLEAU, JACK    )  AND ACCOUNTING MALPRACTICE,
22 | CUTHBERT, DAVID A. SMITH, PAUL R.    )  BREACH OF CONTRACT AND AIDING
BONDERSON, JR., KUMAR MALAVALLI,    )  AND ABETTING BREACHES OF A
23 | GREGORY L. REYES, ANTONIO CANOVA,    )  FIDUCIARY DUTY
MICHAEL J. BYRD, STEPHANIE JENSEN,    )
24 | VICTOR M. RINKLE, CHARLES W. SMITH, )
PETER J. TARRANT, NEAL DEMPSEY,    )
25 | SANJAY VASWANI, L. WILLIAM KRAUSE, )
ROBERT R. WALKER, GLENN C. JONES,    )
26 | MICHAEL J. ROSE, SETH D. NEIMAN,    )
NICHOLAS G. MOORE, CHRISTOPHER B.    )
27 | PAISLEY, WILLIAM K. O'BRIEN, LARRY    )
W. SONSINI, MARK LESLIE and KPMG,    )
28 | LLP,    )
)

BY FAX

(ENDORSED)
FILED
NOV 13 2006

Superior Court of California County of Santa Clara
BY _____ DEPUTY

A. Mussman

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

| | | |
|---|---|---|
| 1 | Defendants | ) |
| | | ) |
| 2 | -and- | ) |
| | | ) |
| 3 | BROCADE COMMUNICATIONS SYSTEMS, | ) |
| | INC., a Delaware Corporation, | ) |
| 4 | | )   Judge: Hon. Jack Komar |
| | Nominal Defendant | )   Dept: 17 |
| 5 | |     Date Action Filed: May 23, 2005 |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1

### TABLE OF CONTENTS

2   NATURE AND SUMMARY OF THE ACTION ................................................................1

3      Background .........................................................................................................1

4      The Backdating Issue .........................................................................................2

5      Improper Backdating at Brocade ........................................................................4

6      Brocade's Initial Announcement of Accounting Issues "Related to Stock-Based
        Compensation" ...............................................................................................6

7

8      The Board's Inaction in the Face of Rampant Illegality .....................................8

9      KPMG's Failure to Comply with Professional Accounting Standards ................9

10      The Board Enters into an Inadequate Settlement .............................................11

11      Defendants' Overarching Failures Have Severely Harmed Brocade .................12

12   JURISDICTION AND VENUE ...............................................................................13

     THE PARTIES.........................................................................................................13

13  DUTIES OF THE INDIVIDUAL DEFENDANTS ..................................................26

14  DUTIES OF DEFENDANT KPMG.........................................................................30

15  CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION ...........34

16  THE BROCADE BOARD.........................................................................................36

17      The Compensation Committee .........................................................................36

18      The Audit Committee .......................................................................................39

19  SUBSTANTIVE ALLEGATIONS ...........................................................................41

20      Brocade's Stock-Based Compensation Policies ...............................................41

21      Reyes, Jensen and Canova Violated Brocade's Stock-Based Compensation
22        Policies ........................................................................................................43

23      Reyes' Use of Stock Options as a Recruiting Perk to Attract Employees .........45

24      Reyes Backdated Options Grants with the Assistance of Jensen ......................45

25      Defendants Reyes and Jensen Caused the Company to Report Materially
        Inaccurate Financial Information.....................................................................53

26

27      Reyes and Jensen Backdated Option Grants to Dates Predating Employees' Start
        Dates. ..........................................................................................................54

28

Canova Perpetuated the Backdating Scheme by Consciously Refusing to Expose It ............................................................................................................54

Reyes Engaged in Self-Dealing to the Detriment of the Company and Shareholders ..............................................................................................56

Reyes Altered Grant Dates to Incentivize Employees While Hiding Expense ..............57

Brocade's Board Is Culpable for Allowing the Scheme to Continue...............................58

SEVERAL OF THE INDIVIDUAL DEFENDANTS RECEIVED MANIPULATED STOCK OPTION GRANTS .................................................................................59

FY:99 Option Grants..................................................................................59

FY:00 Option Grants..................................................................................59

FY:01 Option Grants..................................................................................61

KPMG'S ROLE IN DEFENDANTS' MISCONDUCT ..................................................63

THE TRUTH BEGINS TO EMERGE ...........................................................................64

THE TRUTH COMES TO LIGHT REGARDING DEFENDANTS' ILLEGAL BACKDATING PRACTICES.................................................................................75

CIVIL AND CRIMINAL CHARGES ARE BROUGHT AGAINST DEFENDANTS REYES, JENSEN AND CANOVA.....................................................................79

IMPROPER FINANCIAL REPORTING ......................................................................81

The FY:99 Form 10-Q and Form 10-K..................................................................82

The FY:00 Form 10-Qs and Form 10-K................................................................83

The FY:01 Form 10-Qs and Form 10-K................................................................83

The FY:02 Form 10-Qs and Form 10-K................................................................83

The FY:03 Form 10-Qs and Form 10-K................................................................84

The FY:04 Form 10-Qs and Form 10-K................................................................84

The FY:05 Form 10-Qs and Form 10-K................................................................84

INSIDER SELLING ......................................................................................................90

PLAINTIFFS' DERIVATIVE ALLEGATIONS...........................................................100

DEMAND FUTILITY ALLEGATIONS AGAINST THE BOARD AT THE TIME OF FILING PLAINTIFFS' ORIGINAL COMPLAINTS...............................................100

DEMAND FUTILITY ALLEGATIONS AGAINST BROCADE'S CURRENT BOARD.......107

FIRST CAUSE OF ACTION Against All Defendants for Unjust Enrichment.....................113

SECOND CAUSE OF ACTION  Against All Defendants for Breach of Fiduciary Duty
    for Approving Improperly Dated Stock Option Grants to Brocade's Employees
    and Executive Officers....................................................................................................114

THIRD CAUSE OF ACTION  Against Defendants Dempsey, House, Klayko, Krause,
    Rose, Vaswani and Walker for Breach of Fiduciary Duty for Approving the
    Proposed Settlement.......................................................................................................114

FOURTH CAUSE OF ACTION  Against the Insider Selling Defendants for Violation of
    California Corporations Code §25402...........................................................................115

FIFTH CAUSE OF ACTION  Against the Director Defendants for Violation of
    California Corporations Code §25403 ...........................................................................116

SIXTH CAUSE OF ACTION  Against the Insider Selling Defendants for Breach of
    Fiduciary Duties for Insider Selling and Misappropriation of Information......................117

SEVENTH CAUSE OF ACTION  Against All Defendants for Abuse of Control...................118

EIGHTH CAUSE OF ACTION  Against All Defendants for Gross Mismanagement...............118

NINTH CAUSE OF ACTION  Against All Defendants for Waste of Corporate Assets...........118

TENTH CAUSE OF ACTION  Against the Defendants for an Accounting .............................119

ELEVENTH CAUSE OF ACTION  Against the Officer Defendants for Rescission ................120

TWELFTH CAUSE OF ACTION  Against All Defendants for Constructive Trust .................120

THIRTEENTH CAUSE OF ACTION  Professional Negligence and Accounting
    Malpractice Against Defendant KPMG .........................................................................121

FOURTEENTH CAUSE OF ACTION  Against KPMG for Breach of Contract......................127

FIFTEENTH CAUSE OF ACTION  Aiding and Abetting Breaches of Fiduciary Duty
    Against Defendant KPMG..............................................................................................127

PRAYER FOR RELIEF ..........................................................................................................127

1    Plaintiffs, by their attorneys, submit this *Consolidated Amended Shareholder Derivative*

2    *Complaint* (the "Complaint") against the defendants named herein.

3                        NATURE AND SUMMARY OF THE ACTION

4        1.    This is a shareholder derivative action brought by shareholders of Brocade

5    Communications Systems, Inc. ("Brocade" or the "Company"), on behalf of the Company, against

6    certain of its officers, directors and external auditors seeking to remedy defendants' violations of

7    state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of

8    corporate assets, unjust enrichment, breach of fiduciary duties for insider selling and

9    misappropriation of information, accounting, constructive trust, restitution, violation of California

10   Corporations Code §§25402 and 25403, professional negligence, breach of contract, accounting

11   malpractice and aiding and abetting breaches of a fiduciary duty that have caused substantial losses

12   to Brocade and other damages, such as to its reputation and goodwill, since at least 1999.

13                                    Background

14       2.    Brocade was founded in 1995 and operates in the United States, Western Europe and

15   the greater Asia Pacific region. The Company engages in the design, development, marketing, sale

16   and support of data storage networking and application infrastructure management solutions.

17   Brocade offers storage networking switches, which provide bandwidth and high-speed routing of

18   data and support key applications, such as data backup, remote mirroring, and high-availability

19   clustering, as well as transaction processing applications, including enterprise resource planning and

20   data warehousing. Brocade also offers a range of professional services to assist customers in the

21   design, implementation and operation of their Storage Area Networking ("SAN"), and to provide

22   extended customer support.  Since 1999, Brocade's officers and/or directors represented in the

23   Company's filings with the Securities and Exchange Commission ("SEC") that employee stock

24   options were granted with an exercise price that was "equal to the fair market value of our Common

25   Stock as determined by reference to the closing price reported on the NASDAQ National Market on

26   the date of the grant."

27       3.    The Company's executives and its non-employee directors are compensated in large

28   part through the issuance of stock options, which are granted as part of employee and/or director

- 1 -

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  compensation packages as a means to create incentives to boost profitability and stock value. A

2  stock option granted to an employee and/or director of a corporation allows the employee and/or

3  director to purchase company stock at a specified price - referred to as the "exercise price" - for a

4  specified period of time. When the employee and/or director exercises the option, he or she

5  purchases the stock from the company at the exercise price, regardless of the stock's price at the time

6  the option is exercised. If the exercise price is lower than it should be - "in-the-money" - the

7  employee and/or director pays less for the share and the company receives less when the stock

8  option is exercised.

9        4.    Tax rules and accounting standards in effect from the time Brocade became a public

10  company in 1999 through 2004 turned on whether an option was "at-the-money" – that is, with a

11  strike price at or above the market's closing price for the stock on the day the option was granted –

12  because that makes the option incentive compensation and thus a deductible expense for tax

13  purposes. Though Generally Accepted Accounting Principles ("GAAP")[1] does not restrict a

14  company's ability to grant "in-the-money" options – those issued with an exercise price less than

15  market's closing price for the stock the day the option was granted – it does require that companies

16  expense the excess of the market price of the stock over the exercise price of the option. One of the

17  primary reasons options were issued "at-the-money" in the past was to avoid having to record stock

18  option expense.

19                              **The Backdating Issue**

20        5.    Stock option grants are widely considered to be a good way of giving a company's

21  employees and management an incentive for bolstering the Company's value. The practice of

22  "backdating," wherein an option grant date is moved back in time, presumably to when the stock

23  price was lower, guarantees that an employee receives more value for his/her options. Backdating is

24  _____

25  [1] GAAP are those principles recognized by the accounting profession as the conventions, rules and
procedures necessary to define accepted accounting practices at a particular time. Regulation S-X,
26  17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC which are not prepared
in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires
27  that interim financial statements must also comply with GAAP, with the exception that interim
financial statements need not include disclosures that would be duplicative of disclosures
28  accompanying annual financial statements.

1  not technically illegal if: (i) the practice is clearly communicated to shareholders; (ii) it doesn't

2  violate a company's options granting plan; (iii) it is properly disclosed in the company's financial

3  statements; and (iv) it is accurately reported for tax purposes. Those disclosure requirements,

4  however, are rarely if ever fulfilled and definitely were not here.

5     6.     The topic of impermissible options backdating has recently received tremendous

6  national discussion. According to a study by finance professors Erik Lie of the University of Iowa

7  and Randal Heron of Indiana University, about 30% – or upwards of 1,000 – companies manipulated

8  grants to top executives and employees at some point between 1995 and 2005. In a recent article

9  published by *The Wall Street Journal*, Arthur Levitt ("Levitt"), a former chairman of the SEC was

10  quoted as stating that stock option backdating *"represents the ultimate in greed."* Further, Levitt

11  stated, *"It is stealing, in effect. It is ripping off shareholders in an unconscionable way."* On May

12  5, 2006, President George W. Bush stated in an interview on the Kudlow & Company show airing

13  on CNBC that "overcompensating or trying to backdate things is bad for America, and there ought to

14  be consequences when people don't tell the truth and are not transparent."

15     7.     In fact, shortly after *The Wall Street Journal* article revealed the issue of stock options

16  backdating, numerous reports began surfacing which implicated the Company as engaging in

17  improper backdating. For example, Brocade was identified by *Business Week* on May 23, 2006 as

18  one of seventeen companies which "on at least three occasions had awarded options at, or close to,

19  40-day lows in stock prices."

20     8.     An untold number of Silicon Valley technology companies are currently under

21  investigation for backdating. In response, on July 13, 2006, the U.S. Attorney in San Francisco

22  announced the formation of a local stock options backdating task force. The squad is charged with

23  investigating allegations of companies and individuals in Northern California who may have

24  manipulated option grants to boost compensation. In a press release, U.S. Attorney Kevin Ryan

25  stated, in pertinent part,

26     We will investigate whether individuals and companies may have deliberately
       backdated stock options with the intent to defraud. It is integral to the public trust in
27     our financial markets that books and records are maintained honestly, and that the
       true financial condition of public companies is disclosed accurately. Falsification or
28     backdating of financial documents may call the integrity of companies' financial
       statements into question, can constitute fraud *on the company*, shareholders, and the

- 3 -

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   market, and may give rise to tax violations. *We will evaluate the facts of each case,*
2   *and we will bring criminal charges when appropriate.*

3       9.    Subsequent to the formation of this task force, the SEC announced it would
4   potentially bring civil charges against an unnamed former-executive who engaged in rampant
5   backdating. And then, on July 20, 2006, the SEC revealed that it had filed civil charges against
6   defendants Gregory L. Reyes ("Reyes"), Stephanie Jensen ("Jensen") and Antonio Canova
7   ("Canova"). In a news conference detailing the charges, SEC Chairman Christopher Cox proclaimed
8   that *"The full weight of the federal government is being put behind this effort to stamp out*
9   *fraudulent stock-option backdating."*

10      10.    At the same time the SEC brought civil charges against these three defendants, the
11  United States Attorney for the Northern District of California brought criminal charges against
12  defendants Reyes and Jensen.

13  **Improper Backdating at Brocade**

14      11.    This action concerns a scheme concocted and implemented by three highly influential
15  executives who took advantage of their senior positions by manipulating the grant dates of stock
16  options in order to reward certain of the defendants, thousands of employees and their cronies.
17  Though this type of grant is not technically illegal if disclosed, defendant Reyes, assisted by
18  defendants Jensen and Canova, impermissibly falsified employment records, meeting minutes and
19  option grants to make these backdated options appear that they were legitimately granted at a
20  previous time, and didn't disclose this fact. Thus, thousands of Brocade employees realized an
21  instant paper gain from their backdated option grants.

22      12.    Reyes, Jensen and Canova's illicit practice of backdating stock options was implicitly
23  approved and went undetected for almost seven years due to the acquiescence of Brocade's Board of
24  Directors (the "Board") and the professional negligence of the Company's external auditors, KPMG
25  LLP ("KPMG"). In fact, even after the Company was forced to restate four years of earnings as a
26  result of the backdating scheme, the Board continued to bury their head in the sand and has taken no
27  affirmative action to go after the wrongdoers, instead opting to pay off certain of the grant recipients.
28  Furthermore, as detailed herein, the Board is attempting to insulate itself from *any liability*

- 4 -

1   *whatsoever* by approving an inadequate settlement in a related federal derivative action in return for

2   a full release of the derivative claims against them.

3           13.    Beginning in at least 1999, after Brocade became a public company, the Company's

4   Board authorized numerous stock option plans. Under one such Board-approved plan, Reyes, as the

5   Company's Chief Executive Officer ("CEO") and Chairman of the Board ("Chairman") was granted

6   sweeping authority to "dole out" stock options "as a committee of one." As the sole member of this

7   Board ratified "Compensation Committee," Reyes even held "ad hoc" board meetings with other

8   executives to approve his improper options grants.  Under the virtually unchecked authority

9   delegated to him by Brocade's Board, and in direct contravention of the Company's stock option

10  plans, Reyes granted options to employees that were illegally backdated and also falsified records

11  and other documents in an effort to cover up his misfeasance in an attempt to avoid detection by the

12  Company's shareholders and auditors.

13          14.    As the primary architect of the improper backdating scheme, Reyes was substantially

14  assisted by Jensen, Brocade's Vice President of Human Resources.  Specifically, Reyes and Jensen

15  initiated a system by which they changed the respective stock option grant dates to take advantage of

16  lower exercise prices than the price on the actual grant date.  Specifically, these two defendants

17  looked back to dates in the past and determined what days the Company's stock price was the lowest

18  in the period.  The price of Brocade shares on the reported option-grant date, therefore, was lower

19  than the share price on the actual day options were issued, thus providing Brocade employees and

20  certain of the defendants with more favorably priced options.  Despite his knowledge of the

21  illegitimacy of Reyes and Jensen's crooked maneuvers, Canova, Brocade's Chief Financial Officer

22  ("CFO") between mid-2001 and January 2006, refused to blow the whistle on their illicit actions, and

23  instead became an active participant in the improper backdating of options.

24          15.    Substantially aided by the Board's nonfeasance and KPMG's professional negligence,

25  Reyes, Jensen and Canova put in place a system for falsifying documentation to conceal the

26  manipulation of grant dates and thus avoid detection of their backdating scheme.  Specifically, these

27  three defendants: (i) backdated Board committee meeting minutes; (ii) backdated employment offer

28

- 5 -

1  letters and other personnel records; (iii) made falsified entries into the Company's books and records;

2  (iv) made false statements to Brocade's external auditors; and (v) filed false statements with the SEC.

3      16.    As a result of these defendants' backdating practices, thousands of employees and

4  certain of the defendants received favorably valued—albeit falsely provided—stock option grants.

5  For example, during FY:04, Reyes made thirty-two option grants. Of those grants, nineteen grants

6  were to over 1,000 employees (granting options to purchase a total of approximately 16 million

7  shares), that were priced at the weekly low closing price for Brocade's stock and for an additional

8  three grants, within just $0.03 of the weekly low.

9  **Brocade's Initial Announcement of Accounting Issues "Related to Stock-Based**
   **Compensation"**

10

11     17.    As detailed herein, the wholesale backdating of options as accomplished by Reyes,

12 Jensen and Canova, caused Brocade to materially misstate its financial results during the period

13 beginning no later than FY:00 through FY:04. Beginning in January 2005, the Board, a majority of

14 whom are named herein as defendants, slowly revealed the extent of the Company's fiscal

15 devastation as a result of the illicit practice of backdating.

16     18.    For example, on January 24, 2005, the Company announced the completion of an

17 internal review conducted by its Audit Committee. As a result of this investigation, the Audit

18 Committee concluded there was "insufficient basis to rely on the Company's process and related

19 documentation to support recorded measurement dates used to account for certain stock options

20 granted prior to August 2003." In the months which followed, the Board released similar news

21 piecemeal. It was ultimately revealed on May 16, 2005 that the Company must restate *four years* of

22 earnings to account for additional charges for stock-based compensation expenses.

23     19.    Yet, despite the massive restatement which was admittedly related to stock-option

24 grants, the Board and KPMG refused to earnestly investigate the Company's compensation practices.

25 In fact, rather than fully investigate the causes of the Company's restatement to determine who the

26 bad actors were, the Board merely "guesstimated" that the source of the Company's problems

27 stemmed solely from accounting issues related to stock-based compensation. And since a thorough

28 investigation was not conducted, and the responsible persons remained unidentified, Brocade's

- 6 -

1    historic earnings could not accurately be determined using "fixed" accounting under Accounting

2    Principles Board Opinion ("APB") 25. Rather, the defendants caused the Company to restate its

3    earnings using the imprecise "variable" accounting method, which in effect rendered the Company's

4    restatement to correct for accounting wrongs a sham.[2]

5                    **Defendants' Rampant Backdating of Options Is Disclosed**

6          20.      It was not until mid-May 2006, a year later, that the Board was forced to concede that

7    the Company had a severe issue with improper backdating. On May 12, 2006, the defendants caused

8    or allowed the Company to announce it had filed a Schedule TO ("Tender Offer") to "address recent

9    changes to tax laws that could have serious, unfavorable personal tax consequences for some of

10   Brocade's employees who received certain stock options that were or may have been granted at a

11   discount from fair market value at the time of grant." The Company further disclosed that for certain

12   options granted prior to August 14, 2003, which were granted at a discount, Brocade anticipated

13   making cash payments to employees of approximately $3.5 million to $4.5 million.

14         21.      Despite defendants' imprudent refusal to hold those responsible for the Company's

15   four year restatement and attendant fiscal damage, the extent of Reyes, Jensen and Canova's

16   lawlessness was eventually exposed. On July 20, 2006, the SEC filed civil charges against

17   defendants Reyes, Jensen and Canova. Criminal charges against Reyes and Jensen were filed

18   simultaneously by the United States Attorney for the Northern District of California. The actions,

19   which were the first cases involving manipulation of stock option grants in violation of the federal

20

21   ─────────────────────────────

22   [2] Furthermore, pursuant to GAAP, as set forth in APB No. 20, the type of restatements and revisions
     announced by Brocade were to correct for material errors in previously issued financial statements.
23   APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of
     recognizing an accounting change as it dilutes confidence by investors in the financial statements, it
24   makes it difficult to compare financial statements and it is often difficult, if not impossible, to
     generate the numbers when restatement occurs. APB No. 20, ¶14. Thus, GAAP provides that
25   financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in
     the reporting entity, there is a change in accounting principles used or to correct an error in
26   previously issued financial statements. Brocade's restatements and revisions were not due to a
     change in reporting entity or a change in accounting principle, but rather to errors in previously
27   issued financial statements. Thus, the restatements and revisions were an admission that Brocade's
     previously issued financial results and its public statements regarding those results were false and
28   misleading. Moreover, immaterial corrections are not required to be restated. APB No. 20, ¶38.
     Thus, the restatement indicates that the errors were material.

                                                   - 7 -

1  securities laws and other criminal statutes, were the result of 18-month investigations by the SEC
2  and the Federal Bureau of Investigation ("FBI").

3        22.    The SEC's complaint ("SEC Complaint") and Affidavit in Support of a Criminal
4  Complaint by a Federal Bureau of Investigation Special Agent ("FBI Affidavit") disclosed that these
5  three defendants concealed millions of dollars in expenses in order to benefit themselves, certain
6  employees, officers and directors by falsifying various records relating to employee stock option
7  grants. The SEC Complaint further details how defendant Reyes orchestrated a fraudulent scheme
8  whereby he routinely executed backdated documents and evaded various rules requiring the
9  Company to publicly report these options as compensation expenses.

10              **The Board's Inaction in the Face of Rampant Illegality**

11       23.    The SEC Complaint and FBI Affidavit vividly portray a culture of greed and flouting
12  of state and federal laws, rules and regulations by defendants Reyes, Jensen and Canova. Glaringly
13  absent from this history, as detailed herein, are any concrete actions taken by the Company's Board
14  to either prevent the improper backdating of options or to remove Reyes, who continued to operate
15  as a "Compensation Committee of One." In fact, throughout the time period when Reyes was
16  unilaterally granting options to thousands of employees, the Board did not even question his
17  authority or the logic behind his practices or otherwise ensure that proper oversight by the
18  Compensation Committee of the Board or effective control were in place. Additionally, instead of
19  ensuring that the Company's compensation policies were properly followed, certain of the
20  defendants instead traded on the basis of this material nonpublic information and sold over *$1.5*
21  *billion* worth of their Brocade stock.

22       24.    Adding insult to injury, several of the defendants who received backdated options
23  have recently had their improper shares repurchased by the Company. In a Form 8-K released on
24  June 12, 2006, the defendants caused or allowed the Company to announce that it had entered into a
25  Tender Offer with certain Brocade employees in order to "address recent changes to tax laws that
26  could have serious, unfavorable personal tax consequences for some of Brocade's employees who
27  received certain stock options that were or may have been granted at a discount from fair market
28  value at the time of the grant." Specifically, defendants Michael Klayko ("Klayko") and Richard

- 8 -

1   Deranleau ("Deranleau") will each receive a cash payment totaling over $683,000 as additional
2   compensation to the estimated tax consequences flowing from their improperly dated options. In
3   total, the estimated cost to the Company for the cash payments to employees is $3.5 million to $4.5
4   million. Essentially, the defendants have not only admitted they benefited from Reyes, Jensen and
5   Canova's backdating scheme but have forced the Company to ameliorate the consequences of their
6   acquiescence.

7       25.    Thus, despite the backdating, the members of the Board either turned a blind eye to
8   this illegality and/or personally profited from the lawlessness. Either way, dating back to at least
9   1999, each member of the Company's Board enabled Reyes and his lieutenants to pilfer from
10  Brocade and its shareholders. At no point did any one of the defendants question the consequences
11  of Reyes *et. al.'s* actions on the Company or its shareholders. Rather, the defendants' failure to act,
12  leaves little doubt as to the veracity of their supposed concern for Brocade's well-being.

13              **KPMG's Failure to Comply with Professional Accounting Standards**

14      26.    Defendant KPMG was and is engaged by Brocade to conduct professional audits to
15  ensure that Brocade properly prepared and reasonably presented its financial results from 2002 to the
16  present. KPMG was and is engaged to apply professional auditing standards to ensure that Brocade's
17  accounting and financial reporting was consistent with GAAP and fairly represented the financial
18  condition of the Company. Meanwhile, KPMG emphasized in its promotional literature that its
19  audits are to assist management in finding more profits. In 2002, for example, KPMG advertised its
20  audit services to prospective clients as one which "helps client's manage risk and uncover hidden
21  opportunities that can result in improvements in performance and greater growth for their business."
22  KPMG sales literature also told potential customers: "Our audit and attestation, business risk
23  management, performance measurement, and knowledge service have expanded well beyond
24  traditional financial statement requirements to help clients link risk with business strategies that can
25  drive their success." At Brocade, as advertised, KPMG's failures provided their clients with "finding
26  more profits." Unfortunately for Brocade, these profits were fraudulent and should have been
27  uncovered by KPMG had they performed a professional audit.

28

1    27.    KPMG was Brocade's auditor beginning in 2002 after taking over from Arthur

2  Andersen LLP. KPMG was paid $2.4 million for auditing Brocade's financial results for fiscal years

3  2002 through 2005. KPMG was also paid $2.1 million in non-audit fees during this period.

4  KPMG's representatives were frequently present at Brocade's corporate headquarters and financial

5  offices from 2002 to the present, its partners regularly met with Brocade's executives and finance

6  management, participated in and attended meetings of the Brocade's Audit Committee of the Board

7  of Directors and had virtually limitless access to Brocade's confidential financial and business

8  records, including information concerning Brocade's compensation practices and matters relating to

9  the timing and granting of stock options to individual defendants and key employees.

10    28.    KPMG reviewed Brocade's quarterly and annual financial reports filed with the SEC

11  and conducted Brocade's annual audit and quarterly financial reviews. KPMG also prepared,

12  reviewed and commented on the independent audit report for each year they were associated with the

13  audit and reviewed Brocade's management's discussion and analysis disclosures to insure that they

14  were consistent with Brocade's financial reports, including the footnotes to those reports. KPMG

15  knew, or were reckless in not knowing, that KPMG's name was invoked by Brocade's senior

16  management in annual reports assuring shareholders that KPMG had conducted a professional audit,

17  had found the Company's financial reports were prepared in accordance with GAAP, that they fairly

18  reflected results of operations, and that there were no material weaknesses in the internal accounting

19  controls.

20    29.    KPMG misrepresented to the public and Brocade's shareholders that audits meeting

21  professional standards had been completed, and they issued unqualified approval of Brocade's

22  publicly reported financial accounting. In doing so, KPMG failed to exercise the professional care

23  and skepticism required under Generally Accepted Auditing Standards ("GAAS").[3] KPMG knew or

24

25

26  [3] GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA") governs the conduct of auditors in performing and reporting on audit engagements. Auditing promulgations are set forth in, *inter alia*, a publication entitled AICPA Professional

27  Auditing Standards, Vol. 1 (2001). Promulgations therein are abbreviated with the initial "AU" and will be cited as such.

28

1   were reckless in not knowing that Brocade's financial reports failed to comply with GAAP and were

2   otherwise false or misleading. KPMG abdicated their professional responsibility to challenge

3   Brocade's improper backdating practices and make the Company report its financial results

4   accurately. Year after year, KPMG told the public and Brocade's shareholders that they had

5   conducted a professional audit and that Brocade properly prepared and reasonably presented its

6   financial results when, in fact, KPMG knowingly or recklessly allowed the individual defendants to

7   use self-serving fraudulent backdating schemes to avoid disclosure and recognition of millions of

8   dollars of illicit gains to Company insiders. As a result of KPMG's failure to adequately analyze the

9   Company's option granting practices, the backdating scheme implemented by Reyes, Jensen and

10  Canova went undetected for years.

11                  **The Board Enters into an Inadequate Settlement**

12         30.    Not only did the Board and KPMG fail to uncover and/or stop the improper option

13  backdating and refuse to completely scrutinize the causes of the Company's four-year restatement,

14  which was rendered inaccurate by the lack of any meaningful investigation, the Board has further

15  caused Brocade to enter into a premature settlement in *In re Brocade Communications Systems, Inc.*

16  *Derivative Litigation*, Case No. C05-02233 (N.D. Cal.) (the "Federal Derivative Action") related to

17  the Company's restatement (the "Proposed Settlement"). According to the Amended Settlement

18  Stipulation, plaintiffs in the Federal Derivative Action ("Federal Derivative Plaintiffs") have agreed

19  to release all defendants, except defendant Reyes, in the Federal Derivative Action for *all derivative*

20  *claims* alleged prior to January 2006 in exchange for some corporate therapeutics and $525,000 in

21  attorney's fees. Under the terms of the Proposed Settlement, Brocade will receive no compensation

22  at all for the damages it incurred, the extent of which is still being revealed. Moreover, the Proposed

23  Settlement will release all claims relating to defendants' backdating of stock options that are now the

24  subject of civil and criminal charges without any monetary recovery for Brocade.

25         31.    By entering into this ineffectual settlement, the Board is attempting to protect itself

26  from liability for years of its own delinquency. As evidence of the inadequacy of the Proposed

27  Settlement, on August 18, 2006, United States District Court Judge Charles Breyer refused to

28  approve the settlement stating that attorneys on both sides had not "presented [him] with anything

1   other than the lawyers saying we think this is a good idea." On October 6, 2006, the parties in the

2   Federal Derivative Action provided Judge Breyer with supplemental briefing on the supposed

3   adequacy of the Proposed Settlement. To date, Judge Breyer has yet to preliminarily approve the

4   Proposed Settlement.

5            **Defendants' Overarching Failures Have Severely Harmed Brocade**

6        32.    Defendants' individual and collective wrongdoing resulted from, *inter alia*: (i) their

7   failures in allowing or approving of the Company's top director and executives to improperly

8   backdate stock option grants, which enabled Brocade employees to enrich themselves by knowingly

9   changing the stock option grant dates to dates on which the Company's stock price was lower than

10   the actual grant date (and thus lower than fair market value on the actual grant date); (ii) their failure

11   to ensure that Brocade operated in compliance with all applicable federal and state laws, rules and

12   regulations requiring the dissemination of accurate financial statements and restricting the use of

13   material non-public information; and (iii) their failure to ensure that Brocade did not engage in any

14   unsafe, unsound or illegal business practices.

15        33.    As a result of the defendants' improprieties, the Company has experienced significant

16   damages and will need to expend significant sums of money including the following:

17           (i)     costs incurred to carry out internal investigations, including legal fees paid to

18   outside counsel, accounting firms and consultants;

19           (ii)    costs incurred from responding to subpoenas and requests for information

20   from government agencies including the SEC;

21           (iii)    costs incurred from potential fines in connection with governmental

22   investigations;

23           (iv)    costs incurred from increased Directors and Officer's Insurance ("D&O

24   Insurance") premiums as a result of the illegally manipulated stock option grants;

25           (v)    costs incurred from directing manpower to restate Brocade's prior financial

26   results to correct for the improperly dated stock option grants; and

27           (vi)    costs incurred from canceling improperly backdated options in exchange for a

28   cash payment estimated at $3.5 million to $4.5 million.

34.     As a result of the defendants' actions, Brocade's market capitalization has been damaged by over $9.1 billion. At the same time that the defendants were causing Brocade to suffer such devastation of its market capitalization, certain of the defendants sold over $1.5 billion of their personally held stock and are liable to the Company for treble damages per California Corporations Code §25502.5.

### JURISDICTION AND VENUE

35.     This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, §10, because this case is a cause not given by statute to other trial courts, as this derivative action is brought pursuant to §800 of the California Corporations Code to remedy defendants' violations of law.

36.     This Court retains general jurisdiction over each named defendant who is a resident of California.   Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with California to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Brocade is headquartered in California, and because the allegations contained herein are brought derivatively on behalf of Brocade, defendants' conduct was purposefully directed at California. Finally, exercising jurisdiction over any non-resident defendants is reasonable under these circumstances.

37.     Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this County, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Brocade occurred in this County, and defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

### THE PARTIES

38.     Plaintiffs Chean See Lim and Robert Brown, are, and were at times relevant hereto, owners and holders of Brocade common stock.

- 13 -

39.    Nominal defendant Brocade is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 1745 Technology Drive, San Jose, California. Brocade was founded in 1995 and designs, develops, markets, sells and supports data storage networking products and services.

40.    Defendant David L. House ("House") is Chairman of the Board of Directors (the "Board") and has been since December 2005.  House was Brocade's Executive Chairman of the Board from January 2005 to December 2005; a member of Brocade's Compensation Committee from November 2004 to January 2005; and a member of the Nominating and Corporate Governance Committee from November 2003 to 2004.  House was also a member of the Compensation Committee.  Because of House's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

41.    Defendant Klayko is CEO and a director of Brocade and has been since January 2005. Klayko was Vice President, Worldwide Sales of Brocade from May 2004 until January 2005. From April 2003 until May 2004, Klayko was Vice President, Worldwide Marketing and Support of Brocade, and from January 2003 until April 2003, he was Vice President, OEM Sales of Brocade. Because of Klayko's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith.  Defendant Klayko sold 408,000 of his personally held shares for $2,061,440 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  Brocade paid defendant Klayko the following compensation during the past three years:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options | All Other Compensation |
|-----------|-------------|--------|-------|---------------|------------------------|
| Klayko | 2005 | $481,364 | $341,951 | 1,600,000 | $3,587 |
| | 2004 | $283,333 | $195,230 | 575,000 | $4,664 |
| | 2003 | $175,000 | $42,464 | 713,781 | $3,324 |

42.     Defendant Deranleau is CFO of Brocade and has been since May 2006. Deranleau is also Brocade's Vice President of Finance and has been since November 2005 and Corporate Controller and Treasurer since June 2003. Deranleau was Brocade's interim Chief Financial Officer from December 2005 to May 2006. Because of Deranleau's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith.

43.     Defendant Jack Cuthbert ("Cuthbert") is Vice President, OEM Sales and has been since August 2002. Cuthbert was Brocade's Vice President, Worldwide Sales from November 2001 to August 2002; Vice President, Worldwide Sales, Marketing and Support from November 2000 to November 2001 and Vice President, Worldwide Marketing from April 2000 to November 2000. Because of Cuthbert's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith. Cuthbert received at least 1,525,043 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Cuthbert backdated these stock options and received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Brocade paid defendant Cuthbert the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options | All Other Compensation |
|-----------|-------------|--------|-------|---------------|------------------------|
| Cuthbert | 2003 | $270,000 | $61,974 | 1,167,593 | $2,549 |
| | 2002 | $270,000 | $55,080 | -- | $882 |
| | 2001 | $270,000 | $20,269 | 1,289,211 | $808 |
| | 2000 | $120,000 | $278,750 | 543,328 | $427,460 |
| | 1999 | $114,000 | $20,000 | 560,000 | $102,448 |

- 15 -

1    44.    Defendant David A. Smith ("D. Smith") is Vice President, Service, Support and SAN

2    Integration and has from January 2000 to 2004. Because of D. Smith's position, he knew or should

3    have known that Brocade executives were improperly backdating stock option grants to maximize

4    their personal profits, via access to internal corporate documents, conversations and connections

5    with other corporate officers and employees, attendance at management meetings and committees

6    thereof and via reports and other information provided to him in connection therewith. D. Smith

7    received at least 291,636 options that were dated at or very close to the lowest stock price for the

8    month during which options were granted. Accordingly, on information and belief, plaintiffs allege

9    that D. Smith backdated these stock options and received illegal compensation from Brocade that

10   was not disclosed to the Company's shareholders. Brocade paid defendant D. Smith the following

11   compensation:

12
| Defendant | Fiscal Year | Salary | Bonus | Stock Options | All Other Compensation |
|---|---|---|---|---|---|
| D. Smith | 2001 | $250,000 | $26,125 | 291,636 | $250,675 |
| | 2000 | $160,000 | $358,250 | 288,328 | $642,123 |
| | 1999 | $120,000 | $62,250 | 280,000 | $272,782 |

15   45.    Defendant Paul R. Bonderson, Jr. ("Bonderson"), a co-founder of Brocade, is Chief

16   Technology Officer and Chief Engineer and has been since April 2003. Bonderson was Brocade's

17   Vice President, Engineering from January 2003 to April 2003; Vice President Strategic Development

18   from November 2001 to January 2003 and Vice President, Engineering from August 1995 to

19   November 2001. Because of Bonderson's positions, he knew or should have known that Brocade

20   executives were improperly backdating stock option grants to maximize their personal profits, via

21   access to internal corporate documents, conversations and connections with other corporate officers

22   and employees, attendance at management meetings and committees thereof and via reports and

23   other information provided to him in connection therewith. Bonderson received at least 752,446

24   options that were dated at or very close to the lowest stock price for the month during which options

25   were granted. Accordingly, on information and belief, plaintiffs allege that Bonderson backdated

26   these stock options and received illegal compensation from Brocade that was not disclosed to the

27   Company's shareholders. Defendant Bonderson sold 2,018,320 of his personally held shares for

28   $271,440,260 in proceeds while in possession of material, non-public information concerning the

- 16 -

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   illegally undisclosed backdating stock option grant practices. Brocade paid defendant Bonderson the

2   following compensation:

| Defendant Bonderson | Fiscal Year | Salary | Bonus | Stock Options | All Other Compensation |
|---|---|---|---|---|---|
| | 2001 | $270,00 | $27,844 | 486,446 | $2,235 |
| | 2000 | $220,000 | $396,567 | 532,000 | $1,870 |
| | 1999 | $165,000 | $9,901 | 268,000 | $475 |

    46.    Defendant Kumar Malavalli ("Malavalli") was a co-founder of Brocade and was integral in the Company's business until at least 1999. Because of Malavalli's position, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith. Malavalli received at least 106,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Malavalli received backdated stock options and thus received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Defendant Malavalli sold 693,950 of his personally held shares for $131,473,111 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices. Brocade paid defendant Malavalli the following compensation:

| Defendant Malavalli | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| | 1999 | $167,160 | $21,071 | $134,000 | $475 |
| | 1998 | $162,840 | $13,027 | - | $1,188 |

    47.    Defendant Reyes was CEO and Chairman of Brocade at all times relevant hereto until January 2005. Reyes was a director of Brocade at all times relevant hereto until April 2005. Because of Reyes' positions, he knew that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith. Reyes received at least 10,532,133 options that were dated at or very close to the lowest

stock price for the month during which options were granted. Accordingly, on information and

belief, plaintiffs allege that Reyes backdated these stock options and received illegal compensation

from Brocade that was not disclosed to the Company's shareholders. Defendant Reyes sold

10,152,263 of his personally held shares for $580,036,172 in proceeds while in possession of

material, non-public information concerning the illegally undisclosed backdating stock option grant

practices. Brocade paid defendant Reyes the following compensation during the past seven years:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options | All Other Compensation |
|---|---|---|---|---|---|
| Reyes | 2005 | $112,273 | -- | -- | $262,560 |
| | 2004 | $506,667 | $344,824 | 1,600,000 | $4,350 |
| | 2003 | $500,000 | -- | 1,703,214 | $4,141 |
| | 2002 | $500,000 | -- | -- | $2,385 |
| | 2001 | $500,000 | $74,250 | 10,032,133 | $2,175 |
| | 2000 | $360,000 | $1,615,800 | 1,040,000 | $2,105 |
| | 1999 | $200,000 | $150,000 | -- | $2,175 |

48.     Defendant Canova was Brocade's CFO from May 2001 to January 2006; Vice

President, Administration from November 2004 to 2006; and Vice President, Finance from

November 2000 to May 2001. Because of Canova's positions, he knew or should have known that

Brocade executives were improperly backdating stock option grants to maximize their personal

profits, via access to internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at management meetings and committees thereof and

via reports and other information provided to him in connection therewith. Canova received at least

556,506 options that were dated at or very close to the lowest stock price for the month during which

options were granted. Accordingly, on information and belief, plaintiffs allege that Canova

backdated these stock options and received illegal compensation from Brocade that was not

disclosed to the Company's shareholders. Defendant Canova sold 4,903 of his personally held shares

for $31,526.29 in proceeds while in possession of material, non-public information concerning the

illegally undisclosed backdating stock option grant practices. Brocade paid defendant Canova the

following compensation during the past five years:

- 18 -

| Defendant | Fiscal Year | Salary | Bonus | Stock Options | All Other Compensation |
|---|---|---|---|---|---|
| Canova | 2005 | $331,250 | $154,258 | 175,000 | $2,235 |
| | 2004 | $252,050 | $151,750 | 375,000 | $3,863 |
| | 2003 | $238,525 | $55,826 | 695,149 | $3,593 |
| | 2002 | $235,000 | $36,954 | - | $2,004 |
| | 2001 | $202,790 | $15,477 | 916,506 | $1,897 |

49.     Defendant Michael J. Byrd ("Byrd") was Vice President and CFO of Brocade from 1999 until May 2001. Byrd was Chief Operating Officer and President of Brocade from June 2001 to January 2003. Because of Byrd's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith. Byrd received at least 1,848,768 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Byrd backdated these stock options and received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Defendant Byrd sold 653,380 of his personally held shares for $73,068,872 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices. Brocade paid defendant Byrd the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options | All Other Compensation |
|---|---|---|---|---|---|
| Byrd | 2002 | $325,000 | – | – | $720 |
| | 2001 | $304,205 | $31,955 | 1,806,268 | $560 |
| | 2000 | $250,000 | $413,900 | 85,000 | $420 |
| | 1999 | $100,000 | – | 2,640,000 | $576 |

50.     Defendant Jensen was Vice President of Human Resources of Brocade from October 1999 until February 2004. Jensen was a consultant to Brocade from February 2004 to August 2004. Because of Jensen's positions, she knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information

- 19 -

1  provided to him in connection therewith.

2      51.    Defendant Victor M. Rinkle ("Rinkle") is a Vice-President of Brocade. Because of

3  Rinkle's positions, he knew or should have known that Brocade executives were improperly

4  backdating stock option grants to maximize their personal profits, via access to internal corporate

5  documents, conversations and connections with other corporate officers and employees, attendance

6  at management meetings and committees thereof and via reports and other information provided to

7  him in connection therewith. Rinkle received at least 346,536 options that were dated at or very

8  close to the lowest stock price for the month during which options were granted. Accordingly, on

9  information and belief, plaintiffs allege that Rinkle received backdated stock options and thus

10  received illegal compensation from Brocade that was not disclosed to the Company's shareholders.

11  Defendant Rinkle sold 462,600 of his personally held shares for $72,974,793 in proceeds while in

12  possession of material, non-public information concerning the illegally undisclosed backdating stock

13  option grant practices. Brocade paid defendant Rinkle the following compensation:

14

| Defendant Rinkle | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| | 1999 | $171,875 | $20,188 | $160,000 | $504 |
| | 1998 | $115,340 | $39,375 | $800,000 | $990 |

17      52.    Defendant Charles W. Smith ("C. Smith") is a Vice-President of Brocade. Because of

18  C. Smith's positions, he knew or should have known that Brocade executives were improperly

19  backdating stock option grants to maximize their personal profits, via access to internal corporate

20  documents, conversations and connections with other corporate officers and employees, attendance

21  at management meetings and committees thereof and via reports and other information provided to

22  him in connection therewith. C. Smith received at least 294,194 options that were dated at or very

23  close to the lowest stock price for the month during which options were granted. Accordingly, on

24  information and belief, plaintiffs allege that C. Smith received backdated stock options and thus

25  received illegal compensation from Brocade that was not disclosed to the Company's shareholders.

26  Defendant C. Smith sold 343,900 of his personally held shares for $59,051,185 in proceeds while in

27  possession of material, non-public information concerning the illegally undisclosed backdating stock

28  option grant practices. Brocade paid defendant C. Smith the following compensation:

- 20 -

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

| Defendant<br>C. Smith | Fiscal<br>Year | Salary | Bonus | Securities<br>Underlying<br>Options | All Other<br>Compensation |
|---|---|---|---|---|---|
| | 2000 | $160,000 | $358,250 | 288,328 | $642,123 |
| | 1999 | $120,000 | $62,250 | 280,000 | $272,782 |
| | 1998 | $118,500 | - | 280,000 | $87,306 |

53.    Defendant Peter J. Tarrant ("Tarrant") is a Vice President of Brocade. Because of Tarrant's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and committees thereof and via reports and other information provided to him in connection therewith. Tarrant received at least 166,664 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Tarrant received backdated stock options and thus received illegal compensation from Brocade that was not disclosed to the Company's shareholders. Defendant Tarrant sold 265,000 of his personally held shares for $45,026,665 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices. Brocade paid defendant Tarrant the following compensation:

| Defendant<br>Tarrant | Fiscal<br>Year | Salary | Bonus | Securities<br>Underlying<br>Options | All Other<br>Compensation |
|---|---|---|---|---|---|
| | 1999 | $143,750 | $46,250 | $200,000 | $432 |
| | 1998 | $109,848 | $33,021 | $800,000 | $870 |

54.    Defendant Neal Dempsey ("Dempsey") is a director of Brocade and has been since 1996. Dempsey is also Chairman of Brocade's Compensation Committee and has been since January 2005, and is a member of the Nominating and Corporate Governance Committee and has been since November 2001. Dempsey was Chairman of Brocade's Compensation Committee from 2004 to December 2004 and a member of the Audit Committee from November 1999 to 2004. Because of Dempsey's position, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided

- 21 -

1  to him in connection therewith. Defendant Dempsey sold 136,824 of his personally held shares for

2  $15,205,898 in proceeds while in possession of material, non-public information concerning the

3  illegally undisclosed backdating stock option grant practices.

4      55.    Defendant Sanjay Vaswani ("Vaswani") is a director of Brocade and has been since

5  April 2004. Vaswani is also a member of Brocade's Nominating and Corporate Governance

6  Committee and has been since November 2003. Vaswani was a member of Brocade's Compensation

7  Committee from October 2004 to December 2004. Because of Vaswani's position, he knew or

8  should have known that Brocade executives were improperly backdating stock option grants to

9  maximize their personal profits, via access to internal corporate documents, conversations and

10 connections with other corporate officers and employees, attendance at Board meetings and

11 committees thereof and via reports and other information provided to him in connection therewith.

12     56.    Defendant L. William Krause ("Krause") is a director of Brocade and has been since

13 October 2004. Krause is also Chairman of Brocade's Nominating and Corporate Governance

14 Committee and has been since November 2003; a member of the Compensation Committee has been

15 since October 2004; and a member of the Audit Committee and has been since February 2005.

16 Because of Krause's position, he knew or should have known that Brocade executives were

17 improperly backdating stock option grants to maximize their personal profits, via access to internal

18 corporate documents, conversations and connections with other corporate officers and employees,

19 attendance at Board meetings and committees thereof and via reports and other information provided

20 to him in connection therewith.

21     57.    Defendant Robert R. Walker ("Walker") is a director of Brocade and has been since

22 April 2005. Walker is also a member of the Audit Committee and has been since April 2005.

23 Because of Walker's position, he knew or should have known that Brocade executives were

24 improperly backdating stock option grants to maximize their personal profits, via access to internal

25 corporate documents, conversations and connections with other corporate officers and employees,

26 attendance at Board meetings and committees thereof and via reports and other information provided

27 to him in connection therewith.

28

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

58.     Defendant Glenn C. Jones ("Jones") is a director of Brocade and has been since April 2006. Jones is also a member of the Audit Committee and has been since 2006. Because of Jones' position, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

59.     Defendant Michael J. Rose ("Rose") is a director of Brocade and has been since April 2006. Rose is also a member of the Audit Committee and has been since 2006. Because of Rose's position, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.

60.     Defendant Seth D. Neiman ("Neiman") was a director of Brocade from 1995 until April 2006 and CEO from August 1995 to June 1996. Neiman was also Brocade's Chairman of the Board from August 1995 to May 2001; a member of Brocade's Compensation Committee from 2001 to 2002; and a member of the Audit Committee from 1999 to 2000. Because of Neiman's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Neiman sold 1,100,445 of his personally held shares for $250,579,947 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

61.     Defendant Nicholas G. Moore ("Moore") was a director of Brocade from March 2003 to November 2005. Moore was a member of Brocade's Audit Committee from 2003 to November 2005, and a member of the Nominating and Corporate Governance Committee from November 2003

- 23 -
CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  to November 2005. Because of Moore's position, he knew or should have known that Brocade

2  executives were improperly backdating stock option grants to maximize their personal profits, via

3  access to internal corporate documents, conversations and connections with other corporate officers

4  and employees, attendance at Board meetings and committees thereof and via reports and other

5  information provided to him in connection therewith.

6      62.    Defendant Christopher B. Paisley ("Paisley") was a director of Brocade until April

7  2006. Paisley was a member of Brocade's Audit Committee in 2002 and Chairman of the Audit

8  Committee from August 2002 to April 2006. Because of Paisley's position, he knew or should have

9  known that Brocade executives were improperly backdating stock option grants to maximize their

10  personal profits, via access to internal corporate documents, conversations and connections with

11  other corporate officers and employees, attendance at Board meetings and committees thereof and

12  via reports and other information provided to him in connection therewith.

13      63.    Defendant William K. O'Brien ("O'Brien") was a director of from August 2004 until

14  January 2005. O'Brien was a member of the Audit Committee from October 2004 to January 2005;

15  and a member of the Compensation Committee from November 2004 to December 2004. Because

16  of O'Brien's position, he knew or should have known that Brocade executives were improperly

17  backdating stock option grants to maximize their personal profits, via access to internal corporate

18  documents, conversations and connections with other corporate officers and employees, attendance

19  at Board meetings and committees thereof and via reports and other information provided to him in

20  connection therewith.

21      64.    Defendant Larry W. Sonsini ("Sonsini") was a director of Brocade from 1999 to

22  March 2005. Sonsini was a member of Brocade's Audit Committee from 2001 to 2002 and a

23  member of the Nominating and Corporate Governance Committee from 2002 to 2003. Further,

24  Sonsini's law firm, Wilson, Sonsini Goodrich & Rosatti ("WSGR"), acted as principle legal counsel

25  to Brocade. Because of Sonsini's position, he knew or should have known that Brocade executives

26  were improperly backdating stock option grants to maximize their personal profits, via access to

27  internal corporate documents, conversations and connections with other corporate officers and

28  employees, attendance at Board meetings and committees thereof and via reports and other

- 24 -

information provided to him in connection therewith. Defendant Sonsini sold 12,500 of his personally held shares for $1,738.625 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

65.     Defendant Mark Leslie ("Leslie") was a director of Brocade from 1999 until May 2002. Leslie was a member of Brocade's Compensation Committee from 1999 to 2000 and a member of the Audit Committee in 2001. Because of Leslie's positions, he knew or should have known that Brocade executives were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Defendant Leslie sold 432,612 of his personally held shares for $32,284,184 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.

66.     Defendant KPMG was engaged by Brocade to provide independent auditing and/or consulting services to Brocade, including the preparation, examination and/or review of Brocade's annual and interim financial statements for the period of time from 2002 to the present, which financial statements were disseminated to Brocade shareholders and filed with the SEC. KPMG was engaged to perform and performed these services so that Brocade's financial statements would be presented to, and reviewed and relied upon by Brocade shareholders, governmental agencies, the investing public and members of the financial community. As a result of the services it rendered to Brocade, KPMG's representatives were frequently present at Brocade's corporate headquarters and financial offices from 2002 to the present, and had virtually limitless access to Brocade's confidential corporate financial and business information, including information concerning Brocade's executive compensation and stock option practices along with Brocade's true financial condition which KPMG was aware of and/or negligently disregarded. KPMG actively participated in the presentation, review and issuance of Brocade's false financial statements. Defendant KPMG issued an unqualified audit reports on Brocade's financial statements for the period from 2002 to the present. KPMG also reviewed the Company's interim financial statements.

67.     The defendants identified in ¶¶40-41, 47, 54-65 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶41-53, 60 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶43-49, 51-53 are referred to herein as the "Options Defendants."  The defendants identified in ¶¶41, 45-49, 51-54, 60-61 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants."

68.     The true names and capacities of defendants sued herein under California Code of Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to plaintiffs, who therefore sues these defendants by such fictitious names.  Plaintiffs will seek to amend this Complaint and include these Doe defendants' true names and capacities when they are ascertained. Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the Company as a result of defendants' wanton and illegal conduct.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

69.     By reason of their positions as officers, directors and/or fiduciaries of Brocade and because of their ability to control the business and corporate affairs of Brocade, the Individual Defendants owed Brocade and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Brocade in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Brocade and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

70.     Each director and officer of the Company owes to Brocade and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the compensation paid to its executives and employees.  These disclosures necessarily include the value of stock options granted to the Company's executives.

71.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Brocade, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as the Company's disclosures of its financial results including expenses related to stock option grants. Because of their advisory, executive, managerial and directorial positions with Brocade, each of the Individual Defendants had access to adverse, non-public information about the financial condition and improper representations of Brocade.

72.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Brocade, and was at all times acting within the course and scope of such agency.

73.     To discharge their duties, the officers and directors of Brocade were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Brocade were required to, among other things:

(i)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(ii)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide accurate disclosures of the Company's financials and to avoid wasting the Company's assets;

(iii)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results, and ensuring that the Company maintained an adequate system of internal controls such that the Company's financial reporting would be true and accurate at all times;

(iv)     remain informed as to Brocade's internal controls, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(v)     ensure that Brocade was properly handling its tax liabilities;

- 27 -

1          (vi)    ensure that Brocade's internal controls are sufficient to prevent backdating or

2   other manipulations of stock options granted to Brocade executives; and

3          (vii)   ensure that the Company was operated in a diligent, honest and prudent

4   manner in compliance with all applicable federal, state and local laws, rules and regulations.

5        74.    Each Individual Defendant, by virtue of his or her position as a director and/or

6   officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and

7   the exercise of due care and diligence in the management and administration of the affairs of the

8   Company, as well as in the use and preservation of its property and assets. The conduct of the

9   Individual Defendants complained of herein involves a knowing and culpable violation of their

10   obligations as directors and officers of Brocade, the absence of good faith on their part, and a

11   reckless disregard for their duties to the Company and its shareholders that the Individual

12   Defendants were aware or should have been aware posed a risk of serious injury to the Company.

13   The conduct of the Individual Defendants, who were also officers and/or directors of the Company,

14   has been ratified by the remaining Individual Defendants who collectively comprise all of Brocade's

15   Board.

16        75.    Because of their positions of control and authority as directors and/or officers of

17   Brocade, each of the defendants was able to and did, directly and indirectly, control the wrongful

18   acts complained of herein. As to the Director Defendants, these acts included: (i) agreement to

19   and/or acquiescence in defendants' option backdating scheme; and (ii) refusal to demand the

20   resignations or seek to recover from the defendants for their misconduct. Because of their positions

21   with Brocade, each defendant was aware of these wrongful acts, had access to adverse, non-public

22   information and was required to disclose these facts promptly and accurately to Brocade's

23   shareholders and the financial markets but failed to do so.

24        76.    Defendants repeated in each of the Proxy Statements for 1999-2005 that the stock

25   option grants made during that period carried an exercise price that was *not less than* the fair market

26   value of Brocade's stock *on the date granted*, as calculated by the public trading price of the stock at

27   the market's close on that date. However, the defendants concealed until June 2006 that the stock

28   option grants were repeatedly and consciously backdated to ensure that the strike price associated

1   with the option grants was at or near the lowest trading price for that fiscal period. Plaintiffs seek to

2   have: (i) an accounting of all undisclosed backdated stock option grants made to defendants; (ii) all

3   the unexercised options granted to defendants between at least 1999 and 2005 cancelled; and (iii) the

4   financial gains obtained via the exercise of any backdated stock options returned to the Company.

5       77.    Additionally, the Individual Defendants never disclosed the fact that the Board's

6   Compensation Committee actually delegated Reyes the authority to approve the granting and

7   recording of substantially *all* compensation related activity based upon the Company's liberal use of

8   stock options to attract and retain employees which Brocade's success depended upon. Furthermore,

9   the Individual Defendants never disclosed the Compensation Committee's approval of 1.1 million

10  grants to Reyes and the fact that they effectively delegated to Reyes the authority to approve and

11  record the grant date and exercise price.

12      78.    The Individual Defendants breached their duties of loyalty and good faith by allowing

13  defendants to cause or by themselves causing the Company to misrepresent its financial results, as

14  detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such improper

15  actions. In addition, as a result of defendants' improprieties, Brocade has and will be forced to

16  expend significant sums of money, which include, but are not limited to:

17          (i)    costs incurred to carry out internal investigations, including legal fees paid to

18  outside counsel, accounting firms and consultants;

19          (ii)    costs incurred from responding to subpoenas and requests for information

20  from government agencies including the SEC;

21          (iii)    costs incurred from potential fines in connection with governmental

22  investigations;

23          (iv)    costs incurred from increased D&O Insurance premiums as a result of the

24  illegally manipulated stock option grants;

25          (v)    enormous tax liabilities from improper deductions taken on backdated option

26  grants;

27          (vi)    costs incurred from directing manpower to restate Brocade's prior financial

28  results to correct for the improperly dated stock option grants.

- 29 -
CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1          (vii)    costs incurred from directing manpower to correct Brocade's defective internal

2    controls; and

3          (viii)   Costs incurred from canceling improperly backdated options in exchange for a

4    cash payment of approximately $3.5 million - $4.5 million.

5          79.    The actions have also irreparably harmed Brocade's corporate image and goodwill.

6    For at least the foreseeable future, Brocade will suffer from what is know as the "liar's discount," a

7    term applied to the stocks of companies who have been implicated in illegal behavior and have

8    misled the investing public, such that Brocade's ability to raise equity capital or dept on favorable

9    terms in the future is now impaired.

10                        **DUTIES OF DEFENDANT KPMG**

11         80.    Defendant KPMG owed a duty to Brocade to perform its auditing procedures in

12   accordance with professional auditing standards.  Although standard GAAS procedures should have

13   caused KPMG to identify and act to stop Brocade executive's fraudulent accounting, KPMG also

14   knew or should have known that Brocade exhibited specific characteristics recognized by GAAS of

15   an audit client at higher than normal risk of committing fraud.  These auditing standards were

16   adopted to force heightened awareness by auditors of the possibilities for fraud and, when risk was

17   found to be high, to require more extensive audit planning and procedures in those areas suggesting

18   high risk. These standards applied to the audits of each of Brocade's fraudulent financial statements

19   filed with the SEC for FY:02 through FY:04.[4]

20         81.    GAAS requires, among other things, that an auditor plan and perform the audit with

21   an attitude of professional skepticism.  This requires objective analysis of persuasive evidence to

22   _____

23   [4]  In 1996, the Auditing Standards Board issued SAS No. 82, Consideration of Fraud in a Financial
     Statement Audit which should have been applied to the fraudulent financial statements filed with the
24   SEC for FY:00 and FY:00 audited by Arthur Andersen.  In response to questions and criticism of the
     auditing and accounting profession's lack of adequate addressing of the subject of fraud, the AICPA
25   replaced SAS No. 82 with SAS 99 to give expanded guidance to auditors for detecting fraud. Per the
     AICPA, the standard was part of an effort to "restore investor confidence in U.S. capital markets and
26   re-establish audited financial statements as a clear picture window into Corporate America." SAS 99
     became effective for audits of financial statements for periods beginning on or after December 15,
27   2002. Thus, KPMG's audits should have complied with SAS 99 which established the standards and
     provided guidance to auditors in fulfilling their responsibility to detect fraud.
28

1  make a reasonable judgment whether financial statements are accurate.  When a client can be
2  characterized as a high risk for fraud, as Brocade should have been, then even greater care is
3  required in planning and conducting the audit, and heightened scrutiny is to be applied to
4  management's selection and application of significant accounting practices, especially in areas
5  related to executive compensation to be sure they are not being used to misstate financial results.

6      82.    GAAS also requires an auditor to assess whether an accounting system is effective.
7  Among other things, an effective accounting system records transactions on a timely basis in
8  sufficient detail to permit proper classification and quantification for financial reporting purposes.
9  As part of this process, the auditor must assess the effectiveness of the client's internal control
10  system for preventing or detecting a material misstatement in the financial reports.  Cardinal
11  characteristics of adequate internal controls include, among other things, properly designed
12  procedures to record stock compensation transactions accurately and segregation of duties so that it
13  is difficult to perpetuate and conceal accounting errors and fraud.

14      83.    Thus, KPMG was obligated to perform professional audits and act with reasonable
15  care and competence in the performance of its auditing and consulting services, which required them
16  to ensure that Brocade was properly addressing material matters relating to the timing and
17  accounting for stock option grants.  Furthermore, KPMG was required to exercise professional
18  skepticism, an attitude that includes a questioning mind, including an increased recognition of the
19  need to corroborate management representations and explanations concerning potentially material
20  matters. KPMG either knowingly or recklessly failed to address risks associated with the fact that
21  Brocade improperly accounted for stock option grants, and as a result, materially misstated its
22  financial statements.  KPMG also knowingly or recklessly failed to consider the fact that Brocade
23  had material weaknesses in internal controls related to the accounting, timing and granting of stock
24  options.  KPMG was obligated under professional auditing standards to acquire sufficient
25  information to assess the nature and magnitude of these risks.  KPMG had a duty to consider the
26  following indicators of risk related to Brocade's option granting practices:

27      (a)    As recognized in public filings, the Company's success depended upon its
28  ability to attract and retain qualified personnel along with "an excessive interests in management in

- 31 -
CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    maintaining or increasing the entity's stock price or earnings trends through the use of unusually

2    aggressive accounting practices." AU §316.67.

3          (b)    Brocade's executives and key employees compensation scheme was heavily

4    dependent upon stock option grants. Like other technology companies in Silicon Valley, Brocade

5    faced significant competition to hire and retain qualified personnel. Brocade's management believed

6    that Brocade's success depended in part on Brocade's ability to hire and retain qualified personnel.

7    Brocade made liberal use of employee stock options as a form of compensation.

8          (c)    Brocade's historical stock option grants had "highly variable grant dates,"

9    which coincided with a pattern of jumps in share value following stock-option grants.

10         (d)    Brocade's historical stock price experience high levels of stock-price volatility

11   and Brocade's levels of option grants are high in relation to shares outstanding.

12         (e)    The extent of or lack of involvement of Brocade's Compensation Committee

13   in matters involving the accounting, timing and granting of stock options and the fact that between

14   fiscal years 2000 through 2004, the Compensation Committee only met a total of nine times.

15         (f)    Individual defendant Reyes was Brocade's CEO and Chairman of Brocade's

16   Board and was highly influential and able to recommend that the Board act to compensate officers,

17   including Reyes, through option grants.

18         (g)    Authority of option grants was delegated to Brocade's management. In fact,

19   CEO and individual defendant Reyes acted as a one-man compensation committee and he personally

20   benefited from the option backdating scheme. Reyes was therefore in a unique position to override

21   any existing controls related to the accounting, timing, and granting of stock options.

22         (h)    By June 2003, the fraudulent backdating scheme employed, including the

23   manipulation of the timing and granting of stock option grants, had become so routine that a Brocade

24   Human Resources employee prepared a memorandum describing the practice. The memorandum

25   explicitly directs the Human Resources employees to recommend a pricing date by printing out

26   historical closing prices for Brocade's stock and identifying the closing price that is the lowest since

27   the last pricing date.

28

1          (i)      In June 2003, a committee of the Board approved a recommendation that CEO

2   Reyes be granted 1.1 million options, but failed to stipulate the terms of the award (*i.e.* specified date

3   of grants or strike prices) and allowed CEO Reyes himself to determine the terms of the award. The

4   committee of Brocade's Board did not approve the grants until after CEO Reyes made the grants and

5   they were recorded in Brocade's books and records.

6          84.    KPMG is being sued in its capacity as an auditor for failure to consider obvious risk

7   factors indicating the existence of fraud, failure to exercise professional care and skepticism, failure

8   to obtain sufficient competent evidential matter, and over-reliance on management representations.

9          85.    GAAS requires that auditors exercise due professional care in performing an audit or

10  review and in preparing the audit report. AU §230.01. Due professional care requires that the auditor

11  exercise professional skepticism in performing audit and review procedures and gathering and

12  analyzing audit evidence. AU §230.07-.08. "In exercising professional skepticism, the auditor should

13  not be satisfied with less than persuasive evidence because of a belief that management is honest."

14  AU §230.09. Exercise of professional skepticism requires auditors to demonstrate a questioning

15  mind and to critically assess audit evidence. AU §316.27.

16         86.    GAAS also requires that auditors obtain sufficient competent evidential matter

17  through inspection, observation, inquiries and confirmations to afford a reasonable basis for an audit

18  opinion. AU §326.01. Evidence obtained from independent sources outside the company provides

19  greater assurance of reliability than that secured solely within the company. AU §326.21a. Auditors

20  *may not* substitute management's representations for the application of auditing procedures

21  necessary to afford a reasonable basis for an audit opinion. AU §333.02.

22         87.    In auditing and reviewing Brocade's financial statements, KPMG auditors acted

23  unreasonably in failing to exercise due professional care and skepticism, failing to obtain sufficient

24  competent evidential matter, and substituting management's representations with competent

25  evidential matter.

26         88.    Among other things, KPMG's liability arises from the fact they failed to appropriately

27  consider and modify the nature, timing and extent of procedures performed based upon fraud risk

28  factors and internal control deficiencies, including management's ability to override internal controls.

1   KPMG reasonably should have known that Brocade's accounting and reporting of compensation

2   expense was not in conformity with GAAP. KPMG also reasonably should have know that certain

3   disclosures in Brocade's publicly filed financial information was inconsistent with actual practices

4   employed by Brocade and that these did not comply with GAAP disclosure requirements.

5       89.     KPMG, however, concurred with Brocade's accounting, did not object to Brocade's

6   disclosures, and issued audit reports stating that KPMG had conducted its audits in accordance with

7   GAAS and concluded that Brocade's financial statements fairly presented its financial results in

8   conformity with GAAP.

9       90.     In reaching these conclusions, KPMG unreasonably relied on representations by

10  Brocade management and/or unreasonably determined that the stock compensation expense was

11  immaterial to Brocade's financial statements. As a result, KPMG did not comply with GAAS by

12  unreasonably failing to exercise due professional care and skepticism and to obtain sufficient

13  competent evidential matter. Instead, KPMG substituted management representations for competent

14  evidence and failed to take appropriate action to correct Brocade's inconsistent and deficient public

15  disclosures while issuing inaccurate audit reports. Therefore, KPMG deliberately acquiesced in or

16  ratified the dishonest acts of, and receipt of improperly backdated or otherwise manipulated stock

17  options by Brocade insiders.

18      **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

19      91.     In committing the wrongful acts alleged herein, the Individual Defendants and

20  defendant KPMG have pursued, or joined in the pursuit of, a common course of conduct, and have

21  acted in concert with and conspired with one another in furtherance of their common plan or design.

22  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual

23  Defendants and KPMG further aided and abetted and/or assisted each other in breach of their

24  respective duties.

25      92.     During all times relevant hereto, the Individual Defendants and KPMG collectively

26  and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that

27  Company executives were improperly backdating their stock option grants; (ii) maintain the

28  Individual Defendants' executive and directorial positions at Brocade and the profits, power and

- 34 -

1   prestige that the Individual Defendants enjoyed as a result of these positions; (iii) deceive the

2   shareholders of Brocade, regarding the level of compensation being paid to the Company's

3   executives and the Company's financial condition; and (iv) to artificially inflate the price of Brocade

4   common stock so they could dispose of over $1.5 billion of their personally held stock.  In

5   furtherance of this plan, conspiracy and course of conduct, the Individual Defendants and KPMG

6   collectively and individually took the actions set forth herein.

7           93.     The Individual Defendants and KPMG engaged in a conspiracy, common enterprise

8   and/or common course of conduct.  During this time the Individual Defendants caused the Company

9   to conceal the true fact that Brocade was misrepresenting its financial results and that Brocade

10  executives were improperly backdating their stock option grants.

11          94.     The purpose and effect of the Individual Defendants' and KPMG's conspiracy,

12  common enterprise, and/or common course of conduct was, among other things, to grant themselves

13  undisclosed and unaccounted for compensation in the form of backdated stock option grants and to

14  disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control,

15  gross mismanagement, waste of corporate assets and unjust enrichment.

16          95.     The Individual Defendants and KPMG accomplished their conspiracy, common

17  enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or

18  negligently misrepresent its financial results.  Because the actions described herein occurred under

19  the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial

20  participant in the conspiracy, common enterprise and/or common course of conduct complained of

21  herein.

22          96.     Each of the Individual Defendants and KPMG aided and abetted and rendered

23  substantial assistance in the wrongs complained of herein.  In taking such actions to substantially

24  assist the commission of the wrongdoing complained of herein, each Individual Defendant acted

25  with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

26  wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

27

28

# THE BROCADE BOARD

97.     The Director Defendants, by their fiduciary duties of care, good faith and loyalty, owed to Brocade a duty to ensure that the Company's financial reporting fairly presented, in all material aspects, the operations and financial condition of Brocade. In order to adequately carry out these duties, it is necessary for the Director Defendants to know and understand the material, non-public information to be disclosed or omitted from the Company's public statements. This material, non-public information included the fact that Brocade's internal controls were materially inadequate and that Reyes, Jensen and Canova were improperly backdating option grants to themselves, employees and directors.

98.     The Director Defendants knew this material information through the Board meetings that occurred since 1999, as well as at meetings of committees of the Board.

99.     Despite these duties, the Director Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the improper option grants discussed herein to be issued and approved since at least 1999.

100.     Instead of properly disclosing the improper stock option backdating practices, the Director Defendants caused or allowed these practices to continue unabated and undisclosed until June 2006.

101.     The standing committees of the Brocade Board responsible for compensation and oversight are and have been: (i) the Compensation Committee; and (ii) the Audit Committee.

## The Compensation Committee

102.     The Compensation Committee consists of defendants Dempsey, Krause, House and Vaswani with defendant Dempsey serving for over seven years; defendants Krause, House and Vaswani have each served for at least three years. Since 1999, defendants Leslie, Nieman, O'Brien and Krause also served on the Compensation Committee at various times.

103.     Pursuant to the Compensation Committee Charter, the Committee is charged with:

The Compensation Committee shall, for each of the Company's executive officers, review and approve such executive officer's (i) annual base salary level; (ii) annual incentive compensation; (iii) long-term incentive compensation; (iv) employment, severance and change-in-control agreements, if any; and (v) any other compensation, ongoing perquisites or special benefit items. In so reviewing and approving executive compensation, the Compensation Committee shall:

- identify corporate goals and objectives relevant to executive compensation (including efforts by the Company to retain such executives and the cost to the Company of each executive's compensation or of all executive compensation as a whole);

- evaluate each executive's performance in light of such goals and objectives and set each executive's compensation based on such evaluation and such other factors as the Compensation Committee deems appropriate and in the best interests of the Company; and

- determine any long-term incentive component of each executive's compensation based on awards given to such executive in past years, the Company's performance, stockholder return and the value of similar incentive awards relative to such targets at comparable companies and such other factors as the Compensation Committee deems appropriate and in the best interests of the Company.

The Compensation Committee shall report the results of such review and any action it takes with respect to the compensation of the Company's executive officers to the Board.

Except for grants and awards to executive officers of the Company, the Compensation Committee may delegate to one or more officers of the Company its authority to make grants and awards under the Company's incentive compensation or other equity-based plans *as the Compensation Committee deems appropriate and in accordance with the terms of such plans.*

**Disclosure**

The Compensation Committee shall prepare the report on executive compensation that is required by SEC rules to be included in the Company's annual proxy statement.

**Reporting to the Board**

The Compensation Committee shall make regular reports to the Board. These reports shall include a review of any recommendations or issues that arise with respect to Company compensation and benefits policies, executive compensation and any other matters that the Compensation Committee deems appropriate or is requested to be included by the Board.

104.    Accordingly, as members of the Compensation Committee, defendants Dempsey, Krause, House, Vaswani and Leslie were responsible for administering the issuance of option grants under the Company's stock option plans. In particular, the Compensation Committee: (i) discharges the Board's responsibilities relating to compensation of Brocade's executive officers, including evaluation of the CEO; (ii) produces an annual report on executive compensation for inclusion in Brocade's proxy statements; and (iii) has overall responsibility for approving and evaluating executive officer compensation plans. Though the Compensation Committee may, according to their

- 37 -

1  charter, delegate their authority, they were under a duty to ensure that the delegee, Reyes, acted in

2  accordance with the option plans.

3       105.   Therefore, the members of Brocade's Compensation Committee are responsible for

4  administering the issuance of option grants under the Company's 1999 Stock Option Plan.

5  Accordingly, defendants Dempsey, Krause, House, Vaswani and Leslie were responsible to review

6  the stock option grants to Brocade executives and evaluate the appropriateness of the actions relative

7  to any authority delegated to Reyes. However, since at least 1999, those defendants who sat on the

8  Compensation Committee impermissibly delegated this authority to Reyes. Moreover, on June

9  2003, the Compensation Committee approved a recommendation to award defendant Reyes 1.1

10  million options but failed to provide the terms of the award. Instead, the Compensation Committee

11  effectively delegated to Reyes himself the authority to chose the terms (*i.e.* grant date, exercise

12  price) thus creating the opportunity to fraudulently manipulate the award to enrich himself. Thus,

13  these Director Defendants did not fulfill their duties, therefore causing and allowing the Company's

14  executives to obtain unreasonable and unreported compensation via the backdating of stock option

15  grants.

16       106.   The members of the Compensation Committee knew or should have known that: (i)

17  compensation practices were critical to the Company's success; (ii) executive and employee

18  compensation schemes were heavily dependant upon stock option grants; (iii) Brocade's historical

19  stock option grants had highly variable grant dates which coincided with patterns of jumps in share

20  values following stock option grants; and (iv) the delegation of authority to Reyes to approve

21  substantially all stock options granted to key employees lacked any adequate controls (*i.e.*

22  segregation of duties) which provided Reyes the opportunity to commit and conceal fraud on a

23  massive scale. Reyes, Jensen and Canova were unduly compensating Brocade's employees, officers

24  and directors and thereby permitted or condoned the unlawful practices described herein.

25  Accordingly, through the improper abdication of their duties and responsibilities as members of the

26  Compensation Committee, these defendants directly contributed to the unlawful practices described

27  herein.

28

1                                **The Audit Committee**

2          107.    The Audit Committee consists of defendants Walker, Jones and Rose.  Since 1999,

3    defendants Neiman, Dempsey, Leslie, Sonsini, Paisley, Moore, Krause and O'Brien each served at

4    various times on the Audit Committee.

5          108.    Pursuant to its Charter, the Audit Committee is charged with:

6    **Financial Statements, Disclosure and Other Risk Management and Compliance
     Matters**

7

8          • Reviewing and discussing with management and the independent auditors the
             annual audited financial statements and quarterly unaudited financial
9             statements, including the Company's disclosures under "Management's
             Discussion and Analysis of Financial Condition and Results of Operations,"
10            prior to filing the Company's Annual Reports on Form 10-K and Quarterly
             Reports on Form 10-Q, respectively, with the SEC;
11
          • Directing the Company's independent auditors to review before filing with
12            the SEC the Company's interim financial statements included in Quarterly
             Reports on Form 10-Q, using professional standards and procedures for
13            conducting such reviews;

14         • Conducting a post-audit review of the financial statements and audit findings,
             including any significant suggestions for improvements provided to
15            management by the independent auditors;

16         • Reviewing before release the unaudited quarterly operating results in the
             Company's quarterly earnings release;

17         • Overseeing compliance with the requirements of the SEC for disclosure of
             auditor's services and audit committee members, member qualifications and
18            activities;

19         • Reviewing on a continuing basis the adequacy of the Company's system of
             internal controls, including meeting periodically with the Company's
20            management and the independent auditors to review the adequacy of such
             controls and to review before release the disclosure regarding such system of
21            internal controls required under SEC rules to be contained in the Company's
             periodic filings and the attestations or reports by the independent auditors
22            relating to such disclosure;

23         • Providing a report in the Company's proxy statement in accordance with the
             rules and regulations of the SEC;
24
          • Reviewing the Company's policies and practices with respect to risk
25            assessment and risk management, including discussing with management the
             Company's major financial risk exposures and the steps that have been taken
26            to monitor and control such exposures;

27         • Establishing procedures for receiving, retaining and treating complaints
             received by the Company regarding accounting, internal accounting controls
28

                                          - 39 -

or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

- If necessary, instituting special investigations with full access to all books, records, facilities and personnel of the Company;

- As appropriate, obtaining advice and assistance from outside legal, accounting or other advisors (without seeking Board of Directors approval);

- Reviewing, approving and monitoring the Company's code of ethics for its senior financial officers;

- Reviewing management's monitoring of compliance with the Company's standards of business conduct and with the Foreign Corrupt Practices Act;

- Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

- Reviewing the Company's financial and accounting reporting compliance relating to its employee benefit plans; and

- Reviewing and approving in advance any proposed related party transactions.

**Reporting to the Board**

- At least quarterly, reporting to the Board. This report shall include a review of any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, the performance of the internal audit function and any other matters that the Audit Committee deems appropriate or is requested to be included by the Board;

- At least annually, reviewing and assessing the adequacy of this charter and recommend any proposed changes to the Board for approval; and

- At least annually, evaluating its own performance and report to the Board on such evaluation.

109.    During FY:04, the Audit Committee submitted a report incorporating the fabricated financial results for inclusion in Brocade's FY:05 Proxy Statement that provided, in relevant part:

The Audit Committee has reviewed and discussed our audited financial statements for the fiscal year ended October 30, 2004 with our management. In addition, the Audit Committee has discussed with KPMG LLP, our independent auditors, the matters required to be discussed by Statement on Auditing Standards No. 61 (Communications with Audit Committee). The Audit Committee also has received the written disclosures and the letter from KPMG as required by the Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees) and the Audit Committee has discussed the independence of KPMG LLP with that firm.

- 40 -