# EXHIBIT 5

Based on the Audit Committee's review of the matters noted above and its discussions with our independent auditors and our management, the Audit Committee recommended to the Board of Directors that the financial statements be included in our Annual Report on Form 10-K.

110.   Accordingly, as members of the Audit Committee at some point since at least 1999, defendants Walker, Jones, Rose, Neiman, Dempsey, Leslie, Sonsini, Paisley, Moore, Krause and O'Brien had a special duty to know and understand this material information regarding the stock option grants as set out in the Audit Committee's charter, which provides in relevant part that the Audit Committee is responsible for: (i) assisting the Board in fulfilling its responsibilities for general oversight of the integrity of Brocade's financial statements; (ii) Brocade's compliance with legal and regulatory requirements; (iii) the independent auditors' qualifications and independence; (iv) the performance of Brocade's internal audit function and independent auditors; and (v) risk assessment and risk management.  Under the Audit Committee Charter, the Audit Committee assists the Board in the oversight and monitoring of the Company's financial controls including any improvement or changes to be made in such internal controls.

111.   The members of the Audit Committee knew or should have known that Brocade's financial statements were inaccurate and certain stock option grants were improper because the Audit Committee failed to consider the risks of material misstatement related to matters involving the accounting, timing and granting of stock option, and thereby permitted or condoned the unlawful practices described herein.  Also, the Audit Committee failed to consider the materially weak internal controls designed to ensure stock option practice complied with GAAP and SEC rules. Accordingly, defendants Walker, Jones, Rose, Neiman, Dempsey, Leslie, Sonsini, Paisley, Moore, Krause and O'Brien, through their improper execution of their duties and responsibilities as members of the Brocade Audit Committee, knew of or recklessly disregarded the unlawful practices at Brocade described herein.

## SUBSTANTIVE ALLEGATIONS

### Brocade's Stock-Based Compensation Policies

112.   Brocade, under various stock option plans ("Plans"), grants stock option for shares of the Company's common stock to its employees, directors and consultants.  In March 1999, Brocade's

- 41 -

1   Board approved the adoption of the 1999 Employee Stock Purchase Plan (the "Purchase Plan"),

2   which permits eligible employees to purchase shares of the Company's common stock through

3   payroll deductions. During the same time, the Company's Board approved the Director Option Plan

4   (the "Director Plan") which provides for the grant of Brocade common stock to non-employee

5   directors. Additionally, since 1999, Brocade's officers and/or directors represented in the Company's

6   filings with the SEC that employee stock options were granted with an exercise price that was "equal

7   to the fair market value of our Common Stock as determined by reference to the closing price

8   reported on the NASDAQ National Market on the date of the grant."

9        113.    Tax rules and accounting standards in effect from the time Brocade became a public

10  company in 1999, through 2004, turned on whether an option was "at-the-money" – that is, with a

11  strike price at or above the market's closing price for the stock on the day the option was granted –

12  because that makes the option incentive compensation, and thus a deductible expense for tax

13  purposes. "At-the-money" option grants did not have to be counted as an expense by United States

14  public companies when figuring out their taxable earnings. However, as detailed with more

15  particularity herein, defendants Reyes, Jensen and Canova routinely recorded grant dates that were

16  set back to when the market price was lower than it was when they were actually awarded, meaning

17  the options certain Brocade executives received were actually "in-the-money" – and wouldn't have

18  qualified as tax deductions. Accordingly, if it turns out that the exercise price of an option has been

19  changed, a previously issued option may be disallowed altogether, and previously recognized tax

20  benefits from employee stock option exercises recognized by the Company may have to be either be

21  adjusted or eliminated. As these tax benefits represented a significant source of cash flow for

22  Brocade since 1999, which was unsatisfactorily accounted for in Brocade's recent restatement, the

23  resulting impact on the Company's taxable income may be devastating.

24       114.    While GAAP does not restrict a company's ability to grant "in-the-money" options, it

25  does require that companies expense the excess of the market price of the stock at the date of grant

26  over the exercise price of the option. One of the primary reasons options were issued "at-the-

27  money" in the past was to avoid having to record stock option expense. Indeed, defendants Reyes,

28  Jensen and Canova were motivated to avoid Company policies prohibiting the issuance of certain

1  "in-the-money" options by the desire to provide themselves, other executives, directors and Brocade
2  employees with more lucrative compensation and avoid recognition of compensation expense under
3  accounting conventions, standards, and rules in effect at the time. They further wanted to avoid the
4  millions of dollars of compensation expenses.

5  **Reyes, Jensen and Canova Violated Brocade's Stock-Based Compensation Policies**

6  115.  After Brocade became a public company, the Director Defendants bequeathed to
7  Reyes unfettered authority to grant stock options to employees, other than certain officers and
8  directors, as the sole member of a "Compensation Committee" that acted as the administrator of
9  Brocade's stock option grants.

10  116.  Dating back to at least 1999, defendants Reyes and Jensen initiated an illicit course of
11  conduct by which they manipulated stock option grant dates so as to illegally maximize stock profits
12  for themselves and their cronies. Specifically, Reyes and Jensen changed the respective stock option
13  grant dates on an untold number of stock options to reflect lower exercise prices than the price on the
14  actual grant date in order to unjustifiably benefit Reyes, certain of the Officer and Director
15  Defendants and many Brocade employees. Not only did their actions violate Brocade's stated stock
16  option granting practices, they were also in contravention of applicable accounting rules in effect
17  until 2004, because they willfully and intentionally *did not* record the required compensation
18  expense and make the necessary disclosures to render the financial statements not misleading.

19  117.  Despite his knowledge of the illegitimacy of Reyes and Jensen's practices, defendant
20  Canova, Brocade's CFO between mid-2001 and January 2006, refused to blow the whistle on their
21  illicit actions. Rather, Canova became an active participant in the illicit backdating of options.
22  Canova instructed finance department personnel to ensure that the dates used for option grants in the
23  fabricated Compensation Committee minutes were consistent with the Company's financial records.
24  Defendants Reyes and Canova then made material misrepresentations about the Company's earnings,
25  compensation expense and employee stock option practices. As a result of these defendants'
26  manipulative backdating option practices, numerous employees and certain of the defendants
27  received favorably valued—albeit illicit—stock option grants.

28

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

118.     Though this backdating scheme was designed and implemented by Reyes, Jensen and Canova, the Director Defendants, in turn, acquiesced in this scheme by implicitly approving these grants to the Options Defendants, among others, even though those options were improperly backdated. In fact, the Director Defendants' did nothing to prevent Reyes' improper actions as a "Compensation Committee of One." Further, the Insider Selling Defendants benefited by disposing of over 16,674,981 shares which were traded based on material, nonpublic information, collecting approximately $1.5 billion in illegitimate proceeds.

119.     Defendant Reyes, as CEO and Chairman, caused the Company to make knowingly false representations to Brocade's shareholders and the investing public in its annual and quarterly filings concerning the Company's stock option practices. In embarking upon this scheme to conceal the true nature of Brocade's stock option granting practices and make it appear as if Brocade was in compliance with applicable tax, GAAP and SEC rules, as detailed more particularly herein, Reyes and certain other Brocade executives falsified records and documents in support of their backdated option grants.

120.     In furtherance of their scheme, Reyes, Jensen and Canova put in place a system for falsifying other documentation to conceal the manipulation of grant dates and thus avoid detection of their backdating scheme. Specifically, these three defendants: (i) fabricated Compensation Committee minutes and similar documents so that it appeared that Reyes as the sole Compensation Committee member granted stock options at the market value of Brocade's stock on dates when the value of the Company's stock was relatively low; (ii) fabricated personnel records for certain employees so that they could benefit from stock option grants which were purportedly made and priced when the market value of Brocade's stock was relatively low; (iii) fabricated employment offer letters and other records for certain employees which depicted false employment dates so that they could benefit from stock option grants which were purportedly made and priced when the market value of Brocade's stock was relatively low; and (iv) caused false entries to be made into the Company's financial books and records. By engaging in these illicit activities in an attempt to conceal their backdating practices, Reyes, Jensen and Canova were operating in contravention to Brocade's stock option plans.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

**Reyes' Use of Stock Options as a Recruiting Perk to Attract Employees**

121.    Brocade became a public company in May 1999, which coincided with the "tech boom," a period during which companies specializing in computer technology experienced rapid and substantial growth in revenues, profitability, and in the size of operations.  Due to its specialization in areas of computer technologies, the Company benefited from a blistering rate of growth with a onetime market capitalization of $24 billion.  As a result of this accelerated ascension in revenue and in the size of operations, between October 1999 and October 2002, Brocade hired over 1,150 employees, increasing the size of its workforce by more than six-fold.

122.    During the tech boom, lean and fast-growing tech companies facilitated a frenetic hiring environment marked by increasingly fierce competition over skilled workers.  Stock options were the fastest growing segment of executive pay in 2000.  A survey reported in the CPA Journal (May 2001, p. 15) showed that CEO's average total compensation increased 16% in 2000 to $10.89 million, with an average stock option value of $6.45 million, representing 60% of total remuneration.  This environment fostered a culture of cheating by greedy corporate executives who felt they could disregard the rules.  Brocade was run by one such executive, defendant Reyes, who implemented a pervasive scheme to use deliberately timed option grants as a recruiting tool.  As a result, Brocade violated GAAP, securities laws and tax laws as detailed more particularly herein.  In addition, under the influence of Reyes, the Director Defendants allowed the practice of improperly backdating options to flourish, which caused the outright violation of Brocade's own rules for granting options.

123.    Specifically, to recruit and retain certain employees, defendant Reyes, assisted by Jensen and later Canova, made liberal use of employee stock options as a form of compensation.  The stock options gave employees the right to buy Brocade's stock at a set price, called the exercise price or "strike" price.  The value of the options to these employees was instant to the extent the market price of Brocade's stock exceeded the strike price of the options.

**Reyes Backdated Options Grants with the Assistance of Jensen**

124.    Beginning in at least 1999, defendant Reyes was implicitly given sweeping powers by the Director Defendants.  These powers were continually granted to him by the Director Defendants until Reyes' "resignation" in January 2005.  In essence, Reyes was given authority to "dole out"

- 45 -

1   stock options "as a committee of one" and at times even held "ad hoc" board meetings with other

2   executives to approve his options grants. Under the virtually unchecked authority delegated to him

3   by the Director Defendants, Reyes granted options to employees that were improperly backdated,

4   and also falsified records and other documents in an effort to cover up his misfeasance and avoid

5   detection by the Company's shareholders and auditors.

6       125.    To facilitate this scheme, Reyes enlisted defendant Jensen, then Vice President of

7   Human Resources at the Company. Under his direction, Jensen began to regularly provide Reyes

8   with recent dates where the Company's stock was trading at periodic lows. In calculated hindsight,

9   Reyes would then backdate the grant documentation to one of the earlier dates to make it appear that

10  the options had been granted on that earlier date. Defendant Jensen would, in turn, create fictitious

11  Compensation Committee minutes that matched the exact dates that defendant Reyes had deceitfully

12  chosen as the recorded grant dates. Because Reyes and Jensen supplied documentation that falsely

13  represented that the options were granted on an earlier date and that the exercise price for the grants

14  was the earlier market value, both knew that the grants should be recorded as compensation expense

15  in its financial statements.

16      126.    By June 2003, the fraudulent backdating scheme employed, including the

17  manipulation of the timing and granting of stock option grants, had become so routine that a Brocade

18  Human Resources employee prepared a memorandum describing the practice. The memorandum

19  explicitly directs the Human Resources employees to recommend a pricing date by printing out

20  historical closing prices for Brocade's stock and identifying the closing price that is the lowest since

21  the last pricing date. This memorandum was shared by lower level Human Resources employees

22  who helped implement the process, which continued into 2004.

23      127.    On at least nine occasions between January 2, 2001 and July 2, 2002, Reyes, with

24  Jensen's assistance, backdated grant dates to provide employees with "in-the-money" options while

25  evading the requirement that Brocade incur a compensation expense related to those grants. As

26  indicated by the charts below, those grants were backdated as of the following dates: January 2,

27  2001, April 17, 2001, July 23, 2001, October 1, 2001, October 30, 2001, November 28, 2001,

28  January 22, 2002, February 28, 2002 and July 2, 2002.

128.   In fact, between 3Q:00 and 4Q:02, Reyes granted stock options to employees at the quarterly low stock price in eight of the ten quarters and with exercise prices near the quarterly low stock price in the other two quarters.



October 31, 2000 - January 29, 2001 Stock Option Grants

On January 2, 2001, defendants Reyes, Jensen, and Canova granted options at an exercise price of $75.50 per share - the lowest share price for the fiscal quarter.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT



### January 30, 2001 - April 29, 2001 Stock Option Grants

On April 17, 2001, defendants Reyes and Jensen granted options at an exercise price of $20.70 per share - very close to the lowest share price for the fiscal quarter.

(1) Antonio Canova received 377,750 shares.  Defendant Canova disclosed this grant on a Form 3 filed May 16, 2001.
(2) David A. Smith received 207,810 shares; Jack Cuthbert received 141,760 shares.  Defendants disclosed these grants on a Form 4 filed June 8, 2001.
(3) Paul R. Bonderson received 260,450 shares; Michael J. Byrd received 1,139,056 shares; Gregory Reyes received 3,070,020 shares; Victor Rickle received 172,540 shares and Charles W. Smith received 110,030 shares.  Defendants disclosed these grants on a Form 5 filed December 11, 2001
(4) Larry Sonsini received 50,000 shares; Seth Neiman received 50,000 shares; Mark Leslie received 50,000 shares; Neal Dempsey received 90,000 shares.
Defendants disclosed these grants on a form 5 filed February 7, 2002

### April 30, 2001 - July 29, 2001 Stock Option Grants

On July 23, 2001, defendants Reyes, Jensen, and Canova granted options at an exercise price of $28.11 per share - the lowest share price for the fiscal quarter.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT



CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



129.    Year after year, defendant Reyes' transgressions continued unabated as his sweeping

authority remained unchecked by the Board.  On at least six occasions between August 15, 2003 and

- 50 -

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

October 20, 2004, Reyes backdated options grants to provide employees with "in-the-money" options while evading the requirement that Brocade incur a compensation expense related to those grants. Those grants were backdated as of the following dates: August 15, 2003, October 20, 2003, January 22, 2004, February 26, 2004, March 22, 2004 and June 21, 2004.

130.    Indeed, during Brocade's FY:04, Reyes made 32 option grants. Of those grants, 19 grants were to over 1,000 employees (granting options to purchase a total of approximately 16 million shares), that were priced at the weekly low closing price for Brocade's stock and for an additional three grants, within just $0.03 of the weekly low.





CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT



April 30, 2004 - July 29, 2004 Stock Option Grants

On June 21, 2004, defendants Reyes, Jensen, and Canova granted options at an exercise price of $5.64 per share.

### Defendants Reyes and Jensen Caused the Company to Report Materially Inaccurate Financial Information

131.    Defendants Reyes and Jensen knew the applicable accounting rules in effect at the time, and thus knew their falsifications of official option grant date documents and corresponding fabrications of Compensation Committee minutes violated these rules.  Specifically, defendants Reyes and Jensen were aware of the requirement that "in-the-money" option grants be recorded as a compensation expense through instruction, advisement and participation in conversations regarding the rules with persons at the Company, with the Company's outside auditors and with various consultants.[5]  Reyes spoke frequently, within the Company, with persons outside Brocade, and publicly, about the rules requiring public companies to record an expense for "in-the-money" options

---

[5]  Though he didn't identify companies, compensation consultant Fred Whittlesey recalled that during the tech boom, Silicon Valley executives peppered him with questions about backdating options in search of wiggle room.  "Is there a rule against it? Do they say we can't do it? If we didn't do it right, would anybody find out if we're not audited?" said Whittlesey, a principal for Compensation Venture Group in Seattle.  Some executives even rationalized that they could bend the rules because competitors were doing it too, said Corey Rosen, executive director of the National Center for Employee Ownership in Oakland.

1    grants.

2    **Reyes and Jensen Backdated Option Grants to Dates Predating Employees' Start Dates.**

3    132.    In furtherance of this options backdating scheme, defendant Jensen falsified employee

4    offer letters in order to conceal the backdating.  Specifically, for newly hired employees, Jensen, or

5    persons working at her direction, falsified offer letters with early and inaccurate start dates for

6    employment in order to capitalize on the lowest possible price on options.  In some instances, in

7    order to obtain the false start date, employees would fill out the paperwork even though they were

8    still employed at another company. These fictitious early start dates helped to assure new employees

9    a "locked-in paper gain" on options before they had even started working for the Company.

10    133.    For example, Reyes granted approximately 2 million options to over 260 employees

11    on October 30, 2001, but he did not actually approve this option grant until January 2002, when

12    Brocade's stock price was significantly higher.  In January 2002, Reyes and Jensen backdated the

13    grant to October 30, 2001, fabricating Compensation Committee minutes to create the appearance

14    that the options were actually granted on the earlier date.

15    134.    Among persons included in the grant were two individuals, Dean Traut ("Traut") and

16    Richard Geruson ("Geruson"), who at the time were not employed by Brocade but whom Reyes

17    interviewed personally for positions with Brocade in December 2001 and January 2002,

18    respectively.  Reyes signed Compensation Committee minutes which falsely asserted that Geruson

19    and Traut were hired on October 30, 2001.  Jensen also knew that neither Geruson nor Traut was

20    employed by Brocade on October 30, 2001, as she instructed her subordinates to fabricate offer

21    letters for both executives backdated to October 30, 2001.

22    **Canova Perpetuated the Backdating Scheme by Consciously Refusing to Expose It**

23    135.    Defendant Canova joined Brocade in late 2000 after working previously as a CPA.

24    Canova, with his relevant financial expertise, was wholly familiar with the cardinal principle that

25    "in-the-money" stock options must be recorded as a compensation expense. In complete disregard of

26    this tenet, however, Canova facilitated the maintenance of the backdating subterfuge by turning a

27    blind eye when presented with evidence that suggested the existence of an improper option

28    backdating scheme and forewent discussing the matter with the Company's external auditors despite

1   having ample opportunity to do so. Indeed, Canova ultimately participated in Reyes and Jensen's

2   illegal activities.

3       136.   Beginning in April 2001, after Canova was promoted to the position of CFO, he

4   learned of multiple facts calling into question the integrity of Brocade's financial statements based on

5   the Company's option grants. Canova thus received first hand knowledge of the backdating scheme

6   in place at Brocade through his elevated role in the Company. Specifically, in April 2001, Canova

7   received an e-mail from Jensen in which a Brocade manager had stated that Brocade's option price

8   was "usually the lowest closing price" experienced between meetings when options were granted.

9   Canova instructed that Jensen should caution the manager "not to make statements about the board

10  granting shares at the lowest price."

11      137.   Shortly thereafter, during a discussion between Canova and Brocade's controller, the

12  controller expressed concerns about the delay between purported option grant dates and the dates

13  when the finance department employees received documentation of the grants. Although the delay

14  was a result of, and suggested the existence of, the options backdating scheme, Canova did nothing

15  to investigate other than speaking with defendant Reyes.

16      138.   In early 2002, Canova was presented with further evidence of Reyes and Jensen's

17  backdating scheme. In particular, the options of two Company executives, Geruson and Daniel

18  Cudgma ("Cudgma"), were backdated and supported by falsified offer letters with earlier than actual

19  start dates. Then, in October 2002, Canova again received an e-mail describing the process for

20  granting options to Geruson as "forging paperwork and offer letters so he could get better priced

21  options." Indeed, it is impossible for a person of Canova's financial acumen to even argue that he

22  was unaware that the Company was the victim of an options backdating scheme. Specifically,

23  Canova consciously or recklessly ignored evidence of falsified records and documentation,

24  unscrupulous options pricing conventions, and the absence of effective controls and coordination

25  between the finance and human resource departments. He neither investigated nor reviewed the

26  impact of these improprieties and manipulations on Brocade's financial statements and also failed to

27  alert the Audit Committee or external auditors to their existence. As a result, Brocade failed to

28  record any compensation expense related to the backdated options grants.

139.    Instead, after learning of these facts, Canova facilitated the backdating scheme by directing finance department employees to ensure that the dates used for option grants in the fabricated Compensation Committee minutes were consistent with the falsified employee records reflecting their purported hiring dates. When inconsistencies were found between these documents, Canova directed finance department employees to alter the documents so that they were consistent. This way, the Company's external auditors would not be able to discover the true nature of Brocade's options granting practices.

140.    In light of all these facts and in conjunction with Canova's forced ignorance of the existence of numerous improprieties and manipulations, it is clear that Canova knew the documentation of options grants used to prepare the Company's financial statements were not reliable.

**Reyes Engaged in Self-Dealing to the Detriment of the Company and Shareholders**

141.    Defendant Reyes was motivated, in part, to conceal the backdating scheme from shareholders, external auditors and the SEC due to the fact that he and other Company officers derived substantial personal benefits from the wrongdoings. Specifically, Reyes knew that he and other officers of the Company received options backdated as of the same dates as the backdated employee options. Thus, Reyes abused his position as Chairman of Brocade's Board and CEO of the Company in recommending that the Director Defendants compensate officers, including himself, through options grants.[6]

142.    In a June 2003 resolution, the Director Defendants accepted a recommendation that Reyes, in his position as CEO, be granted a total of 1.1 million options divided into two grants during two fiscal quarters. Relying only on the resolution, Reyes included himself in two options grants that were otherwise made to employees of Brocade. Although nothing in the Board's

---

[6] Ownership of company stock by executives and insiders is usually considered a positive development because it shows a belief in the company's prospects. However, not all ownership positions are created equal. Executive's insider purchases on the open market show a far more real commitment than gratis stock options. Although they are supposed to align the interests of management and shareholders, the granting of backdated stock options are a mechanism to enrich insiders at the expense of shareholders.

resolution specified the dates of the grants to Reyes or the strike prices, Reyes granted himself 600,000 options as of August 15, 2003 and 500,000 options as of December 10, 2003. Only after the grants were made and recorded in Brocade's books and records did the Board approve the grants.

143.   Also, on at least two other occasions, Reyes received large options grants which were dated as of the same dates on which he had granted other employees backdated options. Those grants to Reyes were backdated to April 17, 2001 and October 1, 2001. Further, defendant Klayko was granted over 575,000 backdated options between May 21, 2004 and December 10, 2004.

**Reyes Altered Grant Dates to Incentivize Employees While Hiding Expense**

144.   In the event that Brocade's stock price fell, Reyes employed a contingency scheme that consisted of changing previously issued options grants, so that employees would receive "in-the-money" options but Brocade would not record the necessary compensation expense.

145.   Thus, on February 1, 2002, (in Brocade's second fiscal quarter of 2002), Reyes interviewed Cudgma, who was ultimately employed by Brocade. As part of his original retention packet, Cudgma was told he would receive an options grant, which Jensen was then preparing, that was backdated to November 28, 2001, when Brocade's stock price was approximately $8 per share lower than the February 1, 2002 closing price. Jensen fabricated Compensation Committee meeting minutes, signed by Reyes, which granted Cudgma the option to purchase 285,000 shares, backdated to November 28, 2001. These falsified minutes also asserted that Cudgma was hired on November 28, 2001. Cudgma was then given a letter offering him a position at Brocade which bore the false start date of November 28, 2001.

146.   When, after February 1, 2002, Brocade's stock price declined, Reyes reacted by directing Jensen to change Cudgma's option grant several times in March and April 2002 – again, selecting a date from the past when the stock price was trading at a lower price. During mid-April 2002, in an effort to retain Cudgma, Reyes signed Compensation Committee meeting minutes increasing Cudgma's option grant to 500,000 shares, backdated as of February 28, 2002 (a date on which Brocade's stock closed at approximately $4 per share below the then current market price). At approximately the same time, Jensen directed persons in the Human Resources department to prepare a new offer letter for Cudgma, this time backdated to January 28, 2002.

147.    Reyes knew that the backdated option grants he authorized and signed were false and misleading and rendered Brocade's public statements about how it accounted for employee stock options materially false and misleading.

148.    Jensen also knew that the backdated options documentation and backdated employee offer letters she helped prepare or sign were false and misleading, and that they rendered Brocade's financial statements false and misleading. Jensen also knowingly provided substantial assistance to Reyes' scheme to falsely report the Company's options expenses.

**Brocade's Board Is Culpable for Allowing the Scheme to Continue**

149.    One of the most troubling aspects of this illicit option backdating scheme is that the Director Defendants relinquished total responsibility for setting option grant dates to Reyes and other executives and failed to correct their illicit scheme. In effect, options backdating opens the door to executive self-dealing, which is exactly what happened here. The Director Defendants never disclosed what role, if any, Brocade executives like Reyes played in the Company's stock option grant decision-making process. In sum, the Director Defendants, as Brocade's guardians, should have insured that Brocade's policies on executive stock options were transparent and properly followed.

150.    Not only did the Director Defendants improperly delegate sweeping authority to Reyes in the granting of stock options to employees and executives, they implicitly acquiesced in the improper arrangements described herein by not assuring that the Company's compensation policies were properly followed. Specifically, the Director Defendants failed to compile the required paperwork, lacked internal controls to catch problems associated with falsified paperwork, and allowed inaccurate and incomplete minutes of board meetings to be fabricated while at the same time knowing these were used to document when directors had approved of grants. Furthermore, when presented with the opportunity to actually investigate the Company's compensation practices, the Director Defendants chose to conduct a sham restatement instead.

151.    The Director Defendants' misfeasance calls into question the unscrupulous corporate culture at Brocade, the integrity of the Company's executives and its directors, the Director

Defendants' extremely inadequate oversight posture, and accentuates the Company's deficient internal controls over its compensation practices in general.

## SEVERAL OF THE INDIVIDUAL DEFENDANTS RECEIVED MANIPULATED STOCK OPTION GRANTS

152.    In addition to the untold numbers of Brocade employees who benefited from Reyes, Jensen and Canova's illicit scheme, several of the Individual Defendants also received backdated option grants. As the charts below demonstrate, numerous options were suspiciously granted at or near the lowest price of the month in which the options were granted

### FY:99 Option Grants

153.    During FY:99, defendants Reyes, Charles Smith, Cuthbert, Byrd, Bonderson, Tarrant, Malavalli and Rinkle received options at the lowest price of the month in which the options were granted. Specifically, options granted on November 20, 1999 were recorded at $128.50 per share – the lowest stock price for the month of November.



### FY:00 Option Grants

154.    During FY:00, defendants Reyes, C. Smith, Cuthbert, David Smith, Byrd, Rinkle and Bonderson, received options at or near the lowest price of the month in which the options were

granted. Specifically, options granted on February 1, 2000 were recorded at $76.88 per share – the lowest stock price for the month of February. Similarly, options on November 30, 2000 were recorded at $76.88 per share – the lowest stock price for the month of November.



February 2000 Stock Option Grants

On February 1, 2000, defendants purportedly granted the following options at an exercise price of $76.88 per share - close to the lowest share price for the period of January 19, 2000 through August 8, 2000 - to the following Brocade insider:

Jack Cuthbert          200,000

On August 8, 2000, defendant Cuthbert disclosed these grants on a Form 3.

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT



November 2000 Stock Option Grants

On November 30, 2000, defendants purportedly granted the following options at an exercise price of $76.88 per share - the lowest share price for the months of September 22, 2000 through December 15, 2000 - to the following Brocade insiders:

Paul R. Bonderson, Jr.(5)  220,000    Gregory Reyes (1)    4,800,000
Michael J. Byrd (4)        410,000    Victor Rinkle (6)       80,000
Jack Cuthbert (3)          542,000    Charles W. Smith (1)    80,000
David A. Smith (2)          60,000

(1) On December 11, 2001, defendants Reyes and C. Smith disclosed this grant on a Form 5.
(2) On December 12, 2001, defendant D. Smith disclosed this grant on a Form 5.
(3) On December 13, 2001, defendant Cuthbert disclosed this grant on a Form 5.
(4) On December 14, 2001, defendant Byrd disclosed this grant on a Form 5.
(5) On December 15, 2001, defendant Bonderson disclosed this grant on a Form 5.
(6) On December 18, 2001, defendant Rinkle disclosed this grant on a Form 5.

### FY:01 Option Grants

155.    During FY:01, defendants Reyes, C. Smith, Cuthbert, D. Smith, Byrd, Bonderson, Canova and Rinkle received over 8,461,967 options at the lowest price of the month in which the options were granted.  Specifically, options granted on April 18, 2001 were recorded at $20.70 per share – the lowest stock price for the month of April.  Similarly options granted on October 2, 2001 were recorded at $12.90 per share -- the lowest stock price for the month of October.



156.    The following table provides an estimate as to the illegal paper profit that—the

defendants identified in the prior charts—gained as a result of their stock option manipulations:

| Defendants | Reported Grant Date | Number of Securities Underlying Options | Price of Stock on Reported Grant Date | Estimated Price on Actual Date Option was Granted | | Estimated Paper Profit | |
|---|---|---|---|---|---|---|---|
| | | | | Low | High | Low | High |
| Bonderson | 12/10/1999 | 266,000 | $128.50 | $151.50 | $160.00 | $6,118,000.00 | $8,379,000.00 |
| | 12/11/2001 | 260,450 | $20.70 | $31.34 | $53.26 | $2,771,188.00 | $8,480,252.00 |
| | 12/11/2001 | 5,996 | $12.90 | $13.43 | $38.80 | $3,177.88 | $155,296.40 |
| | 12/15/2001 | 220,000 | $76.88 | $167.94 | $225.13 | $20,033,200.00 | $32,615,000.00 |
| Byrd | 12/10/1999 | 42,500 | $128.50 | $151.50 | $160.00 | $977,500.00 | $1,338,750.00 |
| | 12/11/2001 | 1,139,050 | $20.70 | $31.34 | $53.26 | $12,119,492.00 | $37,087,468.00 |
| | 12/11/2001 | 257,218 | $12.90 | $13.43 | $38.80 | $136,325.54 | $6,661,946.20 |
| | 12/14/2001 | 410,000 | $76.88 | $167.94 | $225.13 | $37,334,600.00 | $60,782,500.00 |
| Canova | 5/16/2001 | 377,750 | $20.70 | $31.34 | $53.26 | $4,019,260.00 | $12,299,540.00 |
| | 12/11/2001 | 178,756 | $12.90 | $13.43 | $38.80 | $94,740.68 | $4,629,780.40 |
| Cuthbert | 8/8/2000 | 35,832 | $128.50 | $151.50 | $160.00 | $824,136.00 | $1,128,708.00 |
| | 8/8/2000 | 200,000 | $81.00 | $89.32 | $213.69 | $1,663,000.00 | $26,538,000.00 |
| | 6/8/2001 | 541,760 | $20.70 | $31.34 | $53.26 | $5,764,326.40 | $17,639,705.60 |
| | 12/7/2001 | 205,451 | $12.90 | $13.43 | $38.80 | $108,889.03 | $5,321,180.90 |
| | 12/13/2001 | 542,000 | $76.88 | $167.94 | $225.13 | $49,354,520.00 | $80,351,500.00 |
| Malavalli | 12/10/1999 | 106,000 | $128.50 | $151.50 | $160.00 | $2,438,000.00 | $3,339,000.00 |
| Reyes | 12/10/1999 | 500,000 | $128.50 | $151.50 | $160.00 | $11,500,000.00 | $15,750,000.00 |
| | 12/11/2001 | 4,800,000 | $76.88 | $167.94 | $225.13 | $437,088,000.00 | $711,600,000.00 |
| | 12/11/2001 | 3,970,020 | $20.70 | $31.34 | $53.26 | $42,241,012.80 | $129,263,851.20 |
| | 12/11/2001 | 1,262,113 | $12.90 | $13.43 | $38.80 | $668,919.89 | $32,688,726.70 |
| Rinkle | 12/10/1999 | 90,000 | $128.50 | $151.50 | $160.00 | $2,070,000.00 | $2,835,000.00 |
| | 12/11/2001 | 172,540 | $20.70 | $31.34 | $53.26 | $1,835,825.60 | $5,617,902.40 |
| | 12/11/2001 | 3,996 | $12.90 | $13.43 | $38.80 | $2,117.88 | $103,496.40 |
| | 12/16/2001 | 80,000 | $76.88 | $167.94 | $225.13 | $7,284,800.00 | $11,860,000.00 |
| Smith, C. | 12/10/1999 | 104,164 | $128.50 | $151.50 | $160.00 | $2,395,772.00 | $3,281,166.00 |
| | 12/11/2001 | 80,000 | $76.88 | $167.94 | $225.13 | $7,284,800.00 | $11,860,000.00 |
| | 12/11/2001 | 110,030 | $20.70 | $31.34 | $53.26 | $1,170,719.20 | $3,582,576.80 |
| Smith, D. | 6/8/2001 | 207,810 | $20.70 | $31.34 | $53.26 | $2,211,098.40 | $6,766,293.60 |
| | 12/11/2001 | 3,826 | $12.90 | $13.43 | $38.80 | $2,027.78 | $99,093.40 |
| | 12/12/2001 | 80,000 | $76.88 | $167.94 | $225.13 | $7,284,800.00 | $11,860,000.00 |
| Tarrant | 12/10/1999 | 166,664 | $128.50 | $151.50 | $160.00 | $3,833,272.00 | $5,249,916.00 |

## KPMG'S ROLE IN DEFENDANTS' MISCONDUCT

157.    At all relevant times, KPMG was a necessary and active participant in the Individual Defendants' improper accounting and financial reporting.  In an effort to preserve its relationship with Brocade, pursuant to which it received millions in dollars in fees, KPMG knowingly or recklessly disregarded the Individual Defendants' improper accounting and financial reporting practices, ignored repeated grants of stock options at monthly, quarterly and annual lows and actively assisted the Individual Defendants in concealing its wrongdoing from the market by, *inter*

1  *alia*, improperly issuing clean audit opinions certifying that Brocade had complied with GAAP. For

2  the relevant years 2000 through 2005, Brocade paid KPMG the following fees:

| Fiscal Year | Fees Paid to KPMG |
|---|---|
| 2006 | - |
| 2005 | $2,424,000 |
| 2004 | $733,000 |
| 2003 | $1,012,000 |
| 2002 | $328,010 |
| **Total** | **$4,497,010** |

8      158.    During its yearly audits and quarterly reviews of Brocade's books, records and

9  financial statements, members of KPMG's engagement team had virtually limitless access to

10  information concerning Brocade's true financial condition. KPMG had unfettered access to Brocade

11  documents and employees, and had conversations with Brocade management and employees about

12  the Individual Defendants' financial reporting and accounting practices.

13      159.    KPMG knew or recklessly disregarded that the Individual Defendants were, contrary

14  to GAAP, booking and reporting revenues that the Company had not actually received. Nonetheless,

15  in the hopes of retaining Brocade as a client and continuing to garner millions of dollars in auditing

16  and consulting fees, KPMG repeatedly ignored risk factors regarding the Individual Defendants'

17  improprieties and continually issued unqualified audit opinions and reports. KPMG's conduct was

18  an extreme departure from the ordinary standard of care for auditors and was in violation of GAAP

19  and GAAS.

20                 **THE TRUTH BEGINS TO EMERGE**

21      160.    Despite Reyes, Jensen and Canova's attempts to conceal their illicit backdating

22  practices, the impact of their actions on the Company began to be disclosed in January 2005. For

23  example, on January 24, 2005, the Company announced that, as a result of an internal review

24  conducted by Brocade's Audit Committee, the Company expected to record additional stock-based

25  compensation charges from FY:99 through 3Q:03. The press release further stated that "[f]or years

26  prior to 2002, the Company will reduce previously reported net income by approximately $304

27  million (consisting of a reduction to net income in years 1999 and 2000 of $15 million and $1,019

28  million, respectively, and an increase to net income in 2001 of $730 million) relating solely to stock

1    based compensation and associated income tax adjustments." Finally, it was disclosed that the

2    Company would calculate the additional historical stock based compensation charges using the

3    variable method of accounting under APB 25.

4        161.    On that same day, the Company announced that defendant Reyes would no longer

5    serve as Brocade's Chairman and CEO. Yet, Reyes was not truly departing from the Company.

6    Instead, he was allowed to remain a director of Brocade and as an advisor to the Board and the new

7    CEO, defendant Klayko.[7]

8        162.    On January 31, 2005, Brocade filed with the SEC its Form 10-K for FY:04. The

9    Form 10-K reported Brocade's false financial results for the quarter and year, which materially

10   overstated net income by $30,666,000, as described herein. The Form 10-K was signed by

11   defendants Klayko, Reyes, Canova, Neiman, House, Krause, Dempsey, Sonsini, Moore, Paisley and

12   Vaswani.

13       163.    According to the Company's Form 10-Q filed with the SEC on March 9, 2005,

14   Brocade incurred internal review costs of $3.7 million, primarily related to professional service fees.

15   Furthermore, Brocade estimated the Company will make adjustments pertaining to stock option

16   grants totaling $304 million in years 1999 and 2000 only. Estimates for adjustments to the

17   Company's cost of stock based compensation for FY:04, FY:03, FY:02 and FY:01 may exceed $52.6

18   million.

19       164.    Notwithstanding the fact that the Company was forced to restate four years of

20   financial results as a result of the Director Defendants acquiescence to Reyes, Jensen and Canova's

21   misfeasance, on February 18, 2005, the Director Defendants announced they had unanimously

22   approved an *increase* in their compensation as directors. Under this increase, in addition to annual

23   fees for sitting on the Board and each respective meeting thereof, each non-employee receives

24   _____

25   [7] The 2005 Proxy, filed with the SEC on February 28, 2005, announced that under the terms of the
     employment agreement Brocade had entered into Reyes with, the Company would pay Reyes
26   $520,000 per year for two years to serve as a consultant to the Company. Furthermore, under this
     agreement, defendant Reyes remained eligible for incentive compensation of $390,000 per year plus
27   reimbursement for expenses "incurred by Reyes in the operation and use of his private plane and
     properties when used for Brocade business."
28

1  $1,500 for each committee meeting the director attends in person and $1,000 for each committee

2  meeting in which the director participates telephonically.   Moreover, the chairman of each

3  committee receives an additional cash payment of $5,000, and the non-employee Lead Director will

4  receive an annual cash payment of $15,000. The Director Defendants made this increase retroactive

5  to apply to all meetings conducted during FY:05, including meetings that had occurred prior to the

6  date of approval.

7        165.    Then, on May 16, 2005, before the markets opened the Company revealed the full

8  extent of its fiscal woes.  On that day, in a press release entitled "Brocade Restates Financial

9  Statements to Reflect Additional Stock-Based Compensation Expense; Company Affirms That None

10  of the Adjustments Impact Historical Revenues, Cash Positions, or Non-Stock Option Related

11  Operating Expenses" it was disclosed that Brocade would be forced to restate its financial statements

12  for FY:00 through FY:04 to record "additional charges for stock-based compensation expenses."

13         Brocade Communications Systems, Inc. announced today that the Company will
       restate its financial statements for the fiscal years ending 2002 through 2004 to
14         record additional charges for stock-based compensation expense.  The Company
       affirmed that none of the charges will have an impact on Brocade's historical
15         revenues, cash positions, or non-stock option related operating expenses.   The
       company expects related adjustments will be made to the Company's financial
16         information for fiscal 2001, as necessary.

17         Following the completion of an Audit Committee review announced on January 24,
       2005, additional information came to the Company's attention that indicated that its
18         guidelines regarding stock option granting practices were not followed during the
       period from August 2003 through November 2004.   After further review, the
19         Company concluded that it could not rely on the documentation used to support the
       recorded measurement dates for stock options granted in that period.  As a result, the
20         Company will restate its financial statements to account for additional stock-based
       compensation for stock options granted from August 2003 through November 2004.
21         The additional charges are expected to result in a cumulative increase in non-cash
       stock option compensation expense of $0.8 million over fiscal years 2003 and 2004.
22
       After discovering the additional information regarding *non-compliance of its*
23         *guidelines*, the Company commenced a review of certain other practices that could
       impact stock option accounting.  This review determined that from 2001 through
24         2004, the Company had not appropriately accounted for the cost of stock based
       compensation for certain employees on leaves of absences (LOA) and in transition
25         roles prior to ceasing employment with Brocade.  Prior to 2003, Brocade's LOA
       policy allowed certain employees to continue vesting in their stock options and to
26         have extended stock option exercise periods for up to three months from the start of
       the LOA.  The expected charges relate principally to options that continued to vest
27         for employees who were on LOAs for a period greater than three months.  The
       Company also expects to record additional adjustments related to options that
28         continued to vest for certain employees in transition roles. *Management estimates*

*the total increase in non-cash compensation expense related to these matters to be in a range of approximately $31 to $52 million for fiscal years 2001 through 2004.*

Brocade's Audit Committee has commenced an independent review of the Company's stock option accounting regarding LOAs. Based on that ongoing review, the Company's preliminary estimates of anticipated adjustments are subject to change.

The table below reflects the total effects of these combined adjustments and are the Company's preliminary estimate of the approximate impact to the Company's non-cash expenses and EPS. The Company does not currently expect that there will be any impact on non-cash expenses and EPS for any period in fiscal year 2005.

| Fiscal Year Ending: | Additional Non-Cash Expense | Reduction in EPS |
| --- | --- | --- |
| 2001 | $12.0 - $26.0 million | $0.05 - $0.11 |
| 2002 | $19.0 - $23.0 million | $0.08 - $0.09 |
| 2003 | $0.2 - $0.8 million | $0.00 - $0.01 |
| 2004 | $0.8 - $2.8 million | $0.00 - $0.01 |

*The Company also announced today that it has been informed that the Department of Justice (DOJ) is working with the SEC in a joint investigation regarding the Company's stock option granting practices.* Brocade has no further information regarding the timing or scope of the investigation.

"It is not unusual in the current environment that multiple relevant government agencies will take an interest in these types of matters," said Michael Klayko, Brocade's newly appointed Chief Executive Officer. "We are cooperating fully with the SEC and DOJ and hope that the investigation can be concluded as quickly as possible." Klayko continued, "The Board and management team are absolutely committed to the highest standard of accounting and continuously improving our internal controls and compliance with our policies. I have confidence in my team and we remain focused on executing to our business plan."

166.    On June 8, 2005, the Company announced the delayed filing of its 2Q:05 Form 10-Q.

167.    On June 9, 2005, the SEC raised the level of its investigation from an informal inquiry to a formal order of investigation, indicating the seriousness of the defendants' misconduct.

168.    On June 13, 2005, the Company issued a press release entitled "Brocade Receives NASDAQ Notification Related to Late Filing of Form 10-Q for Second Quarter of Fiscal 2005." The press release stated in part:

Brocade Communications Systems, Inc. today announced that on June 10, 2005, it received a notice from the Nasdaq Stock Market stating that the Company is not in compliance with Nasdaq's Marketplace Rule 4310(c)(14) because the Company has not timely filed its Report on Form 10-Q for the fiscal quarter ended April 30, 2005. As a result of the filing delay, an "E" will be added to Brocade's ticker symbol and Brocade will begin trading under the symbol "BRCDE" effective at the opening of business on June 14, 2005. The presence of an "E" does not constitute a trading halt or delisting.

169.    On June 30, 2005, the Company filed a Form 8-K with the SEC, which stated in part:

In a Form 8-K filed with the SEC on June 8, 2005, Brocade Communications Systems, Inc. (the "Company") announced that it was delaying the filing of its Form 10-Q for its second fiscal quarter ended April 30, 2005. In that same filing, the Company stated that its Audit Committee has been performing an independent review of the Company's stock option accounting regarding leaves of absence and transition and advisory roles from 2001 through 2004. The Company is working diligently to complete and file its amended Form 10-K for the fiscal year ended October 29, 2004, along with the restatement of its financial statements for prior fiscal years. However, until the Audit Committee review is completed, the Company is unable to complete and file its Form 10-Q for the second fiscal quarter ended April 30, 2005 and the amended 2004 Form 10-K.

*On June 24, 2005, the Company received a letter from the Trustee for the holder of the Company's 2% Convertible Subordinated Notes stating that the Company failed to provide to the Trustee its Form 10-Q for the second fiscal quarter ended April 30, 2005.* The letter further stated that if the Company does not file its Form 10-Q for the second fiscal quarter ended April 30, 2005 with the Trustee within 60 days of June 24, 2005, the date of the letter, *an Event of Default, as defined under the Indenture governing the Notes, will have occurred. If an Event of Default were to occur, the Trustee or holders of at least 25% in aggregate principal amount of the Notes then outstanding could attempt to declare all unpaid principal and premium, if any, and accrued interest on the Notes then outstanding to be immediately due and payable.*

*Approximately $279 million in unpaid principal was outstanding under the Notes as of June 29, 2005.* The Company's total cash and investments as of April, 30, 2005, the end of the Company's second fiscal quarter, was approximately $746 million.

170.    In a Form 8-K filed with the SEC on July 27, 2005, the Company announced the termination of the "agreement and employment arrangement between the Company and [defendant] Reyes." Additional information concerning the termination of Reyes' employment was not released.

171.    On August 23, 2005, the Individual Defendants caused or allowed the Company to file a Form 8-K with the SEC that stated in part:

*On August 23, 2005, Brocade Communications Systems, Inc. (the "Company") made an irrevocable call for redemption of all of the Company's outstanding 2% Convertible Subordinated Notes Due 2007 (the "Notes") as of August 22, 2006 (the "Redemption Date") in accordance with the terms of the Indenture dated as of December 21, 2001 between the Company and U.S. Bank National Association* (as successor trustee to State Street Bank and Trust of California N.A.), as Trustee (the "Indenture"). *In connection with the call for redemption of the Notes, the Company deposited with the Trustee $276.1 million in interest-bearing U.S. Treasury securities* (the "Funds"), which will cover all interest scheduled to become due and owing on the Notes prior to the Redemption Date (which will continue to be paid from the Funds to the noteholders when due and payable) and all accrued interest, principal and call premium owing on the Notes on the Redemption Date, thereby fulfilling the Company's obligations to the noteholders. The Funds will remain on the Company's balance sheet as restricted securities until the Redemption

- 68 -

Date. The Company's call for redemption of the Notes and deposit of the requisite principal, interest and call premium amount with the Trustee for the benefit of the noteholders discharged the Indenture effective as of August 23, 2005, subject only to the rights of the noteholders to receive payments of interest, principal and call premium from the Funds deposited with the Trustee and certain related rights. A call premium of 0.4% of the face value of the Notes will be due because the Notes will be redeemed prior to their due date of January 1, 2007.

*The Company expects to record a loss on investments of approximately $4.7 million in the quarter ending October 29, 2005* with respect to the disposition of certain short-term and long-term investments that was necessary to deposit the Funds with the Trustee.

In the event that the Company had not exercised the call for redemption of the Notes, the Company expected to be declared in default under the Notes due to the Company's inability to file its Form 10-Q for the quarter ended April 30, 2005 on or before August 23, 2005. *In such an event, $279.7 million in principal and accrued interest would have become immediately due and payable under the Notes*. The Notes would have otherwise been due in January 1, 2007.

The Company's total cash and investments as of July 30, 2005, the end of the Company's third fiscal quarter, was $733.8 million. As noted above, *the Funds deposited with the Trustee on August 23, 2005 will remain on the Company's balance sheet as restricted securities until the Redemption Date.*

172.    On September 9, 2005, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC for its 3Q:05 Form 10-Q. Brocade still had yet to file its 2Q:05 Form 10-Q.

173.    On November 14, 2005, the Company filed a Form 8-K with the SEC in which it announced it must restate its FY:04 and 1Q:05 financial results. The Form 8-K stated in pertinent part:

As previously disclosed on Form 8-K filed with the Securities and Exchange Commission on May 16, 2005, Brocade Communications Systems, Inc. (the "Company") determined that *the Company's financial statements for the fiscal years ended October 30, 2004, October 25, 2003, and October 26, 2002, and the interim periods contained therein, should no longer be relied upon because of errors in such financial statements.* The Company has restated those financial statements, which appear in the Company's Annual Report on Form 10-K/A for the fiscal year ended October 30, 2004 (the "Form 10-K/A"). As a result of such restatements, on November 10, 2005, the Company, on management's recommendation and in consultation with the Company's Audit Committee and KPMG, LLP, the Company's independent registered public accounting firm, concluded that *the financial statements for the first fiscal quarter of 2005 ended January 29, 2005, should no longer be relied upon because of an error in such financial statements.*

Specifically, the Company concluded that the Company's balance sheet for the first quarter of fiscal 2005 ended January 29, 2005 needs to be restated to reflect the cumulative effect of the restatements previously announced on additional paid-in capital and retained earnings. The restatement of the financial statements for the quarter ended January 29, 2005 relates exclusively to reclassifications within shareholders equity related to the cumulative effect of the foregoing restatements.

- 69 -

174.    On the same day, the Company also filed its 2Q:05 and 3Q:05 Form 10-Q's with the SEC. Net revenues for 2Q:05 were $144.7 million. Net revenues for 3Q:05 were $122.3 million, a decrease of 19 percent compared with net revenues of $150.0 million for the three months ended July 31, 2004.

175.    Although the Director Defendants refused to adequately investigate the cause of Brocade's restatements, on November 14, 2005, they caused or allowed the Company to list a number of changes it had made to its stock option program's internal controls in response to certain of the material weaknesses present in Brocade's internal controls. In this second restatement, the Company added approximately **$71 million** in stock-based compensation expenses. The amended FY:04 Form 10-K stated in pertinent part:

*Changes from December 2002 through October 30, 2004*

1.    Improvements in Disclosure Controls and Internal Control over Financial Reporting:

- We improved the documentation of our significant accounting policies, which are reviewed with our Audit Committee.

- Improvements have been made to the Audit Committee charter and committee functions. The Audit Committee charter was expanded to include in its scope the responsibility to review and approve all new or changes to, significant accounting policies and positions. In addition, we expanded both the number of Audit Committee meetings from four to eight standing meetings, and the duration of those meetings. This allows a more in-depth review of complex accounting issues.

- We formed a Disclosure Committee composed of representatives from our accounting, legal and investor relations departments, and our financial management, the minutes of which are reviewed with the Audit Committee.

2.    *Improvements in stock option granting process and related Internal Controls*:

- We implemented cross functional teams composed of members of our legal, accounting and human resources departments to develop improvements in the stock option granting process.

- We formalized guidelines relating to the size and vesting schedule of stock option grants for all new employees and on-going employee grants.

- We improved the documentation of the actions of the Compensation Committee and grant subcommittee regarding stock option granting.

- We made personnel changes in areas associated with the stock option granting process to increase the levels of experience of the personnel involved.

- We increased the frequency of stock option grants, moving to grants on a two to three week routine cycle, and significantly reduced the processing time between grant dates and the delivery of option paperwork to employees.

### Changes Subsequent to October 30, 2004

Subsequent to October 30, 2004, we have taken a number of steps to strengthen our disclosure controls and procedures and internal control over financial reporting. These remedial measures include personnel and procedural changes to improve the stock option granting and employee change in status processes. Specifically, we have implemented the following additional internal control improvements:

- Increased the Compensation Committee of the Board of Directors to three independent members.

- The Compensation Committee refined and limited delegation of authority to a subcommittee to grant stock options.

- Documented into a formal written policy our stock option granting process.

- Created a pre-determined schedule for employee stock option grants, including enhancements with respect to the grant routine cycle.

- Adopted a policy not to grant executive officers options when trading is restricted for executives under the Company's Insider Trading Policy.

- Improved the documentation and revised the approval process for initial, or changes to, policies associated with change in employee status, including leaves of absence and in transition and advisory roles.

- Established cross-functional teams comprised of members of our accounting, information technology and human resource departments to develop improvements in the employee change of status systems and processes.

- Performed additional training for personnel in areas associated with the stock option granting and employee change in status processes to increase competency levels of the personnel involved.

We also completed further testing of the policies and procedures and related controls that we recently implemented as discussed above.

176.    On November 16, 2005, the Company issued a press release announcing its preliminary 4Q:05 financial results. In it, Brocade stated that its GAAP earnings per share was expected to include charges of approximately: (i) *$4.9 million related to the internal review and SEC investigation*; and (ii) $0.7 million for stock-based compensation.

- 71 -

177.    On November 22, 2005, the Company issued a press release announcing the resignation of defendant Nicholas G. Moore from the Company's Board. No reasons were given for his departure.

178.    On December 6, 2005, the *Silicon Valley/San Jose Business Journal* published an article entitled *"Probe Costs Drag Down Brocade Earnings."* The article stated in pertinent part:

> Earnings reported Tuesday by Brocade Communications Systems Inc. fell sharply on the costs of an internal probe related to a Securities and Exchange Commission inquiry.
>
> San Jose-based Brocade's posted net income of $1.1 million, or 0 cents per share, compared to $20.3 million, or 8 cents a share, a year ago.
>
> *This year's fourth quarter results included $5 million in inquiry expenses and a $5.2 million pretax loss on investments. The Securities and Exchange Commission and Justice Department are investigating Brocade's treatment of stock options expensing.*
>
> Without the special charges, Brocade would have earned $19 million, or 7 cents a share, in the quarter, 2 cents better than a survey of analysts predicted.
>
> Revenue fell 6 percent from a year ago to $145.5 million.

179.    On December 21, 2005, the Company announced defendant Canova's resignation as CFO. No reason was given for Canova's departure.

180.    On January 13, 2006, the Company filed a Form NT 10-K, indicating that it would not be able to timely file its FY:05 Form 10-K.

181.    On January 23, 2006, the Company filed a Form 8-K with the SEC which announced that Brocade and its Board had entered into a tolling agreement with defendant Reyes. Pursuant to the terms of the tolling agreement, all periods of limitation (statutory or otherwise) affecting any claims or causes of action which defendant Reyes may have against Brocade and its Directors or any of them, or which Brocade and its Directors or any of them may have against defendant Reyes, shall be tolled from January 1, 2006 until the earlier of (1) January 1, 2008, or (2) forty-five days from the date of service upon the attorneys for the parties hereto of a written notice terminating this agreement. This announcement centered on defendant Reyes' plan to file a lawsuit against the directors on January 24, 2006. Brocade's Board was able to persuade him to hold off by extending the statute of limitations on a potential wrongful termination charge.

182.   On February 13, 2006, *Business Week* published an article entitled "Brocade: Stung By Stock Options," which discussed the supposed disputes between members of Brocade's board. Significantly, defendant Reyes is reported to have said that defendant Sonsini urged the board to make Reyes a "committee of one" to dole out options as he wished in 1999. The article stated, in pertinent part:

> After Greg Reyes suddenly resigned as chief executive of Brocade Communications Inc. a year ago, the reputation of the swashbuckling onetime billionaire immediately went from gold to mud. The reason: His ouster came just weeks after Brocade announced options accounting irregularities that required a restatement of earnings. But now, more than his image is on the line. Three sources tell BusinessWeek that the Securities & Exchange Commission is likely to bring civil charges against him in the coming weeks. The Justice Dept. is also investigating a criminal case. "I'm scared," says Reyes.

> He should be. *Twice in the last year, Brocade admitted that it incorrectly accounted for options it granted new hires. The probe comes when the government is investigating many former tech high-fliers for similar practices. Predicts one tech lawyer, "Someone is going to get the opportunity to be the Martha Stewart of options pricing, and Brocade is a leading candidate."*

> But Reyes, who loves to hunt big game, plans to fight back. And he plans to do it in a way that could put a spotlight on Brocade's board -- including Silicon Valley super-lawyer Larry W. Sonsini, who left the board soon after Reyes' departure. The 43-year-old Reyes insists he did nothing to enrich himself and says the mistakes were primarily paperwork errors by a former human resources executive. *Even if he had approved the practices, he says, it would have been within his authority, given the sweeping powers the board gave him in 1999.* Now, he argues, seven current and former directors are scapegoating him to minimize their own liability. "What better way to do that than to throw me under the bus," he says. Neither Brocade, Sonsini, the SEC, or the Justice Dept. would comment for this story.

> Reyes was planning to file a civil suit against the directors on Jan. 24, before Brocade persuaded him to hold off by extending the statute of limitations on a potential wrongful termination charge. And he's also mulling a shareholder suit, alleging that the investigation by the board's audit committee did far more to hurt investors than the alleged accounting miscues. In particular, he says he was in the final stages of selling

Brocade to Cisco Systems Inc. (CSCO ) for $9 a share in November, 2004. Brocade makes data storage gear and was one of the hottest stocks of the Net bubble, with a onetime market cap of $24 billion. But talks with Cisco stalled after the board disclosed the investigation. Other inside sources say that Cisco got cold feet after finding the accounting irregularities on its own but confirm that Reyes' departure two months later further diminished its interest. Cisco declined to comment.

> Much of Reyes' ire is saved for Sonsini, a power broker who has advised everyone from Steve Jobs to Google (GOOG ) during a storied 40-year-career. *Reyes says Sonsini urged the board to make Reyes a "committee of one" to dole out options as he wished in 1999.* The next he heard from the board, he claims, was after a disgruntled former employee threatened to file a whistleblower suit in 2004 alleging improprieties related to options.

- 73 -

*After an investigation, Reyes says Sonsini persuaded him to resign because the evidence pointing to him was "overwhelming and conclusive." Only after Reyes had seen the evidence and, unimpressed, tried to rescind his resignation did Sonsini reveal that Brocade's outside auditor had refused to certify Brocade's financials with Reyes as CEO, says Reyes. His argument: that members of the board overstated his role in order to deflect the auditor's attention from themselves.*

With possible SEC charges looming, Reyes is pressing his demands. He told Brocade he would drop talk of lawsuits if it publicly exonerates him, puts him back on the board, and pays him a rich consulting package it rescinded last summer. But if the government's case is as strong as some insiders close to Brocade hint it is, this big-game hunter may be feeling less like the pursuer and more like prey.

183.    On February 8, 2006, the Company filed a Form 8-K with the SEC which announced that Brocade's Nominating and Corporate Governance Committee approved a one-time payment of $100,000 to defendant David House in recognition of his role as Chairman during the previous year. The filing also announced that defendants Paisley and Neiman notified the Company that they would not be standing for re-election to the Board at the Company's 2006 Annual Meeting of Stockholders.

184.    On February 17, 2006, *Business Week* published an article entitled "The Plot Thickens at Brocade," which highlighted the personnel related disclosures made on February 8, 2006. The article stated in pertinent part:

Turns out that, according to a Feb. 8 government filing, two of Brocade's board members will not stand for reelection at the company's annual meeting on April 17.

One of those directors is *Seth Neiman*, a managing partner at Crosspoint Venture Partners. *He's considered a father of the company, given that he provided initial funding and management aid even before there was a business plan.* My sources suggest his departure is no big surprise, as Nieman has talked about wanting to step off the board for the last few years.

More interesting is the departure of former 3Com Corp. chief financial officer *Chris Paisley. As head of the board's audit committee, he's had a central role in the saga of the past year.* He launched the sweeping internal investigation into the company's books that began in late 2004, after a disgruntled former sales manager threatened to bring a whistleblower suit to the SEC alleging options accounting naughtiness, if the company didn't renege on a threat to foreclose on his house to get repayment of a loan granted to him when he was hired. The investigation led to massive restatements, a public acknowledgement of accounting problems and possibly "improprieties", and the ouster of Reyes, a larger-than-life personality in this niche of the networking market who was seen as the driving force behind the company.

* * *

While on the topic of Brocade, there's one more recent item of note, also announced in that 8-K filing from Feb. 8. *The company announced it was paying boardmember Dave House, a former executive at Intel and Nortel, a one-time*

*$100,000 bonus for his work over the past year. That's interesting because, according to multiple sources, House was originally picked to replace Reyes.* Only after many top executives protested that House lacked sufficient knowledge of the close-knit storage networking business did the board decide to give the job to company executive Mike Klayko, who was running sales at the time.

Brocade, House and Klayko all declined to comment, citing the SEC investigation.

185.   On May 12, 2006, Brocade filed a Form 8-K with the SEC which announced in pertinent part:

On May 12, 2006, Brocade Communications Systems, Inc. filed a Schedule TO ("Tender Offer") with the Securities and Exchange Commission. *The Tender Offer was filed to address recent changes to tax laws that could have serious, unfavorable personal tax consequences for some of Brocade's employees who received certain stock options that were or may have been granted at a discount from fair market value at the time of grant.* Specifically, under Section 409A of the Internal Revenue Code, certain options granted at a discount may trigger certain adverse tax consequences, including income tax at vesting, an additional 20% tax and interest charges, in addition to standard federal, state and other applicable taxes.

**THE TRUTH COMES TO LIGHT REGARDING DEFENDANTS' ILLEGAL BACKDATING PRACTICES**

186.   On June 5, 2006, MercuryNews.com released an article entitled "Company's Recruiting Perks Under Fire in Suit," which elaborated on certain disreputable hiring practices by Brocade since at least 1999. The article stated in pertinent part:

It was boom time in Silicon Valley and Greg Reyes wouldn't take no for an answer.

The CEO of Brocade Communications wanted David Smith, a senior executive at a Houston software firm, to join the hot, newly public company. So he dangled a big relocation bonus and 200,000 options to buy Brocade's stock at $149.06 a share.

*Reyes set the price in a Jan. 6, 2000, offer letter – well before Smith started working at Brocade in April. With Brocade's stock surging, that gave Smith a big head start to millions of dollars in potential profits.*

*Smith, a shareholder lawsuit claims, was among a number of employees who benefited from Brocade's "pervasive scheme" to manipulate option grants.*

*The suit provides a glimpse at how one company allegedly used deliberately timed option grants as a recruiting tool during the dot-com boom.* Brocade is one of more than two dozen companies nationwide where options practices -- including backdating of grants to take advantage of lower stock prices -- are now being investigated by federal regulators or the companies themselves.

Reyes couldn't be reached for comment and his attorney didn't return calls or e-mails. A spokeswoman for Brocade wouldn't comment on pending litigation.

Smith, who was later fired by Brocade and now lives in Florida, declined to comment.

Smith eventually netted $7.4 million from his sale of Brocade shares in 2000 and 2001, the San Jose-based data storage networking company said in court documents.

Other examples

The 112-page shareholder lawsuit, initially filed in May 2005 and consolidated as a class action in April, cites Smith's situation as *one of several examples of how Brocade allegedly violated its own rules for granting options, hid the actual costs from shareholders and regulators, and defrauded investors.*

Much of the activity occurred during the dot-com boom, when Silicon Valley companies were competing fiercely for skilled workers.

"You had a hiring frenzy and stocks going through the roof. Mix in some desperate hiring managers and lax controls around option grants, and it's not surprising that some of the sloppiness evolved into abuse. This is where it all ends up," said Tim Sparks, president of Compensia, a compensation consultant in San Jose. His firm was hired in May to advise Brocade's current board.

*The lawsuit in San Francisco federal district court claims Brocade recruited employees by giving them offer letters with early, often false, start dates for employment -- so they could get the lowest possible price on options. Some came in to fill out paperwork just to get an early start date and were put on leaves of absence from Brocade while they finished their employment at another company, the suit says.*

*The suit alleges that Reyes had the authority to ``dole out'' options ``as a committee of one'' and that he also at times held ``ad hoc'' board meetings with other executives to approve option grants.*

Reyes stepped down as CEO in January 2005, a few weeks after the company's first announcement that it would restate financials. But he stayed on as a consultant until June 2005.

Brocade disclosed May 16, 2005, that the Justice Department and the Securities and Exchange Commission were investigating its option-granting practices.

Leslie Davis, a spokeswoman for Brocade, said the company will address some of the litigation issues in its next quarterly SEC filing. Brocade is in "active" settlement talks with the SEC and has set aside $7 million for a potential settlement, she added.

Spokesmen for the SEC and the Justice Department declined to comment on Brocade.

Attorneys at Wilson Sonsini Goodrich & Rosati, who represent Brocade and its board, did not return calls seeking comment.

Making changes

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Brocade recently has moved to improve its controls and accounting practices. The company, which went public in 1999, has restated every year of its financials through 2004.

*One of its most telling restatements was for fiscal 2000, ended Oct. 31, 2000. Brocade said that it actually lost $951.2 million or $4.59 a share, instead of earning $68 million, or 65 cents a share. The $1 billion difference, the company said, was related to its stock-based compensation and associated income tax adjustments.*

Brocade also said in SEC filings in 2005 that restatements were necessary because it had incorrectly accounted for option grants to new hires, part-time employees, employees on leaves of absence or in transitory roles with the company, from 1999 to 2004.

*The shareholder suit against Brocade was based on information from nine former employees, several of whom were recruiters or worked in human resources handling offer letters and other paperwork.* The Arkansas Public Employee Retirement System, claiming a loss of $1.9 million, is the lead plaintiff in the shareholder suit.

Smith's Jan. 6, 2000, letter offered him a job as a vice president, with a base salary of $240,000 a year and 200,000 options, with the grant date being his first day of employment. "Therefore, with your start date of Jan. 6, 2000, your stock will be priced at $149.063 per share," wrote Reyes, in the letter, which was an exhibit in a separate lawsuit by Brocade against Smith.

In that suit, Smith stated that he started working full time at Brocade in April 2000 -- significantly later than the supposed January start date.

*Another former Brocade employee who allegedly had a confrontation with Reyes was named in the shareholder suit as the whistle-blower in the federal investigations of Brocade. Daniel Cudgma was hired as a vice president in sales, the suit says. A former employee in the recruiting department quoted in the suit recalled "a rush to get approvals and the t's crossed and i's dotted so Cudgma could take advantage of a lower strike price.*

*After a disagreement with Reyes, the suit contends, Cudgma "threatened to expose the whole backdating thing" and was fired.*

Cudgma, who is now a vice president of sales of Gryphon Networks outside of Boston, did not return calls.

187.   The Individual Defendants have thus far refused to admit that they caused and/or allowed the Company to engage in improper backdating of stock options.   Instead, their acquiescence to defendants Reyes, Jensen and Canova's scheme continues as they attempt to fortify any losses they themselves might incur.  For example, the Individual Defendants have caused or allowed the Company to enter into a tender offer agreement with certain employees by which Brocade will cancel their improperly backdated shares in exchange for a cash payment.   The

- 77 -

1   estimated cost to the Company for the cash payments is *$3.5 million to $4.5 million*. A Form 8-K

2   filed with the SEC on May 12, 2006, acknowledged that the tender offer was intended to alleviate

3   "serious, unfavorable personal tax consequences for some of Brocade's employees who received

4   certain stock options that were or may have been granted at a discount from fair market value at the

5   time of grant."

6       188.    On June 12, 2006, the Company filed a Form 8-K with the SEC in which it detailed

7   agreements, totaling over $683,000, entered into with certain of the Individual Defendants, among

8   others, pursuant to the Tender Offer announced on May 12, 2006. The Form 8-K stated in pertinent

9   part:

10      Effective June 12, 2006, Brocade Communications Systems, Inc. (the "Company")
        completed its previously disclosed Tender Offer (see Form 8-K filed May 12, 2006).
11      As previously announced, the Tender Offer was filed to address recent changes to tax
        laws that could have adverse personal tax consequences for some of Brocade's
12      employees who received stock options that were or may have been granted at a
        discount from fair market value at the time of grant. Four of the Company's executive
13      officers elected to participate in the Tender Offer and, as a result, have entered into
        definitive agreements with the Company in connection with the Tender Offer,
14      effective as of June 12, 2006. Each of the agreements with the executive officers who
        participated in the Tender Offer is detailed below and was entered into on the same
15      terms and conditions as were available to all participants in the Tender Offer:

16          •   *Michael Klayko*, Chief Executive Officer, elected to amend a portion
                of his nonqualified stock option grant dated August 15, 2003 to increase the
17              exercise price per share from $5.53 to $5.64. In consideration for the
                amendment to his option, Mr. Klayko will receive a cash payment of
18              *$18,333.37* promptly following January 1, 2007.

19
            •   *Richard Deranleau*, Chief Financial Officer, Vice President and
20              Treasurer, elected (i) to amend a portion of his nonqualified stock option
                grant dated December 10, 2003 to increase the exercise price per share from
21              $5.52 to $5.78 and to receive a cash payment promptly following January 1,
                2007 of *$1,040.00* in consideration for the amendment to such option, (ii) to
22              amend a portion of his nonqualified stock option grant dated June 9, 2004 to
                increase the exercise price per share from $5.68 to $5.71 and to receive a
23              cash payment promptly following January 1, 2007 of *$367.50* in
                consideration for the amendment to such option, and (iii) to cancel a portion
24              of his nonqualified stock option grant dated July 28, 2003 in consideration
                for a cash payment to be made promptly following January 1, 2007 of
25              *$40,327.53*.

26

27

28

                                        - 78 -
                CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

189.    Thus, rather than pursuing action against the recipients of the benefits of the Company's fiscal woes, the defendants on Brocade's Board at the time of the Tender Offer remained more concerned with preventing any financial loss to themselves or their colleagues.

190.    Indeed, the Individual Defendants and KPMG are now attempting to extinguish *any* liability for their misfeasance by entering into a presumably inadequate settlement in the Federal Derivative Action, a settlement which has been approved by those Directors Defendants who are currently on the Board.  According to the terms of the Proposed Settlement, the Federal Derivative Plaintiffs have agreed to release all defendants named in the Federal Derivative Action,[8] except defendant Reyes, as well as all current directors of Brocade, for most claims alleged prior to January 2006 in exchange for some corporate therapeutics and $525,000 in attorney's fees.  Yet, Brocade will receive no compensation for the damage it incurred, the extent of which is still being revealed. Moreover, the proposed release will release all claims relating to defendants' backdating of stock options that are now the subject of civil and criminal charges without regard to any monetary recovery for Brocade.

**CIVIL AND CRIMINAL CHARGES ARE BROUGHT AGAINST DEFENDANTS REYES, JENSEN AND CANOVA**

191.    And then, on July 20, 2006, the SEC announced that it had filed civil charges against defendants Reyes, Jensen and Canova.  A criminal case was simultaneously brought by the United States Attorney for the Northern District of California against Reyes and Jensen. An article by *The Wall Street Journal*, entitled "Brocade Ex-CEO, 2 Others Charged In Options Probe" released on July 21, 2006, explained the charges in both actions.  It stated, in pertinent part, as follows:

> *Federal authorities issued civil and criminal securities-fraud charges against a former Silicon Valley chief executive and two other executives in a stock-options backdating scheme, signaling they will take a hard line in the widening scandal.*
>
> Prosecutors accused 43-year-old Gregory Reyes, the CEO of Brocade Communications Systems Inc. until January 2005, of backdating options he doled out as a "committee of one" to hundreds of employees, boosting the potential value of the

---

[8]  Defendants Canova, Klayko, Neiman, Dempsey, Paisley, House, Moore, Krause, Vaswani and Walker are each named as defendants in the Federal Derivative Action. KPMG is also named as a defendant in the Federal Derivative Action.

options and concealing millions of dollars of compensation expenses from shareholders.

*Officials underscored how seriously they view options manipulation by charging not just Mr. Reyes — who isn't directly accused of backdating his own grants, and who made no profit from them — but also a former chief financial officer and former vice president for human resources at the firm.*

They also indicated that many more executives could face charges related to manipulating options. Securities and Exchange Commission Chairman Christopher Cox said the agency is investigating more than 80 companies.

*"The full weight of the federal government is being put behind this effort to stamp out fraudulent stock-option backdating," he said at a San Francisco news conference.* He said additional cases likely would be brought in the "coming weeks and months."

The crux of the case brought yesterday is that Mr. Reyes altered the dates of option grants to new employees to increase their value and give Brocade, a San Jose, Calif., maker of switching devices for data-storage networks, an edge in the cutthroat scramble for talent during Silicon Valley's boom days. In doing so, prosecutors said, he violated accounting rules by not recording the proper expenses for the options.

*Under a criminal complaint from the U.S. attorney for the Northern District of California, Mr. Reyes faces a single count of securities fraud, which carries a maximum penalty of 20 years in prison. Also facing a criminal-fraud charge is Stephanie Jensen, 48, Brocade's human-resources director from October 1999 through February 2004. She is accused of helping Mr. Reyes with the scheme.*

Both also face civil charges from the SEC of securities fraud and filing false documents. *Antonio Canova, 44, who served as the company's finance chief from May 2001 until he left in December, also was charged in the civil* case but not in the criminal action.

\* \* \*

*The SEC's Mr. Cox warned that backdating "deceives investors and the market as a whole about the financial health of companies that cheat in this way." He added, "It is poisonous to an efficient marketplace."*

\* \* \*

The charges against Ms. Jensen and Mr. Canova suggested that federal officials won't hesitate to pursue those further down the corporate ladder who allegedly participated in an options-timing fraud.

John Coffee, a law professor at Columbia Law School, said human-resources officials could find themselves in the hot seat as prosecutors attempt to persuade them to cooperate in investigations of senior executives. "This is going to send a shiver through the spines of much of corporate America," he said.

*The SEC also showed it won't take a kind view of executives who knew about backdating but signed off on financial statements. The agency said that's what Mr. Canova did, despite hearing misgivings from some employees about the*

*practice. The SEC also alleged that he "helped facilitate" the fraud by directing others to ensure that option dates matched hiring dates in employee records.*

192.     Thus, as the architects of the Company's fiscal woes face civil and criminal charges, the remaining Individual Defendants, who acquiesced to the scheme, have denied any role in the backdating scandal which now embroils Brocade.  Instead, on July 20, 2006, the Individual Defendants caused or allowed the Company to issue a press release, entitled "Brocade Statement Regarding Stock Option Matters," in which they proclaimed that "[n]o executive officers involved in the historical stock option granting practices remain employed with Brocade."  The press release further disclosed that the Company has reserved $7 million for a proposed settlement with the SEC.

193.     Although most of the Individual Defendants have escaped relatively unscathed from the scandal which has embroiled the Company, defendant Reyes and Jensen were charged on August 10, 2006, with a twelve-count indictment by the United States Department of Justice, which includes: (i) charges of conspiracy to commit securities fraud; (ii) securities fraud; (iii) mail fraud; (iv) making false statements in SEC filings; and (v) falsifying books and records.  Reyes was further charged with four counts of making false statements to the Company's auditors.  All but one of the counts brought against Reyes and Jensen carry maximum penalties of twenty years in prison and a $5 million fine plus restitution.  Further, Reyes was ordered to pay a $2 million bail while Jensen's bond was set at $500,000.

194.     The Company still suffers from the effects of Reyes, Jensen and Canova's illegal backdating practices.  The Corporate Library, the leading independent source for United States corporate governance information and analysis, recently downgraded its score for Brocade.  The overall rating for the Company is a "D," which places Brocade in a high risk category due to the numerous allegations related to Reyes, Jensen and Canova's illicit stock option granting practices.

## IMPROPER FINANCIAL REPORTING

195.     The Individual Defendants and defendant KPMG by their fiduciary duties of care, good faith and loyalty owed to Brocade a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and

1  understand the material, non-public information to be either disclosed or omitted from the

2  Company's public statements. This material, non-public information included the presence of

3  material weaknesses in the Company's internal controls. Furthermore, defendants Neiman,

4  Dempsey, Moore, Leslie, Krause, Sonsini, Paisley and O'Brien, as members of the Audit Committee

5  at various times since at least 1999, had a special duty to know and understand this material

6  information as set out in the Audit Committee's charter which provides that it is responsible for,

7  among other things, oversight of: (i) the quality and integrity of the Company's accounting and

8  financial reporting processes and the audits of its financial statements; (ii) the performance of the

9  Company's systems of internal controls, disclosure controls and internal audit functions; and (iii) the

10  Company's procedures for legal and regulatory compliance, risk assessment and business conduct

11  standards. Defendants Klayko, Deranleau, Jaworski, Whiting, Cuthbert, D. Smith, Jensen, Reyes,

12  House, Canova, Bonderson and Byrd, as officers of Brocade, had ample opportunity to discuss this

13  material information with their fellow officers at management meetings and via internal corporate

14  documents and reports. Moreover, defendants House, Klayko, Reyes, Neiman, Dempsey, Walker,

15  Moore, Vaswani, Leslie, Krause, Jones, Rose, Sonsini, Paisley and O'Brien, as directors of Brocade

16  had ample opportunity to discuss this material information with management and fellow directors at

17  any of the forty-six Board meetings that occurred since at least 1999 as well as at meetings of

18  committees of the Board. Despite these duties, the Individual Defendants and KPMG negligently,

19  recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following

20  improper statements to be disseminated by Brocade to the investing public and the Company's

21  shareholders since at least 1999.

22  **The FY:99 Form 10-Q and Form 10-K**

23  196.    On September 15, 1999, the Individual Defendants caused or allowed Brocade to file

24  Form 10-Q for the 3Q:99. On January 31, 2000, the Individual Defendants caused or allowed the

25  Company to file its FY:99 Form 10-K with the SEC. The FY:99 Form 10-K was subsequently

26  amended. Accordingly, on February 28, 2000, the Individual Defendants caused or allowed the

27  Company to file its FY:99 Form 10-K/A with the SEC. The FY:99 Form 10-Qs and 10-K were

28  simultaneously distributed to shareholders and the public. The FY:99 Form 10-Qs and 10-K

1   included Brocade's FY:99 financial statements which were improperly presented in violation of

2   GAAP, due to improper accounting for the backdated stock options. As a result, Brocade's

3   compensation expense was understated and its net earnings were overstated.

### The FY:00 Form 10-Qs and Form 10-K

5   197.   On March 13, 2000, June 13, 2000 and September 12, 2000, the Individual

6   Defendants caused or allowed Brocade to file Form 10-Qs for the 1Q:00, 2Q:00 and 3Q:00,

7   respectively. On January 26, 2001, the Individual Defendants caused or allowed the Company to file

8   its FY:00 Form 10-K with the SEC. The FY:00 Form 10-Qs and 10-K were simultaneously

9   distributed to shareholders and the public. The FY:00 Form 10-Qs and 10-K included Brocade's

10  FY:00 financial statements which were improperly presented in violation of GAAP, due to improper

11  accounting for the backdated stock options. As a result, Brocade's compensation expense was

12  understated and its net earnings were overstated.

### The FY:01 Form 10-Qs and Form 10-K

14  198.   On March 13, 2001, June 12, 2001 and September 11, 2001, the Individual

15  Defendants caused or allowed Brocade to file Form 10-Qs for the 1Q:01, 2Q:01 and 3Q:01,

16  respectively. On January 24, 2002, the Individual Defendants caused or allowed the Company to file

17  its FY:01 Form 10-K with the SEC. The FY:01 Form 10-Qs and 10-K were simultaneously

18  distributed to shareholders and the public. The FY:01 Form 10-Qs and 10-K included Brocade's

19  FY:01 financial statements which were improperly presented in violation of GAAP, due to improper

20  accounting for the backdated stock options. As a result, Brocade's compensation expense was

21  understated and its net earnings were overstated.

### The FY:02 Form 10-Qs and Form 10-K

23  199.   On March 12, 2002, May 30, 2002 and August 27, 2002, the Individual Defendants

24  caused or allowed Brocade to file Form 10-Qs for the 1Q:02, 2Q:02 and 3Q:02, respectively. On

25  January 22, 2003, the Individual Defendants caused or allowed the Company to file its FY:02 Form

26  10-K with the SEC. The FY:02 Form 10-Qs and 10-K were simultaneously distributed to

27  shareholders and the public. The FY:02 Form 10-Qs and 10-K included Brocade's FY:02 financial

28  statements which were improperly presented in violation of GAAP, due to improper accounting for

1   the backdated stock options. As a result, Brocade's compensation expense was understated and its

2   net earnings were overstated.

3               **The FY:03 Form 10-Qs and Form 10-K**

4        200.   On March 7, 2003, June 9, 2003 and September 8, 2003, the Individual Defendants

5   caused or allowed Brocade to file Form 10-Qs for the 1Q:03, 2Q:03 and 3Q:03, respectively. On

6   January 20, 2004, the Individual Defendants caused or allowed the Company to file its FY:03 Form

7   10-K with the SEC. The FY:03 Form 10-Qs and 10-K were simultaneously distributed to

8   shareholders and the public. The FY:03 Form 10-Qs and 10-K included Brocade's FY:03 financial

9   statements which were improperly presented in violation of GAAP, due to improper accounting for

10   the backdated stock options. As a result, Brocade's compensation expense was understated and its

11   net earnings were overstated.

12               **The FY:04 Form 10-Qs and Form 10-K**

13        201.   On March 8, 2004, June 14, 2004 and September 13, 2004, the Individual Defendants

14   caused or allowed Brocade to file Form 10-Qs for the 1Q:04, 2Q:04 and 3Q:04, respectively. On

15   January 31, 2005, the Individual Defendants caused or allowed the Company to file its FY:04 Form

16   10-K with the SEC. The FY:04 Form 10-Qs and 10-K were simultaneously distributed to

17   shareholders and the public. The FY:04 Form 10-Qs and 10-K included Brocade's FY:04 financial

18   statements which were improperly presented in violation of GAAP, due to improper accounting for

19   the backdated stock options. As a result, Brocade's compensation expense was understated and its

20   net earnings were overstated.

21               **The FY:05 Form 10-Qs and Form 10-K**

22        202.   On March 9, 2005, June 10, 2005 and September 9, 2005, the Individual Defendants

23   caused or allowed Brocade to file Form 10-Q for the 1Q:05, and NT 10-K's for 2Q:05 and 3Q:05,

24   respectively. On January 19, 2006, the Individual Defendants caused or allowed the Company to file

25   its FY:05 Form 10-K with the SEC. On November 14, 2005, the Individual Defendants caused or

26   allowed Brocade to file Form 10-Qs for the 2Q-05 and 3Q:05, Form 10-Q/A for the 1Q:05 and Form

27   10-K/A for the FY:04. The FY:05 Form 10-Qs, 10-Q/A and 10-K along with the FY:04 Form 10-

28   K/A were simultaneously distributed to shareholders and the public. The FY:05 Form 10-Qs and 10-

1  K included Brocade's FY:05 financial statements which were improperly presented in violation of

2  GAAP, due to improper accounting for the backdated stock options. As a result, Brocade's

3  compensation expense was understated and its net earnings were overstated.

4      203.    The improper FY:98 to FY:05 Form 10-Ks and 10-Qs described above were

5  reviewed, prepared and/or endorsed by the Individual Defendants. The following chart details the

6  defendants who signed and certified the Company's filings under the Sarbanes-Oxley Act of 2002

7  ("SOX"):

| Date | Filing | Person(s) Who Signed and Certified |
|---|---|---|
| 9/15/99 | 10-Q | Michael J. Byrd (Vice President, Finance and Chief Financial Officer) |
| 01/31/00 | 10-K | Gregory L. Reyes (President, Chief Executive Officer, and Director), Michael J. Byrd (Vice President, Finance and Chief Financial Officer), Seth D. Neiman (Chairman of the Board), Neal Dempsey (Director), Mark Leslie (Director), Larry W. Sonsini (Director) |
| 01/31/00 | 10-K/A | Gregory L. Reyes (President, Chief Executive Officer, and Director), Michael J. Byrd (Vice President, Finance and Chief Financial Officer), Seth D. Neiman (Chairman of the Board), Neal Dempsey (Director), Mark Leslie (Director), Larry W. Sonsini (Director) |
| 02/28/00 | 10-K/A | Gregory L. Reyes (President, Chief Executive Officer, and Director), Michael J. Byrd (Vice President, Finance and Chief Financial Officer, and Assistant Secretary), Seth D. Neiman (Chairman of the Board), Neal Dempsey (Director), Mark Leslie (Director), Larry W. Sonsini (Director) |
| 03/13/00 | 10-Q | Michael J. Byrd (Vice President, Finance and Chief Financial Officer) |
| 06/13/00 | 10-Q | Michael J. Byrd (Vice President, Finance and Chief Financial Officer) |
| 09/12/00 | 10-Q | Michael J. Byrd (Vice President, Finance and Chief Financial Officer) |
| 01/26/01 | 10-K | Gregory L. Reyes (President, Chief Executive Officer, and Director [Principal Executive Officer] ), Michael J. Byrd (Vice President and Chief Financial Officer [Principal Financial and Accounting Officer] ), Seth D. Neiman (Chairman of the Board), Neal Dempsey (Director), Mark Leslie (Director), Larry W. Sonsini (Director) |
| 03/13/01 | 10-Q | Michael J. Byrd (Vice President and Chief Financial Officer) |
| 06/12/01 | 10-Q | Antonio Canova (Vice President, Finance and Chief Financial Officer) |
| 09/11/01 | 10-Q | Antonio Canova (Vice President, Finance and Chief Financial Officer) |
| 01/24/02 | 10-K | Gregory L. Reyes (Chairman of the Board and Chief Executive Officer [Principal Executive Officer] ), Antonio Canova (Vice President, Finance and Chief Financial Officer [Principal Financial and Accounting Officer] ), Neal Dempsey (Director), Mark Leslie (Director), Seth D. Neiman (Director), Larry W. Sonsini (Director) |
| 03/12/06 | 10-Q | Antonio Canova (Vice President and Chief Financial Officer) |
| 05/30/02 | 10-Q | Antonio Canova (Vice President and Chief Financial Officer) |
| 08/27/02 | 10-Q | Antonio Canova (Vice President, Finance and Chief Financial Officer) **SOX Certificate** Gregory L. Reyes (Chairman of the Board and Chief Executive Officer), Antonio Canova (Vice President, Finance and Chief Financial Officer) |

- 85 -

| | | |
|---|---|---|
| 01/22/03 | 10-K | Gregory L. Reyes (Chairman of the Board and Chief Executive Officer [Principal Executive Officer] ), Antonio Canova (Vice President, Finance and Chief Financial Officer [Principal Financial and Accounting Officer] ), Neal Dempsey (Director), Seth D. Neiman (Director), Christopher B. Paisley (Director), Larry W. Sonsini (Director) **SOX Certificate** Gregory L. Reyes (Chairman of the Board and Chief Executive Officer), Antonio Canova (Vice President, Finance and Chief Financial Officer) |
| 03/07/03 | 10-Q | Antonio Canova (Vice President, Finance and Chief Financial Officer), Gregory L. Reyes (Chairman of the Board and Chief Executive Officer [Principal Executive Officer] ) **SOX Certificate** Gregory L. Reyes (Chairman of the Board and Chief Executive Officer), Antonio Canova (Vice President, Finance and Chief Financial Officer) |
| 06/09/03 | 10-Q | Antonio Canova (Vice President, Finance and Chief Financial Officer) **SOX Certificate** Gregory L. Reyes (Chairman of the Board and Chief Executive Officer), Antonio Canova (Vice President, Finance and Chief Financial Officer) |
| 09/08/03 | 10-Q | Antonio Canova (Vice President, Finance and Chief Financial Officer), Gregory L. Reyes (Chairman of the Board and Chief Executive Officer [Principal Executive Officer] ) **SOX Certificate** Gregory L. Reyes (Chairman of the Board and Chief Executive Officer), Antonio Canova (Vice President, Finance and Chief Financial Officer) |
| 01/20/04 | 10-K | Gregory L. Reyes (Chairman of the Board and Chief Executive Officer [Principal Executive Officer] ), Antonio Canova (Vice President, Finance and Chief Financial Officer [Principal Financial and Accounting Officer] ), Neal Dempsey (Director), Seth D. Neima (Director), Christopher B. Paisley (Director), Larry W. Sonsini (Director), Nicholas G. Moore (Director) **SOX Certificate** Gregory L. Reyes (Chairman of the Board and Chief Executive Officer), Antonio Canova (Vice President, Finance and Chief Financial Officer) |
| 03/08/04 | 10-Q | Antonio Canova (Vice President, Finance and Chief Financial Officer), Gregory L. Reyes (Chairman of the Board and Chief Executive Officer [Principal Executive Officer] ) **SOX Certificate** Gregory L. Reyes (Chairman of the Board and Chief Executive Officer), Antonio Canova (Vice President, Finance and Chief Financial Officer) |
| 06/14/04 | 10-Q | Antonio Canova (Vice President, Finance and Chief Financial Officer), Gregory L. Reyes (Chairman of the Board and Chief Executive Officer [Principal Executive Officer] ) **SOX Certificate** Gregory L. Reyes (Chairman of the Board and Chief Executive Officer), Antonio Canova ((Vice President, Finance and Chief Financial Officer) |
| 09/13/04 | 10-Q | Antonio Canova (Vice President, Finance and Chief Financial Officer), Gregory L. Reyes (Chairman of the Board and Chief Executive Officer [Principal Executive Officer] ) **SOX Certificate** Gregory L. Reyes (Chairman of the Board and Chief Executive Officer), Antonio Canova (Vice President, Finance and Chief Financial Officer) |
| 01/31/05 | 10-K | Michael Klayko (Chief Executive Officer [Principal Executive Officer] ), Antonio Canova (Vice President, Administration and Chief Financial Officer [Principal Financial and Accounting Officer] ), David L. House (Executive Chairman), L. William Krause (Lead Director), Neal Dempsey (Director), Nicholas G. Moore (Director), Seth D. Neiman (Director) **SOX Certificate** Michael Klayko (Chief Executive Officer), Antonio Canova (Vice President, Administration and Chief Financial Officer) |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

| | | |
|---|---|---|
| 03/09/05 | 10-Q | Antonio Canova (Vice President, Administration and Chief Financial Officer), Michael Klayko (Chief Executive Officer [Principal Executive Officer] ) **SOX Certificate** Michael Klayko (Chief Executive Officer), Antonio Canova (Vice President, Administration and Chief Financial Officer) |
| 09/09/05 | NT 10-Q | Antonio Canova (Vice President, Administration and Chief Financial Officer) |
| 11/14/05 | 10-K/A | Michael Klayko (Chief Executive Officer [Principal Executive Officer and Director] ), Antonio Canova (Vice President, Administration and Chief Financial Officer [Principal Financial and Accounting Officer] ), David L. House (Executive Chairman), L. William Krause (Lead Director), Neal Dempsey (Director), Nicholas G. Moore (Director), Seth D. Neiman (Director), Christopher B. Paisley (Director), Sanjay Vaswani (Director), Robert Walker (Director) **SOX Certificate** Michael Klayko (Chief Executive Officer), Antonio Canova (Vice President, Administration and Chief Financial Officer) |
| 11/14/05 | 10-Q | Antonio Canova (Vice President, Administration and Chief Financial Officer), Michael Klayko (Chief Executive Officer [Principal Executive Officer] ) **SOX Certificate** Michael Klayko (Chief Executive Officer), Antonio Canova (Vice President, Administration and Chief Financial Officer) |
| 11/14/05 | 10-Q | Antonio Canova (Vice President, Administration and Chief Financial Officer), Michael Klayko (Chief Executive Officer [Principal Executive Officer] ) **SOX Certificate** Michael Klayko (Chief Executive Officer), Antonio Canova (Vice President, Administration and Chief Financial Officer) |
| 11/14/05 | 10-Q/A | Antonio Canova (Vice President, Administration and Chief Financial Officer), Michael Klayko (Chief Executive Officer [Principal Executive Officer] ) **SOX Certificate** Michael Klayko (Chief Executive Officer), Antonio Canova (Vice President, Administration and Chief Financial Officer) |
| 01/13/06 | NT 10-K | Richard Deranleau (Vice President and Interim Chief Financial Officer) |
| 01/19/06 | 10-K | Michael Klayko (Chief Executive Officer [Principal Executive Officer and Director] ), Richard Deranleau (Vice President, Accounting and Interim Chief Financial Officer [Principal Financial and Accounting Officer] ), David L. House (Chairman of the Board), L. William Krause (Lead Director), Neal Dempsey (Director) **SOX Certificate** Michael Klayko (Chief Executive Officer), Richard Deranleau (Interim Chief Financial Officer, VP, Controller and Treasurer) |
| 03/08/06 | 10-Q | Richard Deranleau (Vice President, Interim Chief Financial Officer, and Treasurer), Michael Klayko (Chief Executive Officer [Principal Executive Officer] ) **SOX Certificate** Michael Klayko (Chief Executive Officer [Principal Executive Officer] ), Richard Deranleau (Interim Chief Financial Officer [Principal Accounting Officer] ) |
| 06/07/06 | 10-Q | Richard Deranleau (Chief Financial Officer), Michael Klayko (Chief Executive Officer [Principal Executive Officer] ) **SOX Certificate** Michael Klayko (Chief Executive Officer), Richard Deranleau (Chief Financial Officer) |
| 09/06/06 | 10-Q | Richard Deranleau (Chief Financial Officer), Michael Klayko [Chief Executive Officer [Principal Executive Officer]] **SOX Certificate** Michael Klayko (Chief Executive Officer), Richard Deranleau (Chief Financial Officer) |

CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

204.    The SOX certifications signed in conjunction with the filing of Brocade's Form 10-Ks and 10-Qs contained language that was substantially similar or identical to the following certification attached to Brocade's FY:05 Form 10-K that was signed by defendants Klayko and Deranleau:

I, [Michael Klayko/Richard Deranleau], certify that:

1.  I have reviewed this Annual Report on Form 10-K for the fiscal year ended October 29, 2005 of Brocade Communications Systems, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the

registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

205.    Pursuant to the Audit Committee's Charter, defendants Dempsey, Neiman, Leslie, Sonsini, Paisley, Moore and Krause, as members of the Audit Committee since at least 1999, were each responsible for financial information oversight, which included reviewing and discussing with management and the independent auditor the Company's quarterly and annual financial statements, the critical accounting policies and practices used by the Company and earnings press releases, guidance and other information provided to analysts and rating agencies.  Specifically, the Audit Committee was required to review in advance and approve all filings with the SEC containing, or incorporating by reference, the Company's financial including the Quarterly Reports on Form 10-Q and the Annual Report on Form 10-K and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in such filings.  Thus, by reason of their stated duties, defendants Dempsey, Neiman, Leslie, Sonsini, Paisley, Moore and Krause knew of the false and misleading statements contained in the FY:00, FY:01, FY:02, FY:03 and FY:04 Form 10-K's. Further, in the Audit Committee's Report contained in the Company's Proxy Statement for FY:00, FY:01, FY:02, FY:03 and FY:04, which were each filed with the SEC, defendants Dempsey, Neiman, Leslie, Sonsini, Paisley, Moore and Krause affirmed that they had fulfilled these duties in relation to each of the Forms 10-K:

    The following is the report of the Audit Committee of the Board of Directors. The Audit Committee has reviewed and discussed our audited financial statements for the fiscal year ended 2000 with our management. In addition, the Audit Committee has discussed with KPMG LLP, our independent auditors, the matters required to be discussed by Statement on Auditing Standards No. 61 (Communications with Audit Committee). The Audit Committee also has received the written disclosures and the letter from KPMG as required by the Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees) and the Audit Committee has discussed the independence of KPMG LLP with that firm.

Based on the Audit Committee's review of the matters noted above and its discussions with our independent auditors and our management, the Audit Committee recommended to the Board of Directors that the financial statements be included in our Annual Report on Form 10-K.

### INSIDER SELLING

206.    As a result of the Individual Defendants' actions, Brocade's market capitalization has been damaged by over $9.1 billion.  At the same time that the defendants were causing Brocade to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling approximately $1.5 billion dollars of their personally held stock.

| Defendant | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BONDERSON | 8/23/1999 | 20,000 | $164.22 | $3,284,400.00 |
| | 8/24/1999 | 20,000 | $168.67 | $3,373,400.00 |
| | 8/25/1999 | 27,000 | $181.35 | $4,896,450.00 |
| | 8/26/1999 | 20,000 | $179.38 | $3,587,600.00 |
| | 9/22/1999 | 7,750 | $226.33 | $1,754,057.50 |
| | 9/23/1999 | 12,250 | $225.13 | $2,757,842.50 |
| | 9/27/1999 | 10,000 | $210.27 | $2,102,700.00 |
| | 9/28/1999 | 10,000 | $213.15 | $2,131,500.00 |
| | 9/30/1999 | 10,000 | $211.71 | $2,117,100.00 |
| | 12/8/1999 | 39,000 | $144.50 | $5,635,500.00 |
| | 12/10/1999 | 21,000 | $140.00 | $2,940,000.00 |
| | 12/10/1999 | 10,000 | $141.00 | $1,410,000.00 |
| | 12/10/1999 | 10,000 | $141.38 | $1,413,800.00 |
| | 12/17/1999 | 60,000 | $140.33 | $8,419,800.00 |
| | 2/22/2000 | 500 | $264.56 | $132,280.00 |
| | 2/22/2000 | 50,000 | $266.06 | $13,303,000.00 |
| | 2/22/2000 | 500 | $276.31 | $138,155.00 |
| | 2/23/2000 | 10,000 | $267.90 | $2,679,000.00 |
| | 2/24/2000 | 40,000 | $267.05 | $10,682,000.00 |
| | 2/24/2000 | 21,500 | $268.37 | $5,769,955.00 |
| | 2/25/2000 | 18,500 | $269.16 | $4,979,460.00 |
| | 3/7/2000 | 18,500 | $336.03 | $6,216,555.00 |
| | 3/9/2000 | 31,500 | $325.33 | $10,247,895.00 |
| | 4/4/2000 | 160 | $135.00 | $21,600.00 |
| | 4/4/2000 | 160 | $135.00 | $21,600.00 |
| | 5/30/2000 | 50,000 | $110.03 | $5,501,500.00 |
| | 6/1/2000 | 40,000 | $120.47 | $4,818,800.00 |
| | 6/2/2000 | 10,000 | $126.50 | $1,265,000.00 |
| | 6/2/2000 | 50,000 | $133.18 | $6,659,000.00 |
| | 6/15/2000 | 78,500 | $141.79 | $11,130,515.00 |
| | 6/16/2000 | 7,500 | $145.00 | $1,087,500.00 |
| | 6/16/2000 | 21,500 | $146.63 | $3,152,545.00 |
| | 6/19/2000 | 42,500 | $145.00 | $6,162,500.00 |
| | 8/18/2000 | 25,000 | $209.00 | $5,225,000.00 |