# EXHIBIT 2

# VERISIGN INC/CA

# FORM 10-Q
### (Quarterly Report)

## Filed 11/05/07 for the Period Ending 09/30/07

| | |
|---|---|
| Address | 487 EAST MIDDLEFIELD ROAD |
| | ATTN: GENERAL COUNSEL |
| | MOUNTAIN VIEW, CA 94043 |
| Telephone | 6509617500 |
| CIK | 0001014473 |
| Symbol | VRSN |
| SIC Code | 7371 - Computer Programming Services |
| Industry | Software & Programming |
| Sector | Technology |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2008, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-Q

---

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2007**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission File Number: 000-23593**

---

# VERISIGN, INC.
**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| **Delaware** | **94-3221585** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **487 East Middlefield Road, Mountain View, CA** | **94043** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (650) 961-7500**

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES  ☒    NO  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer  ☒        Accelerated filer  ☐        Non-accelerated filer  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.): YES  ☐    NO  ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

| Class | Shares Outstanding October 31, 2007 |
|---|---|
| Common stock, $.001 par value | 220,953,447 |

Table of Contents

## TABLE OF CONTENTS

**PART I—FINANCIAL INFORMATION**

|  |  | **Page** |
|---|---|---|
| Item 1. | Condensed Consolidated Financial Statements (Unaudited) | 3 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 26 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 38 |
| Item 4. | Controls and Procedures | 39 |

**PART II—OTHER INFORMATION**

| Item 1. | Legal Proceedings | 41 |
|---|---|---|
| Item 1A. | Risk Factors | 44 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 63 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 64 |
| Item 5. | Other Information | 65 |
| Item 6. | Exhibits | 66 |
| Signatures |  | 67 |
| Certifications |  |  |

2

**Table of Contents**

**PART I—FINANCIAL INFORMATION**

**ITEM 1. CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Unaudited)**

    As required under Item 1—Condensed Consolidated Financial Statements (Unaudited) included in this section are as follows:

| Financial Statement Description | Page |
| --- | --- |
| • Condensed Consolidated Balance Sheets as of September 30, 2007 and December 31, 2006 | 4 |
| • Condensed Consolidated Statements of Income for the Three and Nine Months Ended September 30, 2007 and 2006 | 5 |
| • Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2007 and 2006 | 6 |
| • Notes to Condensed Consolidated Financial Statements | 7 |

3

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(In thousands, except share data)**
**(Unaudited)**

| | September 30, 2007 | December 31, 2006 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 1,061,312 | $ 478,749 |
| Short-term investments | 61,095 | 198,656 |
| Accounts receivable, net of allowance for doubtful accounts of $5,920 and $8,083 at September 30, 2007 and December 31, 2006, respectively | 220,232 | 241,570 |
| Prepaid expenses and other current assets | 116,191 | 294,955 |
| Deferred tax assets | 77,179 | 81,773 |
| Current assets of discontinued operations | — | 36,661 |
| Total current assets | 1,536,009 | 1,332,364 |
| Property and equipment, net | 599,202 | 605,292 |
| Goodwill | 1,267,967 | 1,442,493 |
| Other intangible assets, net | 213,246 | 333,430 |
| Restricted cash | 47,406 | 49,437 |
| Long-term deferred tax assets | 183,265 | 179,023 |
| Other assets | 56,511 | 25,214 |
| Investments in unconsolidated entities | 122,866 | — |
| Long-term assets of discontinued operations | — | 7,000 |
| Total long-term assets | 2,490,463 | 2,641,889 |
| Total assets | $ 4,026,472 | $ 3,974,253 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable and accrued liabilities | $ 317,210 | $ 681,996 |
| Accrued restructuring costs | 5,850 | 3,818 |
| Deferred revenues | 525,003 | 448,414 |
| Short-term debt | — | 199,000 |
| Deferred tax liabilities | 1,116 | 1,448 |
| Current liabilities of discontinued operations | — | 24,601 |
| Total current liabilities | 849,179 | 1,359,277 |
| Long-term deferred revenues | 185,757 | 159,439 |
| Long-term accrued restructuring costs | 1,831 | 937 |
| Convertible debentures | 1,262,608 | — |
| Long-term tax liability | 34,777 | — |
| Other long-term liabilities | 5,994 | 5,175 |
| Long-term deferred tax liabilities | 13,686 | 24,849 |
| Total long-term liabilities | 1,504,653 | 190,400 |
| Total liabilities | 2,353,832 | 1,549,677 |
| Minority interest in subsidiaries | 52,326 | 47,716 |
| Commitments and contingencies | — | — |
| Stockholders' equity: | | |
| Preferred stock—par value $.001 per share | | |
| Authorized shares: 5,000,000 | | |
| Issued and outstanding shares: none | — | — |
| Common stock—par value $.001 per share | | |
| Authorized shares: 1,000,000,000 | | |
| Issued and outstanding shares: 225,486,395, excluding 67,062,812 held in treasury, at September 30, 2007 and 243,844,122, excluding 35,471,662 shares held in treasury, at December 31, 2006 | 293 | 279 |
| Additional paid-in capital | 22,435,748 | 23,314,476 |
| Accumulated deficit | (20,815,457) | (20,929,497) |
| Accumulated other comprehensive loss | (270) | (8,398) |
| Total stockholders' equity | 1,620,314 | 2,376,860 |
| Total liabilities and stockholders' equity | $ 4,026,472 | $ 3,974,253 |

See accompanying Notes to Condensed Consolidated Financial Statements.

4

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATED STATEMENTS OF INCOME**
**(In thousands, except per share data)**
**(Unaudited)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Revenues | $373,587 | $396,418 | $1,109,853 | $1,154,359 |
| Costs and expenses | | | | |
|     Cost of revenues | 149,984 | 143,357 | 448,460 | 426,039 |
|     Sales and marketing | 65,411 | 94,850 | 208,251 | 278,209 |
|     Research and development | 39,897 | 33,164 | 121,313 | 92,444 |
|     General and administrative | 59,130 | 69,049 | 187,861 | 188,862 |
|     Restructuring, impairments and other charges (reversals), net | 2,006 | (84) | 44,197 | (4,279) |
|     Amortization of other intangible assets | 29,237 | 30,978 | 90,693 | 90,809 |
|     Acquired in-process research and development | — | 1,200 | — | 16,700 |
|       Total costs and expenses | 345,665 | 372,514 | 1,100,775 | 1,088,784 |
| Operating income | 27,922 | 23,904 | 9,078 | 65,575 |
|     Other (loss) income, net | (6,204) | 4,599 | 86,032 | 38,266 |
| Income from continuing operations before income taxes, earnings from unconsolidated entities and minority interest | 21,718 | 28,503 | 95,110 | 103,841 |
| Income tax (expense) benefit | (3,501) | (13,769) | (23,871) | 303,552 |
| Earnings from unconsolidated entities, net of tax | 216 | — | 2,412 | — |
| Minority interest, net of tax | (2,054) | (719) | (2,541) | (2,124) |
| Net income from continuing operations | 16,379 | 14,015 | 71,110 | 405,269 |
| Net income from discontinued operations, net of tax | 1,268 | 1,259 | 3,573 | 3,278 |
| Gain on sale of discontinued operations, net of tax | 1,357 | — | 1,357 | — |
| Net income | $ 19,004 | $ 15,274 | $ 76,040 | $ 408,547 |
| Basic net income per share from: | | | | |
|     Continuing operations | $ 0.07 | $ 0.06 | $ 0.29 | $ 1.66 |
|     Discontinued operations | 0.01 | — | 0.02 | 0.01 |
|     Net income | $ 0.08 | $ 0.06 | $ 0.31 | $ 1.67 |
| Diluted net income per share from: | | | | |
|     Continuing operations | $ 0.07 | $ 0.06 | $ 0.29 | $ 1.64 |
|     Discontinued operations | 0.01 | — | 0.02 | 0.01 |
|     Net income | $ 0.08 | $ 0.06 | $ 0.31 | $ 1.65 |
| Shares used in per share computation: | | | | |
|     Basic | 240,054 | 243,536 | 242,570 | 244,620 |
|     Diluted | 245,537 | 245,657 | 247,752 | 247,005 |

See accompanying Notes to Condensed Consolidated Financial Statements.

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(In thousands)**
**(Unaudited)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2007 | 2006 |
| Cash flows from operating activities: | | |
| Net income | $ 76,040 | $ 408,547 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Gain on divestiture of majority stake in Jamba | (74,999) | — |
| Gain on sale of discontinued operations | (1,357) | — |
| Unrealized gain on joint venture call options | (7,747) | — |
| Realized and unrealized loss on embedded derivative | 12,589 | — |
| Depreciation of property and equipment | 84,578 | 78,095 |
| Amortization of other intangible assets | 90,693 | 90,809 |
| Amortization of debt issuance costs | 617 | 177 |
| Acquired in-process research and development | — | 16,700 |
| Provision for doubtful accounts | (116) | 1,576 |
| Stock-based compensation and other | 61,380 | 49,044 |
| Restructuring, impairments and other charges (reversals), net | 44,197 | (4,279) |
| Impairment of equity investment | 4,363 | — |
| Net gain on sale of investments | (934) | (21,260) |
| Earnings from unconsolidated entities, net of tax | (2,412) | — |
| Minority interest, net of tax | 2,541 | 2,124 |
| Deferred income taxes | 16,442 | (299,137) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (113,268) | 42,372 |
| Prepaid expenses and other current assets | 133,053 | (119,754) |
| Accounts payable and accrued liabilities | (158,141) | 5,307 |
| Deferred revenues | 96,719 | 80,781 |
| Net cash provided by operating activities | 264,238 | 331,102 |
| Cash flows from investing activities: | | |
| Purchases of investments | (311) | (536,569) |
| Proceeds from maturities and sales of investments | 144,849 | 693,731 |
| Purchases of property and equipment | (94,267) | (139,044) |
| Cash paid in business combinations, net of cash acquired | — | (543,821) |
| Proceeds received on divestiture of majority stake in Jamba, net of cash contributed | 152,643 | — |
| Investments in unconsolidated entities | (17,150) | — |
| Proceeds from sale of discontinued operations | 12,779 | — |
| Net proceeds received on long-term note receivable | — | 47,786 |
| Other assets | 3,639 | 125 |
| Net cash provided by (used in) investing activities | 202,182 | (477,792) |
| Cash flows from financing activities: | | |
| Proceeds from issuance of common stock from option exercises and employee stock purchase plan | 219,994 | 52,668 |
| Change in net assets of subsidiary and other | (436) | 332 |
| Repurchase of common stock | (1,154,763) | (135,000) |
| Proceeds from drawdown of credit facility, net of issuance costs | — | 295,619 |
| Repayment of short-term debt | (199,000) | (100,000) |
| Proceeds from issuance of convertible debentures, net of issuance costs | 1,224,600 | — |
| Repayment of long-term liabilities | — | (2,362) |
| Net cash provided by financing activities | 90,395 | 111,257 |
| Effect of exchange rate changes on cash and cash equivalents | 2,713 | 1,020 |
| Net increase (decrease) in cash and cash equivalents | 559,528 | (34,413) |
| Cash and cash equivalents at beginning of period | 501,784 | 478,660 |
| Cash and cash equivalents at end of period | 1,061,312 | 444,247 |
| Cash and cash equivalents of discontinued operations at end of period | — | (21,541) |
| Cash and cash equivalents of continuing operations at end of period | $ 1,061,312 | $ 422,706 |
| Supplemental cash flow disclosures: | | |
| Cash paid for income taxes, net of refunds received | $ 17,845 | $ 20,367 |

See accompanying Notes to Condensed Consolidated Financial Statements.

6

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(Unaudited)**

**Note 1. Basis of Presentation and Summary of Significant Accounting Policies**

*Interim Financial Statements*

The accompanying unaudited Condensed Consolidated Financial Statements have been prepared by VeriSign, Inc. and its subsidiaries ("VeriSign" or "the Company") in accordance with the instructions for Form 10-Q pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC") and, therefore, do not include all information and notes normally provided in audited financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals and other adjustments) considered necessary for a fair presentation have been included. The results of operations for any interim period are not necessarily indicative, nor comparable to the results of operations for any other interim period or for a full fiscal year. These unaudited Condensed Consolidated Financial Statements should be read in conjunction with the Consolidated Financial Statements and related notes, contained in VeriSign's fiscal 2006 Annual Report on Form 10-K filed with the SEC (the "2006 Form 10-K") on July 12, 2007, and updated in Form 8-K filed with the SEC on November 2, 2007.

The Company recorded an additional amount of $3.1 million of depreciation expense during the quarter ended September 30, 2007, related to certain software licenses to be in conformity with its accounting policy.

*Reclassifications*

In September 2007, VeriSign sold its wholly owned Jamba Service GmbH subsidiary ("Jamba Service"), and in November 2005, VeriSign sold its payment gateway business. The associated assets and liabilities of Jamba Service and the payment gateway business have been classified as discontinued operations and their operations have been reported in net income from discontinued operations for all periods presented in accordance with Statement of Financial Accounting Standards ("SFAS") No. 144 ("SFAS 144"), " *Accounting for the Impairment or Disposal of Long Lived Assets.* "

*Critical Accounting Policies*

VeriSign made no material changes to its critical accounting policies, which are included in its 2006 Form 10-K.

The Company accounts for its contingent convertible debentures and related provisions in accordance with the provisions of Emerging Issues Task Force Issue ("EITF") No. 98-5, " *Accounting for Convertible Securities with Beneficial Conversion Features or Contingently Adjustable Conversion Ratios,* " EITF No. 00-27, " *Application of Issue No. 98-5 to Certain Convertible Instruments,* " EITF No. 00-19 ("EITF 00-19"), " *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock,* " and EITF No. 01-6, " *The Meaning of 'Indexed to a Company's Own Stock* '," EITF No. 04-08 ("EITF 04-08"), " *The Effect of Contingently Convertible Debt on Diluted Earnings Per Share* " and EITF No. 90-19, " *Convertible Bonds with Issuer Option to Settle for Cash upon Conversion.* " The Company also evaluates the instruments in accordance with SFAS No. 133 ("SFAS 133"), " *Accounting for Derivative Instruments and Hedging Activities,* " which requires bifurcation of embedded derivative instruments and measurement of fair value for accounting purposes. EITF 04-08 requires the Company to include the dilutive effect of the shares of its common stock issuable upon conversion of the outstanding convertible debentures in its diluted income per share calculation regardless of whether the market price trigger or other contingent conversion feature has been met. The Company applies the treasury stock method as it has the intent and current ability to settle the principal amount of the convertible debentures in cash. This method results in incremental dilutive shares when the average fair value of the Company's common stock for a reporting period exceeds the initial conversion price per share of $34.37.

7

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

The Company adopted Financial Accounting Standards Board ("FASB") Interpretation No. 48 ("FIN 48"), " *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109,* " on January 1, 2007. FIN 48 is an interpretation of SFAS No. 109 ("SFAS 109"), " *Accounting for Income Taxes,* " and it seeks to reduce the diversity in practice associated with certain aspects of measurement and recognition in accounting for income taxes. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position that an entity takes or expects to take in a tax return. Additionally, FIN 48 provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosures, and transition. Under FIN 48, an entity may only recognize or continue to recognize tax positions that meet a "more likely than not" threshold. In accordance with its accounting policy, the Company recognizes accrued interest and penalties related to unrecognized tax benefits as a component of income tax expense. The impact on adoption of FIN 48 is more fully described in Note 15, "Income Taxes."

In June 2006, the FASB issued EITF No. 06-3 ("EITF 06-3"), " *How Taxes Collected from Customers and Remitted to Governmental Authorities Should Be Presented in the Income Statement.* " EITF 06-3 provides guidance on an entity's disclosure of its accounting policy regarding the gross or net presentation of certain taxes and provides that if taxes included in gross revenues are significant, a company should disclose the amount of such taxes for each period for which an income statement is presented (i.e., both interim and annual periods). Taxes within the scope of EITF 06-3 are those that are imposed on and concurrent with a specific revenue-producing transaction. VeriSign records transaction-based taxes on a net basis. These taxes are recorded as current liabilities until remitted to the relevant government authority.

**Note 2. Stock-Based Compensation**

Staff Accounting Bulletin ("SAB") No. 107 ("SAB 107") provides the SEC Staff's views on a variety of matters relating to stock-based compensation. SAB 107 requires stock-based compensation to be classified in the same expense line items as cash compensation. The following table sets forth the total stock-based compensation recognized on the Company's Condensed Consolidated Statements of Income:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (In thousands, except per share data) | | | |
| Stock-based compensation: | | | | |
| Cost of revenues | $ 6,545 | $ 2,911 | $ 13,622 | $ 10,221 |
| Sales and marketing | 5,345 | 4,001 | 14,538 | 11,184 |
| Research and development | 4,813 | 2,495 | 10,162 | 7,337 |
| General and administrative | 5,960 | 6,481 | 26,244 | 18,978 |
| Restructuring, impairments and other charges (reversals), net | — | — | 2,297 | — |
| Total stock-based compensation | 22,663 | 15,888 | 66,863 | 47,720 |
| Tax (benefit) associated with stock-based compensation expense | (4,397) | (4,369) | (16,181) | (11,882) |
| Net effect of stock-based compensation expense on net income | $18,266 | $11,519 | $ 50,682 | $ 35,838 |
| Net effect of stock-based compensation expense on net income per share: | | | | |
| Basic | $ 0.08 | $ 0.05 | $ 0.21 | $ 0.15 |
| Diluted | $ 0.07 | $ 0.05 | $ 0.20 | $ 0.15 |

8

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

VeriSign currently uses the Black-Scholes option pricing model to determine the fair value of stock options and 1998 Employee Stock Purchase Plan ("1998 Purchase Plan") awards. On August 30, 2007, the Company's stockholders approved the 2007 Employee Stock Purchase Plan ("2007 Purchase Plan"). The determination of the fair value of stock-based awards using an option-pricing model is affected by the Company's stock price as well as assumptions regarding a number of complex and subjective variables. The following table sets forth the weighted average assumptions used to estimate the fair value of the stock options and Purchase Plan awards:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| Stock options: | | | | |
| Volatility | 37% | 41% | 37% | 39% |
| Risk-free interest rate | 4.44% | 4.86% | 4.49% | 4.83% |
| Expected term | 3.4 years | 3.7 | 3.32 | 3.4 |
| Dividend yield | zero | zero | zero | zero |
| Employee Stock Purchase Plan awards: | | | | |
| Volatility | 27% | 32% | 33% | 33% |
| Risk-free interest rate | 4.94% | 5.21% | 5.20% | 5.09% |
| Expected term | 1.25 years | 1.25 years | 1.25 years | 1.25 years |
| Dividend yield | zero | zero | zero | zero |

During the second quarter of 2007, the Company accelerated some of the outstanding options to purchase shares of the Company's common stock and restricted stock units held by Mr. Stratton Sclavos, the former Chief Executive Officer. The Company has accounted for the acceleration of the stock-based awards as a modification. As such, the Company recognized $11.0 million of stock-based compensation upon modification.

During the third quarter of 2007, the Company accelerated some of the outstanding options and awards to purchase shares of the Company's common stock held by Ms. Dana Evan, the former Chief Financial Officer, and another employee, due to their terminations. The Company has accounted for the acceleration of the stock-based awards as a modification. As such, the Company recognized $1.2 million of stock-based compensation expense upon modification.

*Employee Stock Purchase Plans*

The Company resumed its employee payroll withholdings for the purchase of its common stock under the 1998 Purchase Plan during July 2007. The Company allowed its employees affected by the earlier suspension of the 1998 Purchase Plan to make catch-up payments to their accounts under the 1998 Purchase Plan for the lost payroll contributions attributable to the period when the Company was not current in its reporting obligations under the Securities Exchange Act of 1934. The Company also allowed employees to increase their contribution withholding percentages from 15% up to a maximum of 25% of their compensation, subject to applicable U.S. Internal Revenue Service ("IRS") limits, effective August 1, 2007. The Company has accounted for the increases in employee payroll withholdings as modifications. The Company recorded $12.1 million and $16.9 million of stock-based compensation expense for the purchase plans for the three and nine months ended September 30, 2007, respectively.

*Market-based Restricted Stock Units*

During the three months ended September 30, 2007, the Compensation Committee of our Board of Directors approved grants of 580,406 market-based restricted stock units related to stock-price appreciation and a service

9

Table of Contents

## VERISIGN, INC. AND SUBSIDIARIES

### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (Unaudited)

condition. The Company used the Monte-Carlo simulation option-pricing model to determine the fair value of these awards. The Monte-Carlo simulation option-pricing model takes into account the same input assumptions as the Black-Scholes model; however, it also further incorporates into the fair-value determination, the possibility that the market condition may not be satisfied and the impact of the possible differing stock price paths. Compensation costs related to awards with a market-based condition will be recognized regardless of whether the market condition is satisfied, provided that the requisite service has been provided. The stock-based compensation expense is recognized over the requisite service period for each award. The Company recorded $0.5 million of stock-based compensation for the market-based awards for the three months ended September 30, 2007.

## Note 3. Joint Ventures

On January 31, 2007, VeriSign entered into two joint venture agreements with Fox Entertainment ("Fox"), a subsidiary of News Corporation, to provide mobile entertainment to consumers on a global basis. Under the terms of the agreements, Fox owns a 51% interest and VeriSign owns a 49% interest in the joint ventures. One of the joint ventures, Netherlands Mobile Holdings, C.V., is based in the Netherlands, and the other, US Mobile Holdings LLC, is based in the United States. VeriSign contributed 51% of its stake in its wholly owned subsidiary Jamba's business to consumer business to the Netherlands joint venture and Fox contributed its Fox Mobile Entertainment assets to the U.S.-based joint venture. Fox paid VeriSign approximately $192.4 million in cash for the divestiture of 51% of its stake in Jamba and VeriSign paid Fox approximately $4.9 million in cash for its contribution of Fox Mobile Entertainment assets. The Company recognized a gain of approximately $75.0 million upon the divestiture of its majority stake in Jamba and recorded its interests in the joint ventures as investments in unconsolidated entities as of September 30, 2007. The Company's Condensed Consolidated Financial Statements for the nine months ended September 30, 2007, includes one month of Jamba's consolidated activity. The Company invested an additional amount of $17.2 million in the unconsolidated entities during the three months ended September 30, 2007.

In connection with the joint ventures, VeriSign and Fox entered into various put and call agreements. VeriSign has the option ("the put") to sell all of its interests in the joint ventures to Fox at particular times within five years of the date of the agreements at prices determined pursuant to the terms of the put and call agreements. Fox has the option ("the call") to purchase all of VeriSign's interests in the joint ventures at particular times within five years of the date of the agreements at a price determined pursuant to the put and call agreements. The Company calculated the initial fair value of its written call options to be $10.9 million using the Black-Scholes option-pricing model. The Company has recorded the fair value of the call options within other long-term liabilities, and will mark-to-market the call options at each reporting period. For the three and nine months ended September 30, 2007, the Company recorded an unrealized gain of $4.0 million and $7.7 million, respectively, on joint venture call options within Other (loss) income, net. The fair value of the written call options was $3.2 million as of September 30, 2007.

## Note 4. Discontinued Operations

On September 1, 2007, the Company sold Jamba Service for $12.8 million in cash and recorded a net gain totaling $1.4 million. Jamba Service was part of the Communications Services Group segment.

In November 2005, VeriSign sold its payment gateway business which was part of the Internet Services Group segment.

In connection with the sale of the payment gateway business, the Company entered into a Transitional Service Agreement ("TSA") with PayPal to provide certain transitional network and customer support services.

10

Table of Contents

## VERISIGN, INC. AND SUBSIDIARIES

### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
#### (Unaudited)

The related fees were recorded as a direct reduction to the respective costs and expenses included in discontinued operations. The expected cash flows under the TSA do not represent a significant continuation of the direct cash flows of the disposed payment gateway business. In April 2006, PayPal elected to terminate the customer support services provided by VeriSign under the TSA. In September 2006, PayPal elected to terminate the billing services, production services and other transitional services provided under the TSA.

The associated assets and liabilities of Jamba Service and the payment gateway businesses have been classified as discontinued operations and their operations reported in net income from discontinued operations for all periods presented in accordance with SFAS 144.

The following table represents operations from the Jamba Service and the payment gateway businesses and the components of earnings from the discontinued operations:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
|  | (In thousands) | | | |
| Revenues (1) | $ 3,065 | $ 2,974 | $11,868 | $ 8,573 |
| Income from discontinued operations before income taxes (1) | $ 2,075 | $ 1,913 | $ 5,847 | $ 4,702 |
| Income tax expense (2) | (807) | (654) | (2,274) | (1,424) |
| Net income from discontinued operations | $ 1,268 | $ 1,259 | $ 3,573 | $ 3,278 |

(1)  The disposed payment gateway business did not have any operating activity for the three and nine months ended September 30, 2007. For the three and nine months ended September 30, 2007, Jamba Service operating activity was recorded through August 31, 2007.

(2)  The tax rate applied to income from the Jamba Service subsidiary was equivalent to the German corporate and trade statutory tax rates of 38.90% for the three and nine months ended September 30, 2007 and 39.17% for the three and nine months ended September 30, 2006, respectively.

The following table presents the carrying amounts of major classes of assets and liabilities relating to Jamba Service and the payment gateway businesses:

|  | September 30, 2007 | | December 31, 2006 |
|---|---|---|---|
|  | (In thousands) | | |
| **Assets: (1)** | | | |
| Cash and cash equivalents | $ | — | $ 23,035 |
| Accounts receivable, net | | — | 11,201 |
| Prepaid expenses and other current assets | | — | 95 |
| Deferred tax assets | | — | 2,330 |
| Current assets of discontinued operations | | — | 36,661 |
| Long-term assets | | — | 7,000 |
| Total assets of discontinued operations | $ | — | $ 43,661 |
| **Liabilities: (1)** | | | |
| Accounts payable and accrued liabilities | $ | — | $ 18,068 |
| Deferred revenues | | — | 6,533 |
| Current liabilities of discontinued operations | | — | 24,601 |
| Total liabilities of discontinued operations | $ | — | $ 24,601 |

(1)  As of September 30, 2007, there were no assets or liabilities attributable to the Jamba Service and the disposed payment gateway businesses.

11

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

**Note 5. Restructuring, Impairments and Other Charges (Reversals), Net**

A comparison of restructuring, impairments and other charges (reversals), net, is presented below:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (In thousands) | | | |
| 2007 restructuring plan charges | $ 1,577 | $ — | $30,309 | $ — |
| 2002 and 2003 restructuring plan (reversals) charges, net | (51) | (84) | 91 | (6,228) |
| Total restructuring charges (reversals), net | 1,526 | (84) | 30,400 | (6,228) |
| Impairments and other charges | 480 | — | 13,797 | 1,949 |
| Total restructuring, impairments and other charges (reversals), net | $ 2,006 | $ (84) | $44,197 | $(4,279) |

*2007 Restructuring Plan*

In January 2007, VeriSign initiated a restructuring plan to execute a company-wide reorganization replacing the previous business unit structure with a new combined worldwide sales and services team, and an integrated development and products organization. The restructuring plan included workforce reductions, abandonment of excess facilities, and other exit costs. To date, VeriSign has recorded $30.3 million in restructuring charges under its 2007 restructuring plan.

*Workforce reduction:* VeriSign recorded restructuring charges related to workforce reduction in accordance with SFAS No. 112 ("SFAS 112"), " *Employers' Accounting for Postemployment Benefits an amendment of FASB Statements No. 5 and 43,* " since benefits were provided pursuant to a severance plan which used a standard formula of paying benefits based upon tenure with the Company. The accounting for these restructuring charges has met the four requirements of SFAS 112 which are: (i) the Company's obligation relating to employees' rights to receive compensation for future absences is attributable to employees' services already rendered; (ii) the obligation relates to rights that vest or accumulate; (iii) payment of the compensation is probable; and (iv) the amount can be reasonably estimated. The 2007 restructuring plan will result in a workforce reduction of approximately 350 employees across both segments which started in the first quarter of 2007, followed by the next four quarters. All severance related charges will be paid by the end of the first quarter of 2008.

*Excess facilities:* Excess facilities restructuring charges take into account the fair value of lease obligations of the abandoned space, including the potential for sublease income. Estimating the amount of sublease income requires management to make estimates for the properties that will be rented, the rate per square foot that might be received and the vacancy period of each property. These estimates could differ materially from actual amounts due to changes in the real estate markets in which the properties are located, such as the supply of office space and prevailing lease rates. Changing market conditions by location and considerable work with third-party leasing companies requires the Company to periodically review each lease and change its estimates on a prospective basis, as necessary. VeriSign recorded additional charges for excess facilities located primarily in the United States and Europe that were either abandoned or downsized relating to lease terminations and non-cancelable lease costs.

*Other exit costs:* VeriSign recorded other exit costs primarily relating to the realignment of its organization, including consulting fees related to the strategic and organizational structure.

12

Table of Contents

## VERISIGN, INC. AND SUBSIDIARIES

### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
### (Unaudited)

Consolidated restructuring charges associated with the 2007 restructuring plan are as follows:

| | Three Months Ended September 30, 2007 | | Nine Months Ended September 30, 2007 |
|---|---|---|---|
| | | (In thousands) | |
| Workforce reduction | $ (2,274) | | $ 21,024 |
| Excess facilities | 2,707 | | 5,191 |
| Other exit costs | 1,144 | | 4,094 |
| Total restructuring charges | $ 1,577 | | $ 30,309 |

For the nine months ended September 30, 2007, approximately $2.3 million of the workforce reduction charges related to stock-based compensation for certain severed employees.

At September 30, 2007, the accrued restructuring costs associated with the 2007 restructuring plan are $5.8 million and consist of the following:

| | Restructuring Charges | Cash Payments | Non-cash Write-offs | Accrued Restructuring Costs at September 30, 2007 |
|---|---|---|---|---|
| | | (In thousands) | | |
| Workforce reduction | $ 21,024 | $(16,865) | $(2,315) | $ 1,844 |
| Excess facilities | 5,191 | (1,571) | 5 | 3,625 |
| Other exit costs | 4,094 | (3,720) | — | 374 |
| Total accrued restructuring costs | $ 30,309 | $(22,156) | $(2,310) | $ 5,843 |
| Included in current portion of accrued restructuring costs | | | | $ 4,012 |
| Included in long-term portion of accrued restructuring costs | | | | $ 1,831 |

Cash payments totaling approximately $6.0 million related to the abandonment of excess facilities under the 2007 restructuring plan will be paid over the respective lease terms, the longest of which extends through 2011. The present value of future cash payments related to lease terminations due to the abandonment of excess facilities is expected to be as follows:

| | Contractual Lease Payments | Anticipated Sublease Income | Net |
|---|---|---|---|
| | | (In thousands) | |
| 2007 (remaining 3 months) | $ 417 | $ — | $ 417 |
| 2008 | 1,950 | (295) | 1,655 |
| 2009 | 1,228 | (688) | 540 |
| 2010 | 1,252 | (692) | 560 |
| 2011 | 994 | (541) | 453 |
| | $ 5,841 | $ (2,216) | $3,625 |

13

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

*2002 and 2003 Restructuring Plans*

As of September 30, 2007, the Company had accrued restructuring costs of $1.9 million, primarily pertaining to future excess facility charges accrued in connection with the sale of its Network Solutions business and the restructuring of business units and operations. The Company expects to pay these obligations over the life of the related obligations, which extends through 2008. During the three and nine months ended September 30, 2007, the Company paid $0.8 million and $3.0 million, respectively, for facility charges associated with both restructuring plans.

*Impairments and Other Charges*

The following table presents the impairments and other charges:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2007 | 2006 | 2007 | 2006 |
|  | (In thousands) | | | |
| Impairment of other intangibles assets | $ — | $ — | $ 4,849 | $1,950 |
| Other charges | 480 | — | 8,948 | (1) |
| Total impairments and other charges | $ 480 | $ — | $13,797 | $1,949 |

*Impairment of other intangible assets*

During the nine months ended September 30, 2007, VeriSign wrote-off approximately $4.8 million of other intangible assets specifically related to a significant change in the operations of an asset group. During the nine months ended September 30, 2006, VeriSign wrote off approximately $2.0 million of other intangible assets specifically related to abandoned technology acquired for a specific customer.

*Other charges*

Other charges comprised of excess and obsolete property and equipment that were impaired, disposed of or abandoned. During the three and nine months ended September 30, 2007, VeriSign recorded other charges of approximately $0.5 million and $8.9 million, respectively, primarily for the abandonment of obsolete property and equipment and impairment specifically related to a significant change in the operations of an asset group.

## Note 6. Goodwill and Other Intangible Assets

The following table summarizes the changes in the carrying amount of goodwill as allocated to the Company's operating segments during the nine months ended September 30, 2007:

|  | Internet Services Group | Communications Services Group | Total |
| --- | --- | --- | --- |
|  | | (In thousands) | |
| Balance at December 31, 2006 | $  415,792 | $  1,026,701 | $1,442,493 |
| Adjustment for divestiture of Jamba and sale of Jamba Service | — | (180,249) | (180,249) |
| Other adjustments (1) | 712 | 5,011 | 5,723 |
| Balance at September 30, 2007 | $  416,504 | $  851,463 | $1,267,967 |

(1)   VeriSign makes certain goodwill adjustments after the initial purchase to acquired companies for income tax adjustments, foreign exchange fluctuations and other additions or reductions that were determined after the initial purchase.

14

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

Purchased goodwill is not amortized but is subject to testing for impairment on at least an annual basis. VeriSign performed its most recent annual impairment test as of June 30, 2007. The fair value of VeriSign's reporting units is determined using either the income or the market valuation approach or a combination thereof. Under the income approach, the fair value of the reporting unit is based on the present value of estimated future cash flows that the reporting unit is expected to generate over its remaining life. Under the market approach, the value of the reporting unit is based on an analysis that compares the value of the reporting unit to values of publicly traded companies in similar lines of business. In the application of the income and market valuation approaches, VeriSign is required to make estimates of future operating trends and judgments on discount rates and other variables. Actual future results related to assumed variables could differ from these estimates. There were no impairment charges to goodwill from the annual impairment tests conducted as of June 30, 2007 or 2006.

VeriSign's other intangible assets are comprised of:

| | As of September 30, 2007 | | |
| --- | --- | --- | --- |
| | Gross Carrying Value | Accumulated Amortization (In thousands) | Net Carrying Value |
| Customer relationships | $457,898 | $ (376,425) | $ 81,473 |
| Technology in place | 226,593 | (155,454) | 71,139 |
| Carrier relationships | 36,300 | (7,346) | 28,954 |
| Non-compete agreement | 32,450 | (17,012) | 15,438 |
| Trade name | 13,646 | (3,966) | 9,680 |
| Other | 10,340 | (3,778) | 6,562 |
| Total other intangible assets | $777,227 | $ (563,981) | $213,246 |

| | As of December 31, 2006 | | |
| --- | --- | --- | --- |
| | Gross Carrying Value | Accumulated Amortization (In thousands) | Net Carrying Value |
| Customer relationships | $459,088 | $ (331,279) | $127,809 |
| Technology in place | 237,238 | (138,866) | 98,372 |
| Carrier relationships | 64,000 | (15,345) | 48,655 |
| Non-compete agreement | 40,196 | (13,785) | 26,411 |
| Trade name | 34,557 | (11,480) | 23,077 |
| Other | 11,250 | (2,144) | 9,106 |
| Total other intangible assets | $846,329 | $ (512,899) | $333,430 |

15

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

Fully amortized other intangible assets are not included in the above tables. For the three months ended September 30, 2007 and 2006, amortization of other intangible assets was $29.2 million and $31.0 million, respectively. For the nine months ended September 30, 2007 and 2006, amortization of other intangible assets was $90.7 million and $90.8 million, respectively. Estimated future amortization expense related to other intangible assets at September 30, 2007 is as follows:

|  | (In thousands) |
|---|---|
| 2007 (remaining 3 months) | $ 25,480 |
| 2008 | 53,815 |
| 2009 | 45,152 |
| 2010 | 33,986 |
| 2011 | 22,996 |
| Thereafter | 31,817 |
|  | $ 213,246 |

**Note 7. Other Balance Sheet Items**

*Prepaid Expenses and Other Current Assets*

Prepaid expenses and other current assets consist of the following:

|  | September 30, 2007 | December 31, 2006 |
|---|---|---|
|  | (In thousands) | |
| Prepaid expenses | $ 31,814 | $ 73,374 |
| Other current assets | 84,377 | 141,581 |
| Securities litigation receivable | — | 80,000 |
| Total prepaid expenses and other current assets | $ 116,191 | $ 294,955 |

The Company recorded an $80.0 million receivable for the settlement of the Securities Litigation and Derivative Litigation as of December 31, 2006. Under the terms of the settlement, liability insurers for the Company and its directors and officers paid $80.0 million in settlement of the lawsuits during the three months ended March 31, 2007.

*Other Assets*

Other assets consist of the following:

|  | September 30, 2007 | December 31, 2006 |
|---|---|---|
|  | (In thousands) | |
| Long-term note receivable | $ 15,000 | $ — |
| Long-term investments | 3,701 | 11,234 |
| Debt issuance costs | 28,385 | 3,027 |
| Security deposits and other | 9,425 | 10,953 |
| Total other assets | $ 56,511 | $ 25,214 |

16

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

**(Unaudited)**

Long-term note receivable as of September 30, 2007, included a working capital loan provided under a promissory note to the joint ventures described in Note 3, "Joint Ventures." The promissory note bears an interest rate of 6% per annum and is receivable in December 2011. The promissory note may be optionally prepaid by the borrower at any time before maturity.

During the three months ended September 30, 2007, the Company recorded approximately $4.4 million for an other-than-temporary impairment of an equity investment.

Debt issuance costs as of September 30, 2007, primarily included costs incurred upon the issuance of the convertible debentures, as described in Note 10, "Junior Subordinated Convertible Debentures."

*Accounts Payable and Accrued Liabilities*

Accounts payable and accrued liabilities consist of the following:

|  | September 30, 2007 | December 31, 2006 |
|---|---|---|
|  | (In thousands) | |
| Accounts payable | $ 9,519 | $ 33,903 |
| Employee compensation | 97,405 | 109,775 |
| Customer deposits | 99,559 | 73,845 |
| Taxes payable and other tax liabilities | 31,720 | 226,342 |
| Other accrued liabilities | 79,007 | 158,131 |
| Securities litigation payable (1) | — | 80,000 |
| Total accounts payable and accrued liabilities | $ 317,210 | $ 681,996 |

(1) VeriSign recorded an $80.0 million payable for the settlement of the In re: VeriSign, Inc. Securities Litigation and In re: VeriSign, Inc. Derivative Litigation. Under the terms of the settlement, liability insurers for the Company and its directors and officers paid $80.0 million in settlement of the lawsuits during the three months ended March 31, 2007.

## Note 8. Comprehensive Income

Comprehensive income consists of net income adjusted for unrealized gains and losses on marketable securities classified as available-for-sale and foreign currency translation adjustments.

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
|  | (In thousands) | | | |
| Net income | $19,004 | $15,274 | $76,040 | $408,547 |
| Change in unrealized (loss) gain on investments, net of tax | (493) | 1,909 | 2,389 | 2,566 |
| Foreign currency translation adjustments | 7,210 | (581) | 5,739 | 1,608 |
| Comprehensive income | $25,721 | $16,602 | $84,168 | $412,721 |

## Note 9. Credit Facility

On June 7, 2006, VeriSign entered into a credit agreement (the "Credit Agreement") with a syndicate of banks and other financial institutions related to a $500.0 million senior unsecured revolving credit facility (the

17

**Table of Contents**

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

"Facility"), under which VeriSign, or certain designated subsidiaries may be borrowers. On February 28, 2007, the outstanding loan balance under the Facility of $199.0 million was repaid. As of September 30, 2007, there were no outstanding borrowings under the Facility. The terms of the Credit Agreement and the Facility are more fully described in VeriSign's 2006 Form 10-K.

On September 17, 2007, VeriSign, Inc. entered into an amendment agreement with Bank of America, N.A., as Administrative Agent and several financial institutions to amend the Credit Agreement. The amendment added certain covenants related to the indenture that VeriSign entered into with U.S. Bank National Association, as Trustee, on August 20, 2007, and VeriSign's issuance of $1.25 billion aggregate principal amount of 3.25% convertible debentures due 2037 as described in Note 10, "Junior Subordinated Convertible Debentures." Pursuant to the terms of the Amendment, the debentures are not included in the definition of "Consolidated Funded Indebtedness" in the Credit Agreement, and thus, the debentures are not included in the calculation of the Consolidated Leverage Ratio (as defined in the Credit Agreement), which was decreased such that it cannot exceed 1.50 to 1.00 at any time during any period of four fiscal quarters. VeriSign also agreed in the amendment that it would not enter into certain specified types of amendments to the debentures and indenture, and an event of default under the indenture would be an event of default under the Credit Agreement.

**Note 10. Junior Subordinated Convertible Debentures**

In August 2007, VeriSign issued $1.25 billion principal amount of 3.25% convertible debentures due August 15, 2037, to an initial purchaser in a private offering. The debentures are subordinated in right of payment to the Company's existing and future senior debt and to the other liabilities of the Company's subsidiaries. The debentures are initially convertible, subject to certain conditions, into shares of the Company common stock at a conversion rate of 29.0968 shares of common stock per $1,000 principal amount of debentures, representing an initial effective conversion price of approximately $34.37 per share of common stock. The conversion rate will be subject to adjustment for certain events as outlined in the indenture governing the debentures but will not be adjusted for accrued interest.

The Company received net proceeds of approximately $1.22 billion after deduction of $25.4 million of costs incurred upon the issuance of the convertible debentures. The debt issuance costs are recorded in long-term other assets and are being amortized to interest expense over 30 years. Interest is payable semiannually in arrears on August 15 and February 15, beginning on February 15, 2008. Interest expense related to the debentures for the three months ended September 30, 2007, was approximately $4.7 million and was included in Other (loss) income, net. The debentures also have a contingent interest component that will require the Company to pay interest based on certain thresholds beginning with the semi-annual interest period commencing on August 15, 2014, and upon the occurrence of certain events, as outlined in the indenture governing the debentures.

On or after August 15, 2017, the Company may redeem all or part of the debentures for the principal amount plus any accrued and unpaid interest if the closing price of the Company's common stock has been at least 150% of the conversion price then in effect for at least 20 trading days during any 30 consecutive trading-day period prior to the date on which the Company provides notice of redemption. Upon conversion, the Company has the intent and the current ability to pay the holder the cash value of the applicable number of shares of the Company's common stock, up to the principal amount of the debentures. If the conversion value exceeds $1,000, the Company may also deliver, at its option, cash or common stock or a combination of cash and common stock for the conversion value in excess of $1,000 ("conversion spread").

18

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

Holders of the debentures may convert their debentures at the applicable conversion rate, in multiples of $1,000 principal amount, only under the following circumstances:

- during any fiscal quarter beginning after December 31, 2007, if the last reported sale price of the Company's common stock for at least 20 trading days during the period of 30 consecutive trading days ending on the last trading day of the immediately preceding fiscal quarter is greater than or equal to 130% of the applicable conversion price on the last trading day of such preceding fiscal quarter;

- during the five business-day period after any 10 consecutive trading-day period in which the trading price per debenture for each day of that 10 consecutive trading-day period was less than 98% of the product of the last reported sale price of the Company's common stock and the conversion rate on such day;

- if the Company calls any or all of the debentures for redemption, at any time prior to the close of business on the trading day immediately preceding the redemption date;

- upon the occurrence of specified corporate transactions as specified in the indenture governing the debentures; or

- at any time on or after May 15, 2037, and prior to the maturity date.

In addition, holders of the debentures who convert their debentures in connection with a fundamental change, as defined in the indenture, may be entitled to a make-whole premium in the form of an increase in the conversion rate. Additionally, in the event of a fundamental change, the holders of the debentures may require VeriSign to purchase all or a portion of their debentures at a purchase price equal to 100% of the principal amount of debentures, plus accrued and unpaid interest, if any. As of September 30, 2007, none of the conditions allowing holders of the debentures to convert had been met.

The Company concluded that the embedded features related to the contingent interest payments, over-allotment option, and the Company making specific types of distributions (e.g., extraordinary dividends) qualify as derivatives and should be bundled as a compound embedded derivative under SFAS 133. The fair value of the derivative at the date of issuance of the debentures was $11.4 million including $7.8 million for the contingent interest payment features and $3.6 million for the over-allotment option feature, which is accounted for as a discount on the debentures. The over-allotment feature was revalued at $12.6 million on the date of exercise at August 28, 2007, which is accounted for as a premium on the debentures. The debt discount and the debt premium are being accreted to the face value of the debentures as interest expense and interest income, respectively, over 30 years. Any change in the fair value of this embedded derivative will be included in Other (loss) income, net. The fair value of the derivative as of September 30, 2007, was $11.4 million.

The balance of the convertible debentures at September 30, 2007, was $1.26 billion, including the fair value of the embedded derivative. The Company also concluded that the debentures are not conventional convertible debt instruments and that the embedded stock conversion option qualifies as a derivative under SFAS 133. In addition, in accordance with EITF 00-19, the Company has concluded that the embedded conversion option would be classified in stockholders' equity if it were a freestanding instrument. Accordingly, the embedded conversion option is not required to be accounted for separately as a derivative.

Under the terms of the debentures, the Company is required to file a shelf registration statement covering resale of the debentures and any common stock issuable upon conversion of the debentures with the SEC and to use reasonable efforts to cause the shelf registration statement to be declared effective within 200 days of the

19

Table of Contents

## VERISIGN, INC. AND SUBSIDIARIES

### NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)
#### (Unaudited)

closing of the offering of the debentures. In addition, the Company must use reasonable efforts to maintain the effectiveness of the shelf registration statement for a period of two years after the closing of the offering of the debentures, subject to certain rights to suspend use of the shelf registration statement set forth in the registration rights agreement and the other limitations. If the Company fails to meet these terms, it will be required to pay additional interest on the debentures at a rate per annum equal to 0.25% for the first 90 days after the occurrence of the event and 0.50% after the first 90 days. The Company filed the shelf registration statement with the SEC on November 2, 2007.

**Note 11. Calculation of Net Income Per Share**

Basic net income per share is computed by dividing net income (numerator) by the weighted-average number of shares of common stock outstanding (denominator) during the period. Diluted net income per share gives effect to dilutive common equivalent shares, including unvested stock options, unvested restricted stock units, employee stock purchases, warrants and the conversion spread relating to the convertible debentures using the treasury stock method.

The following table represents the computation of basic and diluted net income per share:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (In thousands, except per share data) | | | |
| **Net income:** | | | | |
| Net income from continuing operations | $ 16,379 | $ 14,015 | $ 71,110 | $405,269 |
| Net income from discontinued operations | 1,268 | 1,259 | 3,573 | 3,278 |
| Gain on sale of discontinued operations | 1,357 | — | 1,357 | — |
| Net income | $ 19,004 | $ 15,274 | $ 76,040 | $408,547 |
| **Weighted-average shares:** | | | | |
| Weighted-average common shares outstanding | 240,054 | 243,536 | 242,570 | 244,620 |
| Weighted-average potential common shares outstanding: | | | | |
| Stock options | 4,533 | 1,965 | 4,425 | 2,241 |
| Unvested restricted stock awards and other | 950 | 156 | 757 | 144 |
| Shares used to compute diluted net income per share | 245,537 | 245,657 | 247,752 | 247,005 |
| **Net income per share:** | | | | |
| Basic: | | | | |
| Net income from continuing operations | $ 0.07 | $ 0.06 | $ 0.29 | $ 1.66 |
| Net income from discontinued operations | — | — | 0.01 | 0.01 |
| Gain on sale of discontinued operations | 0.01 | — | 0.01 | — |
| | $ 0.08 | $ 0.06 | $ 0.31 | $ 1.67 |
| Diluted: | | | | |
| Net income from continuing operations | $ 0.07 | $ 0.06 | $ 0.29 | $ 1.64 |
| Net income from discontinued operations | — | — | 0.01 | 0.01 |
| Gain on sale of discontinued operations | 0.01 | — | 0.01 | — |
| | $ 0.08 | $ 0.06 | $ 0.31 | $ 1.65 |

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

Weighted-average potential common shares do not include stock options with an exercise price that exceeded the average fair market value of VeriSign's common stock and the conversion spread relating to the convertible debentures because the average stock price did not exceed $34.37 for the periods presented. The following table sets forth the weighted-average stock options outstanding that were excluded from the above calculation because the effect was anti-dilutive and the respective weighted-average exercise prices:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2007 | 2006 |
| | (In thousands, except per share data) | | | |
| Weighted-average stock options outstanding | 5,842 | 27,168 | 8,022 | 25,468 |
| Weighted-average exercise price | $ 46.27 | $ 34.47 | $ 53.68 | $ 37.09 |

**Note 12. Repurchase of Common Stock**

On May 16, 2006, the Board of Directors of VeriSign authorized a new stock repurchase program ("2006 stock repurchase program") to repurchase up to $1.0 billion of VeriSign's common stock on the open market, or in negotiated or block trades. As of September 30, 2007, the Company has approximately $984.7 million available under the 2006 stock repurchase program.

On August 7, 2007, the Board of Directors of VeriSign authorized the use of the net proceeds from the issuance of the convertible debentures as described in Note 10, "Junior Subordinated Convertible Debentures," to repurchase shares of its common stock in addition to the previously approved 2006 stock repurchase program.

During the three months ended September 30, 2007, the Company used proceeds from the issuance of the convertible debentures to repurchase 12.2 million shares of its common stock for an aggregate of approximately $350.0 million. Additionally, the Company entered into a $600.0 million Accelerated Share Repurchase ("ASR") agreement and a $200.0 million Guaranteed Share Repurchase ("GSR") agreement with two independent financial institutions. These agreements have been accounted for under EITF No. 99-7, " *Accounting for an Accelerated Share Repurchase Program* " and EITF 00-19.

Under the terms of the ASR agreement, the actual purchase price per share of the common stock repurchased under the agreement is determined and adjusted based on a discount to the volume-weighted average price of the common stock during a period following the execution of the ASR Agreement. The exact number of shares repurchased pursuant to the accelerated share repurchase program is determined based on such adjusted price. The counterparty to the agreement may buy or sell the common stock in the secondary market to hedge its position. On August 20, 2007, 12.9 million shares of the Company's common stock were delivered to the Company, and the Company expects to receive delivery of up to 6.6 million additional shares of its common stock no later than December 2007.

Under the terms of the GSR agreement, on September 26, 2007, 6.3 million shares of the Company's common stock were settled and delivered to the Company.

**Note 13. Segment Information**

*Description of segments*

VeriSign operates its business in two reportable segments: the Internet Services Group and the Communications Services Group.

21

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

VeriSign is currently organized into two reportable service-based segments: the Internet Services Group and the Communications Services Group. The Internet Services Group consists of the Security Services business and the Information Services business. The Security Services business provides products and services that protect online and network interactions, enabling companies to manage reputational, operational and compliance risks. The Information Services business is the authoritative directory provider of all *.com* , *.net* , *.cc* , and *.tv* domain names, and also provides other value added services, including intelligent supply chain services, real-time publisher services and digital brand management services. The Communications Services Group provides communications services, such as connectivity and interoperability services and intelligent database services; commerce services, such as billing and operational support system services, mobile commerce, self-care and analytics services; and content services, such as digital content and messaging services.

The segments were determined based primarily on how the chief operating decision maker ("CODM") views and evaluates VeriSign's operations. VeriSign's Chief Executive Officer has been identified as the CODM as defined by SFAS No. 131, " *Disclosures about Segments of an Enterprise and Related Information.* " Other factors, including customer base, homogeneity of products, technology and delivery channels, were also considered in determining the reportable segments. Additionally, the performance of the Internet Services Group and the Communications Services Group is the measure used by the CODM for purposes of making decisions about allocating resources between the segments.

The following table reflects the results of VeriSign's reportable segments:

| | Internet Services Group | Communications Services Group | Unallocated Corporate Expenses | Total Segments |
|---|---|---|---|---|
| | | (In thousands) | | |
| **Three months ended September 30, 2007:** | | | | |
| Revenues | $235,976 | $ 137,611 | $ — | $ 373,587 |
| Cost of revenues | 41,745 | 87,205 | 21,034 | 149,984 |
| Gross margin | $194,231 | $ 50,406 | $ (21,034) | $ 223,603 |

| | Internet Services Group | Communications Services Group | Unallocated Corporate Expenses | Total Segments |
|---|---|---|---|---|
| | | (In thousands) | | |
| **Three months ended September 30, 2006:** | | | | |
| Revenues | $194,693 | $ 201,725 | $ — | $ 396,418 |
| Cost of revenues | 41,363 | 90,199 | 11,795 | 143,357 |
| Gross margin | $153,330 | $ 111,526 | $ (11,795) | $ 253,061 |

| | Internet Services Group | Communications Services Group | Unallocated Corporate Expenses | Total Segments |
|---|---|---|---|---|
| | | (In thousands) | | |
| **Nine months ended September 30, 2007:** | | | | |
| Revenues | $672,308 | $ 437,545 | $ — | $1,109,853 |
| Cost of revenues | 121,896 | 269,870 | 56,694 | 448,460 |
| Gross margin | $550,412 | $ 167,675 | $ (56,694) | $ 661,393 |

22

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

| | Internet Services Group | Communications Services Group | Unallocated Corporate Expenses | Total Segments |
|---|---|---|---|---|
| | | (In thousands) | | |
| Nine months ended September 30, 2006: | | | | |
| Revenues | $554,686 | $  599,673 | $  — | $1,154,359 |
| Cost of revenues | 118,406 | 272,719 | 34,914 | 426,039 |
| Gross margin | $436,280 | $  326,954 | $ (34,914) | $  728,320 |

A reconciliation of the totals reported for the reportable segments to the applicable line items in the Condensed Consolidated Financial Statements is as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (In thousands) | | | |
| Gross margin from reportable segments | $223,603 | $253,061 | $661,393 | $728,320 |
| Operating expenses (1) | 195,681 | 229,157 | 652,315 | 662,745 |
| Operating income | 27,922 | 23,904 | 9,078 | 65,575 |
| Other income, net | (6,204) | 4,599 | 86,032 | 38,266 |
| Income from continuing operations before income taxes, earnings from unconsolidated entities and minority interest | $  21,718 | $  28,503 | $  95,110 | $103,841 |

(1)   Operating expenses include sales and marketing, research and development, general and administrative, restructuring, impairments and other charges (reversals), net, amortization of other intangible assets and acquired in-process research and development.

*Revenues by Geographic Region*

The following tables show a comparison of our revenues by geographic region:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (In thousands) | | | |
| Americas: | | | | |
| United States | $ 314,113 | $ 280,561 | $  921,315 | $  810,979 |
| Other (1) | 9,783 | 11,109 | 27,799 | 29,978 |
| Total Americas | 323,896 | 291,670 | 949,114 | 840,957 |
| EMEA (2) | 26,288 | 73,770 | 89,039 | 226,055 |
| APAC (3) | 23,403 | 30,978 | 71,700 | 87,347 |
| Total revenues | $ 373,587 | $ 396,418 | $ 1,109,853 | $ 1,154,359 |

(1)   Canada and Latin America
(2)   Europe, the Middle East and Africa ("EMEA")
(3)   Australia, Japan and Asia Pacific ("APAC")

VeriSign primarily operates in the United States, Canada, Latin America, Europe, Japan, Australia, South Africa, and India. In general, revenues are attributed to the country in which the contract originated.

23

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

However, revenues from all digital certificates issued from the Mountain View, California facility and domain names issued from the Dulles, Virginia facility are attributed to the United States because it is impracticable to determine the country of origin.

The following table shows a comparison of property and equipment, net of accumulated depreciation, by geographic region:

|  | September 30, 2007 | December 31, 2006 |
|---|---|---|
|  | (In thousands) | |
| Americas: | | |
| United States | $ 575,394 | $ 575,321 |
| Other | 1,318 | 1,599 |
| Total Americas | 576,712 | 576,920 |
| EMEA | 6,229 | 11,780 |
| APAC | 16,261 | 16,592 |
| Total property and equipment, net | $ 599,202 | $ 605,292 |

Assets are not tracked by segment and the CODM does not evaluate segment performance based on asset utilization.

**Note 14. Other (Loss) Income, Net**

The following table presents the components of other (loss) income, net:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
|  | (In thousands) | | | |
| Interest income | $ 11,426 | $ 6,024 | $ 28,274 | $20,349 |
| Interest expense | (5,061) | (2,477) | (7,643) | (4,303) |
| Net gain on sale of investments | 49 | 14 | 934 | 21,260 |
| Impairment of equity investment | (4,363) | — | (4,363) | — |
| Unrealized gain on joint venture call options | 3,992 | — | 7,747 | — |
| Realized and unrealized loss on embedded derivative | (12,589) | — | (12,589) | — |
| Net gain on divestiture of majority stake in Jamba | — | — | 74,999 | — |
| Other, net | 342 | 1,038 | (1,327) | 960 |
| Total other (loss) income, net | $ (6,204) | $ 4,599 | $ 86,032 | $38,266 |

**Note 15. Income Taxes**

For the three and nine months ended September 30, 2007, VeriSign recorded an income tax expense from continuing operations of $3.5 million and $23.9 million, respectively. For the three and nine months ended September 30, 2006, VeriSign recorded an income tax expense of $13.8 million and an income tax benefit of $303.6 million, respectively. For the nine months ended September 30, 2006, the tax benefit was primarily attributed to a release of the valuation allowance on deferred tax assets.

24

Table of Contents

**VERISIGN, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**
**(Unaudited)**

The Company applies a valuation allowance to certain deferred tax assets which management does not believe that it is more likely than not that they will be realized. These deferred assets consist primarily of investments with differing book and tax bases and net operating losses related to certain foreign operations.

The Company adopted the provisions of FIN 48 on January 1, 2007. The cumulative effect of adopting FIN 48 was a decrease in income taxes payable of $9.3 million, an increase in long-term deferred tax assets of $28.7 million, and a decrease in the January 1, 2007, accumulated deficit balance of $38.0 million. At the adoption date of January 1, 2007, the Company had an unrecognized tax benefit for income taxes associated with uncertain tax positions of $87.6 million. Of this amount, $86.2 million would impact the Company's effective tax rate if recognized.

In accordance with its accounting policy, the Company recognizes accrued interest and penalties related to unrecognized tax benefits as a component of tax expense. At January 1, 2007, the Company had $8.4 million of accrued interest and penalties. For the three and nine months ended September 30, 2007, the Company expensed an additional amount of $0.7 million and $2.5 million, respectively, for interest and penalties related to income tax liabilities through income tax expense.

During the first quarter of 2007, the IRS commenced its audit of the Company's U.S. income tax returns for 2004. The Company is also under examination by various state and international taxing jurisdictions. Because the Company uses historic net operating loss carryforwards and other tax attributes to offset its taxable income in current and future years, such attributes can be adjusted by the IRS and other taxing authorities until the statute closes on the year in which such attribute was utilized. The Company does not anticipate a significant change to the total amount of unrecognized tax benefits within the next 12 months.

**Note 16. Recent Accounting Pronouncements**

In February 2007, the FASB issued SFAS No. 159 ("SFAS 159"), " *The Fair Value Option for Financial Assets or Financial Liabilities,* " which provides companies with an option to report selected financial assets and liabilities at fair value. The objective is to reduce both complexity in accounting for financial instruments and the volatility in earnings caused by measuring related assets and liabilities differently. SFAS 159 also establishes presentation and disclosure requirements designed to facilitate comparisons between companies that choose different measurement attributes for similar types of assets and liabilities. SFAS 159 is effective as of the beginning of an entity's first fiscal year beginning after November 15, 2007. Early adoption is permitted as of the beginning of the previous fiscal year provided that the entity makes that choice in the first 120 days of that fiscal year and also elects to apply the provisions of SFAS No. 157 ("SFAS 157"), " *Fair Value Measurements.* " The Company is currently evaluating the effect of SFAS 159, and the impact it will have on its financial position and results of operations.

In September 2006, the FASB issued SFAS 157, which defines fair value, establishes guidelines for measuring fair value and expands disclosures regarding fair value measurements. SFAS 157 does not require any new fair value measurements but rather eliminates inconsistencies in guidance found in various prior accounting pronouncements. SFAS 157 is effective for fiscal years beginning after November 15, 2007. Earlier adoption is permitted, provided the company has not yet issued financial statements, including for interim periods, for that fiscal year. The Company is currently evaluating the effect of SFAS 157, and the impact it will have on its financial position and results of operations.

25

Table of Contents

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion in conjunction with the interim unaudited Condensed Consolidated Financial Statements and related notes.*

*Except for historical information, this Report contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These forward-looking statements involve risks and uncertainties, including, among other things, statements regarding our anticipated costs and expenses and revenue mix. Forward-looking statements include, among others, those statements including the words "expects," "anticipates," "intends," "believes" and similar language. Our actual results may differ significantly from those projected in the forward-looking statements. Factors that might cause or contribute to such differences include, but are not limited to those discussed in the section titled "Risk Factors" in Part II, Item 1A. You should carefully review the risks described in other documents we file from time to time with the Securities and Exchange Commission, including the Quarterly Reports on Form 10-Q or Current Reports on Form 8-K that we file in 2007 and our Annual Report on Form 10-K for the year ended December 31, 2006, which was filed on July 12, 2007, which discuss our business in greater detail. You are cautioned not to place undue reliance on the forward-looking statements, which speak only as of the date of this Quarterly Report on Form 10-Q. We undertake no obligation to publicly release any revisions to the forward-looking statements or reflect events or circumstances after the date of this document.*

**Overview**

We operate intelligent infrastructure services that enable and protect billions of interactions every day across the world's voice and data networks. In 2007, our business consists of two reportable segments: the Internet Services Group and the Communications Services Group.

The Internet Services Group consists of the Security Services business and information Services business. The Security Services business provides products and services that protect online and network interactions, enabling companies to manage reputational, operational and compliance risks. The following types of services are included in the Security Services business: SSL certificate services; managed security services; iDefense security intelligence services; authentication services, including managed public key infrastructure ("PKI") services, unified authentication services, and VeriSign Identity Protection services; and global security consulting services. The Information Services business operates the authoritative directory of all *.com*, *.net*, *.cc*, and *.tv* domain names, and provides other services, including intelligent supply chain services, real-time publisher services, and digital brand management services.

The Communications Services Group provides managed solutions to fixed line, broadband, mobile operators and enterprise customers through our integrated communications, content and commerce platforms. Our communications services offerings include network connectivity and interoperability services and intelligent database services; our content services offerings include digital content services and messaging services; and our commerce services offerings include billing and operational support system services, mobile commerce services, and self care and analytics services.

The Internet Services Group recorded revenues of $236.0 million during the three months ended September 30, 2007, a 21% increase from the same period last year. During the third quarter of 2007, we experienced continued growth in our Internet Services Group primarily due to an increase in domain name registrations and an increase in the sale of SSL certificates. Our active domain names ending in *.com* and *.net* increased 25% from the same period last year. Our installed base of SSL certificates increased 17% from the same period last year.

Our Communications Services Group recorded revenues of $137.6 million during the third quarter of 2007, down 32% from the same period last year. The decline was primarily related to the divestiture of our majority

26

**Table of Contents**

stake in Jamba which recorded revenues of $71.1 million during the third quarter of 2006. This decline was offset by an increase in revenues from our professional communication consulting services which increased $10.9 million during the third quarter as compared to the same period last year, as a result of our acquisition of inCode Telecom Group, Inc. ("inCode").

### Acquisitions and Dispositions

On January 31, 2007, we finalized two joint venture agreements with Fox Entertainment ("Fox"), a subsidiary of News Corporation, to provide mobile entertainment to consumers on a global basis. Under the terms of the agreements, Fox owns a 51% interest and we own a 49% interest in the joint ventures. One of the joint ventures, Netherlands Mobile Holdings, C.V., is based in the Netherlands, and the other is based in the United States. We contributed our Jamba "business to consumer" business to the Netherlands joint venture and Fox contributed its Fox Mobile Entertainment assets to the U.S-based joint venture. Fox paid us approximately $192.4 million in cash for our contribution of the Jamba business and we paid Fox approximately $4.9 million in cash for its contribution of Fox Mobile Entertainment assets. We recognized a gain of approximately $75.0 million upon the divestiture of our majority stake in Jamba and recorded our interests in the joint ventures as investments in unconsolidated entities. We invested an additional amount of $17.2 million in the unconsolidated entities during the three months ended September 30, 2007.

In September 2007, we sold our Jamba Service business for approximately $12.8 million and recorded a net gain of $1.4 million. Jamba Service operations were recorded through August 31, 2007, and their operations have been classified as discontinued operations for all periods presented.

### Critical Accounting Policies and Significant Management Estimates

We account for our contingent convertible debentures and related provisions in accordance with the provisions of EITF No. 98-5, " *Accounting for Convertible Securities with Beneficial Conversion Features or Contingently Adjustable Conversion Ratios,* " EITF No. 00-27, " *Application of Issue No. 98-5 to Certain Convertible Instruments,* " EITF No. 00-19, " *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock,* " and EITF No. 01-6, " *The Meaning of 'Indexed to a Company's Own Stock',* " EITF No. 04-08 ("EITF 04-08"), " *The Effect of Contingently Convertible Debt on Diluted Earnings Per Share* " and EITF 90-19, " *Convertible Bonds with Issuer Option to Settle for Cash upon Conversion.* " We also evaluate the instruments in accordance with SFAS No. 133, " *Accounting for Derivative Instruments and Hedging Activities,* " which requires bifurcation of embedded derivative instruments and measurement of fair value for accounting purposes. EITF 04-08 requires us to include the dilutive effect of the shares of our common stock issuable upon conversion of the outstanding convertible debentures in our diluted income per share calculation regardless of whether the market price trigger or other contingent conversion feature has been met. We apply the treasury stock method as we have the intent and the current ability to settle the principal amount of the convertible debentures in cash. This method results in incremental dilutive shares when the average fair value of our common stock for a reporting period exceeds the initial conversion price per share of $34.37.

We adopted FIN 48, " *Accounting for Uncertainty in Income Taxes—an interpretation of FASB Statement No. 109,* " on January 1, 2007. FIN 48 is an interpretation of SFAS No. 109, " *Accounting for Income Taxes,* " and it seeks to reduce the diversity in practice associated with certain aspects of measurement and recognition in accounting for income taxes. FIN 48 prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position that an entity takes or expects to take in a tax return. Additionally, FIN 48 provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods, disclosures, and transition. Under FIN 48, an entity may only recognize or continue to recognize tax positions that meet a "more likely than not" threshold. In accordance with our accounting policy, we recognize accrued interest and penalties related to unrecognized tax benefits as a component of income tax expense.

27

Table of Contents

In June 2006, the FASB issued EITF No. 06-3 ("EITF 06-3"), " *How Taxes Collected from Customers and Remitted to Governmental Authorities Should Be Presented in the Income Statement.*" EITF 06-3 provides guidance on an entity's disclosure of its accounting policy regarding the gross or net presentation of certain taxes and provides that if taxes included in gross revenues are significant, a company should disclose the amount of such taxes for each period for which an income statement is presented (i.e., both interim and annual periods). Taxes within the scope of EITF 06-3 are those that are imposed on and concurrent with a specific revenue-producing transaction. We record transaction-based taxes on a net basis. These taxes are recorded as current liabilities until remitted to the relevant government authority.

### Recent Accounting Pronouncements

In February 2007, the FASB issued SFAS No. 159 ("SFAS 159"), " *The Fair Value Option for Financial Assets or Financial Liabilities,* " which provides companies with an option to report selected financial assets and liabilities at fair value. The objective is to reduce both complexity in accounting for financial instruments and the volatility in earnings caused by measuring related assets and liabilities differently. SFAS 159 also establishes presentation and disclosure requirements designed to facilitate comparisons between companies that choose different measurement attributes for similar types of assets and liabilities. SFAS 159 is effective as of the beginning of an entity's first fiscal year beginning after November 15, 2007. Early adoption is permitted as of the beginning of the previous fiscal year provided that the entity makes that choice in the first 120 days of that fiscal year and also elects to apply the provisions of SFAS No. 157 ("SFAS 157"), " *Fair Value Measurements.* " We are currently evaluating the effect of SFAS 159 and the impact it will have on our financial position and results of operations.

In September 2006, the FASB issued SFAS 157, which defines fair value, establishes guidelines for measuring fair value and expands disclosures regarding fair value measurements. SFAS 157 does not require any new fair value measurements but rather eliminates inconsistencies in guidance found in various prior accounting pronouncements. SFAS 157 is effective for fiscal years beginning after November 15, 2007. Earlier adoption is permitted, provided we have not yet issued financial statements, including for interim periods, for that fiscal year. We are currently evaluating the effect of SFAS 157 and the impact it will have on our financial position and results of operations.

## Results of Operations

### Revenues

We have two reportable segments: the Internet Services Group and the Communications Services Group. A comparison of revenues is presented below.

| | Three Months Ended September 30, | | % Change |
|---|---|---|---|
| | 2007 | 2006 | |
| | (Dollars in thousands) | | |
| Internet Services Group | $ 235,976 | $ 194,693 | 21% |
| Communications Services Group | 137,611 | 201,725 | (32%) |
| Total revenues | $ 373,587 | $ 396,418 | (6%) |

| | Nine Months Ended September 30, | | % Change |
|---|---|---|---|
| | 2007 | 2006 | |
| | (Dollars in thousands) | | |
| Internet Services Group | $ 672,308 | $ 554,686 | 21% |
| Communications Services Group | 437,545 | 599,673 | (27%) |
| Total revenues | $1,109,853 | $1,154,359 | (4%) |

28

Table of Contents

*Internet Services Group*

Internet Services Group revenues increased $41.3 million and $117.6 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year. Our security services revenues increased $13.8 million and $41.3 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year primarily as a result of an increase in the installed base of SSL certificates and an increase in demand for our authentication, threat intelligence and identity protection services. Information services revenues increased approximately $24.0 million and $68.4 million, for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year as a result of an increase in managed active domain names ending in *.com* and *.net* . Our professional security consulting revenues increased $3.5 million and $7.9 million, for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year as a result of an increase in demand of our professional consulting services in the network security and the public service sector.

The following table compares active domain names ending in *.com* and *.net* managed by our information services business and the approximate installed base of SSL certificates in our commerce site services business as of September 30, 2007 and 2006:

| | September 30, | | % |
| --- | --- | --- | --- |
| | **2007** | **2006** | **Change** |
| Active domain names ending in *.com* and *.net* | 77.0 million | 61.4 million | 25% |
| Installed base of SSL certificates | 912,000 | 781,000 | 17% |

*Communications Services Group*

Communications Services Group revenues decreased approximately $64.1 million and $162.1 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year. Revenues from our business-to-consumer content services decreased $71.1 million and $193.4 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year. The decline is primarily related to the joint ventures with Fox and the related deconsolidation of Jamba in January 2007.

Communication and Commerce services revenues, which include our network services, intelligent database services, billing and payments services and clearing and settlement services, decreased approximately $7.5 million and $36.4 million, for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year. Network services revenues decreased due to increased customer direct connects and pricing pressures. Commerce revenues decreased due to key customer losses for the prepaid and clearing businesses. These declines were partially offset by increases in revenues from digital content services, which includes messaging services and mobile content delivery services, of $3.6 million and $29.4 million, for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year. These increases were primarily the result of our business acquisitions in the second quarter of 2006 and an increase in the volume of our premium short messaging and multimedia mobile messaging services. Professional consulting revenues for our communication services increased approximately $10.9 million and $38.3 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year, as a result of the acquisition of inCode in November 2006.

29

**Table of Contents**

*Revenues by Geographic Region*

The following tables show a comparison of our revenues by geographic region:

| | Three Months Ended September 30, | | % Change |
|---|---|---|---|
| | 2007 | 2006 | |
| | (Dollars in thousands) | | |
| Americas: | | | |
| United States | $ 314,113 | $ 280,561 | 12% |
| Other (1) | 9,783 | 11,109 | (12)% |
| Total Americas | 323,896 | 291,670 | 11% |
| EMEA (2) | 26,288 | 73,770 | (64)% |
| APAC (3) | 23,403 | 30,978 | (24)% |
| Total revenues | $ 373,587 | $ 396,418 | (6)% |

| | Nine Months Ended September 30, | | % Change |
|---|---|---|---|
| | 2007 | 2006 | |
| | (Dollars in thousands) | | |
| Americas: | | | |
| United States | $ 921,315 | $ 810,979 | 14% |
| Other (1) | 27,799 | 29,978 | (7)% |
| Total Americas | 949,114 | 840,957 | 13% |
| EMEA (2) | 89,039 | 226,055 | (61)% |
| APAC (3) | 71,700 | 87,347 | (18)% |
| Total revenues | $1,109,853 | $1,154,359 | (4)% |

(1)    Canada and Latin America
(2)    Europe, the Middle East and Africa ("EMEA")
(3)    Australia, Japan and Asia Pacific ("APAC")

Revenues increased $32.2 million and $108.2 million in the Americas region for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year primarily due to an increase in the demand for domain names ending in *.com* and *.net* , an increase in the installed base of SSL certificates, an increase in demand for our authentication, threat intelligence, identity protection services and professional consulting services. Revenues in the EMEA region decreased $47.5 million and $137.0 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year primarily due to the decrease in mobile content services that resulted from the divestiture of our majority stake in Jamba in January 2007. APAC revenues decreased $7.6 million and $15.6 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year primarily due to a decrease in communication services revenues in the region, that resulted from pricing pressures, offset by an increase in security services revenues in Japan and APAC affiliate revenues.

*Cost of revenues*

Cost of revenues consist primarily of content licensing costs, carrier costs for our SS7 and IP-based networks, costs related to providing digital certificate enrollment and issuance services, billing services, operational costs for the domain name registration business, customer support and training, consulting and development services, operational costs related to the management and monitoring of our clients' network security infrastructures, labor costs to provide security and communications consulting, and costs of facilities and computer equipment used in these activities.

30

Table of Contents

A comparison of cost of revenues is presented below:

| | Three Months Ended September 30, | | % Change |
| | 2007 | 2006 | |
| | (Dollars in thousands) | | |
|---|---|---|---|
| Cost of revenues | $149,984 | $143,357 | 5% |
| Percentage of revenues | 40% | 36% | |

| | Nine Months Ended September 30, | | % Change |
| | 2007 | 2006 | |
| | (Dollars in thousands) | | |
|---|---|---|---|
| Cost of revenues | $448,460 | $426,039 | 5% |
| Percentage of revenues | 40% | 37% | |

Cost of revenues increased approximately $6.6 million and $22.4 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year. Salary and employee benefits increased $6.8 million and $19.8 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year primarily due to an increase in headcount resulting from our business acquisitions in late 2006 offset by a reduction in headcount due to the 2007 restructuring plan, and an increase in stock-based compensation expense. Telecommunication expenses increased $3.1 million and $7.6 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year primarily due to increased spending on capacity for global constellation sites that support our *.com* and *.net* registries. Expenses related primarily to redeployed employees of $3.5 million and $10.1 million were included in cost of revenues from the general and administrative expense category during the three and nine months ended September 30, 2007, respectively, due to the realignment of business divisions as a result of the 2007 restructuring plan. Direct cost of revenues decreased $6.7 million and $14.0 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year primarily due to a decrease in third-party expenses as a result of the divestiture of our majority stake in Jamba.

*Sales and marketing*

Sales and marketing expenses consist primarily of costs related to sales, marketing and policy activities. These expenses include salaries, sales commissions, sales operations and other personnel-related expenses, travel and related expenses, trade shows, costs of lead generation, costs of computer and communications equipment and support services, facilities costs, consulting fees and costs of marketing programs, such as internet, television, radio, print and direct mail advertising costs.

A comparison of sales and marketing expenses is presented below:

| | Three Months Ended September 30, | | % Change |
| | 2007 | 2006 | |
| | (Dollars in thousands) | | |
|---|---|---|---|
| Sales and marketing | $ 65,411 | $ 94,850 | (31%) |
| Percentage of revenues | 18% | 24% | |

| | Nine Months Ended September 30, | | % Change |
| | 2007 | 2006 | |
| | (Dollars in thousands) | | |
|---|---|---|---|
| Sales and marketing | $208,251 | $278,209 | (25%) |
| Percentage of revenues | 19% | 24% | |

Table of Contents

Sales and marketing expenses decreased $29.4 million and $70.0 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year. Advertising and marketing expenses decreased $32.9 million and $88.6 million, respectively, as compared to the same periods last year primarily due to a reduction in spending in our content services business as a result of the divestiture of our majority stake in Jamba. Salary and employee benefit costs increased $4.1 million and $16.2 million, respectively, as compared to the same periods last year primarily due to an increase in headcount resulting from our business acquisitions in 2006 offset by a reduction in headcount due to the 2007 restructuring plan, and an increase in stock-based compensation expense. Expenses related primarily to redeployed employees of $0.9 million and $2.8 million were included in sales and marketing from the general and administrative expense category during the three and nine months ended September 30, 2007, respectively, due to the realignment of business divisions as a result of the 2007 restructuring plan.

*Research and development*

Research and development expenses consist primarily of costs related to research and development personnel, including salaries and other personnel-related expenses, consulting fees and the costs of facilities, computer and communications equipment and support services used in service and technology development.

We believe that continued development of new and enhanced services and technologies are necessary to maintain our leadership position in the marketplace. Accordingly, we intend to continue to recruit experienced research and development personnel both domestically and internationally and to make other investments in research and development.

A comparison of research and development expenses is presented below:

|  | Three Months Ended September 30, | | % Change |
|  | 2007 | 2006 | |
|  | (Dollars in thousands) | | |
| Research and development | $ 39,897 | $33,164 | 20% |
| Percentage of revenues | 11% | 8% | |

|  | Nine Months Ended September 30, | | % Change |
|  | 2007 | 2006 | |
|  | (Dollars in thousands) | | |
| Research and development | $121,313 | $92,444 | 31% |
| Percentage of revenues | 11% | 8% | |

Research and development expenses increased approximately $6.7 million and $28.9 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year. Salary and employee benefit expenses increased $6.2 million and $18.0 million, respectively, as compared to the same periods last year primarily due to an increase in headcount resulting from our business acquisitions in 2006 offset by a reduction in headcount due to the 2007 restructuring plan, and an increase in stock-based compensation expense. Contract and professional services expenses decreased $3.0 million and $2.5 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year primarily due to an increase in projects in which we capitalize outside services. Expenses related primarily to redeployed employees of $2.8 million and $9.8 million were included in research and development from the general and administrative expense category during the three and nine months ended September 30, 2007, respectively, due to the realignment of business divisions as a result of the 2007 restructuring plan.

*General and administrative*

General and administrative expenses consist primarily of salaries and other personnel-related expenses for our executive, administrative, legal, finance, information technology and human resources personnel, facilities,

**Table of Contents**

computer and communications equipment, management information systems, support services, professional services fees, certain tax and license fees and bad debt expense.

A comparison of general and administrative expenses is presented below:

| | Three Months Ended September 30, | | % Change |
|---|---|---|---|
| | 2007 | 2006 | |
| | (Dollars in thousands) | | |
| General and administrative | $ 59,130 | $ 69,049 | (14%) |
| Percentage of revenues | 16% | 17% | |

| | Nine Months Ended September 30, | | % Change |
|---|---|---|---|
| | 2007 | 2006 | |
| | (Dollars in thousands) | | |
| General and administrative | $187,861 | $188,862 | (1%) |
| Percentage of revenues | 17% | 16% | |

General and administrative expenses decreased approximately $9.9 million and $1.0 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year. Legal expenses decreased $5.7 million and $7.5 million for the three and nine months ended September 30, 2007, respectively, primarily as a result of reduced litigation expenses. Expenses related primarily to redeployed employees of $7.2 million and $22.7 million in general and administrative were allocated into the other expense categories during the three and nine months ended September 30, 2007, respectively, due to the realignment of business divisions as a result of the 2007 restructuring plan. Salary and employee benefit costs increased approximately $2.2 million and $25.7 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year. The increase during the nine months ended September 30, 2007, was primarily due to an increase in headcount resulting from our business acquisitions in 2006 and $21.4 million in stock-based compensation and severance charges in connection with the separation agreement entered into with our former Chief Executive Officer that was incurred in the second quarter of 2007 offset by a reduction in headcount due to the 2007 restructuring plan.

*Restructuring, impairments and other charges (reversals), net*

A comparison of restructuring, impairments and other charges (reversals), net, is presented below:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (In thousands) | | | |
| 2007 restructuring plan charges | $ 1,577 | $ — | $30,309 | $ — |
| 2002 and 2003 restructuring plan charges (reversals), net | (51) | (84) | 91 | (6,228) |
| Total restructuring charges (reversals), net | 1,526 | (84) | 30,400 | (6,228) |
| Impairments and other charges | 480 | — | 13,797 | 1,949 |
| Total restructuring, impairments and other charges (reversals), net | $ 2,006 | $ (84) | $44,197 | $(4,279) |

*2007 Restructuring Plan* . In January 2007, we initiated a restructuring plan to execute a company-wide reorganization replacing our previous business unit structure with a new combined worldwide sales and services team, and an integrated development and products organization. The restructuring plan included workforce reductions, abandonment of excess facilities and other charges as described in Note 5, "Restructuring, Impairments and Other Charges (Reversals), Net," of the Notes to Condensed Consolidated Financial Statements.

Table of Contents

*2002 and 2003 Restructuring Plan.* In November 2003, we initiated a restructuring plan related to the sale of our Network Solutions business and the realignment of other business units. In April 2002, we initiated a plan to restructure our operations to rationalize, integrate and align resources.

### Impairments of other intangible assets and other charges

During the nine months ended September 30, 2007, we wrote-off approximately $4.8 million of other intangible assets specifically related to a significant change in the operations of an asset group. During the nine months ended September 30, 2006, we wrote off approximately $2.0 million of other intangible assets specifically related to abandoned technology acquired for a specific customer.

Other charges comprised of excess and obsolete property and equipment that were impaired, disposed of or abandoned. During the three and nine months ended September 30, 2007, respectively, we recorded other charges of approximately $0.5 million and $8.9 million, respectively, primarily for the abandonment of obsolete property and equipment and impairment specifically related to a significant change in the operations of an asset group.

### Amortization of other intangible assets

A comparison of amortization of other intangible assets is presented below:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | | (In thousands) | | |
| Amortization of other intangible assets | $29,237 | $30,978 | $90,693 | $90,809 |

Amortization of other intangible assets decreased approximately $1.7 million for the three months ended September 30, 2007, as compared to the same period last year primarily due to not amortizing the other intangible assets of Jamba as a result of the divestiture of our majority stake in January 2007. Amortization of other intangible assets decreased approximately $0.1 million for the nine months ended September 30, 2007, as compared to the same period last year primarily due to other intangible assets associated with business acquisitions in late 2006, partially offset by a decrease in the amortization of other intangible assets of Jamba.

### Acquired in-process research and development

During the three and nine months ended September 30, 2006, we wrote off $1.2 million and $16.7 million of in-process research and development ("IPR&D"), respectively. The IPR&D was related to our acquisitions of Kontiki, m-Qube and GeoTrust.

### Other (loss) income, net

Other (loss) income, net, consists primarily of interest earned on our cash, cash equivalents, and investments, interest expense related to our borrowings, gains and losses on the sale or impairment of equity investments, gains and losses on divestiture of subsidiary, unrealized gains and losses on joint venture call options, realized and unrealized gains and losses on embedded derivative, and the net effect of foreign currency gains and losses.

34

Table of Contents

A comparison of other (loss) income is presented below:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2007 | 2006 |
| | | (In thousands) | | |
| Interest income | $ 11,426 | $ 6,024 | $ 28,274 | $20,349 |
| Interest expense | (5,061) | (2,477) | (7,643) | (4,303) |
| Net gain on sale of investments | 49 | 14 | 934 | 21,260 |
| Impairment of equity investment | (4,363) | — | (4,363) | — |
| Unrealized gain on joint venture call options | 3,992 | — | 7,747 | — |
| Realized and unrealized loss on embedded derivative | (12,589) | — | (12,589) | — |
| Net gain on divestiture of majority stake in Jamba | — | — | 74,999 | — |
| Other, net | 342 | 1,038 | (1,327) | 960 |
| Total other (loss) income, net | $ (6,204) | $ 4,599 | $ 86,032 | $38,266 |

Other (loss) income, net, decreased approximately $10.8 million for the three months ended September 30, 2007, as compared to the same period last year and increased $47.8 million for the nine months ended September 30, 2007, as compared to the same period last year. Interest income increased approximately $5.4 million and $7.9 million for the three and nine months ended September 30, 2007, respectively, primarily as a result of higher cash balances as compared to the same periods last year. Interest expense increased approximately $2.6 million and $3.3 million for the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year, primarily due to the additional interest expense related to our convertible debentures issued during the three months ended September 30, 2007. During the three and nine months ended September 30, 2007, we recorded $4.0 million and $7.7 million, respectively, for unrealized gain on joint venture call options as described in Note 3, "Joint Ventures," of the Notes to Condensed Consolidated Financial Statements. During the three months ended September 30, 2007, we recorded $12.6 million realized and unrealized loss on the embedded derivative associated with our convertible debt. Due to the fact that we are required to mark-to-market the fair value of these call options and the embedded derivative at each reporting period, such revaluations could result in gains or losses. During the three months ended September 30, 2007, we recorded an other-than-temporary impairment loss of $4.4 million for an equity investment.

### Income taxes

For the three and nine months ended September 30, 2007, we recorded an income tax expense of $3.5 million and $23.9 million, respectively, compared to an income tax expense of $13.8 million and an income tax benefit of $303.6 million, respectively, for the same periods in 2006. For the nine months ended September 30, 2006, the tax benefit was primarily attributed to a release of the valuation allowance on deferred tax assets.

We apply a valuation allowance to certain deferred tax assets which we do not believe that it is more likely than not that they will be realized. These deferred assets consist primarily of investments with differing book and tax bases and net operating losses related to certain foreign operations.

We adopted the provisions of FIN 48 on January 1, 2007. The cumulative effect of adopting FIN 48 was a decrease in income taxes payable of $9.3 million, an increase in long-term deferred tax assets of $28.7 million, and a decrease in the January 1, 2007 accumulated deficit balance of $38.0 million. At the adoption date of January 1, 2007, the unrecognized tax benefit for income taxes associated with uncertain tax positions was $87.6 million. Interest and penalties related to income tax liabilities are included in income tax expense. At January 1, 2007, we had $8.4 million of accrued interest and penalties. For the three and nine months ended September 30, 2007, we expensed an additional amount of $0.7 million and $2.5 million, respectively, for interest and penalties related to income tax liabilities through income tax expense.

Table of Contents

### Earnings from unconsolidated entities, net of tax

Earnings from unconsolidated entities, net of tax, represents the net income earned from the joint ventures entered into with Fox, as described in Note 3, "Joint Ventures," of the Notes to Condensed Consolidated Financial Statements. We recorded earnings, net of tax, of approximately $0.2 million and $2.4 million from the joint ventures for the three and nine months ended September 30, 2007, respectively.

### Minority interest, net of tax

Minority interest, net of tax, represents the portion of net income belonging to minority shareholders of our consolidated subsidiaries.

A comparison of minority interest is presented below:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2007 | 2006 | 2007 | 2006 |
| | (In thousands) | | | |
| Minority interest, net of tax | $ (2,054) | $ (719) | $(2,541) | $(2,124) |

Minority interest, net of tax, increased during the three and nine months ended September 30, 2007, respectively, as compared to the same periods last year primarily due to a tax benefit associated with our VeriSign Japan subsidiary which resulted in increased net income.

## Liquidity and Capital Resources

| | September 30, 2007 | December 31, 2006 |
|---|---|---|
| | (Dollars in thousands) | |
| Cash and cash equivalents | $1,061,312 | $ 478,749 |
| Short-term investments | 61,095 | 198,656 |
| Subtotal | 1,122,407 | 677,405 |
| Restricted cash and investments | 47,406 | 49,437 |
| Total | $1,169,813 | $ 726,842 |

At September 30, 2007, our principal source of liquidity was $ 1.1 billion of cash, cash equivalents and short-term investments, consisting principally of commercial paper, medium term investment-grade corporate notes, corporate bonds and notes, U.S. government and agency securities and money market funds.

In August 2007, VeriSign issued $1.25 billion principal amount of 3.25% convertible debentures due August 15, 2037, to an initial purchaser in a private offering. The Company received net proceeds of $1.22 billion after deduction of issuance costs of $25.4 million.

On May 16, 2006, the Board of Directors of VeriSign authorized a new stock repurchase program ("2006 stock repurchase program") to repurchase up to $1.0 billion of our common stock on the open market, or in negotiated or block trades. As of September 30, 2007, we have approximately $984.7 million available under our 2006 stock repurchase program.

On August 7, 2007, the Board of Directors of VeriSign authorized the use of the net proceeds from the issuance of the convertible debentures as described in Note 10, "Junior Subordinated Convertible Debentures," to repurchase shares of our common stock in addition to the previously approved 2006 stock repurchase program.

36

Table of Contents

During the three months ended September 30, 2007, we used proceeds from the issuance of the convertible debentures to repurchase 12.2 million shares of our common stock for an aggregate of approximately $350.0 million. Additionally, we entered into a $600.0 million Accelerated Share Repurchase ("ASR") agreement and a $200.0 million Guaranteed Share Repurchase ("GSR") agreement with two independent financial institutions.

Under the terms of the ASR agreement, on August 20, 2007, 12.9 million shares of our common stock were delivered to us, and we expect to receive delivery of up to 6.6 million additional shares of our common stock no later than December 2007.

Under the terms of the GSR agreement, on September 26, 2007, 6.3 million shares of our common stock were settled and delivered to us.

In summary, our cash flows were as follows:

|  | Nine Months Ended September 30, | |
| --- | --- | --- |
|  | 2007 | 2006 |
|  | (Dollars in thousands) | |
| Net cash provided by operating activities | $264,238 | $ 331,102 |
| Net cash provided by (used in) investing activities | 202,182 | (477,792) |
| Net cash provided by financing activities | 90,395 | 111,257 |
| Effect of exchange rate fluctuations on cash and cash equivalents | 2,713 | 1,020 |
| Net increase (decrease) in cash and cash equivalents | $559,528 | $ (34,413) |

*Cash flows from operating activities*

Our largest source of operating cash flows is cash collections from our customers. Our primary uses of cash from operating activities are for personnel related expenditures, and other general operating expenses, as well as payments related to taxes and facilities.

Net cash provided by operating activities decreased for the nine months ended September 30, 2007, as compared to the same period last year, primarily due to decrease in net income adjusted for non-cash items and changes in operating assets and liabilities. The non-cash items contributing to the decrease primarily included gain on divestiture of our majority stake in Jamba and unrealized gain on joint venture call options, partially offset by an increase in restructuring, impairments and other charges (reversals), net, associated with our 2007 restructuring plan, increase in stock-based compensation expense primarily due to acceleration of stock options and awards related to the separation of our former Chief Executive Officer, and a change in deferred income taxes primarily due to a release of the valuation allowance on deferred tax assets. The changes in operating assets and liabilities was primarily due to changes in accounts receivable and accounts payable and accrued liabilities due to timing of shipments, receipts, purchases and payments.

*Cash flows from investing activities*

The changes in cash flows from investing activities primarily relate to business combinations, divestiture and sale of business subsidiaries, timing of purchases, maturities and sales of investments and purchases of property and equipment.

Net cash provided by investing activities increased for the nine months ended September 30, 2007, as compared to the net cash used by investing activities for the same period last year. The increase was primarily due to proceeds received on divestiture of our majority stake in Jamba in January 2007, proceeds received from sale of discontinued operations in September 2007 and the decrease in cash spent on business combinations and purchases of property and equipment. There were no business combinations during the nine months ended September 30, 2007.

Table of Contents

*Cash flows from financing activities*

The changes in cash flows from financing activities primarily relate to borrowings and payments under debt obligations as well as stock repurchase and stock option exercise activity.

Net cash provided by financing activities decreased for the nine months ended September 30, 2007, as compared to the same period last year, primarily due to an increase in stock repurchase activity and repayment of short-term debt under the Credit Facility, partially offset by proceeds received from issuance of convertible debentures and an increase in proceeds received from issuance of common stock from stock option exercises and the employee stock purchase plan.

*Other Liquidity and Capital Resources Information*

On February 28, 2007, the outstanding loan balance under the Facility, as described in Note 9, "Credit Facility," of our Notes to Condensed Consolidated Financial Statements, of $199.0 million was repaid. As of September 30, 2007, there were no outstanding borrowings under the Facility. As of the date of the filing of this report, VeriSign was in compliance with all covenants under the Credit Agreement.

Future operating lease payments include payments related to leases on excess facilities included in our restructuring plans. If sublease rates decrease in these markets, or if it takes longer than expected to sublease these facilities, the actual lease expense could exceed this estimate by an additional $2.3 million over the next five years relating to our restructuring plans. Cash payments totaling approximately $7.7 million related to the abandonment of excess facilities will be paid over the next five years. See Note 5, "Restructuring, Impairments and Other Charges (Reversals), Net," of our Notes to Condensed Consolidated Financial Statements.

We believe existing cash and short-term investments, together with funds generated from operations should be sufficient to meet our working capital and capital expenditure requirements. Our philosophy regarding the maintenance of a balance sheet with a large component of cash, cash equivalents and short-term investments reflects our views on potential future capital requirements relating to expansion of our businesses, acquisitions, and share repurchases. We regularly assess our cash management approach and activities in view of our current and potential future needs.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Our market risk profile has not changed significantly from that described in our annual report on Form 10-K for the fiscal year ended December 31, 2006.

### Interest rate sensitivity

The primary objective of our short-term investment management activities is to preserve principal with the additional goals of maintaining appropriate liquidity and driving after-tax returns. We manage our interest rate risk by maintaining an investment portfolio generally consisting of debt instruments of high credit quality and relatively short maturities. We invest in a variety of securities, including commercial paper, medium-term notes, corporate bonds and notes, U.S. government and agency securities and money market funds. In general, money market funds are not considered to be subject to interest rate risk because the interest paid on such funds fluctuates with the prevailing interest rate.

Notwithstanding our efforts to manage interest rate risks, there can be no assurance that we will be adequately protected against risks associated with interest rate fluctuations. At any time, a sharp change in interest rates could have a significant impact on the fair value of our investment portfolio. The following table presents the hypothetical changes in fair value of our fixed income securities in our short-term investments portfolio as of September 30, 2007, arising from potential changes in interest rates. The modeling technique

38

Table of Contents

estimates the change in fair value from immediate hypothetical parallel shifts in the yield curve of plus or minus 25 basis points ("BPS"), 50 BPS, 100 BPS, and 150 BPS.

| Uniform decrease in interest rates | | | | | | Uniform increase in interest rates | | |
|---|---|---|---|---|---|---|---|---|
| -1.50% | -1.00% | -0.50% | -0.25% | 0.00% | 0.25% | 0.50% | 1.00% | 1.50% |
| 1,227 | 818 | 409 | 204 | — | (204) | (409) | (818) | (1,227) |

## Foreign exchange risk management

We conduct business throughout the world and transact in multiple foreign currencies. As we continue to expand our international operations, we are increasingly exposed to currency exchange rate risks. In the fourth quarter of 2003, we initiated a foreign currency risk management program designed to mitigate foreign exchange risks associated with the monetary assets and liabilities of our operations that are denominated in non-functional currencies. The primary objective of this hedging program is to minimize the gains and losses resulting from fluctuations in exchange rates. We do not enter into foreign currency transactions for trading or speculative purposes, nor do we hedge foreign currency exposures in a manner that entirely offsets the effects of changes in exchange rates. The program may entail the use of forward or option contracts and, in each case, these contracts are limited to a duration of less than 12 months.

At September 30, 2007, we held forward contracts in notional amounts totaling approximately $41.9 million, to mitigate the impact of exchange rate fluctuations associated with certain foreign currencies. All forward contracts are recorded at fair market value. We attempt to limit our exposure to credit risk by executing foreign exchange contracts with high-quality financial institutions.

## ITEM 4. CONTROLS AND PROCEDURES

An Ad Hoc Group of independent directors of the Board of Directors conducted a review of our historical stock option granting practices for the period January 1998 through May 2006. During the course of the review, the Ad Hoc Group identified stock option grants with incorrect measurement dates, without required documentation, or with initial grant dates and prices that were subsequently modified. Consequently, in our Annual Report on Form 10-K for the year ended December 31, 2006 ("2006 Form 10-K"), we restated the consolidated balance sheet as of December 31, 2005, and the related consolidated statements of operations, stockholders' equity, comprehensive income and cash flows for each of the fiscal years ended December 31, 2005 and December 31, 2004. In addition, we restated the unaudited quarterly financial information and financial statements for interim periods of 2005, and unaudited Condensed Consolidated Financial Statements for the three months ended March 31, 2006.

Details of the independent review, the restatement and its underlying circumstances are discussed in the Explanatory Note and in Note 2, "Restatement of Consolidated Financial Statements," of the Notes to Consolidated Financial Statements reporting our 2006 Form 10-K.

## Evaluation of Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended ("Exchange Act") as of September 30, 2007. We determined that our disclosure controls and procedures were not effective to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC because of the material weakness in our internal control over financial reporting as disclosed in Item 9A, Controls and Procedures, of our 2006 Form 10-K. Our management, based upon the substantial work performed during the preparation of this report, has

39

Table of Contents

concluded that our Condensed Consolidated Financial Statements for the periods covered by and included in this report are prepared in accordance with the instruction for Form 10-Q pursuant to the rules and regulations of the SEC and are a fair presentation of our financial position, results of operations and cash flows for each of the periods presented herein.

**Changes in Internal Control over Financial Reporting**

Subsequent to December 31, 2006, our Board of Directors approved additional internal control policies and procedures intended to remediate the material weakness. As of the date of this filing, we have implemented and are in the process of testing the implementation of the following corrective actions:

- Develop and implement detailed equity-based grant policies and procedures and related compensation and human resources practices, including procedures to ensure accurate and timely communication of Compensation Committee actions.

- Validation of critical stock administration data fields including employee termination dates and stock option cancellation dates.

- Designation of individuals in the legal and accounting departments to oversee the documentation of, and accounting for, equity-based grants.

- Additional training for our finance, human resource, stock administration, and legal personnel concerning the equity grant process and the accounting and financial reporting for equity awards and modifications of such awards.

- Awarding equity-based grants (new hire, promotion, and annual performance) at pre-determined dates, with all required approvals documented and finalized on or before those dates.

- Improving the coordination and communication among the human resources, accounting and legal departments to identify, in advance, accounting issues relating to equity-based awards, and to ensure that those awards are properly accounted for under generally accepted accounting principles.

Additionally, we are investing in ongoing efforts to continuously improve our internal control over financial reporting and have committed considerable resources to the improvement of the design, implementation, documentation, testing and monitoring of our internal controls.

As of the date of this filing, we have completed the implementation of the corrective actions noted above and are in the process of testing the effectiveness of these new internal control policies and procedures. We believe we have made substantial progress toward remediation of the material weakness disclosed in Item 9A, Controls and Procedures, of our 2006 Form 10-K.

There was no change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the three months ended September 30, 2007, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Because of its inherent limitations, our internal control over financial reporting may not prevent material errors or fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. The continued effectiveness of our internal control over financial reporting is subject to risks, including that the controls may become inadequate because of changes in conditions or that the degree of compliance with our policies or procedures may deteriorate.

Table of Contents

## PART II—OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS

On September 7, 2001, NetMoneyIN, an Arizona corporation, filed a complaint alleging patent infringement against VeriSign and several other previously-named defendants in the United States District Court for the District of Arizona asserting infringement of U.S. patent Nos. 5,822,737 and 5,963,917. NetMoneyIN amended its complaint on October 15, 2002, alleging infringement by VeriSign and several other defendants of a third U.S. patent (No. 6,381,584) in addition to the two patents previously asserted. On August 27, 2003, NetMoneyIN filed a third amended complaint alleging direct infringement of the same three patents by VeriSign and several other previously-named defendants. NetMoneyIN dropped its claim of active inducement of infringement by VeriSign. Some of the other current defendants include IBM, BA Merchant Services, Wells Fargo Bank, Cardservice International, InfoSpace, E-Commerce Exchange and Paymentech. VeriSign filed an answer denying any infringement and asserting that the three asserted patents are invalid and later filed an amended answer asserting, in addition, that the asserted patents are unenforceable due to inequitable conduct before the U.S. Patent and Trademark Office. The complaint alleged that VeriSign's Payflow payment products and services directly infringe certain claims of NetMoneyIN's three patents and requested the Court to enter judgment in favor of NetMoneyIN, a permanent injunction against the defendants' alleged infringing activities, an order requiring defendants to provide an accounting for NetMoneyIN's damages, to pay NetMoneyIN such damages and three times that amount for any willful infringers, and an order awarding NetMoneyIN attorney fees and costs. NetMoneyIN has withdrawn its allegations of infringement of the '584 patent and the Court has dismissed with prejudice all claims of infringement of the '584 patent. In its ruling on the claim construction issues, the Court found four of the five claims asserted against VeriSign, claims 1, 13 and 14 of the '737 patent and claim 1 of the '917 patent, invalid. NetMoneyIN may file an appeal after a final judgment seeking to overturn this ruling. Thus, only claim 23 of the '737 patent remains in the case. The Court granted the defendants' motion to strike certain of the Plaintiff's assertions of infringement, including all charges of infringement under the so-called "doctrine of equivalents." The Court recently granted the defendants' motion for summary judgment of no inducement and no contributory infringement. Fact and expert witness discovery are completed. On September 29, 2006, VeriSign filed a Motion for Summary Judgment on Non-Infringement. On October 20, 2006, VeriSign filed a Motion for Summary Judgment on Invalidity. On November 1, 2006, NetMoneyIN filed a Motion for Summary Judgment on Infringement. On July 9, 2007, the Court heard oral argument on the pending motions for summary judgment. On July 13, 2007, the Court issued an order granting summary judgment in favor of VeriSign based on the Court's finding that claim 23 of the '737 patent is invalid, and denying all other pending dispositive motions. On August 29, 2007, Plaintiff filed a Notice of Appeal. On September 19, 2007, the U.S. Court of Appeals for the Federal Circuit docketed the appeal. While we cannot predict the outcome of this lawsuit, VeriSign believes that the allegations are without merit.

On February 14, 2005, Southeast Texas Medical Associates, LLP filed a putative class action lawsuit in the Superior Court of California, alleging violations of the unfair competition laws, breach of express warranty and unjust enrichment relating to our Secure Site Pro SSL certificates. The complaint is brought on behalf of a class of persons who purchased the Secure Site Pro certificate from February 2001 to present. On April 17, 2006, the class was certified and class notice was issued on May 21, 2007. VeriSign disputes these claims. While we cannot predict the outcome of this matter, VeriSign believes that the allegations are without merit.

On April 11, 2005, Prism Technologies, LLC filed a complaint against VeriSign in the U.S. District Court for the District of Delaware alleging that VeriSign's "Go Secure suite of application and related hardware and software products and its Unified Authentication solution and related hardware and software products, including the VeriSign Identity Protection ("VIP") product" infringe U.S. Patent No. 6,516,416, entitled "Subscription Access System for Use With an Untrusted Network." Prism Technologies seeks judgment in favor of Prism Technologies, a permanent injunction from infringement, damages in an amount not less than a reasonable royalty, attorneys' fees and costs. Prism Technologies has also named RSA Security, Inc., Netegrity, Inc. Computer Associates International, Inc and Johnson & Johnson as co-defendants. VeriSign responded on June 6, 2005, by filing a counterclaim for declaratory relief and an answer denying any infringement and asserting that

41

the patent is invalid. On November 9, 2006, the Court held a Markman claim construction hearing. On February 9, 2007, Plaintiff withdrew its claim against Go Secure, leaving claims against Unified Authentication and VIP. On April 2, 2007, the Court issued a ruling from the Markman claim construction hearing. On April 13, 2007, the Court granted Defendants' Motion for Leave to File Amended Answers and Counterclaims to add an inequitable conduct defense. On April 23, 2007, on the basis of the Markman claim construction ruling, the Court entered a stipulated Final Judgment of Non-Infringement, dismissing all claims and counterclaims in the case. On April 27, 2007, Plaintiff filed a Notice of Appeal. On May 8, 2007, the U.S. Court of Appeals for the Federal Circuit docketed the appeal. While we cannot predict the outcome of this matter, VeriSign believes that the allegations are without merit and intends to vigorously defend against them.

On June 26, 2006, VeriSign received a grand jury subpoena from the U.S. Attorney for the Northern District of California requesting documents relating to VeriSign's stock option grants and practices. VeriSign also received an informal inquiry from the Securities and Exchange Commission ("SEC") requesting documents related to VeriSign's stock option grants and practices. On February 9, 2007, VeriSign received a formal order of investigation from the SEC. VeriSign is cooperating fully with the U.S. Attorney's investigation and the SEC investigation.

On July 6, 2006, a stockholder derivative complaint (Parnes v. Bidzos, et al., and VeriSign) was filed against the Company, as a nominal defendant, and certain of its current and former directors and executive officers related to certain historical stock option grants. The complaint seeks unspecified damages on behalf of VeriSign, constructive trust and other equitable relief. Two other derivative actions were filed, one in federal court (Port Authority v. Bidzos, et al., and VeriSign), and one in state court (Port Authority v. Bidzos, et al., and VeriSign) on August 14, 2006. VeriSign is named as a nominal defendant in these actions. The federal actions have been consolidated and plaintiffs filed a consolidated complaint on November 20, 2006. Motions to dismiss the consolidated federal court complaint were heard on May 23, 2007. Those motions were granted on September 14, 2007. Motions to stay the state court action are pending. On May 15, 2007, a putative class action (Mykityshyn v. Bidzos, et al., and VeriSign) was filed in state court naming the Company and certain current and former officers and directors, alleging false representations and disclosure failures regarding certain historical stock option grants. The plaintiff purports to represent all individuals who owned VeriSign common stock between April 3, 2002, and August 9, 2006. The complaint seeks rescission of amendments to the 1998 and 2006 Option Plans and the cancellation of shares added to the 1998 Option Plan. The complaint also seeks to enjoin defendants from granting any stock options and from allowing the exercise of any currently outstanding options granted under the 1998 and 2006 Option Plans. The complaint seeks an unspecified amount of compensatory damages, costs and attorneys fees. The matter was removed to federal court on June 25, 2007. The identical case was filed in state court under a separate name (Pace. v. Bidzos, et al., and VeriSign) on June 19, 2007, and on October 3, 2007 (Mehdian v. Bidzos, et al.). VeriSign and the individual defendants dispute all of these claims.

On November 7, 2006, a judgment was entered against VeriSign by an Italian trial court in the matter of Penco v. VeriSign, Inc., for Euro 5.8 million plus fees arising from a lawsuit brought by a former consultant who claimed to be owed commissions. VeriSign was granted a stay on execution of the judgment. VeriSign has appealed the lower court's ruling on the merits and the hearing on the appeal is scheduled in May 2008. VeriSign believes the claims are without merit.

On November 30, 2006, Freedom Wireless, Inc. filed a complaint against VeriSign and other defendants alleging that VeriSign infringes certain patents by making, using, selling or supplying products, methods or services relating to supplying prepaid wireless telephone services to telecommunications companies. VeriSign filed an answer to the complaint on January 25, 2007. The lawsuit is pending in the United States District Court for the Eastern District of Texas. While we cannot predict the outcome of this matter, VeriSign believes that the allegations are without merit and intends to vigorously defend against them.

On January 31, 2007, VeriSign and News Corporation finalized a joint venture giving News Corporation a controlling interest in VeriSign's wholly owned Jamba subsidiary. Accordingly, effective January 31, 2007,

42

**Table of Contents**

VeriSign transferred to the joint venture direction and control of all litigation, described in prior reports filed with the SEC, relating to Jamba! GmbH and Jamster International Sarl. Litigation and other legal matters covered by that transfer, include, but are not limited to: In Re Jamster Marketing Litigation (multi-district litigation pending in the United States District Court for the Southern District of California, and consisting of the Ford, Page, Herrington, Harmon and Edwards matters), relating to marketing and advertising of mobile phone "ringtones" and other content by Jamba and Jamster; Federal Trade Commission access letter, dated June 2, 2005, seeking information relating to alleged unfair or deceptive acts or practices by Jamster in its advertising, offering and billing for content services and products; Illinois Attorney General Civil Investigative Demand, dated June 30, 2005, requesting information relating to the marketing of Jamster ringtones and other downloadable content; Florida Attorney General Subpoena Duces Tecum, dated October 6, 2005, requesting information related to the marketing of Jamster ringtones and other downloadable content; and GEMA Application for Arbitration, dated February 24, 2006, relating to alleged underpaid royalties in connection with Jamba's sale of ringtones and other downloadable content.

On May 31, 2007, plaintiffs Karen Herbert, et al., on behalf of themselves and a nationwide class of consumers, filed a complaint against VeriSign, Inc., m-Qube, Inc., and other defendants alleging that defendants collectively operate an illegal lottery under the laws of multiple states by allowing viewers of the NBC television show "Deal or No Deal" to incur premium text message charges in order to participate in an interactive television promotion called "Lucky Case Game." On August 15, 2007, VeriSign filed a Motion to Dismiss the Complaint. The lawsuit is pending in the United States District Court for the Central District of California, Western Division. While we cannot predict the outcome of this matter, VeriSign believes that the allegations are without merit and intends to vigorously defend against them.

On June 5, 2007, plaintiffs Cheryl Bentley, et al., on behalf of themselves and a nationwide class of consumers, filed a complaint against VeriSign, Inc., m-Qube, Inc., and other defendants alleging that defendants collectively operate an illegal lottery under the laws of multiple states by allowing viewers of the NBC television show "Get Rich With Trump." The lawsuit is pending in the United States District Court for the Central District of California, Western Division. On August 15, 2007, VeriSign filed a Motion to Dismiss the Complaint. While we cannot predict the outcome of this matter, VeriSign believes that the allegations are without merit and intends to vigorously defend against them.

On June 7, 2007, plaintiffs Michael and Michele Hardin, on behalf of themselves and a nationwide class of consumers, filed a complaint against VeriSign, Inc. and other defendants alleging that defendants collectively operate various "gambling games" in violation of Georgia state law. Plaintiffs allege that interactive television promotions contained in various broadcasts, including NBC's "Deal or No Deal," wrongly permit participants to incur premium text message charges in order to participate in the promotions to win a prize. The lawsuit is pending in the United States District Court for the Northern District of Georgia, Gainesville Division. On August 17, 2007, VeriSign filed a Motion to Dismiss the Complaint. On September 20, 2007, the Court heard oral argument on VeriSign's Motion to Dismiss. While we cannot predict the outcome of this matter, VeriSign believes that the allegations are without merit and intends to vigorously defend against them.

On October 9, 2007, the Associated Press ("AP") filed a complaint in federal court in New York against Moreover Technologies, Inc. and VeriSign, Inc. for copyright and trademark infringement and other claims arising from the Real Time Publishing business. The complaint seeks unspecified compensatory, punitive and treble damages and a permanent injunction. While we cannot predict the outcome of this matter, VeriSign intends to vigorously defend against the claims.

VeriSign is involved in various other investigations, claims and lawsuits arising in the normal conduct of its business, none of which, in our opinion will harm its business. VeriSign cannot assure that it will prevail in any litigation. Regardless of the outcome, any litigation may require VeriSign to incur significant litigation expense and may result in significant diversion of management attention.

43

Table of Contents

## ITEM 1A. RISK FACTORS

*In addition to other information in this Form 10-Q, the following risk factors should be carefully considered in evaluating us and our business because these factors currently have a significant impact or may have a significant impact on our business, operating results or financial condition. Actual results could differ materially from those projected in the forward-looking statements contained in this Form 10-Q as a result of the risk factors discussed below and elsewhere in this Form 10-Q.*

**Our operating results may fluctuate and our future revenues and profitability are uncertain.**

Our operating results have varied in the past and may fluctuate significantly in the future as a result of a variety of factors, many of which are outside our control. These factors include the following:

- the long sales and implementation cycles for, and potentially large order sizes of, some of our security and communications services and the timing and execution of individual customer contracts;

- volume of domain name registrations and customer renewals in our naming services business;

- the mix of all our services sold during a period;

- our success in marketing and market acceptance of our services by our existing customers and by new customers;

- changes in marketing expenses related to promoting and distributing our services;

- customer renewal rates and turnover of customers of our services;

- continued development of our direct and indirect distribution channels for our security services and communications services, both in the U.S. and abroad;

- changes in the level of spending for information technology-related products and services by enterprise customers;

- our success in assimilating the operations, products, services and personnel of any acquired businesses;

- the timing and execution of individual customer contracts, particularly large contracts;

- the impact of price changes in our communications services and security services or our competitors' products and services;

- the impact of Statement of Financial Accounting Standards No. 123R that will require us to record a charge to earnings for stock-based compensation; and

- general economic and market conditions as well as economic and market conditions specific to the telecommunications and Internet industries.

Our operating expenses may increase. If an increase in our expenses is not accompanied by a corresponding increase in our revenues, our operating results will suffer, particularly as revenues from some of our services are recognized ratably over the term of the service, rather than immediately when the customer pays for them, unlike our sales and marketing expenditures, which are expensed in full when incurred.

Due to all of the above factors, our revenues and operating results are difficult to forecast. Therefore, we believe that period-to-period comparisons of our operating results will not necessarily be meaningful, and you should not rely upon them as an indication of future performance. Also, operating results may fall below our expectations and the expectations of securities analysts or investors in one or more future periods. If this were to occur, the market price of our common stock would likely decline.

44

Table of Contents

**Our operating results may be adversely affected by the uncertain geopolitical environment and unfavorable economic and market conditions.**

Adverse economic conditions worldwide have contributed to downturns in the telecommunications and technology industries in the past and could impact our business in the future, resulting in:

- reduced demand for our services as a result of a decrease in information technology and telecommunications spending by our customers;

- increased price competition for our products and services; and

- higher overhead costs as a percentage of revenues.

Recent political turmoil in many parts of the world, including terrorist and military actions, may continue to put pressure on global economic conditions. If the economic and market conditions in the United States and globally do not continue to improve, or if they deteriorate, we may experience material adverse impacts on our business, operating results, and financial condition as a consequence of the above factors or otherwise.

**Our limited operating history under our current business structure may result in significant fluctuations of our financial results.**

We have acquired many companies, a number of which operated in different businesses from our then-current business. Therefore, we have only a limited operating history on which to base an evaluation of our consolidated business and prospects. Our success will depend on many factors, many of which are not entirely under our control, including, but not limited to, the following:

- the successful integration of acquired companies;

- the use of the Internet and other Internet Protocol ("IP") networks for electronic commerce and communications;

- the extent to which digital certificates and domain names are used for electronic commerce or communications;

- growth in the number of Web sites;

- growth in wireless networks and communications;

- growth in demand for our services;

- the continued evolution of electronic and mobile commerce as a viable means of conducting business;

- the competition for any of our services;

- the perceived security of electronic commerce and communications over the Internet and other IP networks;

- the perceived security of our services, technology, infrastructure and practices;

- the significant lead times before a new product or service begins generating revenues;

- the varying rates at which telecommunications companies, telephony resellers and Internet service providers use our services;

- the success in marketing and overall demand for our content services to consumers and businesses;

- the loss of customers through industry consolidation or customer decisions to deploy in-house or competitor technology and services; and

- our continued ability to maintain our current, and enter into additional, strategic relationships.

45

Table of Contents

To address these risks we must, among other things:

- successfully market our services to new and existing customers;

- attract, integrate, train, retain and motivate qualified personnel;

- respond to competitive developments;

- successfully introduce new services; and

- successfully introduce enhancements to our services to address new technologies and standards and changing market conditions.

**The internal review of our historical stock option granting practices, the restatement of certain of our historical consolidated financial statements, investigations by the SEC and related events have had, and will continue to have, an adverse effect on us.**

The Ad Hoc Group of independent directors of the Board of Directors conducted a review of our historical stock option granting practices for the period January 1998 through May 2006. During the course of the review, the Ad Hoc Group identified stock option grants with incorrect measurement dates, without required documentation, or with initial grant dates and exercise prices that were subsequently modified. Consequently, we recorded additional non-cash stock-based compensation expense and related tax effects with regard to past stock option grants. Details regarding the independent review and of the restatement and its underlying circumstances are discussed in the Explanatory Note in Note 2 "Restatement of Consolidated Financial Statements" of the Notes to Consolidated Financial Statements in our 2006 Form 10-K.

As a result of the events described above, we have become subject to a number of significant risks, each of which could have an adverse effect on our business, financial condition and results of operations, including:

- we are subject to significant pending civil litigation, including shareholder class action lawsuits and derivative claims made on behalf of us, the defense of which will require us to devote significant management attention and to incur significant legal expense and which litigation, if decided against us, could require us to pay substantial judgments, settlements or other penalties;

- we are subject to a continuing formal order of investigation from the SEC and a grand jury subpoena from the U.S. Attorney for the Northern District of California which could require significant management time and attention and cause us to incur significant accounting and legal expense and which could require us to pay substantial fines or other penalties;

- we are subject to the risk of additional litigation and regulatory proceedings or actions; and

- many members of our senior management team and our Board of Directors have been and will be required to devote a significant amount of time on matters relating to the continuing formal order of investigation from the SEC and a grand jury subpoena from the U.S. Attorney for the Northern District of California, remedial efforts and related litigation.

**We have identified a material weakness in our internal controls over financial reporting that could cause investors to lose confidence in the reliability of our financial statements and result in a decrease in the value of our securities.**

Our management has identified a material weakness in our internal control over financial reporting as of December 31, 2006, arising from a combination of internal control deficiencies in our stock administration policies and practices, as discussed in Part I, Item 4, "Controls and Procedures." In addition, due to the identification of a material weakness in internal control over financial reporting, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2006, and the date of this report, our disclosure controls and procedures were not effective.

46

Table of Contents

We will continue to evaluate, upgrade and enhance our internal controls. Because of inherent limitations, our internal control over financial reporting may not prevent or detect misstatements, errors or omissions, and any projections of any evaluation of effectiveness of internal controls to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with our policies or procedures may deteriorate. We cannot be certain in future periods that other control deficiencies that may constitute one or more "significant deficiencies" (as defined by the relevant auditing standards) or material weaknesses in our internal control over financial reporting will not be identified. If we fail to maintain the adequacy of our internal controls, including any failure to implement or difficulty in implementing required new or improved controls, our business and results of operations could be harmed, the results of operations we report could be subject to adjustments, we could fail to be able to provide reasonable assurance as to our financial results or the effectiveness of our internal controls or meet our reporting obligations and there could be a material adverse effect on the price of our securities.

We have expended significant resources in connection with our efforts to comply with the requirements of the Sarbanes-Oxley Act. In future periods, we will likely continue to expend substantial amounts in connection with these compliance efforts and with ongoing evaluation of, and improvements and enhancements to, our internal control over financial reporting. These expenditures may make it difficult for us to control or reduce the growth of our general and administrative and other expenses, which could adversely affect our results of operations and the price of our securities.

**If our cost reduction and restructuring efforts are ineffective, our revenues and profitability may be hurt.**

During 2007, we have undertaken various cost reduction and restructuring activities that replaced our previous business unit structure with a functional organization consisting of a combined worldwide sales and services team and an integrated marketing and product development organization. The restructuring, impairments and other charges, net, are approximately $44.2 million for the nine months ended September 30, 2007; however, if we incur additional restructuring-related charges, our financial condition and results of operations may suffer. In addition, the cost reduction and restructuring activities may not produce the full efficiencies and benefits we expect or the efficiencies and benefits might be delayed. There can be no assurance that these efforts, as well as any potential future cost reduction and restructuring activities, will not adversely affect our business, operations or customer perceptions, or result in additional future charges. In addition, we have recently experienced changes in our management, which together with these cost reduction and restructuring activities, could also cause our remaining employees to leave or result in reduced productivity by our remaining employees, which in turn may affect our revenues and other operating results in the future.

**We have faced difficulties assimilating, and may incur costs associated with, acquisitions and dispositions.**

We made numerous acquisitions and dispositions in the last six years and will pursue additional acquisitions and dispositions in the future. We have experienced difficulty in, and in the future may face difficulties, integrating the personnel, products, technologies or operations of companies or businesses we acquire or divest. Assimilating acquired businesses and dispositions involve a number of other risks, including, but not limited to:

- the potential disruption of our ongoing business;

- the potential impairment of relationships with our employees, customers and strategic partners;

- the need to manage more geographically-dispersed operations, such as our offices in the states of Georgia, Kansas, Illinois, Massachusetts, New York, Rhode Island, Texas, Virginia, and Washington, and globally in Australia, Europe, India, Japan, South Africa and South America;

- greater than expected costs and/or lower than expected revenues and the assumption of unknown liabilities;

- the diversion of management's attention from our other businesses in identifying, completing and integrating acquisitions;

47

Table of Contents

- the inability to retain the key employees of the acquired businesses;

- adverse effects on the existing customer relationships of acquired companies;

- the inability to incorporate acquired technologies successfully into our operations infrastructure;

- the difficulty of assimilating the operations and personnel of the acquired businesses;

- the potential incompatibility of business cultures;

- additional regulatory requirements;

- any perceived adverse changes in business focus;

- entering into markets and acquiring technologies in areas in which we have little experience;

- the need to incur debt, which may reduce our cash available for operations and other uses, or issue equity securities, which may dilute the ownership interests of our existing stockholders; and

- the inability to maintain uniform standards, controls, procedures and policies.

If we are unable to successfully address any of these risks for future acquisitions and dispositions, our business could be harmed.

Additionally, there is risk that we may incur additional expenses associated with an impairment of a portion of goodwill and other intangible assets due to changes in market conditions for acquisitions and dispositions. Under generally accepted accounting principles, we are required to evaluate goodwill for impairment on an annual basis and to evaluate other intangible assets as events or circumstances indicate that such assets may be impaired. These evaluations could result in further impairments of goodwill or other intangible assets.

**Considerable Number of Common Shares Subject to Future Issuance**

As of September 30, 2007, we had one billion authorized common shares, of which 225.5 million shares were outstanding. In addition, 21.6 million common shares were reserved for issuance pursuant to employee stock option and employee stock purchase plans ("Equity Plans"), and approximately 36.4 million shares were reserved for issuance upon conversion or repurchase of the 3.25% junior subordinated convertible debentures due 2037. The availability of substantial amounts of our common stock resulting from the exercise or settlement of equity awards outstanding under our Equity Plans or the conversion or repurchase of debentures using common stock, which would be dilutive to existing security holders, could adversely affect the prevailing market price of our common stock and could impair our ability to raise additional capital through the sale of equity securities.

**We have not historically maintained substantial levels of indebtedness, and our financial condition and results of operations could be adversely affected if we do not effectively manage our liabilities.**

As a result of the sale of the $1.25 billion principal amount of 3.25% junior subordinated convertible debentures, we have a substantially greater amount of long term debt than we have maintained in the past. In addition to the debentures, we have a revolving credit facility with a borrowing capacity of $500 million. While we currently have no outstanding borrowings under our credit facility, its availability allows us immediate access to working capital if we identify opportunities for the use of this cash. Our maintenance of substantial levels of debt could adversely affect our flexibility to take advantage of corporate opportunities and could adversely affect our financial condition and results of operations.

**We may not have the ability to repurchase the debentures in cash upon the occurrence of a fundamental change, or to pay cash upon the conversion of debentures, as required by the indenture governing the 3.25% junior subordinated convertible debentures.**

Holders of our outstanding 3.25% junior convertible subordinated debentures will have the right to require us to repurchase the debentures upon the occurrence of a fundamental change. Although we currently have the

48

Table of Contents

intent and the ability to settle the principal amount of the convertible debentures in cash, we may not have sufficient funds to repurchase the debentures in cash or to make the required repayment at such time or have the ability to arrange necessary financing on acceptable terms. In addition, upon conversion of the debentures, we will be required to make cash payments to the holders of the debentures equal to the lesser of the principal amount of the debentures being converted and the conversion value of those debentures. Such payments could be significant, and we may not have sufficient funds to make them at such time.

A fundamental change may also constitute an event of default or prepayment under, or result in the acceleration of the maturity of, our then-existing indebtedness. Our ability to repurchase the debentures in cash or make any other required payments may be limited by law or the terms of other agreements relating to our indebtedness outstanding at the time. Our failure to repurchase the debentures or pay cash in respect of conversions when required would result in an event of default with respect to the debentures.

## Potential Effect of New Accounting Pronouncements

There may be potential new accounting pronouncements or regulatory rulings, which may have an impact on our future financial condition and results of operations. For example, at the July 25, 2007, FASB meeting, the FASB approved the proposed FSP on convertible debt instruments that may be settled in cash upon conversion (including partial cash settlement). Our 3.25% convertible debentures due 2037 would be affected by this proposed FSP. The proposed FSP would require the issuer to separately account for the liability and equity components of the instrument in a manner that reflects the issuer's economic interest cost. Further, the proposed FSP would require bifurcation of a component of the debt, classification of that component as equity, and then accretion of the resulting discount on the debt to result in the "economic interest cost" being reflected in the statement of income. In applying this FSP, the FASB emphasized that the FSP would be applied to the terms of the instruments as they existed for the time periods they existed, therefore, the application of the FSP would be applied retrospectively to all periods presented. If the FSP is issued, it is expected to be effective for fiscal years beginning after December 15, 2007. The Company would be required to implement the proposed standard during the first quarter of fiscal 2008, which begins on January 1, 2008. We are currently evaluating the effect that the adoption of this FSP would have on our consolidated results of operations and financial condition. We cannot predict the outcome of this process or any other changes in GAAP that may affect accounting for convertible debt securities. Any change in the accounting method for convertible debt securities could have an adverse impact on our financial results. These impacts could adversely affect the trading price of our common stock and in turn negatively impact the trading price of the debentures.

See Note 10 to our Condensed Consolidated Financial Statements included in Part 1. "Junior Subordinated Convertible Debentures" for additional information about the debentures. Please also see Note 16 to our Condensed Consolidated Financial Statements included in Part 1. "Recent Accounting Pronouncements" for additional information about recent accounting pronouncements.

**We may not realize the benefits we are seeking from our investments in the Jamba joint ventures as a result of lower than predicted operating results, larger funding requirements or lower cash distributions or otherwise.**

We have a 49% equity interest in two joint ventures related to our former Jamba business. We will recognize our proportionate share of the income or losses of these joint ventures in our condensed consolidated statements of income. We do not have control over the budget, day-to-day management or many of the other operating expenditures of the joint ventures, and therefore, we cannot predict with certainty the extent of the impact on our financial statements of these joint ventures for any particular period. Accordingly, our share of the income or losses of these joint ventures could materially affect our results of operations in future periods.

The joint venture agreements contain provisions requiring minimum cash distributions to the members. However, these provisions are subject to conditions and limitations, and therefore, we cannot assure you that we

49

Table of Contents

will ever receive cash distributions from these joint ventures. If the joint ventures require capital to fund their operations, we could be required to make capital contributions or loans to the joint ventures. The business operated by the U.S. joint venture is a newer business and therefore it may be more likely to require additional funding, although we cannot assure that the Netherlands joint venture will not require additional funding as well. If the Netherlands joint venture makes cash distributions to its members, to the extent we seek to use the cash in the U.S., we would be required to pay taxes on those funds if they are brought to the U.S., and therefore we would not receive the full benefit of any cash distribution. Additionally, we could be required to pay additional amounts to the joint ventures if it is later determined that we breached any of the representations of warranties in the formation agreement for the joint ventures.

The value of our investment in these joint ventures is subject to general economic, technological and market trends, as well as to the operating and financial decisions of the management team of the joint venture, all of which are outside of our control. In addition, these joint ventures may not gain the expected number of customers and/or generate the expected level of revenues, and consequently, we may never receive any cash distributions from these joint ventures, and in fact, they may require additional funding, any of which could diminish the value of or dilute our investment. Our investments in these joint ventures may not provide the economic returns we are seeking and may not increase in value above the minimum amounts that we can require Fox or News Corporation to buy our shares from us. We cannot assure you that the commercial agreements, including the Gateway Services Agreement, will provide us any benefit. It is also possible that Fox and News Corporation could purchase our shares from us in the future, prior to the businesses of the joint ventures reaching their full potential. Therefore, we cannot provide you with any assurance as to whether we will achieve a favorable return on our investment.

We also entered into various other commercial relationships with the joint ventures; however, we cannot assure you we will derive significant revenues from these other relationships.

**The expansion of our international operations subjects our business to additional economic risks that could have an adverse impact on our revenues and business.**

We have approximately 1,241 employees outside the United States, including Europe, Asia, Australia, and the Americas. Expansion into international markets has required and will continue to require significant management attention and resources. We may also need to tailor some of our other services for a particular market and to enter into international distribution and operating relationships. We have limited experience in localizing our services and in developing international distribution or operating relationships. We may not succeed in expanding our services into international markets. Failure to do so could harm our business. Moreover, local laws and customs in many countries differ significantly from those in the United States. In many foreign countries, particularly in those with developing economies, it is common for others to engage in business practices that are prohibited by our internal policies and procedures or United States regulations applicable to us. There can be no assurance that all of our employees, contractors and agents will not take actions in violations of them. Violations of laws or key control policies by our employees, contractors or agents could result in financial reporting problems, fines, penalties, or prohibition on the importation or exportation of our products and could have a material adverse effect on our business. In addition, there are risks inherent in doing business on an international basis, including, among others:

- competition with foreign companies or other domestic companies entering the foreign markets in which we operate;

- differing and uncertain regulatory requirements;

- legal uncertainty regarding liability and compliance with foreign laws;

- export and import restrictions on cryptographic technology and products incorporating that technology;

- tariffs and other trade barriers and restrictions;

50

Table of Contents

- difficulties in staffing and managing foreign operations;

- longer sales and payment cycles;

- problems in collecting accounts receivable;

- currency fluctuations, as our international revenues from Europe, South Africa, Japan, South America and Australia are not denominated in U.S. Dollars;

- potential problems associated with adapting our services to technical conditions existing in different countries;

- the necessity of developing foreign language portals and products for our services;

- difficulty of authenticating customer information for digital certificates and other purposes;

- political instability;

- failure of foreign laws to protect our U.S. proprietary rights adequately;

- more stringent privacy policies in foreign countries;

- additional vulnerability from terrorist groups targeting U.S. interests abroad;

- seasonal reductions in business activity; and

- potentially adverse tax consequences.

**Our failure to manage past and future growth in our business could harm our business.**

Between December 31, 1995, and September 30, 2007, we grew from 26 to 4,373 employees. This was achieved through internal growth, as well as acquisitions. During this time period, we opened new sales offices and significantly expanded our U.S. and non-U.S. operations. To successfully manage past growth and any future growth, we will need to continue to implement additional management information systems, continue the development of our operating, administrative, financial and accounting systems and controls and maintain close coordination among our executive, engineering, accounting, finance, marketing, sales and operations organizations. Any failure to manage growth effectively could harm our business.

**The business environment is highly competitive and, if we do not compete effectively, we may suffer price reductions, reduced gross margins and loss of market share.**

*Competition in Security Services* . Our security services are targeted at the rapidly evolving market for Internet security services, including network security, authentication and validation, which enable secure electronic commerce and communications over wireline and wireless IP networks. The market for security services is intensely competitive, subject to rapid change and significantly affected by new product and service introductions and other market activities of industry participants.

Principal competitors generally fall within one of the following categories: (1) companies such as RSA Security, Inc. and Entrust Technologies, which offer software applications and related digital certificate products that customers operate themselves; (2) companies such as Digital Signature Trust Company (a subsidiary of Identrus) that primarily offer digital certificate and certification authority related services; (3) companies focused on providing a bundled offering of products and services; and (4) companies offering competing SSL certificate and other security services, including GoDaddy and other domain name registrars. We also experience competition from a number of smaller companies, and we believe that our primary long-term competitors may not yet have entered the market. Furthermore, Netscape and Microsoft have introduced software products that enable the issuance and management of digital certificates, and we believe that other companies could introduce similar products.

51

Table of Contents

In addition, browser companies that embed our interface technologies or otherwise feature them as a provider of digital certificate products and services in their Web browsers or on their Web sites could also promote our competitors or charge us substantial fees for promotions in the future.

*Competition in Managed Security Services* . Consulting companies or professional services groups of other companies with Internet expertise are current or potential competitors to our managed security services. These companies include large systems integrators and consulting firms, such as Accenture, IBM Global Services, Getronics and Lucent NetCare. We also compete with security product companies that offer managed security services in addition to other security services, such as Symantec and ISS, as well as a number of providers such as BT Counterpane that offer managed security services. Telecommunications providers, such as Verizon Business, a provider of managed security services, are also potential competitors. In addition, we compete with some companies that have developed products that automate the management of IP addresses and name maps throughout enterprise-wide intranets, and with companies with internally developed systems integration efforts.

*Competition in Communications Services.* The market for communications services is extremely competitive and subject to significant pricing pressure. Competition in this area arises from two primary sources. Incumbent carriers provide competing in-house services in their respective regions. In addition, we face direct competition from national, unregulated companies, including Syniverse Technologies, Telcordia, NeuStar and other carriers such as Southern New England Telephone Diversified Group, a unit of AT&T. Furthermore, customers are increasingly likely to deploy internally developed communications technologies and services which may reduce the demand for technologies and services from third party providers, such as VeriSign, and further increase competitive pricing pressures.

*Competition in Commerce Services* . Our wireless billing and payment services are also subject to competition from providers such as Comverse, Amdocs, Convergys Corporation and Boston Communications Group. We are also aware of major Internet service providers, software developers and smaller entrepreneurial companies that are or may in the future be focusing significant resources on developing and marketing products and services that may compete directly with ours. Furthermore, customers are increasingly likely to deploy internally developed communications technologies and services which may reduce the demand for technologies and services from third-party providers such as VeriSign and further increase competitive pricing pressures.

*Competition in Content Services.* The market for content services is extremely competitive. Competitors include developers of content and entertainment products and services in a variety of domestic and international markets, such as Infospace, Itouch, Arvato mobile, Monstermob, and Motricity. This business also faces competition from mobile network operators such as Cingular, Verizon Wireless, Sprint Nextel Corporation, T-Mobile, Vodafone, O $_2$ , Orange, E-Plus and Telefónica, as well as Internet portal operators such as Yahoo!, AOL, T-Online and Google. Additional competitors are handset manufacturers such as Nokia and software providers such as Microsoft and Apple. As the market for wireless data, including information and entertainment data, matures, new categories of competitors, such as mobile phone companies, broadcasters, music publishers, other content providers or others have begun to develop competing products or services.

*Competition in Naming Services.* We face competition in the domain name registry space from other generic top level domain ("gTLD") and country code top level domain ("ccTLD") registries that are competing for the business of entities and individuals that are seeking to establish a Web presence, including registries offering services related to the . *mobi* , . *biz* , *.name, .pro, .aero, .museum* and *.coop* gTLDs and registries offering services related to ccTLDs. There are currently 16 gTLD registries and over 240 ccTLD registries.

We also face competition from service providers that offer outsourced domain name registration, resolutions and other DNS services to organizations that require a reliable and scalable infrastructure. Among the competitors are UltraDNS, NeuLevel, Afilias, Register.com and Tucows.com.

52

**Table of Contents**

*Competition in Intelligent Supply Chain Services.* There are a number of companies that provide intelligent supply chain services. For point-of-sale data, we face competition from IRI and AC Nielsen, as well as smaller software companies. For consulting services, we face competition from traditional consulting firms.

*Competition in Real-Time Publisher Services* . We face competition from various smaller companies providing similar services.

*Competition in Digital Brand Management Services.* We face competition from companies providing services similar to some of our Digital Brand Management Services. In the monitoring services, registration and domain name asset management area of our business, our competition comes primarily from ICANN accredited registrars and various smaller companies providing similar services.

Several of our current and potential competitors have longer operating histories and significantly greater financial, technical, marketing and other resources than we do and therefore may be able to respond more quickly than we can to new or changing opportunities, technologies, standards and customer requirements. Many of these competitors also have broader and more established distribution channels that may be used to deliver competing products or services directly to customers through bundling or other means. If such competitors were to bundle competing products or services for their customers, the demand for our products and services might be substantially reduced and the ability to distribute our products successfully and the utilization of our services would be substantially diminished. New technologies and the expansion of existing technologies may increase the competitive pressure.

New technologies and the expansion of existing technologies may increase competitive pressure. We cannot assure you that competing technologies developed by others or the emergence of new industry standards will not adversely affect our competitive position or render our security services or technologies noncompetitive or obsolete. In addition, our markets are characterized by announcements of collaborative relationships involving our competitors. The existence or announcement of any such relationships could adversely affect our ability to attract and retain customers. As a result of the foregoing and other factors, we may not be able to compete effectively with current or future competitors, and competitive pressures that we face could materially harm our business.

**Our communications services business depends in part on the acceptance of our SS7 network and the telecommunications industry's continuing use of SS7 technology.**

Our future growth in our communications services business depends, in part, on the commercial success and reliability of our SS7 network. Our SS7 network is a vital component of our intelligent network services and has been a significant source of revenues for our Communications Services Group. Our communications services business will suffer if our target customers do not use our SS7 network. Our future financial performance will also depend on the successful development, introduction and customer acceptance of new and enhanced SS7-based services. We are not certain that our target customers will choose our particular SS7 network solution or continue to use our SS7 network. In the future, we may not be successful in marketing our SS7 network or any new or enhanced services.

**The inability of our customers to successfully implement our signaling and network services with their existing systems could adversely affect our business.**

Significant technical challenges exist in our signaling and network services business because many of our customers:

- purchase and implement SS7 network services in phases;

- deploy SS7 connectivity across a variety of telecommunication switches and routes; and

- integrate our SS7 network with a number of legacy systems, third-party software applications and engineering tools.

53

Table of Contents

Customer implementation currently requires participation by our order management and our engineering and operations groups, each of which has limited resources. Some customers may also require us to develop costly customized features or capabilities, which increases our costs and consumes a disproportionate share of our limited customer service and support resources. Also, we typically charge one-time fees for initially connecting a customer to our SS7 network and a monthly recurring flat rate fee after the connection is established. If new or existing customers have difficulty deploying our products or require significant amounts of our engineering service support, we may experience reduced operating margins. Our customers' ability to deploy our network services to their own customers and integrate them successfully within their systems depends on our customers' capabilities and the complexity involved. Difficulty in deploying those services could reduce our operating margins due to increased customer support and could cause potential delays in recognizing revenues until the services are implemented.

**Our failure to achieve or sustain market acceptance of our communications services at desired pricing levels and industry consolidation could adversely impact our revenues and cash flow.**

The telecommunications industry is characterized by significant price competition. Competition and industry consolidation in our communications services could result in significant pricing pressure and an erosion in our market share. Pricing pressure from competition could cause large reductions in the selling price of our services. For example, our competitors may provide customers with reduced communications costs for Internet access or private network services, reducing the overall cost of services and significantly increasing pricing pressures on us. We would need to offset the effects of any price reductions by increasing the number of our customers, generating higher revenues from enhanced services or reducing our costs, and we may not be able to do so successfully. We believe that the business of providing network connectivity and related network services will see increased consolidation in the future. Consolidation could decrease selling prices and increase competition in these industries, which could erode our market share, revenues and operating margins in our Communications Services Group. Consolidation in the telecommunications industry has led to the merging of many companies, including, Nextel and Price Communications, customers of our Communications Services Group. Our business could be harmed if these mergers result in the loss of customers by our Communications Services Group. Furthermore, customers may choose to deploy internally developed communications technologies and services thereby reducing the demand for technologies and services we offer which could harm our business.

**Our content services business depends on agreements with many different third parties, including wireless carrier, and content providers. If these agreements are terminated or not renewed, or are amended to require us to change the way our content services are offered to customers, our business could be harmed.**

Our content services business depends on our ability to enter into and maintain agreements with many different third parties including wireless carriers and other mobile phone service providers, upon which this business is highly dependent for billing its customers.

These agreements are typically for a short term, or are otherwise terminable upon short notice, and in the case of agreements with carriers, other mobile phone service providers and content developers, are non-exclusive. If these third parties reduce their commitment to us, terminate their agreements with us or enter into similar agreements with our competitors, our content services business could be materially harmed.

**Our business depends on the continued growth of the Internet and adoption and continued use of IP networks.**

Our future success depends, in part, on continued growth in the use of the Internet and IP networks. If the use of, and interest in, the Internet and IP networks does not grow, our business would be harmed. To date, many businesses and consumers have been deterred from utilizing the Internet and IP networks for a number of reasons, including, but not limited to:

- potentially inadequate development of network infrastructure;

54

Table of Contents

- security concerns, particularly for online commerce, including the potential for merchant or user impersonation and fraud or theft of stored data and information communicated over IP networks;

- privacy concerns, including the potential for third parties to obtain personally identifiable information about users or to disclose or sell data without notice to or the consent of such users;

- other security concerns such as attacks on popular Web sites by "hackers;"

- inconsistent quality of service;

- inability to integrate business applications on IP networks;

- the need to operate with multiple and frequently incompatible products;

- limited bandwidth access; and

- government regulation.

The widespread acceptance of the Internet and IP networks will require a broad acceptance of new methods of conducting business and exchanging information. Organizations that already have invested substantial resources in other methods of conducting business may be reluctant to adopt new methods. Also, individuals with established patterns of purchasing goods and services and effecting payments may be reluctant to change.

A number of states, as well as the U.S. Congress, have been considering various initiatives that could permit sales and use taxes on Internet sales. If any of these initiatives are adopted, it could substantially impair the growth of electronic commerce and therefore hinder the growth in the use of the Internet and IP networks, which could harm our business.

**Many of our target markets are evolving, and if these markets fail to develop or if our products and services are not widely accepted in these markets, our business could suffer.**

We target our security services at the market for trusted and secure electronic commerce and communications over IP and other networks. Our Information Services business unit is developing managed services designed to work with the EPCglobal Network and radio frequency identification ("RFID"), technology, point-of-sale data services and real-time publisher services. These are rapidly evolving markets that may not continue to grow. Even if these markets grow, our services may not be widely accepted. Accordingly, the demand for our services is very uncertain. The factors that may affect market acceptance of our services include the following:

- market acceptance of products and services based upon technologies other than those we use;

- public perception of the security of our technologies and of IP and other networks;

- the introduction and consumer acceptance of new generations of mobile handsets;

- demand for supply chain information services, including acceptance of RFID technology, the EPCglobal Network and point-of-sale data services;

- the ability of the Internet infrastructure to accommodate increased levels of usage; and

- government regulations affecting electronic commerce and communications over IP networks.

If the market for electronic commerce and communications over IP and other networks does not grow or these services are not widely accepted in the market, our business would be materially harmed.

**Governmental regulation and the application of existing laws may slow business growth, increase our costs of doing business and create potential liability.**

The growth and development of the Internet has led to new laws and regulations, as well as the application of existing laws to the Internet and wireless communications. Application of these laws can be unclear. The costs

55

Table of Contents

of complying or failure to comply with these laws and regulations could limit our ability to operate in our markets, expose us to compliance costs and substantial liability and result in costly and time-consuming litigation.

Foreign, federal or state laws could have an adverse impact on our business. For example, recent laws include those designed to restrict the on-line distribution of certain materials deemed harmful to children and impose additional restrictions or obligations for on-line services when dealing with minors. Such legislation may impose significant additional costs on our business or subject us to additional liabilities.

Due to the nature of the Internet, it is possible that the governments of other states and foreign countries might attempt to regulate Internet transmissions or prosecute us for violations of their laws. We might unintentionally violate such laws, such laws may be modified and new laws may be enacted in the future. Any such developments could increase the costs of regulatory compliance for us, force us to change our business practices or otherwise materially harm our business.

**Our inability to react to changes in our industry and successfully introduce new products and services could harm our business.**

The emerging nature of the Internet, other communication networks, content, digital certificate, and domain name registration markets, and their rapid evolution, require us continually to improve the performance, features and reliability of our services, particularly in response to competitive offerings. In particular, the market for entertainment and information is characterized by changing technology, developing industry standards, changing customer preferences and trends (which also vary from country to country), and the constant introduction of new products and services. In order to remain competitive, we must continually improve our access technology and software, support the latest transmission technologies, and adapt our products and services to changing market conditions and customer preferences. When entertainment products are placed on the market, it is difficult to predict whether they will become popular.

The communications network services industry is also characterized by rapid technological change and frequent new product and service announcements. Significant technological changes could make our technologies obsolete and other changes in our markets could result in some of our other products and services losing market share. Accordingly, we must continually improve the responsiveness, reliability and features of our services and develop new features, services and applications to meet changing customer needs in our target markets. For example, we sell our SS7 network services primarily to traditional telecommunications companies that rely on traditional voice networks. Many emerging companies are providing convergent Internet protocol-based network services. Our future success could also depend upon our ability to provide products and services to these Internet protocol-based telephony providers, particularly if IP-based telephony becomes widely accepted. We cannot assure that we will be able to adapt to these challenges or respond successfully or in a cost-effective way to adequately meet them. Our failure to do so would adversely affect our ability to compete and retain customers or market share.

**New products and services developed or introduced by us may not result in any significant revenues.**

We must commit significant resources to develop new products and services before knowing whether our investments will result in products and services the market will accept. The success of new products and services depends on several factors, including proper new definition and timely completion, introduction and market acceptance. For example, our selection in January 2004 by EPCglobal, a not-for-profit standards organization, to operate the Object Naming Service as the root directory for the EPCglobal Network, may not increase our revenues in the foreseeable future. There can be no assurance that we will successfully identify new product and service opportunities, develop and bring new products and services to market in a timely manner, or achieve market acceptance of our products and services, or that products, services and technologies developed by others will not render our products, services or technologies obsolete or noncompetitive. Our inability to successfully market new products and services may harm our business.

56

**Table of Contents**

**Issues arising from our agreements with ICANN and the Department of Commerce could harm our registry business.**

The U.S. Department of Commerce ("DOC") has adopted a plan for the phased transition of the DOC's responsibilities for the domain name system to the Internet Corporation for Assigned Names and Numbers ("ICANN"). As part of this transition, as the exclusive registry of domain names within the . *com* and . *net* gTLDs, we have entered into agreements with ICANN and with the DOC.

We face risks from the transition of the DOC's responsibilities for the domain name system to ICANN, including the following:

- ICANN could adopt or promote policies, procedures or programs that are unfavorable to us as the registry operator of the .*com* and .*net* gTLDs or that are inconsistent with our current or future plans;

- the DOC or ICANN could terminate our agreements to be the registry for the .*com* or .*net* gTLDs under the circumstances described elsewhere in this report;

- if the . *com* and . *net* Registry Agreements are terminated, it could have a material adverse impact on our business;

- the DOC's or ICANN's interpretation of provisions of our agreements with either of them could differ from ours;

- the DOC could revoke its recognition of ICANN, as a result of which the DOC could take the place of ICANN for purposes of our agreements with ICANN, and could take actions that are harmful to us;

- the U.S. Government could refuse to transfer certain responsibilities for domain name system administration to ICANN due to security, stability or other reasons, resulting in fragmentation or other instability in domain name system administration; and

- our registry business could face legal or other challenges resulting from our activities or the activities of registrars.

**Challenges to ongoing privatization of Internet administration could harm our domain name registry business.**

Risks we face from challenges by third parties, including governmental authorities in the United States and other countries, to our role in the ongoing privatization of the Internet include:

- legal, regulatory or other challenges could be brought, including challenges to the agreements governing our relationship with the DOC or ICANN, or to the legal authority underlying the roles and actions of the DOC, ICANN or us;

- the U.S. Congress could take action that is unfavorable to us;

- ICANN could fail to maintain its role, potentially resulting in instability in domain name system administration; and

- some governments and governmental authorities outside the U.S. have in the past disagreed with, and may in the future disagree with, the actions, policies or programs of ICANN, the U.S. Government and us relating to the domain name system. These foreign governments or governmental authorities may take actions or adopt policies or programs that are harmful to our business.

As a result of these and other risks, it may be difficult for us to introduce new services in our domain name registry business and we could also be subject to additional restrictions on how this business is conducted.

Table of Contents

**If we encounter system interruptions, we could be exposed to liability and our reputation and business could suffer.**

We depend on the uninterrupted operation of our various systems, secure data centers and other computer and communication networks. Our systems and operations are vulnerable to damage or interruption from:

- power loss, transmission cable cuts and other telecommunications failures;

- damage or interruption caused by fire, earthquake, and other natural disasters;

- computer viruses or software defects; and

- physical or electronic break-ins, sabotage, intentional acts of vandalism, terrorist attacks and other events beyond our control.

Most of our systems are located at, and most of our customer information is stored in, our facilities in Mountain View, California and Kawasaki, Japan, both of which are susceptible to earthquakes; Providence, Rhode Island; Dulles, Virginia; Lacey, Washington; Overland Park, Kansas, Melbourne, Australia and Berlin, Hamburg and Verl, Germany. Any damage or failure that causes interruptions in any of these facilities or our other computer and communications systems could materially harm our business. Although we carry insurance for property damage and business interruption, we do not carry insurance or financial reserves for interruptions or potential losses arising from earthquakes or terrorism.

In addition, our ability to issue digital certificates, our domain name registry services and other of our services depend on the efficient operation of the Internet connections from customers to our secure data centers and from our customers to the shared registration system. These connections depend upon the efficient operation of Internet service providers and Internet backbone service providers, all of which have had periodic operational problems or experienced outages in the past.

A failure in the operation of our domain name zone servers, the domain name root servers, or other events could result in the deletion of one or more domain names from the Internet for a period of time. A failure in the operation of our shared registration system could result in the inability of one or more other registrars to register and maintain domain names for a period of time. A failure in the operation or update of the master database that we maintain could result in the deletion of one or more top-level domains from the Internet and the discontinuation of second-level domain names in those top-level domains for a period of time. Any of these problems or outages could decrease customer satisfaction, which could harm our business.

**If we experience security breaches, we could be exposed to liability and our reputation and business could suffer.**

We retain certain confidential customer information in our secure data centers and various registration systems. It is critical to our business strategy that our facilities and infrastructure remain secure and are perceived by the marketplace to be secure. Our domain name registry operations also depend on our ability to maintain our computer and telecommunications equipment in effective working order and to reasonably protect our systems against interruption, and potentially depend on protection by other registrars in the shared registration system. The root zone servers and top-level domain name zone servers that we operate are critical hardware to our registry services operations. Therefore, we may have to expend significant time and money to maintain or increase the security of our facilities and infrastructure.

Despite our security measures, our infrastructure may be vulnerable to physical break-ins, computer viruses, attacks by hackers or similar disruptive problems. It is possible that we may have to expend additional financial and other resources to address such problems. Any physical or electronic break-in or other security breach or compromise of the information stored at our secure data centers and domain name registration systems may jeopardize the security of information stored on our premises or in the computer systems and networks of our

58

Table of Contents

customers. In such an event, we could face significant liability and customers could be reluctant to use our services. Such an occurrence could also result in adverse publicity and therefore adversely affect the market's perception of the security of electronic commerce and communications over IP networks as well as of the security or reliability of our services.

**The reliance of our network connectivity and interoperability services and content services on third-party communications infrastructure, hardware and software exposes us to a variety of risks we cannot control.**

The success of our network connectivity and interoperability services and content services depends on our network infrastructure, including the capacity leased from telecommunications suppliers. In particular, we rely on AT&T, Sprint and other telecommunications providers for leased long-haul and local loop transmission capacity. These companies provide the dedicated links that connect our network components to each other and to our customers. Our business also depends upon the capacity, reliability and security of the infrastructure owned by third parties that is used to connect telephone calls. Specifically, we currently lease capacity from regional providers on four of the fourteen mated pairs of SS7 signal transfer points that comprise our network.

We have no control over the operation, quality or maintenance of a significant portion of that infrastructure or whether or not those third parties will upgrade or improve their equipment. We depend on these companies to maintain the operational integrity of our connections. If one or more of these companies is unable or unwilling to supply or expand its levels of service to us in the future, our operations could be severely interrupted. In addition, rapid changes in the telecommunications industry have led to the merging of many companies. These mergers may cause the availability, pricing and quality of the services we use to vary and could cause the length of time it takes to deliver the services that we use to increase significantly.

Our signaling and SS7 services rely on links, equipment and software provided to us from our vendors, the most important of which are gateway equipment and software from Tekelec and Agilent Technologies, Inc. We cannot assure you that we will be able to continue to purchase equipment from these vendors on acceptable terms, if at all. If we are unable to maintain current purchasing terms or ensure product availability with these vendors, we may lose customers and experience an increase in costs in seeking alternative suppliers of products and services.

**Capacity limits on our technology and network hardware and software may be difficult to project and we may not be able to expand and upgrade our systems to meet increased use.**

If traffic from our telecommunication and content customers through our network increases, we will need to expand and upgrade our technology and network hardware and software. We may not be able to expand and upgrade, in a timely manner, our systems and network hardware and software capabilities to accommodate increased traffic on our network. If we do not appropriately expand and upgrade our systems and network hardware and software, we may lose customers and revenues.

**We rely on third parties who maintain and control root zone servers and route Internet communications.**

We currently administer and operate only two of the thirteen root zone servers. The others are administered and operated by independent operators on a volunteer basis. Because of the importance to the functioning of the Internet of these root zone servers, our registry services business could be harmed if these volunteer operators fail to maintain these servers properly or abandon these servers, which would place additional capacity demands on the two root zone servers we operate.

Further, our registry services business could be harmed if any of these volunteer operators fail to include or provide accessibility to the data that it maintains in the root zone servers that it controls. In the event and to the extent that ICANN is authorized to set policy with regard to an authoritative root server system, as provided in our registry agreement with ICANN, it is required to ensure that the authoritative root will point to the top-level domain zone servers designated by us. If ICANN does not do this, our business could be harmed.

Table of Contents

**Undetected or unknown defects in our services could harm our business and future operating results.**

Services as complex as those we offer or develop frequently contain undetected defects or errors. Despite testing, defects or errors may occur in our existing or new services, which could result in loss of or delay in revenues, loss of market share, failure to achieve market acceptance, diversion of development resources, injury to our reputation, tort or warranty claims, increased insurance costs or increased service and warranty costs, any of which could harm our business. The performance of our services could have unforeseen or unknown adverse effects on the networks over which they are delivered as well as on third-party applications and services that utilize our services, which could result in legal claims against us, harming our business. Furthermore, we often provide implementation, customization, consulting and other technical services in connection with the implementation and ongoing maintenance of our services, which typically involves working with sophisticated software, computing and communications systems. Our failure or inability to meet customer expectations in a timely manner could also result in loss of or delay in revenues, loss of market share, failure to achieve market acceptance, injury to our reputation and increased costs.

**Services offered by our Internet Services Group rely on public key cryptography technology that may compromise our system's security.**

Services offered by our Internet Services Group depend on public key cryptography technology. With public key cryptography technology, a user is given a public key and a private key, both of which are required to perform encryption and decryption operations. The security afforded by this technology depends on the integrity of a user's private key and that it is not lost, stolen or otherwise compromised. The integrity of private keys also depends in part on the application of specific mathematical principles known as "factoring." This integrity is predicated on the assumption that the factoring of large numbers into their prime number components is difficult. Should an easy factoring method be developed, the security of encryption products utilizing public key cryptography technology would be reduced or eliminated. Furthermore, any significant advance in techniques for attacking cryptographic systems could also render some or all of our existing PKI services obsolete or unmarketable. If improved techniques for attacking cryptographic systems were ever developed, we would likely have to reissue digital certificates to some or all of our customers, which could damage our reputation and brand or otherwise harm our business. In the past there have been public announcements of the successful attack upon cryptographic keys of certain kinds and lengths and of the potential misappropriation of private keys and other activation data. This type of publicity could also hurt the public perception as to the safety of the public key cryptography technology included in our digital certificates. This negative public perception could harm our business.

**Some of our security services have lengthy sales and implementation cycles.**

We market many of our security services directly to large companies and government agencies and we market our communications services to large telecommunication carriers. The sale and implementation of our services to these entities typically involves a lengthy education process and a significant technical evaluation and commitment of capital and other resources. This process is also subject to the risk of delays associated with customers' internal budgeting and other procedures for approving large capital expenditures, deploying new technologies within their networks and testing and accepting new technologies that affect key operations. As a result, the sales and implementation cycles associated with certain of our services can be lengthy, potentially lasting from three to nine months. Our quarterly and annual operating results could be materially harmed if orders forecasted for a specific customer for a particular quarter are not realized.

**Failure of VeriSign Affiliates to follow our security and trust practices or to maintain the privacy or security of confidential customer information could have an adverse impact on our revenues and business.**

We have licensed to VeriSign Affiliates our Processing Center platform, which is designed to replicate our own secure data centers and allows the VeriSign Affiliate to offer back-end processing of PKI services for

Table of Contents

enterprises. The VeriSign Processing Center platform provides a VeriSign Affiliate with the knowledge and technology to offer PKI services similar to those offered by us. It is critical to our business strategy that the facilities and infrastructure used in issuing and marketing digital certificates remain secure and we are perceived by the marketplace to be secure. Although we provide the VeriSign Affiliate with training in security and trust practices, network management and customer service and support, these practices are performed by the affiliate and are outside of our control. Any failure of a VeriSign Affiliate to maintain the privacy or security of confidential customer information could result in negative publicity and therefore adversely affect the market's perception of the security of our services as well as the security of electronic commerce and communication over IP networks generally.

**We rely on our intellectual property, and any failure by us to protect, or any misappropriation of, our intellectual property could harm our business.**

Our success depends on our internally developed technologies, patents and other intellectual property. Despite our precautions, it may be possible for a third party to copy or otherwise obtain and use our trade secrets or other forms of our intellectual property without authorization. Furthermore, the laws of foreign countries may not protect our proprietary rights in those countries to the same extent U.S. law protects these rights in the United States. In addition, it is possible that others may independently develop substantially equivalent intellectual property. If we do not effectively protect our intellectual property, our business could suffer. In the future, we may have to resort to litigation to enforce our intellectual property rights, to protect our trade secrets or to determine the validity and scope of the proprietary rights of others. This type of litigation, regardless of its outcome, could result in substantial costs and diversion of management and technical resources.

We also license third-party technology that is used in our products and services to perform key functions. These third-party technology licenses may not continue to be available to us on commercially reasonable terms or at all. Our business could suffer if we lost the rights to use these technologies. A third-party could claim that the licensed software infringes a patent or other proprietary right. Litigation between the licensor and a third-party or between us and a third-party could lead to royalty obligations for which we are not indemnified or for which indemnification is insufficient, or we may not be able to obtain any additional license on commercially reasonable terms or at all. The loss of, or our inability to obtain or maintain, any of these technology licenses could delay the introduction of our Internet infrastructure services until equivalent technology, if available, is identified, licensed and integrated. This could harm our business.

**We could become subject to claims of infringement of intellectual property of others, which could be costly to defend and which could harm our business.**

Claims relating to infringement of intellectual property of others or other similar claims have been made against us in the past and could be made against us in the future. In addition, we use news content as part of our real-time publisher service. It is possible that we could become subject to additional claims for infringement of the intellectual property of third parties. Any claims, with or without merit, could be time-consuming, result in costly litigation and diversion of technical and management personnel, cause delays or require us to develop non-infringing technology or enter into royalty or licensing agreements. Royalty or licensing agreements, if required, may not be available on acceptable terms or at all. If a successful claim of infringement were made against us, we could be required to pay damages or have portions of our business enjoined. If we could not develop non-infringing technology or license the infringed or similar technology on a timely and cost-effective basis, our business could be harmed.

In addition, legal standards relating to the validity, enforceability, and scope of protection of intellectual property rights in Internet-related businesses are uncertain and still evolving. Because of the growth of the Internet and Internet-related businesses, patent applications are continuously and simultaneously being filed in connection with Internet-related technology. There are a significant number of U.S. and foreign patents and

61

Table of Contents

patent applications in our areas of interest, and we believe that there has been, and is likely to continue to be, significant litigation in the industry regarding patent and other intellectual property rights.

**We must establish and maintain strategic and other relationships.**

One of our significant business strategies has been to enter into strategic or other similar collaborative relationships in order to reach a larger customer base than we could reach through our direct sales and marketing efforts. We may need to enter into additional relationships to execute our business plan. We may not be able to enter into additional, or maintain our existing, strategic relationships on commercially reasonable terms. If we fail to enter into additional relationships, we would have to devote substantially more resources to the distribution, sale and marketing of our security services and communications services than we would otherwise. Our success in obtaining results from these relationships will depend both on the ultimate success of the other parties to these relationships and on the ability of these parties to market our services successfully.

Furthermore, our ability to achieve future growth will also depend on our ability to continue to establish direct seller channels and to develop multiple distribution channels. Failure of one or more of our strategic relationships to result in the development and maintenance of a market for our services could harm our business. If we are unable to maintain our relationships or to enter into additional relationships, this could harm our business.

**We depend on key personnel to manage our business effectively and may not be successful in attracting and retaining such personnel.**

We depend on the performance of our senior management team and other key employees. Our success also depends on our ability to attract, integrate, train, retain and motivate these individuals and additional highly skilled technical and sales and marketing personnel, both in the U.S. and abroad. In addition, our stringent hiring practices for some of our key personnel, which consist of background checks into prospective employees' criminal and financial histories, further limit the number of qualified persons for these positions.

We have no employment agreements with any of our key executives that prevent them from leaving VeriSign at any time. In addition, we do not maintain key person life insurance for any of our officers or key employees. The loss of the services of any of our senior management team or other key employees or failure to attract, integrate, train, retain and motivate additional key employees could harm our business.

**Compliance with rules and regulations concerning corporate governance is costly and could harm our business.**

The Sarbanes-Oxley Act mandates, among other things, that companies adopt new corporate governance measures and imposes comprehensive reporting and disclosure requirements, sets stricter independence and financial expertise standards for audit committee members and imposes increased civil and criminal penalties for companies, their chief executive officers and chief financial officers and directors for securities law violations. For example, Section 404 of the Sarbanes-Oxley Act requires companies to do a comprehensive and costly evaluation of their internal controls. In addition, the NASDAQ Stock Market has adopted additional comprehensive rules and regulations relating to corporate governance. These laws, rules and regulations have increased the scope, complexity and cost of our corporate governance, reporting and disclosure practices, and our compliance efforts have required significant management attention. It has become more difficult and more expensive for us to obtain director and officer liability insurance, and we have been required to accept reduced coverage and incur substantially higher costs to obtain the reduced level of coverage. Further, our board members, chief executive officer and chief financial officer could face an increased risk of personal liability in connection with the performance of their duties. As a result, we may have difficulty attracting and retaining qualified board members and executive officers, which could harm our business.

Table of Contents

**We have anti-takeover protections that may delay or prevent a change in control that could benefit our stockholders.**

Our amended and restated Certificate of Incorporation and Bylaws contain provisions that could make it more difficult for a third-party to acquire us without the consent of our Board of Directors. These provisions include:

- our stockholders may take action only at a meeting and not by written consent;

- our board must be given advance notice regarding stockholder-sponsored proposals for consideration at annual meetings and for stockholder nominations for the election of directors;

- vacancies on our board may be filled until the next annual meeting of stockholders only by majority vote of the directors then in office; and

- special meetings of our stockholders may be called only by the chairman of the board, the president or the board, and not by our stockholders.

VeriSign has also adopted a stockholder rights plan that may discourage, delay or prevent a change of control and make any future unsolicited acquisition attempt more difficult. Under the rights plan:

- The rights will become exercisable only upon the occurrence of certain events specified in the plan, including the acquisition of 20% of VeriSign's outstanding common stock by a person or group.

- Each right entitles the holder, other than an "acquiring person," to acquire shares of VeriSign's common stock at a 50% discount to the then-prevailing market price.

- VeriSign's Board of Directors may redeem outstanding rights at any time prior to a person becoming an "acquiring person," at a price of $0.001 per right. Prior to such time, the terms of the rights may be amended by VeriSign's Board of Directors without the approval of the holders of the rights.

**Changes in, or interpretations of, tax rules and regulations may adversely affect our effective tax rates.**

We are subject to income taxes in both the United States and numerous foreign jurisdictions. Significant judgment is required in determining our worldwide provision for income taxes. In the ordinary course of our business, there are many transactions and calculations where the ultimate tax determination is uncertain. We are subject to audit by various tax authorities. Although we believe our tax estimates are reasonable, the final determination of tax audits and any related litigation could be materially different than that which is reflected in historical income tax provisions and accruals. Should additional taxes be assessed as a result of an audit or litigation, an adverse effect on our income tax provision and net income in the period or periods for which that determination is made could result.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**Unregistered Sales of Equity Securities**

In August 2007, the Registrant issued $1.25 billion aggregate principal amount of 3.25% Junior Subordinated Convertible Debentures due 2037 to J.P. Morgan Securities, Inc. and paid $25.0 million in underwriting fees and commissions. The offer and sale of these securities were effected without registration in reliance on the exemption afforded by Section 4(2) of the Securities Act promulgated thereunder.

On July 16, 2007, August 1, 2007 and August 24, 2007, the Registrant issued an aggregate of 40,595 shares of common stock to certain directors and executive officers of the Registrant in connection with the vesting of certain restricted stock units issued in 2006 under the Registrant's 2006 Equity Incentive Plan. The offer and sale of these securities were effected without registration in reliance on the exemption afforded by Regulation D and/or Section 4(2) of the Securities Act promulgated thereunder.

Table of Contents

**Share Repurchases**

On May 16, 2006, the Board of Directors of VeriSign authorized a new stock repurchase program ("2006 stock repurchase program") to repurchase up to $1.0 billion of our common stock on the open market, or in negotiated or block trades. As of September 30, 2007, we have approximately $984.7 million available under our 2006 stock repurchase program.

On August 7, 2007, the Board of Directors of VeriSign authorized the use of the net proceeds from the issuance of the convertible debentures as described in Note 10, "Junior Subordinated Convertible Debentures," to repurchase shares of our common stock in addition to the previously approved 2006 stock repurchase program.

During the three months ended September 30, 2007, we used proceeds from the issuance of the convertible debentures to repurchase 12.2 million shares of our common stock for an aggregate of approximately $350.0 million. Additionally, we entered into a $600.0 million Accelerated Share Repurchase ("ASR") agreement and a $200.0 million Guaranteed Share Repurchase ("GSR") agreement with two independent financial institutions.

Under the terms of the ASR agreement, the actual purchase price per share of the common stock repurchased under the agreement is determined and adjusted based on a discount to the volume-weighted average price of the common stock during a period following the execution of the ASR Agreement. The exact number of shares repurchased pursuant to the accelerated share repurchase program is determined based on such adjusted price. The counterparty to the agreement may buy or sell the common stock in the secondary market to hedge its position. On August 20, 2007, 12.9 million shares of our common stock were delivered to us, and we expect to receive delivery of up to 6.6 million additional shares of our common stock no later than December 2007.

Under the terms of the GSR agreement, on September 26, 2007, 6.3 million shares of our common stock were settled and delivered to us.

**ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

The 2007 Annual Meeting of Stockholders was held on August 30, 2007, at our corporate offices, located at 487 East Middlefield Road, Mountain View, California. Four proposals were voted on at the meeting. The results of each proposal are as follows.

Proposal No. 1 to elect three (3) Class III directors, each to serve a one-year term (if Proposal No. 2 is approved) or a three-year term (if Proposal No. 2 is not approved), was approved by the stockholders. The nominees received the following votes:

|  | For | Withheld |
| --- | --- | --- |
| D. James Bidzos | 120,967,877 | 96,470,283 |
| William L. Chenevich | 119,906,243 | 97,531,917 |
| Louis A. Simpson | 151,364,779 | 66,073,381 |

In Proposal No. 2, stockholders approved the Fourth Amended and Restated Certificate of Incorporation to eliminate our classified board structure and provide for annual election of directors. This proposal received the following votes:

|  | Votes |
| --- | --- |
| For | 214,697,103 |
| Against | 1,607,342 |
| Abstain | 1,133,715 |

64

Table of Contents

In Proposal No. 3, stockholders approved the 2007 Employee Stock Purchase Plan. This proposal received the following votes:

|  | Votes |
|---|---|
| For | 175,908,047 |
| Against | 14,382,633 |
| Abstain | 1,187,537 |

In Proposal No. 4, stockholders ratified the appointment of KPMG LLP as independent auditors of VeriSign for the fiscal year ending December 31, 2007. This proposal received the following votes:

|  | Votes |
|---|---|
| For | 214,438,965 |
| Against | 1,806,551 |
| Abstain | 1,192,644 |

Abstentions and broker non-votes were included in the determination of the number of shares represented at the meeting for purposes of determining the presence of a quorum at the Annual Meeting of Stockholders. Abstentions had the same effect as a vote against Proposal No. 2 and Proposal No. 3.

## ITEM 5. OTHER INFORMATION

10b5-1 Trading Plans

The following executive officers have entered into trading plans intended to comply with the guidelines specified in Rule 10b5-1 under the Securities Exchange Act of 1934, as amended ("Rule 10b5-1"): Aristotle N. Balogh, Executive Vice President, Chief Technology Officer; Albert E. Clement, Chief Financial Officer; John M. Donovan, Executive Vice President, Global Sales and Consulting Services; and Mark D. McLaughlin, Executive Vice President, Products, Marketing and Customer Care. Other VeriSign executive officers (as well as VeriSign employees) may adopt Rule 10b5-1 trading plans from time to time. These plans generally provide for the exercise of stock options and the subsequent sale of the acquired shares on the open market and the sale of shares that were acquired upon vesting of restricted stock units, subject to specified limitations and minimum price thresholds. Under these plans, the executive officers do not control the specific timing of any option exercise or sale. Rule 10b5-1 permits corporate officers and directors to adopt written, pre-arranged stock trading plans when they are not in possession of material, non-public information.

65

**Table of Contents**

**ITEM 6. EXHIBITS**

(a) Index to Exhibits

| Exhibit Number | Exhibit Description | Filed Herewith |
|---|---|---|
| 31.01 | Certification of President and Chief Executive Officer pursuant to Exchange Act Rule 13a-14(a). | X |
| 31.02 | Certification of Chief Financial Officer pursuant to Exchange Act Rule 13a-14(a). | X |
| 32.01 | Certification of President and Chief Executive Officer pursuant to Exchange Act Rule 13a-14(b) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350). * | X |
| 32.02 | Certification of Chief Financial Officer pursuant to Exchange Act Rule 13a-14(b) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350). * | X |

\*   As contemplated by SEC Release No. 33-8212, these exhibits are furnished with this Quarterly Report on Form 10-Q and are not deemed filed with the Securities and Exchange Commission and are not incorporated by reference in any filing of VeriSign, Inc. under the Securities Act of 1933 or the Securities Act of 1934, whether made before or after the date hereof and irrespective of any general incorporation language in such filings.

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

VERISIGN, INC.

Date: November 2, 2007

By:      /s/  WILLIAM A. ROPER, JR.

**William A. Roper Jr.**
**President and Chief Executive Officer**
**(Principal Executive Officer)**

Date: November 2, 2007

By:      /s/  ALBERT E. CLEMENT

**Albert E. Clement**
**Chief Financial Officer**
**(Principal Financial and Accounting Officer)**

67

Table of Contents

## EXHIBITS

As required under Item 6—Exhibits, the exhibits filed as part of this report are provided in this separate section. The exhibits included in this section are as follows:

| Exhibit Number | Exhibit Description |
| --- | --- |
| 31.01 | Certification of President and Chief Executive Officer pursuant to Exchange Act Rule 13a-14(a). |
| 31.02 | Certification of Chief Financial Officer pursuant to Exchange Act Rule 13a-14(a). |
| 32.01 | Certification of President and Chief Executive Officer pursuant to Exchange Act Rule 13a-14(b) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350). * |
| 32.02 | Certification of Chief Financial Officer pursuant to Exchange Act Rule 13a-14(b) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. 1350). * |

\* As contemplated by SEC Release No. 33-8212, these exhibits are furnished with this Quarterly Report on Form 10-Q and are not deemed filed with the Securities and Exchange Commission and are not incorporated by reference in any filing of VeriSign, Inc. under the Securities Act of 1933 or the Securities Act of 1934, whether made before or after the date hereof and irrespective of any general incorporation language in such filings.

68

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO
EXCHANGE ACT RULE 13a-14(a)/15d-14(a)
AS ADOPTED PURSUANT TO SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002**

I, William A. Roper, Jr., certify that:

1. I have reviewed this quarterly report on Form 10-Q of VeriSign, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 2, 2007

By: _____ /s/  WILLIAM A. ROPER, JR.
**William A. Roper, Jr.**
*President and Chief Executive Officer*

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO**
**EXCHANGE ACT RULE 13a-14(a)/15d-14(a)**
**AS ADOPTED PURSUANT TO SECTION 302**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Albert E. Clement, certify that:

1. I have reviewed this quarterly report on Form 10-Q of VeriSign, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15 (f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 2, 2007                                By: _____ /s/   ALBERT E. CLEMENT _____
                                                            **Albert E. Clement**
                                                            *Chief Financial Officer*

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, William A. Roper, Jr., President and Chief Executive Officer of VeriSign, Inc. (the "Company"), do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1. the Quarterly Report on Form 10-Q of the Company for the fiscal quarter ended September 30, 2007, as filed with the Securities and Exchange Commission (the "Report"), fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 2, 2007

/s/  WILLIAM A. ROPER, JR.

**William A. Roper, Jr.**
*President and Chief Executive Officer*
*(Principal Executive Officer)*

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906**
**OF THE SARBANES-OXLEY ACT OF 2002**

I, Albert E. Clement, Chief Financial Officer of VeriSign, Inc. (the "Company"), do hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1. the Quarterly Report on Form 10-Q of the Company for the fiscal quarter ended September 30, 2007, as filed with the Securities and Exchange Commission (the "Report"), fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2. the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 2, 2007

/s/  ALBERT E. CLEMENT

**Albert E. Clement**
*Chief Financial Officer*
*(Principal Financial and Accounting Officer)*